## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| WALKER EDISON HOLDCO LLC, *et al.*, | Case No. 25-11602 (___) |
| Debtors.[1] | (Joint Administration Requested) |

## DECLARATION OF NATE BROWN IN SUPPORT OF DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS

I, Nate Brown, pursuant to 28 U.S.C. § 1746, and under penalty of perjury, declare the following to the best of my knowledge, information and belief:

1.      I am the Chief Financial Officer of Walker Edison Furniture Company LLC ("Walker Edison" or the "Company").

2.      Prior to joining Walker Edison in January 2024, I was the Chief Financial Officer of Hello Bello, a high-growth consumer packaged goods company offering premium baby, health, and wellness products, where I led financial strategy, private equity reporting, capital raises, debt negotiations, and the financial aspects of vertically integrating a U.S.-based diaper manufacturing facility. Following its acquisition by Johnson & Johnson in 2018, I was the Head of Finance for Zarbee's Naturals where I managed full post-acquisition integration, SOX compliance, SAP implementation, and treasury transitions. I have also held positions as the Chief Operating and Chief Financial Officer of XANGO, LLC and Chief Financial Officer of Modere.

---

[1]    The Debtors in these cases, along with the last four digits of each Debtor's federal EIN, are as follows: Walker Edison Holdco LLC (8817); Walker Edison Intermediate, LLC (3363); Walker Edison Furniture Company LLC (6576); and EW Furniture, LLC (6288). The Debtors' mailing address is 1553 W 9000 S, West Jordan, UT 84088.

I have a Master of Accountancy from Brigham Young University and a Bachelor of Accounting from the University of Utah.  I am also a Certified Public Accountant.

3.      As a result of my position with Walker Edison, I am familiar with the Company's day-to-day operations, business and financial affairs, and books and records.  All facts set forth in this declaration (the "Declaration") are based on: (i) my personal knowledge; (ii) my communications with other members of the senior management team, and the Company's professional advisors; or (iii) my opinions developed through my overall professional experience, personal knowledge of the Company's history, financial condition, and business operations and affairs.

4.      I am over the age of 18 and am authorized to submit this Declaration on behalf of the Debtors.  If called as a witness, I could and would testify competently to the matters set forth herein.

5.      On the date hereof (the "Petition Date"), each of the Debtors filed a voluntary petition for relief (collectively, the "Petitions") in the United States Bankruptcy Court for the District of Delaware (the "Court") under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code").  The Debtors intend to continue in possession of their assets and the management of their business as debtors in possession during the pendency of these chapter 11 cases (the "Chapter 11 Cases").

6.      Concurrently with this Declaration, the Debtors have filed various motions and applications seeking immediate or expedited relief (collectively, the "First Day Motions") to minimize the adverse effects on their business pending the contemplated sale of all or substantially all of their assets pursuant to an auction and sale process in order to enhance the Debtors' ability to maximize value for their estates and creditors.

## <u>OVERVIEW AND SUMMARY INTRODUCTION</u>

7.      These cases were filed for two purposes: first, to quickly sell the Debtors'
operating assets and save as many jobs as possible with the time and money available to the
Debtors, and second, to preserve valuable causes of action for the benefit of the Debtors' creditors.

8.      **The Proposed Sale**: The Debtors have been trying to stabilize their
business operations for years since the former owners, founders, and management (collectively,
the "<u>Former Shareholders</u>") essentially abandoned the Company to the current owners, who were
and remain the term lenders (the "<u>Prepetition Term Lenders</u>") in 2023.  Unfortunately, the Debtors'
efforts to stabilize their business operations over these last two years have failed.  At this point,
the only way to save employee jobs and allow the Company's distinctive and high-quality ready-
to-assemble furniture lines to continue is to sell the operating assets to a leading designer and
manufacturer of indoor and outdoor furniture, Twin-Star International, Inc. ("<u>Twin-Star</u>"), as
quickly as possible.

9.      Due to continuing losses being experienced by the Debtors and because the
Debtors cannot afford to replenish their inventory at this time, a sale to Twin-Star must be
completed quickly so that the value of the Debtors' assets does not erode (diminishing any
purchase price due to a working capital adjustment) and to ensure that Twin-Star has the time to
take over the Debtors' business lines and integrate the Debtors' employees before the holiday
season begins.  A quick sale of these assets is instrumental in preserving the value of these estates.

10.      **The Causes of Action**: As detailed in litigation complaints filed in state
court in Utah by both the Company and one of the Prepetition Term Lenders (the "<u>Utah</u>
<u>Litigations</u>"), the events that precipitated the Debtors' chapter 11 filings originated in 2021 when
the Debtors' Former Shareholders distributed hundreds of millions of dollars to themselves amid
skyrocketing sales costs and sluggish sales based on financial data that significantly misstated the

Company's financial health, leaving the current owners, the Prepetition Term Lenders, holding the proverbial bag.

11.     It is my understanding that the complaints allege that the Prepetition Term Lenders were induced to loan $300 million to the Debtors by the Former Shareholders only to find out later that they were fraudulently induced to do so through material misstatements and omissions by the Former Shareholders concerning the Company's existing and anticipated financial prospects.  Specifically, I understand that the Utah Litigations allege that the Former Shareholders knew at the time of the loan transactions and the subsequent funding of the Special Dividend (as defined below) about financial challenges faced by the Debtors such that pulling money out of the Debtors would leave the Debtors with insufficient capital to operate, and certainly insufficient capital to operate and pay their debts in the ordinary course of business, rendering the Debtors insolvent following the Special Dividend.  I further understand that the Utah Litigations allege that, shortly after the Prepetition Term Lenders first executed the term loan transaction, the Former Shareholders notified the Prepetition Term Lenders that there was a material accounting error that materially understated certain costs in the Debtors' financial statements.

12.     As alleged in the Utah Litigations, the Debtors' financial problems continued post-transaction. As a result, in January 2023, the Former Shareholders were forced to exit the business, turning the keys over to the Prepetition Term Lenders and leaving them to deal with the aftermath of the crisis that the Former Shareholders created.  Once the Prepetition Term Lenders took possession of the Debtors, the scope of the Former Shareholders' malfeasance became clear.

13.     **Preparations for these Cases**: Despite the current owners having advanced more than $79.25 million since taking over the Debtors, and given the Debtors' fragile financial

state caused by the Former Shareholders' actions and economic conditions outside of their control, the Debtors have continued to lose money, leaving them no choice but to explore strategic alternatives.  As a result, in late May 2025, the Company's managing Board of Managers (the "Board") appointed a new independent manager with expertise in restructuring matters and designated him as a special committee of the Board (the "Special Committee") with sole power and authority to explore strategic alternatives for the Debtors.  At approximately the same time, the Debtors engaged Morris, Nichols, Arsht & Tunnell LLP ("Morris Nichols") as restructuring counsel, Lincoln International LLC ("Lincoln") as investment banker, and MACCO Restructuring Group, LLC ("MACCO") as restructuring advisor, to assist the Debtors in exploring a range of strategic alternatives.

14.     The Debtors' professionals quickly mobilized, interfacing with senior management to analyze the Debtors' financial position and outlook and prepared marketing and diligence materials in search of a potential purchaser for the Debtors.  Little more than eight weeks later, those efforts have culminated in a value maximizing sale transaction with Twin-Star that will preserve employment for many of Company's employees and allow the Company to satisfy its first-lien debt in full.  However, due to the lack of liquidity and the declining value of the Debtors' assets, the Debtors must complete the sale quickly.

15.     **Critical First Day Relief**: To enable the sale to be completed on the timeline proposed herein and in the papers filed contemporaneously with this declaration, the Debtors have obtained subordinated secured debtor-in-possession financing with their Prepetition Term Lenders for a $13 million new money term loan.  Given the potential value of the Utah Litigations to the estate and the advanced stage of the proceedings, it is critical that the sale is quickly approved and the litigation is funded and permitted to proceed without any risk of delay

occasioned by the Debtors' chapter 11 filings.  As a result, contemporaneously with the filing of their Chapter 11 Cases and the First Day Motions, the Debtors have filed (a) the *Debtors' Motion for (I) an Order Pursuant to Sections 105, 363, 364, 365 and 541 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006 and 9007 and Del. Bankr. L.R. 2002-1 and 6004-1 (A) Approving Bid Procedures for the Sale of Substantially All of the Debtors' Assets; (B) Approving the Debtors' Entry Into Stalking Horse Agreement and Related Bid Protections; (C) Approving Procedures for the Assumption and Assignment or Rejection of Designated Executory Contracts and Unexpired Leases; (D) Scheduling an Auction and Sale Hearing; (E) Approving Forms and Manner of Notice of Respective Dates, Times, and Places In Connection Therewith; and (F) Granting Related Relief; (II) an Order (A) Approving the Sale of the Debtors' Assets Free and Clear of Claims, Liens, and Encumbrances; and (B) Approving the Assumption and Assignment of Designated Executory Contracts and Unexpired Leases; and (III) Certain Related Relief* (the "Sale Motion") seeking the marketing and sale of the Debtors' operating assets within the first thirty (30) days of these Chapter 11 Cases and (b) a motion seeking clarification that the automatic stay does not apply to the prosecution of the Utah Litigations or, alternatively, to modify the automatic stay to permit the Utah Litigations to continue during the pendency of the Chapter 11 Cases for the benefit of the estates.

## CORPORATE BACKGROUND

16.     Walker Edison is a Delaware corporation having its principal executive offices in West Jordan, Utah.  Walker Edison is managed by its sole member and manager, Walker Edison Intermediate LLC (also a Delaware corporation) ("Intermediate"), which is managed by its sole member, Walker Edison Holdco LLC ("Holdco") through Holdco's Board of Managers.

Debtor EW Furniture LLC ("EWFC") is a wholly-owned subsidiary of Walker Edison and is incorporated in the State of Utah.

17. The Debtors are suppliers of affordable, ready-to-assemble home furnishing products which they sell through e-commerce channels to consumers worldwide. Unlike traditional brick-and-mortar furniture stores, the Debtors operate exclusively through e-commerce channels, in which orders are placed on platforms such as Wayfair and Amazon, as well as through their own direct-to-consumer website.

18. The vast majority of the Debtors' products are shipped from manufacturing suppliers in Asia and Brazil to the Company's distribution centers in Ohio and California, or to the distribution centers of the Company's e-commerce partners, where they are delivered directly to consumers. As of the end of fiscal year 2024, approximately 90% of the Company's sales were generated through relationships with just five e-commerce platforms—Wayfair, Amazon, Walmart, Target and Home Depot—as well as through its own direct-to-consumer website. The Company's gross sales in 2024 were approximately $124.6 million.

### PRE-PETITION FINANCING HISTORY

**A.      Prepetition ABL Credit Agreement.**

19. Wells Fargo is the asset-based lender (the "ABL Lender") to the Debtors under the ABL Credit Agreement dated as of September 26, 2018 (as amended from time to time, the "ABL Agreement"), with Debtors Walker Edison and EWFC as borrowers, and Intermediate as guarantor, with such ABL Agreement having been amended by the Consent and Amendment No.1, dated July 22, 2019; Amendment No.2, dated September 9, 2019; Amendment No. 3, dated November, 2020; Consent and Amendment No. 4, dated March 31, 2021; Amendment No. 5, dated May 21, 2021; Consent and Amendment No. 6, dated August 24, 2021; Amendment No. 7, dated

December 8, 2021; Consent and Amendment No. 8, dated March 1, 2023; Amendment No. 9, dated June 6, 2023; Amendment No. 10, dated December 18, 2023; Amendment No. 11, dated February 19, 2025;  and Amendment No. 12 dated as of April 2, 2025.  Pursuant to the ABL Agreement, the Debtors obtained a senior secured credit facility in an aggregate amount not to exceed $20,000,000.

20.     As security for the Debtors' repayment obligations under the ABL Agreement, the Debtors granted the ABL Lender first priority liens upon and senior security interests in substantially all of the Debtors' property and assets as more particularly set forth in certain security documents and instruments, including but not limited to Collateral or Mortgaged Property as defined in the ABL Agreement.

21.     As of the Petition Date, the Debtors owe approximately $10,512,451.10 on account of the ABL Agreement.

**B.     Prepetition Term Loan Credit Agreement.**

22.     On March 31, 2021, Walker Edison, as borrower, and Intermediate, as guarantor, and Owl Rock Capital Corporation, as administrative agent for the lenders and as collateral agent for the secured parties (previously defined as the "Prepetition Term Lenders"), entered into that certain Term Loan Agreement dated as of March 31, 2021 (the "2021 Term Loan Agreement").  The 2021 Term Loan Agreement provided for a secured term loan in the amount of $300,000,000 in part to fund a $210,000,000 payment to existing equity holders and option holders.

23.     When the Former Shareholders abandoned the Company to the Prepetition Term Lenders in 2023, the Prepetition Term Lenders equitized a portion of their investment and assumed ownership of the Debtors.  In connection with that transaction, on March 1, 2023, Walker

Edison, as borrower, and Intermediate, as guarantor, and Owl Rock, as administrative agent for the lenders and as collateral agent for the Prepetition Term Lenders, entered into that certain Amended and Restated Loan Agreement (as amended by Amendment No. 1, dated as of March 14, 2023; Amendment No. 2, dated as of December 18, 2023; Amendment No. 3, dated as of December 4, 2024; and Amendment No. 4, dated as of March 26, 2025 (the "<u>Amended Term Loan Agreement</u>," and with the 2021 Term Loan Agreement, the "<u>Prepetition Term Loan Agreement</u>")). The Amended Term Loan Agreement provided the Debtors with revolving commitments in a principal amount of $40,000,000 secured by certain of Debtors' assets as described in the Amended Term Loan Agreement.

24.     As of the Petition Date, the Debtors owe approximately $214,097,528.56 on account of the Prepetition Term Loan Agreement.

<u>**EVENTS LEADING TO CHAPTER 11**</u>

25.     Walker Edison was founded in 2006 by Brad Bonham ("<u>Bonham</u>") and Matt Davis ("<u>Davis</u>") who served on the board of managers of Walker Edison's former holding company (the "<u>Former Holdco</u>") [2] and served, respectively, as the Former Holdco's Chief Executive and Chief Operating Officers.  In September 2018, a Massachusetts-based private equity firm and family of funds now known as Prospect Hill acquired an approximately 55% majority share in the Former Holdco, following which it added five additional members to the Former Holdco's board of managers.  Bonham and Davis continued in their senior management positions and as members of the board of managers.

---

[2]     The Former Holdco was "Walker Edison Holding Company, LLC" (not to be confused with Debtor Holdco, the current holding company).  Walker Edison Holding Company, LLC *is not* one of the Debtors and *is one* of the defendants in the Utah Litigations.  The Former Holdco was replaced by Debtor Holdco in the 2023 transaction in which the Prepetition Term Lenders assumed control of the subsidiary and operating Debtors.

26.     Walker Edison grew rapidly in the years leading up to and including portions of 2020 amid the COVID-19 pandemic, as their brick-and-mortar competitors shut their doors and consumer demand rose as people were forced to spend more time at home.  From 2017 to 2020, Walker Edison saw earnings before interest, taxes, depreciation and amortization ("EBITDA") grow from $13 million to $84 million.

27.     Seeking to capitalize on this growth, in early 2020, the Former Shareholders began to look for ways to monetize their investment.  As alleged in the Utah Litigations, when various non-debt options proved unsuccessful, and seeing strong indications that the company's growth was nearing an end while costs were rising, the Former Shareholders decided to finance an immediate payout through a dividend recapitalization, or "dividend recap," and in March 2021, caused Walker Edison to enter into the 2021 Term Loan Agreement with the Prepetition Term Lenders, the proceeds of which they immediately used to fund a $210 million special dividend (the "Special Dividend") to themselves.

28.     The circumstances surrounding the disclosures made in connection with the 2021 Term Loan Agreement and the Former Shareholders actions taken in connection therewith and in connection with the Special Dividend are the subject of the aforementioned Utah Litigations, which were filed in Utah state court and captioned *Walker Edison Furniture Company v. Brad Bonham, et al*. (Case No. 230902160) and *Blue Owl Capital Corporation v. Brad Bonham, et al.* (Case No. 240903251).  These actions have been consolidated for discovery purposes.

29.     These consolidated actions assert claims for, among other things, wrongful distribution, fraudulent transfer, breach of fiduciary duty, aiding and abetting a breach of fiduciary duty, civil conspiracy, unlawful dividend, and fraud and seek to recover hundreds of millions of dollars in actual and punitive damages from the Former Shareholders.  Fact discovery, including

party depositions, is underway.  Fact discovery is set to close on October 23, 2025, and any motions for summary judgment are due on May 12, 2026.

30.     It is my understanding that, among other things, the lawsuits allege that beginning during the latter part of 2020, Walker Edison had experienced financial challenges related to: (i) inflationary cost pressures driven by dramatically elevated freight and shipping costs; and (ii) supply chain disruptions and challenges.  I also understand that the lawsuits allege that at the time of the Special Dividend, and unbeknownst to the Prepetition Term Lenders at the close of the 2021 Term Loan Agreement, the Former Shareholders were aware of sufficient facts to know, among other things, that: (i) Walker Edison had substantial cash flow problems and problems meeting its EBITDA forecasts, would be unable to pay its suppliers on time, and were internally discussing slashes to hiring and other measures to address its liquidity shortage; (ii) the historical financial statements for Walker Edison overstated profitability by failing to properly account for incurred freight expenses that were rapidly increasing; (iii) Walker Edison would be unable to meet the financial covenants required under the Loan Agreement; and (iv) the financial projections used by Defendants to justify the $210 million Special Dividend were materially inflated and failed to account for the massive increase in expenses Walker Edison had experienced during the preceding months that were expected to persist for the foreseeable future.

31.     It is my understanding that the lawsuits allege that notwithstanding the receipt of $300 million in term loan proceeds and increased capacity under the ABL Agreement from $55 million to $100 million, Walker Edison lacked the cash necessary to fund continued operations for the foreseeable future immediately after the Special Dividend.  While the Former Shareholders propped Walker Edison up with small equity infusions for a time, consistent with

what the Former Shareholders knew at the time of the Special Dividend, Walker Edison's performance continued to decline.

32.     Ultimately, on January 27, 2023, the Former Shareholders, Prepetition Term Lenders and Walker Edison entered into a Restructuring Support Agreement (the "RSA") through which the Former Shareholders transferred ownership of Walker Edison to the Prepetition Term Lenders in exchange for the extension of an additional $13 million under the 2021 Term Loan Agreement.  The transfer of ownership also included the conversion of a substantial portion of the Prepetition Term Lenders' loans under the Amended Term Loan Agreement into equity. However, given the fragile state of the Company and continued market challenges, the Company continued to lose money requiring additional loans from the Prepetition Term Lenders of $66.25 million to fund operations.

33.     With the need for additional liquidity amid mounting expenses and soft sales, on June 15, 2025, the Board of Managers appointed a new independent manager with expertise in restructuring matters and designated him as a special committee of the Board (the "Special Committee") with sole power and authority to explore strategic alternative for the Debtors.  At approximately the same time, the Debtors engaged Morris Nichols, Lincoln, and MACCO to assist that effort.

34.     In June 2025, Lincoln commenced outreach to potential buyers with a teaser introducing the opportunity and inviting potential buyers to enter into a confidentiality agreement ("NDA") with the Debtors to receive access to additional information.  During the prepetition marketing process, Lincoln contacted approximately 45 potential buyers, of which 20 executed NDAs.  Potential buyers that executed NDAs received access to a confidential information presentation that contained a detailed overview of the Debtors' business operations, assets,

commercial arrangements, and historical financial results. Additionally, these potential buyers received access to an online data room that contained hundreds of unique documents and diligence materials, and potential buyers were given the opportunity to request specific diligence items, which were provided on a rolling basis into the data room. Lincoln maintained a dialogue with these potential buyers throughout the process and facilitated discussions between potential buyers and the Debtors' management.

35.     This initial stage of the marketing process culminated in the receipt of five non-binding indications of interest ("IOIs"). After reviewing the IOIs, the Debtors and Lincoln engaged with each potential buyer to discuss the terms of each potential bid. After further diligence, three interested parties submitted letters of interest ("LOIs"). The LOIs representing the highest value for the Debtors' assets required that the Debtors consummate the sale through a chapter 11 sale process in order to realize the values stated in the LOIs. As such, the Debtors began to negotiate with these potential buyers to develop the terms of an agreement to serve as a stalking horse.

36.     After several weeks, the Debtors reached an agreement with Twin-Star (the "Stalking Horse Bidder"), setting the floor for other potential bids to acquire certain assets during these Chapter 11 Cases. Under the August 28, 2025 asset purchase agreement between the Debtors and the Stalking Horse Bidder (as modified from time to time, the "Stalking Horse Agreement") the Stalking Horse Bidder has committed, subject to Court approval, to acquire substantially all of the assets of the Debtors in exchange for (A) Twenty Million Dollars ($20,000,000.00), subject to this Section 2.6 of the Stalking Horse Agreement, plus (B) the assumption of the Assumed Liabilities (as defined in the Stalking Horse Agreement) by Stalking Horse Bidder; and importantly, as part of deal, the Stalking Horse Bidder is planning to offer continuing employment

to many of the Debtors' employees.  The Debtors seek approval of this sale as expeditiously as possible pursuant to the Sale Motion.

## THE PROPOSED DIP FACILITY

37.     To provide the Debtors with limited funds to sell their operating assets, the Prepetition Term Lenders (collectively, the "Proposed DIP Lenders") have agreed to provide a post-petition, junior secured financing facility with a junior secured debtor-in-possession term loan facility (the "DIP Facility") consisting of (i) a $6 million new money term loan (the "New Money DIP Loan") and (ii) a separate $7 million new money term loan (the "Litigation DIP Loan") to support both the proposed sale and fund the Debtors' ongoing litigation expenses in connection with the Utah Litigations, subject to a deemed roll-up of the Prepetition Loans as more fully described in the *Debtors' Motion for Interim and Final Orders (I) Authorizing Secured Post-Petition Financing Pursuant to 11 U.S.C. § 364, (II) Granting Adequate Protection Pursuant to 11 U.S.C. §§ 361, 363, and 364, and (III) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001(c)* filed contemporaneously herewith.

38.     I believe the liquidity made available through the New Money DIP Loan signals to the Debtors' vendors, suppliers, customers, and employees that the Debtors have the liquidity necessary to continue operating while they complete a successful going concern sale of their assets.  Without the DIP Facility, I expect that the value of the Debtors' business and assets would quickly deteriorate, materially and irreparably harming the Debtors' estates.  Given the substantial sums owed to the Debtors prepetition ABL Lender and Prepetition Term Lenders on a prepetition basis, I believe the DIP Facility being offered by the Prepetition Term Lenders represents the only proposed path to a successful going concern sale of the Debtors' assets, as

without the liquidity provided by the DIP Facility, the Debtors would be unable to pay vendors and suppliers resulting in the immediate cessation of their business operations.

39. Additionally, I believe the new money being made available to the Debtors under the Litigation DIP Loan is critical to the Debtors' ability to continue prosecuting the Utah Litigations, the proceeds of which are the estate's most valuable asset. To that end, contemporaneously with the filing of these Chapter 11 Cases, the Debtors have filed a motion seeking clarification that the automatic stay does not apply to the prosecution of the Utah Litigations or, alternatively, to modify the automatic stay to permit the Utah Litigations to continue during the pendency of the Chapter 11 Cases for the benefit of the estates.

## FIRST DAY MOTIONS

40. Concurrently with the filing of their Chapter 11 Cases, the Debtors have filed the following First Day Motions seeking relief that the Debtors and their professional advisors believe is necessary to enable them to maximize the value of their estates for all stakeholders while their Chapter 11 Cases are pending:

    i. *Debtors' Motion for Entry of an Order Directing Joint Administration of Chapter 11 Cases*;

    ii. *Debtors' Application Pursuant to 28 U.S.C. § 156(c), 11 U.S.C. §§ 503 and 1107, and Fed. R. Bankr. P. 2002(f) for Entry of an Order (I) Authorizing and Approving the Appointment of Epiq Corporate Restructuring, LLC as Claims and Noticing Agent and (II) Granting Related Relief*;

    iii. *Debtors' Motion for Entry of an Order (I) Authorizing Debtors to Seal Certain Personally Identifiable Information for Individuals and (II) Granting Related Relief*;

    iv. *Debtors' Motion for Interim and Final Orders (I) Authorizing Debtors to Continue Insurance and Surety Bond Program and Pay All Obligations with Respect Thereto, (II) Honor Certain Prepetition Obligations Related to the Foregoing, (III) Renew, Revise, Extend, Supplement, Change, or Enter into New Insurance Coverage, Surety*

*Indemnity Agreements, and Insurance Premium Financing as Needed in Their Business Judgment, and (IV) Granting Related Relief*;

v. *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay Certain Prepetition Taxes and Fees, and (II) Granting Related Relief*;

vi. *Debtors' Motion for Entry of Interim and Final Orders (I) Prohibiting Utility Providers from Altering, Refusing or Discontinuing Utility Services, (II) Approving Proposed Adequate Assurance of Payment to Utility Providers and Authorizing Debtors to Provide Additional Assurance, (III) Establishing Procedures to Resolve Requests for Additional Assurance and (IV) Granting Related Relief*;

vii. *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Honor and Continue Customer Programs and Customer Obligations in the Ordinary Course of Business, and (II) Granting Related Relief*;

viii. *Debtors' Motion for Interim and Final Orders (I) Authorizing Payment of Prepetition Claims to (A) Certain Possessory Claimants and (B) Critical Vendors and (II) Granting Related Relief*;

ix. *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing, But Not Directing, the Debtors to (A) Pay Prepetition Employee Wages, Salaries, Other Compensation, and Reimbursable Employee Expenses and (B) Maintain Employee Benefits Programs, and (II) Granting Related Relief*;

x. *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Debtors to (A) Continue Their Existing Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, (C) Maintain Their Bank Accounts and Existing Business Forms, (D) Implement Changes to the Existing Cash Management System as Necessary, and (E) Continue Ordinary Course Intercompany Transactions; (II) Extending the Time to Comply with the Requirements of 11 U.S.C. § 345(b) and the U.S. Trustee's Operating Guidelines; and (III) Granting Related Relief*;

xi. *Debtors' Motion for Interim and Final Orders (I) Authorizing Secured Post-Petition Financing Pursuant to 11 U.S.C. § 364, (II) Granting Adequate Protection Pursuant to 11 U.S.C. §§ 361, 363, and 364, and (III) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001(c)*;

xii. *Debtors' Motion for Entry of a Standing Order Confirming the Statutory Protections of the Bankruptcy Code*;

      xiii.   *Debtors' Motion for Clarification that the Automatic Stay Does Not Apply to the Utah Litigations or, in the Alternative, to Modify the Automatic Stay to Permit the Utah  Litigations to Continue for the Benefit of the Estates*; and

      xiv.   *Debtors' Motion for (I) an Order Pursuant to Sections 105, 363, 364, 365, and 541 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006, and 9007, and Del. Bankr. L.R. 2002-1 and 6004-1 (A) Approving Bid Procedures for the Sale of Substantially All of the Debtors' Assets; (B) Approving the Debtors' Entry into Stalking Horse Agreement and Related Bid Protections; (C) Approving Procedures for the Assumption and Assignment or Rejection of Designated Executory Contracts and Unexpired Leases; (D) Scheduling an Auction and Sale Hearing; (E) Approving Forms and Manner of Notice of Respective Dates, Times, and Places in Connection Therewith; and (F) Granting Related Relief; (II) an Order (A) Approving the Sale of the Debtors' Assets Free and Clear of Claims, Liens, and Encumbrances; and (B) Approving the Assumption and Assignment of Designated Executory Contracts and Unexpired Leases; and (III) Certain Related Relief.*

For a more detailed description of the First Day Motions, I respectfully refer the Court to the facts set forth in the respective First Day Motion which are incorporated herein by reference.  To the extent of any inconsistency between this Declaration and the First Day Motions, the terms of the First Day Motion shall control.  For the avoidance of doubt, the Debtors request authority, but not direction, to incur indebtedness, pay amounts and/or satisfy obligations with respect to the relief requested in the First Day Motions.

      41.     I have reviewed each of the First Day Motions (including the exhibits and schedules thereto) and am familiar with the content and substance contained therein. To the best of my knowledge, information and belief with appropriate reliance on other members of the Debtors' senior management team and the Debtors' professional advisors, the facts set forth in each First Day Motion are true and correct and I can attest to such facts.

      42.     Based on my firsthand experience as the Company's Chief Financial Officer and my review of the materials and other information received from other members of the Debtors'

senior management team and the Debtors' professional advisors I believe that the relief requested in the First Day Motions is necessary and essential to ensuring that the Debtors (and other constituencies) will not suffer any immediate and irreparable harm as the result of the commencement of these Chapter 11 Cases and the requested relief has been narrowly tailored to that end.  I further believe that an orderly transition into Chapter 11 is critical to the viability of the Debtors' operations and that any delay in granting the relief requested in the First Day Motions could hinder the Debtors' operations and cause them irreparable injury.

I certify under penalty of perjury that, based upon my knowledge, information and belief as set forth herein, the foregoing is true and correct.

Dated: August 28, 2025

*/s/ Nate Brown*
Nate Brown
Chief Financial Officer
Walker Edison Furniture Company LLC