**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re | Chapter 11 |
| WALKER EDISON HOLDCO LLC, *et al.*, | Case No. 25-11602 (TMH) |
| Debtors.[1] | (Joint Administration Requested) |

**DEBTORS' MOTION FOR (I) AN ORDER PURSUANT TO SECTIONS 105, 363, 364, 365 AND 541 OF THE BANKRUPTCY CODE, BANKRUPTCY RULES 2002, 6004, 6006 AND 9007 AND DEL. BANKR. L.R. 2002-1 AND 6004-1 (A) APPROVING BID PROCEDURES FOR THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS; (B) APPROVING THE DEBTORS' ENTRY INTO STALKING HORSE AGREEMENT AND RELATED BID PROTECTIONS (C) APPROVING PROCEDURES FOR THE ASSUMPTION AND ASSIGNMENT OR REJECTION OF DESIGNATED EXECUTORY CONTRACTS AND UNEXPIRED LEASES; (D) SCHEDULING AN AUCTION AND SALE HEARING; (E) APPROVING FORMS AND MANNER OF NOTICE OF RESPECTIVE DATES, TIMES, AND PLACES IN CONNECTION THEREWITH; AND (F) GRANTING RELATED RELIEF; (II) AN ORDER (A) APPROVING THE SALE OF THE DEBTORS' ASSETS FREE AND CLEAR OF CLAIMS, LIENS, AND ENCUMBRANCES; AND (B) APPROVING THE ASSUMPTION AND ASSIGNMENT OF DESIGNATED EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (III) CERTAIN RELATED RELIEF**

The above-captioned debtors and debtors in possession (the "Debtors") hereby move (this "Motion") for entry of an order, in the form attached hereto as **Exhibit A** (the "Bid Procedures Order"), (a) approving the bid procedures (the "Bid Procedures") attached as **Exhibit 1** to the Bid Procedures Order in connection with the sale of all or substantially all of the Debtors' assets; (b) approving various forms and the manner of notice of respective dates, times and places in connection therewith; (c) authorizing the Debtors to enter into and perform under an asset purchase agreement attached hereto as **Exhibit B** (the "Stalking Horse Agreement") between the

---

[1]    The Debtors in these cases, along with the last four digits of each Debtor's federal EIN, are as follows: Walker Edison Holdco LLC (8817); Walker Edison Intermediate, LLC (3363); Walker Edison Furniture Company LLC (6576); and EW Furniture, LLC (6288).  The Debtors' mailing address is 1553 W 9000 S, West Jordan, UT 84088.

Debtors and Twin-Star International, Inc. (the "Stalking Horse Bidder"), subject to the solicitation of higher and otherwise better offers for the Debtors' assets (the "Acquired Assets"); (d) approving the Bid Protections (defined below) granted to the Stalking Horse Bidder; (e) approving procedures for the assumption and assignment of designated executory contracts and unexpired leases (the "Designation Procedures"); (f) scheduling the auction (the "Auction") and the date and time of the hearing to approve the sale (the "Sale Hearing") of the Acquired Assets and assumption of certain liabilities of the Debtors (the "Assumed Liabilities"); and (g) granting related relief.  The Debtors further request that at the Sale Hearing, the Court enter an order, in the form attached hereto as **Exhibit C** (the "Sale Order"), (i) authorizing the Sale of the Acquired Assets (the "Sale") free and clear of all liens, claims, interests and other encumbrances (collectively, the "Liens"); (ii) authorizing the assumption and assignment of certain Contracts and Leases; and (iii) granting related relief.  In support of this Motion, the Debtors rely upon and incorporate by reference the *Declaration of Nate Brown in Support of Chapter 11 Petitions and First Day Relief* (the "First Day Declaration"), filed contemporaneously herewith.

As discussed herein, the Debtors propose the following timeline for conducting the Sale process:

| Event | Deadline |
|---|---|
| Deadline for Debtors to File Notice of Proposed Cure Amounts and Adequate Assurance | One week after the Petition Date |
| Sale Order to be Filed | One week after the Petition Date |
| Bid Procedures Hearing | September 15, 2025 |
| Sale Objection Deadline | September 22, 2025, at 4:00 p.m. (ET) |
| Bid Deadline | September 22, 2025, at 4:00 p.m. (ET) |
| Deadline to Designate Qualified Bids | September 23, 2025 |
| Auction | September 24, 2025, at 10:00 a.m. (ET) |

| Event | Deadline |
|---|---|
| Deadline to Serve Notice of Winning Bidder and Supplemental Cure Notice | One (1) business day after the close of the auction |
| Deadline to File Supplemental Sale Objection Solely Related to Conduct at the Auction and Objection to Assumption or Cure Amount (If Winning Bidder is Different Than Stalking Horse Bidder) | September 25, 2025, at 11:59 p.m. (ET) |
| Sale Hearing | September 26, 2025 |

## JURISDICTION AND VENUE

1.     The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over these chapter 11 cases and this Motion pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue of these cases and the Motion is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

2.     The Debtors consent pursuant to rule 9013-1(f) of the Local Rules of the United States Bankruptcy Court for the District of Delaware (the "Local Rules") to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

3.     The statutory bases for the relief requested in this Motion are sections 105, 363, 364, 365, and 541 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 6004, 6006 and 9007 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Local Rules 2002-1 and 6004-1.

**BACKGROUND**

4.        On August 28, 2025 (the "Petition Date"), the Debtors each filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in this Court.  The Debtors continue to manage their business as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee, examiner, or official committee has been appointed in these cases.

5.        Beginning in June 2025, the Debtors engaged with their proposed investment banker, Lincoln International LLC ("Lincoln") to explore the possibility of a sale of the Debtors' assets.  Accordingly, Lincoln began working with the Debtors' management to analyze the Debtors' financial position and outlook, prepare marketing and diligence materials (including a 32-page confidential information presentation (the "CIP")), and populate an electronic data room (the "Data Room") with over 130 files that provided potential purchasers with a detailed overview of the Debtors' business operations, assets, commercial arrangements, and historical financial results.  Because of Lincoln's overall experience in the furniture sales sector, Lincoln was quickly able to identify the universe of potential purchasers.  Lincoln contacted approximately 45 potential buyers, some of which were backed by private equity sponsors.  Lincoln deemed these potential buyers the most likely to be interested in the acquisition of the Company given, among other things, the operational losses at the Company and the potential buyers' ability to pursue cost synergies.  Lincoln continued to maintain a dialogue with all potential purchasers throughout the process and facilitated discussions between potential purchasers and the Debtors' management.  Lincoln and management of the Debtors addressed approximately 230 diligence questions from the parties either via e-mail or during meetings with management.

6.        This initial stage of the marketing process culminated in the receipt of five non-binding indications of interest ("IOIs").  After reviewing the IOIs, the Debtors and Lincoln

engaged with each potential purchaser to discuss the terms of each potential bid. After this further diligence, three interested parties submitted letters of interest ("LOIs"). The LOIs representing the highest value for the Debtors' assets required that the Debtors consummate the sale through a chapter 11 sale process in order to realize the values stated in the LOIs. As such, the Debtors began to negotiate with these potential buyers to develop the terms of an agreement to serve as a stalking horse.

7.     After several weeks, the Debtors reached an agreement with the Stalking Horse Bidder, setting the floor for other potential bids to acquire certain assets during these chapter 11 cases. Under the August 28, 2025 asset purchase agreement between the Debtors and the Stalking Horse Bidder (as modified from time to time, the "Stalking Horse Agreement") the Stalking Horse Bidder has committed, subject to Court approval, to acquire substantially all of the assets of the Debtors in exchange for (A) the amount of $20,000,000 subject to section 2.6 of the Stalking Horse Agreement, plus (B) the assumption of the Assumed Liabilities[2] by the Stalking Horse Bidder (the "Stalking Horse Bid").

8.     In addition to the purchase price detailed above, the Stalking Horse Agreement contemplates the Stalking Horse Bidder purchasing certain in-transit inventory ordered by the Debtors, but which have not yet been received by the Debtors. Further, pursuant to the

---

[2]     **Assumed Liabilities**: Upon the terms and subject to the conditions set forth herein, at the Closing, Purchaser shall assume and shall timely perform and discharge in accordance with their respective terms (a) all Liabilities and Cure Amounts with respect to the Assigned Contracts, (b) all Liabilities (including for any Tax) that arise on or after the Closing Date with respect to Purchaser's ownership or operation of the Acquired Assets on and after the Closing, (c) all Liabilities arising from the employment of Transferred Employees by Purchaser or any of its Affiliates after the Closing for wages, compensation, bonuses, deferred compensation, overtime, benefits workers' compensation, sick pay, vacation, personal days and severance benefits that are on account of events, matters and circumstances occurring after the Closing, (d) the Specified Vendor Costs, (e) Unfilled Customer Orders, and (f) all Transfer Taxes not otherwise exempt under the Final Order pursuant to Section 6.10(a) (collectively "Assumed Liabilities"). Stalking Horse Agreement § 2.3.

terms of the Stalking Horse Agreement, the Stalking Horse Bidder intends to assume responsibility for a large percentage of employees of the Debtors upon the Closing Date of the Sale.

9.      The bid submitted by the Stalking Horse Bidder for substantially all assets of the Debtors and documented in the binding Stalking Horse Agreement will serve the critical function of setting a "floor" for recoveries to creditors and a structure for further competitive bidding.  While negotiating with the Stalking Horse Bidder, Lincoln and the Debtors continued facilitating diligence and engaging in discussions with the other potential buyers to further develop their interest in anticipation of the filing of these chapter 11 cases and the competitive process the Debtors intend to conduct pursuant to the Bid Procedures.

10.     The Debtors were teetering on the brink of chapter 7 until receiving the Stalking Horse Bid, which allowed for a going-concern sale to the benefit of all stakeholders.  Due to continuing losses being experienced by the Debtors and because the Debtors cannot afford to replenish their inventory at this time, a sale to Stalking Horse Bidder must be completely quickly so that the value of the Acquired Assets do not erode (diminishing any purchase price due to a working capital adjustment) and ensure that the Stalking Horse Bidder has the time to take over the Debtors' business lines and integrate the Debtors' employees before the holiday season begins.

11.     Thus, it is essential that the Debtors be allowed to proceed as expeditiously as possible to consummate a Sale with the Stalking Horse Bidder or another Qualified Bidder (as defined below) at the conclusion of the Auction.  The Bid Procedures proposed herein ensure that the Debtors' assets will be subject to a competitive bidding and auction process without unduly delaying the progress of these cases.  The process contemplated by the Bid Procedures will leave no doubt that, at the conclusion of that process, the Debtors will have explored all available alternatives and identified the highest acceptable offer for the Acquired Assets.

12.     The Debtors believe, in an exercise of their business judgment, that approval of the Stalking Horse Agreement (including the Bid Protections) and the Bid Procedures will set these cases on a positive trajectory and are essential to the Debtors' ability to identify and consummate the sale or restructuring transaction offering the greatest value to their creditors. Accordingly, the Debtors respectfully submit that the Court should grant the relief requested herein.

## THE PROPOSED SALE AND BID PROCEDURES

### A.    Summary of Key Terms of the Stalking Horse Bid

13.     By this Motion, the Debtors are requesting approval of the designation of the Stalking Horse Bidder and the Stalking Horse Bid on the terms provided in the Stalking Horse Agreement, as well as approval of reasonable and customary Bid Protections.  Specifically, the Bid Protections consist of a break-up fee in the amount of $700,000 (the "Break-Up Fee") and a reimbursement of the Stalking Horse Bidder's actual, reasonable, documented out-of-pocket expenses up to an amount not to exceed $500,000 (the "Expense Reimbursement," together with the Break-Up Fee, the "Bid Protections"). Given the Debtors' need to maximize the value of the Acquired Assets through a timely and efficient marketing and sale process, the ability to designate a Stalking Horse Bid and offer Bid Protections is justified, appropriate and essential.

14.     In accordance with Local Rule 6004-1(b), the pertinent terms of the Stalking Horse Agreement are summarized in the following table.[3]  The Debtors respectfully submit that all terms of the Stalking Horse Agreement, including those required to be highlighted under Local

---

[3]    This summary is provided for the convenience of the Court and parties in interest.  To the extent there is any conflict between this summary and the Stalking Horse Agreement, the latter governs in all respects.  Capitalized terms used but not otherwise defined in this summary shall have the meanings set forth in the Stalking Horse Agreement.

Rule 6004-1(b), are fair, reasonable, and appropriate under the circumstances in light of the parties' good faith, arm's-length negotiation of the Stalking Horse Bid, the support of the Debtors' key creditor constituencies for the Debtors' entry into such agreement, and the substantial benefits the Debtors and their estates will realize as a result thereof, including the establishment of a baseline price for the Debtors' assets.

| Term | Description |
| --- | --- |
| **Sellers:** | Walker Edison Holdco LLC; Walker Edison Intermediate, LLC; Walker Edison Furniture Company LLC; and EW Furniture, LLC |
| **Stalking Horse Bidder:** | Twin-Star International, Inc. |
| **Purchase Price:** | The purchase price for the Acquired Assets shall be equal to the sum of: (A) Twenty Million Dollars ($20,000,000.00), subject to Section 2.6 of the Stalking Horse Agreement, *plus* (B) the assumption of the Assumed Liabilities by the Stalking Horse Bidder. |
| **Acquired Assets:** | The Acquired Assets are set forth in Section 2.1 of the Stalking Horse Agreement and include, among other things: all tangible property, including machinery and equipment; all Pre-Petition On-Hand Inventory, Pre-Petition In-Transit Inventory and Post-Petition Inventory (each as defined in the Stalking Horse Agreement); the Acquired Claims (as defined in the Stalking Horse Agreement); all intangible personal property, to the extent of the Debtors' interest in same; all Intellectual Property; all deposits and prepaid items that related to the Acquired Assets; all Accounts Receivable arising or accrued prior to Closing; and certain IT systems. |
| **Excluded Assets:** | The Excluded Assets are set forth in Section 2.2 of the Stalking Horse Agreement and include, among other things: cash; all Excluded Inventory (as defined in the Stalking Horse Agreement); all Contracts that are not Assigned Contracts (each as defined in the Stalking Horse Agreement); all Estate Causes of Action including the actions set forth on Schedule 2.2(h); and all assets, properties and rights listed on Schedule 2.2(l) of the Stalking Horse Agreement. |

| Assumed Liabilities: | The Assumed Liabilities are set forth in Section 2.3 of the Stalking Horse Agreement and include, among other things: (a) all Liabilities and Cure Amounts (each as defined in the Stalking Horse Agreement) with respect to Assigned Contracts; (b) all Liabilities that arise on or after the Closing Date with respect to Purchaser's ownership or operation of the Acquired Assets on and after Closing; (c) all Liabilities arising from the employment of Transferred Employees (as defined in the Stalking Horse Agreement) by the Stalking Horse Bidder; and (d) all Transfer Taxes not otherwise exempt under the Final Order (each as defined in the Stalking Horse Agreement) pursuant to Section 6.10(a) of the Stalking Horse Agreement. |
|---|---|
| Excluded Liabilities: | The Excluded Liabilities are set forth in Section 2.4 of the Stalking Horse Agreement and include any Liability other than the Assumed Liabilities. |
| Other Terms and Conditions: | Pursuant to Section 2.5 of the Stalking Horse Agreement, the Stalking Horse shall have up to five (5) business days prior to the Closing Date to add or remove any Contract from the definition of Acquired Assets or Excluded Assets. |

| Rule | Disclosure/Location |
|---|---|
| **Sale to Insider** *Local Bankr. R. 6004-1(b)(iv)(A)* | Not applicable. |
| **Agreements with Management or Key Employees**<br><br>*Local Bankr. R. 6004-1(b)(iv)(B)*<br><br>Stalking Horse Agreement, § 6.9. | The Stalking Horse Bidder shall have the option to make offers of employment to each employee of each Debtor who is listed on Schedule 6.9 of the Stalking Horse Agreement, subject to such employee's satisfaction of the Stalking Horse Bidder's onboarding requirements. |

| | |
|---|---|
| **Releases**<br><br>*Local Bankr. R. 6004-1(b)(iv)(C)*<br><br><br>Stalking Horse Agreement, § 8.20. | Effective as of immediately prior to the Closing, Debtors for itself and each of their Affiliates and each of their respective equity holders, successors and assigns, fully and unconditionally releases, acquits and forever discharges the Stalking Horse Bidder from any and all manner of actions, causes of actions, claims obligations, demands, damages, costs, expenses, compensation or other relief, whether known or unknown, whether in law or equity, of any kind, Debtors now have or have ever had against the Stalking Horse Bidder. Notwithstanding the foregoing, the release and discharge provided for in the Stalking Horse Agreement shall not release the Stalking Horse Bidder of their respective obligations or liabilities pursuant to this Agreement, the Ancillary Agreements or the Confidentiality Agreement. |
| **Private Sale/No Competitive Bid** *Local Bankr. R. 6004-1(b)(iv)(D)* | The Sale to the Stalking Horse Bidder is subject to the Auction and the Bid Procedures. |
| **Closing and Other Deadlines** *Local Bankr. R. 6004-1(b)(iv)(E)*<br><br>Stalking Horse Agreement,<br><br>§ 3.1 | The Debtors' proposed timeline for the sale process in these chapter 11 cases is set forth on pages 2-3, *supra*.<br><br>The closing (the "<u>Closing</u>") of the sale and purchase of the Acquired Assets and the assumption of the Assumed Liabilities shall take place on the date that is three (3) Business Days after the date on which all of the conditions set forth in Article III of the Stalking Horse Agreement are satisfied, at a location specified by the Debtors or remotely if agreed by the Debtors and the Stalking Horse Bidder. |
| **Good Faith Deposit** *Local Bankr. R. 6004-1(b)(iv)(F)*<br><br>Stalking Horse Agreement,<br><br>§ 2.7(a) | $2,500,000. |
| **Interim Arrangements with Stalking Horse Bidder**<br><br>*Local Bankr. R. 6004-1(b)(iv)(G)* | The Debtors are not entering into any interim arrangements with the Stalking Horse Bidder. |
| **Use of Proceeds** *Local Bankr. R. 6004-1(b)(iv)(H)* | Not Applicable. |
| **Tax Exemption** *Local Bankr. R. 6004-1(b)(iv)(I)* | Not Applicable. |

| | |
|---|---|
| **Record Retention**<br>*Local Bankr. R. 6004-1(b)(iv)(J)*<br><br>Stalking Horse Agreement, § 2.1(d) | All books and records of Debtors relating primarily to the Acquired Assets, including production records, accounting records, Tax records, financial records, property records, mailing lists, marketing plans and market research, sales and purchase correspondence and customer and vendor lists, *provided* that Debtors may obtain, at their own expense, copies of any or all such books and records before their transfer to Purchaser; *provided, further* that Debtors may retain any and all documents they determine, in their reasonable discretion, to be relevant to any causes of action that constitute Excluded Assets provided that they provide copies and reasonable access to any such documents. |
| **Sale of Avoidance Actions**<br>*Local Bankr. R. 6004-1(b)(iv)(K)* | Section 2.2(h) of the Stalking Horse Agreement provides that all Estate Causes of Actions are Excluded Assets. Estate Causes of Action are defined as "any and all causes of action, defenses, and counterclaims accruing to the Debtors or to a trustee or to a creditor or that is property of their Estates or related to their claims, based upon facts, circumstances and transactions or agreements that occurred prior to the Closing Date, including any avoidance, illegal or unauthorized dividend, fraudulent transfer, or other recovery action that belongs to, have previously been raised by, could have been raised, or can be raised post-filing by the Debtors or the debtors in possession or their respective Estates under Chapter 5 of the Bankruptcy Code or other federal or state law, except for any Acquired Claims, but including, for the avoidance of doubt, any and all claims between and among Debtors, against current and prior direct and indirect stockholders, members, directors, managers, officers or employees; provided, that Estate Causes of Action shall include the right to defend and assert counterclaims in respect to any Acquired Claims." |
| **Successor Liability**<br><br>*Local Bankr. R. 6004-1(b)(iv)(L)* | The Sale Order provides that the parties intend that the Stalking Horse Bidder is not a mere continuation of the Debtors or their estates, and that the Stalking Horse Bidder shall not have any successor liability of any kind or character. |
| **Sale Free and Clear of Unexpired Leases**<br><br>*Local Bankr. R. 6004-1(b)(iv)(M)* | None |
| **Credit Bid** *Local Bankr. R. 6004-1(b)(iv)(N)* | Not Applicable. |

11

| | |
|---|---|
| **Relief from Bankruptcy Rule 6004(h)**<br><br>*Local Bankr. R. 6004-1(b)(iv)(O)* | The Debtors seek a waiver of the 14-day stay under Bankruptcy Rules 6006(d) and 6004(h), as described in more detail below. |

## B.    Bid Procedures Order

15.    By this Motion, as set more fully below, the Debtors seek entry of the Bid Procedures Order: (i) approving the Bid Procedures; (ii) approving various forms and the manner of notice of respective dates, times and places in connection therewith; (iii) approving Twin-Star International, Inc. as the Stalking Horse Bidder and the Bid Protections; (iv) establishing the Designation Procedures; and (v) scheduling the Auction and a Sale Hearing.

### (i)        The Bid Procedures

16.    To maximize the value of the Acquired Assets for the benefit of the Debtors' estates and stakeholders, the Debtors seek to continue their competitive marketing process by implementing a process for soliciting higher and otherwise better bids than the bid set forth in the Stalking Horse Agreement.  The Debtors, in consultation with their advisors, entered into the Stalking Horse Agreement to provide a floor for a bid on the Debtors' assets. The Bid Procedures would provide 25 days between the filing of this Motion and the Bid Deadline, which the Debtors believe will be sufficient to allow other potential bidders to conduct diligence and formulate competing bids given the extensive marketing process that occurred prepetition.  Following the Petition Date, Lincoln will continue the marketing process as described herein and in more detail in the First Day Declaration.

17.    As described more fully in the Bid Procedures and the Bid Procedures Order, the Debtors seek approval to sell the Acquired Assets to a Qualified Bidder, determined in accordance with the Bid Procedures and Bid Procedures Order, that makes the highest acceptable

offer for the Acquired Assets.  The Debtors request that competing bids for the Acquired Assets

be governed by the Bid Procedures and Bid Procedures Order, which provide:

- the requirements a Potential Bidder must satisfy to be entitled to participate in the bidding process and become a Qualified Bidder;

- the requirements for Qualified Bidders to submit bids and the method and criteria by which such bids become Qualified Bids;

- the deadline by which bids must be submitted;

- the procedures for conducting the Auction;

- the assumption and assignment procedures for Contracts and Leases; and

- various other matters relating to the sale process generally, the Sale Hearing, return of any Good Faith Deposits, and designation of a Back-Up Bidder.

18.     Local Rules 6004-1(c)(i)(A) and (B) further provide that a bid procedures

motion must highlight "[a]ny provision governing an entity becoming a qualified bidder" and

"[a]ny provision governing a bid being a qualified bid." Local Rule 6004-1(c)(i)(A) and (B).  The

Bid Procedures provide as follows with respect to qualifying bids[3]:

a.     **Participation Requirements.**  To participate in the formal bidding process or otherwise be considered for any purpose hereunder, a person (other than the Stalking Horse Bidder) interested in submitting a bid (an "<u>Interested Party</u>") must deliver to the Debtors, Morris Nichols Arsht & Tunnell, LLP ("<u>Morris Nichols</u>"), the Debtors' proposed legal counsel, and Lincoln an executed confidentiality agreement (each, a "<u>Confidentiality Agreement</u>"). Such person or entity that has delivered an executed Confidentiality Agreement shall be considered a potential bidder (a "<u>Potential Bidder</u>").

b.     **Due Diligence**.  The Debtors will provide to each Potential Bidder reasonable due diligence information, as requested, as soon as reasonably practicable after such request, provided that if any Potential Bidder is (or is affiliated with) a competitor of the Debtors, the Debtors will not be required

---

[3]     To the extent any inconsistencies exist between the summary provided in this Motion and the actual terms of the Bid Procedures, the Bid Procedures shall control.  Capitalized terms used but not otherwise defined in connection with this summary shall have the meanings ascribed to such terms in the Bid Procedures.

to disclose to such Potential Bidder any trade secrets, proprietary information, or other commercially sensitive information unless, under the Debtors' business judgment, in consultation with the Consultation Parties, the Confidentiality Agreement executed by such Potential Bidder (i) sufficiently protects the Debtors' estates, and (ii) contains appropriate provisions to ensure that such trade secrets or proprietary information will not be used by such Potential Bidder or its Affiliates for an improper purpose or to gain an unfair competitive advantage. Each Potential Bidder will comply with all reasonable requests for additional information and due diligence access by the Debtors or their advisors regarding such Potential Bidder and its contemplated transaction. If the Debtors determine at any time in their reasonable discretion, in consultation with the Consultation Parties, that a Potential Bidder is not reasonably likely to be a Qualified Bidder (as defined below), then the Debtors' obligation to provide due diligence information to such Potential Bidder will terminate and all information provided by the Debtors prior to such time shall be returned to the Debtors or destroyed in accordance with the terms of the applicable Confidentiality Agreement.

c.   **Bid Requirements.**   To be eligible to participate in the Auction, each Potential Bidder must submit a proposal (a "<u>Bid</u>") to purchase some or all of the Debtors' assets by September 22, 2025, at 4:00 p.m. (ET) (the "<u>Bid Deadline</u>") which must:

  1)   state that the applicable Potential Bidder offers to purchase the Acquired Assets upon terms and conditions no less favorable to the Debtors' estates, as the Debtors may reasonably determine, in consultation with the Consultation Parties (as defined in the Bid Procedures), than the transactions contemplated in the Stalking Horse Agreement;

  2)   be accompanied by a deposit (each, a "<u>Good Faith Deposit</u>") in the form of a wire transfer or certified check or such other form acceptable to the Debtors in their sole discretion, payable to the order of Epiq Corporate Restructuring, LLC (the "<u>Escrow Agent</u>"), in an amount equal to 10% of the cash portion of the Purchase Price being bid;

  3)   specify the amount of cash or other consideration offered by the Potential Bidder (the "<u>Purchase Price</u>"), which Purchase Price must, except for a Partial Bid (defined below): (a) exceed the aggregate sum of (i) the aggregate consideration set forth in the Stalking Horse Agreement; (ii) the Assumed Liabilities set forth in the Stalking Horse Agreement; (iii) the Bid Protections, and (iv) the minimum bid increment of [$250,000]; and (b) include an amount of cash consideration at closing that exceeds the aggregate sum of (i), (iii) and (iv) (such aggregate sum specified in (a) and (b), the "<u>Minimum Purchase Price</u>"); *provided*, *however*, that the Debtors, in their business judgment and in consultation with the Proposed DIP

Lenders, shall have the right to modify any of the terms contained in the calculation of the Minimum Purchase Price. If any modifications to the Minimum Purchase Price are made, the Debtors will provide notice to any interested parties within two [2] days of the Bid Deadline;

4) agree to a purchase price adjustment mechanism in substantially the same terms as clause 2.6(a)(iii) of the Stalking Horse Agreement;

5) include an executed asset purchase agreement, together with all exhibits and schedules thereto, pursuant to which the Potential Bidder proposes to effectuate a proposed transaction at the Purchase Price (the "Transaction Documents"), which Transaction Documents must include a copy of the proposed asset purchase agreement marked against the Stalking Horse Agreement to show all changes requested by the Potential Bidder including, but not limited to, treatment of any assumed liabilities;

6) be irrevocable by the Potential Bidder until the selection of the Successful Bid in accordance with the terms of these Bid Procedures; *provided* that if such Potential Bidder is selected as the Successful Bidder or Back-Up Bidder and is required to be a Back-Up Bidder hereunder, its Bid must remain irrevocable until the Debtors' consummation of a sale with the Successful Bidder;

7) include a list which specifies in detail which of the Debtors' Leases and Contracts are to be assumed by the Debtors and assigned to the Potential Bidder in connection with the consummation of the proposed transaction and an agreement that the Potential Bidder will pay any related cure costs;

8) contain a description of how the Potential Bidder intends to treat the Debtors' current employees;

9) provide a commitment to close by September 28, 2025;

10) not be conditioned on any contingency, including unperformed due diligence, obtaining financing, obtaining third-party consents, or any internal approval;

11) include an acknowledgement that the sale or transfer of the Acquired Assets will be on an "as is, where is" basis and without representations or warranties of any kind by Debtors or their agents other than as set forth in the Stalking Horse Agreement;

12) include a description of all governmental, licensing, regulatory or other filings, approvals or consents, including all filings required under the HSR Act, that are required to be made or obtained to close the proposed transaction, together with evidence of the ability to make any applicable filings or submissions within three (3) business days of being declared the Successful Bidder;

15

13)      contain written evidence of a commitment for financing or other evidence of the ability to consummate a proposed transaction at the Purchase Price (including sufficient financial or other information to establish adequate assurance of future performance pursuant to section 365(f)(2) of the Bankruptcy Code and, if applicable, section 365(b)(3) of the Bankruptcy Code to the non-Debtor counterparties to any Contracts and Leases to be assumed by the Debtors and assigned to the Potential Bidder in connection with the proposed transaction), satisfactory to the Debtors in their reasonable discretion with appropriate contact information for such financing sources;

14)      contain written evidence satisfactory to the Debtors, in consultation with the Consultation Parties, of authorization and approval from the Potential Bidder's board of directors (or comparable governing body) with respect to the submission, execution, delivery and consummation of such Bid and the transaction(s) contemplated therein and any Overbid(s) (as defined below), and related Transaction Documents;

15)      not request or entitle the Potential Bidder to any break-up fee, termination fee, expense reimbursement or similar type of payment (except to the extent consented to in writing by Debtors in consultation with the Consultation Parties);

16)      fully disclose the identity of each entity that will be bidding for the Acquired Assets or otherwise sponsoring, financing (including through the issuance of debt in connection with such Bid), participating in or benefiting from (including through license or similar arrangement with respect to the assets to be acquired in connection with such Bid) such Bid (a "Participating Party"), and the complete terms of any such sponsorship, participation, financing or benefit;

17)      constitute a good faith, bona fide offer to effectuate the proposed transaction;

18)      include a written acknowledgement by such Potential Bidder that it agrees to all of the terms for sale set forth in the Bid Procedures;

19)      include an agreement to provide any other information reasonably requested by the Debtors; and

20)      be received by the Bid Deadline.

d.     **Qualified Bidder.** A qualified bidder ("Qualified Bidder") is a Potential Bidder that, in the Debtors' reasonable determination, in consultation with the Consultation Parties, (i) has timely submitted a Bid that satisfies each of the requirements listed above in the section entitled "Bid Requirements" and (ii) is able to consummate the proposed transaction within the required timeframe if selected as the Successful Bidder (such Bid submitted by a Qualified Bidder, a "Qualified Bid"); *provided* that the Debtors reserve the

right to work with any Potential Bidder to cure any deficiencies in a Bid that is not initially deemed a Qualified Bid. Within two (2) business days after a Potential Bidder delivers all of the documents described above, the Debtors will determine in their reasonable discretion, in consultation with the Consultation Parties, whether such Potential Bidder is a Qualified Bidder and notify the Potential Bidder of such determination. For the avoidance of doubt, (i) the Stalking Horse Bidder is a Qualified Bidder, (ii) the Stalking Horse Agreement is a Qualified Bid and (iii) the Stalking Horse Bidder is authorized to submit any Overbids (as defined below) during the Auction, in each instance without further qualification required of the Stalking Horse Bidder.

19.     If the Debtors receive one or more Qualified Bids (in addition to the Stalking Horse Bid), the Debtors will conduct the Auction to determine the highest acceptable Qualified Bid with respect to the Acquired Assets. If no Qualified Bids (other than the Stalking Horse Bid) are received by the Bid Deadline, then the Auction shall be cancelled, the Stalking Horse Bidder will be deemed the Successful Bidder, the Stalking Horse Agreement will be the Successful Bid, and, at the Sale Hearing, the Debtors will seek final Court approval of the Sale of the Acquired Assets to the Stalking Horse Bidder in accordance with the terms of the Stalking Horse Agreement.

20.     The Debtors propose that the following procedures govern any Auction:

a.     **Baseline Bid**.  No later than one (1) day prior to the commencement of the Auction, the Debtors will provide all Notice Parties and Consultation Parties with complete copies of all Transaction Documents and all other bid materials submitted by each other Qualified Bidder, subject to exclusion of any confidential financial information as determined by the Debtors in their reasonable discretion or which has been so designated by the applicable Qualified Bidder.  At the commencement of the Auction, the Debtors will notify all Qualified Bidders and Notice Parties of the highest acceptable Qualified Bid, as determined by the Debtors in their reasonable discretion, in consultation with the Consultation Parties (the "Baseline Bid").  The Debtors' determination, in consultation with the Consultation Parties, of which Qualified Bid constitutes the Baseline Bid shall take into account factors such as the projected percentage recovery to general unsecured creditors pursuant to such Qualified Bid and the certainty of such recovery, whether all administrative, priority and secured claims will be paid in full under such Qualified Bid and any other factors the Debtors, in consultation

17

with the Consultation Parties, reasonably deem relevant to the value of the Qualified Bid to the estates. No later than the day prior to the commencement of the Auction, each Qualified Bidder that has timely submitted a Qualified Bid must inform the Debtors whether it intends to attend the Auction; *provided* that in the event a Qualified Bidder elects not to attend the Auction, such Qualified Bidder's Qualified Bid will nevertheless remain fully enforceable against such Qualified Bidder.

b.    **Auction Date and Location.**  The Auction will commence on or before September 24, 2025, at 10:00 a.m. (Prevailing Eastern Time) at the offices of **Morris Nichols Arsht & Tunnell, LLP, 1201 N. Market Street, Wilmington, DE 19801**, or on such other date and/or at such other location as determined by the Debtors, in consultation with the Consultation Parties.

c.    **Participation Requirements.**  Only a Qualified Bidder that has submitted a Qualified Bid will be eligible to participate at the Auction. The authorized representatives of each of the Qualified Bidders (including the Stalking Horse Bidder), the Debtors, the Consultation Parties, and the Committee will be permitted to attend the Auction.  In addition, pursuant to Local Rule 6004-1, all creditors of the Debtors who have not submitted Bids may attend the Auction as observers, provided that they send an email to Debtors' counsel indicating that they intend to attend the Auction no less than one (1) Business Day prior to the Auction, provided further that the Debtors' right to object on an emergency basis to any such creditor's proposed attendance at the Auction is reserved.

d.    **Auction Procedures**.  The Debtors and their professionals will direct and preside over the Auction.  At the start of the Auction, the Debtors will describe the terms of the Baseline Bid.  All Bids made thereafter must be Overbids (as defined below) and will be made and received on an open or closed basis, as determined by Debtors, in consultation with the Consultation Parties, and all material terms of each Bid will be fully disclosed to all other Qualified Bidders.  The Debtors will maintain a transcript of all Bids made and announced at the Auction, including the Baseline Bid, all Overbids, the Successful Bid and the Back-Up Bid.  Each Qualified Bidder will be required to confirm on the record of the Auction that it has not engaged in any collusion with respect to the bidding or the sale of the Acquired Assets.  The Debtors, in their reasonable discretion, in consultation with the Consultation Parties, reserve the right to conduct the Auction in a manner designed to maximize value based upon the nature and extent of the Qualified Bids received.

During the Auction, bidding will begin initially with the Baseline Bid and subsequently continue in minimum increments of at least [$250,000] (each, an "Overbid").  The Debtors will announce at the Auction the material terms of each Overbid, value each Overbid in accordance with the Bid Procedures

and provide each Qualified Bidder with an opportunity to make a subsequent Overbid (except in the event of a round of closed, final bidding). Additional consideration in excess of the amount set forth in the Baseline Bid may include cash and/or other consideration acceptable to the Debtors, in consultation with the Consultation Parties, in accordance with the Bid Procedures. When bidding at the Auction, the Stalking Horse Bidder will receive a cash credit in the amount of the Bid Protections and will be allowed to bid the Bid Protections.

To the extent that an Overbid has been accepted entirely or in part because of the addition, deletion, or modification of a provision or provisions in the applicable Transaction Documents or the Stalking Horse Agreement, the Debtors will provide notice to each participant of the value ascribed by the Debtors, in consultation with the Consultation Parties, to any such added, deleted, or modified provision or provisions, with such value being determined by the Debtors in their reasonable discretion and in consultation with the Consultation Parties.

Any Overbid made from time to time by a Qualified Bidder must remain open and binding on the Qualified Bidder until and unless (i) the Debtors accept a higher and otherwise better bid submitted by another Qualified Bidder during the Auction as an Overbid and (ii) such Overbid is not selected as the Back-Up Bid (as defined below). To the extent not previously provided (which will be determined by the Debtors), a Qualified Bidder submitting an Overbid must submit at the Debtors' request, as part of its Overbid, written evidence (in the form of financial disclosure or credit-quality support information or enhancement reasonably acceptable to the Debtors in consultation with the Consultation Parties) demonstrating such Qualified Bidder's ability to close the transaction at the purchase price contemplated by such Overbid.

21.     As set forth in more detail in the Bid Procedures and subject to the conditions provided for therein, at the conclusion of the Auction, the Debtors, in the exercise of their reasonable business judgment will select as the Successful Bid the highest acceptable bid submitted by a Qualified Bidder during the Auction, and the Debtors may, in their discretion, select a Back-Up Bid as set forth in the Bid Procedures. The Successful Bidder and Back-Up Bidder, following the completion of the Auction, must increase their Good Faith Deposit so that they equal 10% of such Successful Bid or Back-Up Bid, as applicable.

(ii)    **Partial Bids**

22.    If any of the Qualified Bids submitted by the Bid Deadline are structured as a purchase of less than all or substantially all of the Debtors' assets (each such bid, a "<u>Partial Bid</u>"), the Debtors may conduct separate auctions at the Auction for each lot of assets (each, an "<u>Auction Lot</u>") subject to a Partial Bid.  Any Partial Bid must meet all of the requirements of a Qualified Bid, unless otherwise modified herein, including without limitation, the Good Faith Deposit.  The Debtors may also combine multiple Partial Bids into an Auction Lot to compete against Qualified Bids for all of the Debtors' assets.

(iii)    **Designation Procedures**

23.    The Debtors are seeking approval of the Designation Procedures for notifying counterparties to Contracts and Leases of proposed Cure Amounts (as defined below) and the timing of assumption and assignment or rejection with respect to those Contracts and Leases that the Debtors propose to assume and assign to the Successful Bidder.  The following is a summary of the Designation Procedures:

a.    **Cure Notice.**  On or before one week after the Petition Date, or as soon thereafter as practicable, the Debtors shall file with the Court a notice of the proposed assumption and assignment of certain Contracts and Leases in connection with the Sale, substantially in the form attached as **<u>Exhibit 2</u>** to the Bid Procedures Order (the "<u>Cure Notice</u>").  The Debtors will serve the Cure Notice via first class mail on all non-Debtor counterparties to Contracts and Leases, and their respective known counsel, and provide a copy of same to the Contract Party and the Stalking Horse Bidder.  The Cure Notice shall inform each recipient that its respective Contract or Lease may be designated by the Contract Party (as defined below) as either assumed or rejected and the timing and procedures relating to such designation, and, to the extent practicable (i) the title of the Contract or Lease, (ii) the name of the counterparty to the Contract or Lease, (iii) the Debtors' good faith estimates of the cure amounts required in connection with such Contract or Lease (the "<u>Cure Amount</u>"), (iv) the identity of the Contract Party and (v) the deadline by which any such Contract or Lease counterparty may file an objection to the proposed assumption and assignment and/or cure amount, and the procedures relating thereto; provided, however, that service of a Cure Notice does not constitute an admission that such Contract or Lease is an executory

contract or unexpired lease.  If the Debtors identify additional Contracts or Leases that might be assumed by the Debtors and assigned to the Contract Party, the Debtors will promptly send a supplemental Cure Notice to the applicable counterparties to such Contract or Lease.

b.   **Adequate Assurance**.  The Debtors shall serve by first class mail (or by electronic mail, if available) one week after the Petition Date the evidence of adequate assurance of future performance under the Contracts and Leases provided in connection with the Stalking Horse Bidder, including the legal name of the proposed assignee, the proposed use of any leased premises, general information about the proposed assignee's financial wherewithal and a contact person with the proposed assignee whom counterparties may contact if they wish to obtain further information regarding the proposed assignee. No later than three (3) business days after the Bid Deadline, the Debtors shall serve on affected counterparties and their respective known counsel by electronic mail (if available) or first class mail the adequate assurance information provided by each Qualified Bidder.

c.   **Objections**. Objections, if any, to the proposed assumption and assignment of any Contract or Lease or to the cure amount proposed with respect thereto must: (i) be in writing, (ii) comply with the applicable provisions of the Bankruptcy Rules, Local Rules and any other orders of the Court, (iii) state with specificity the nature of the objection and, if the objection pertains to the proposed cure amount, the correct cure amount alleged by the objecting counterparty, together with any applicable and appropriate documentation in support thereof and (iv) be filed with the Court and served so as to be actually received by the Notice Parties before the Sale Objection Deadline.

Following the Debtors' selection of the Successful Bidder and the Back-Up Bidder, if any, at the conclusion of the Auction, the Debtors shall announce the Successful Bidder and the Back-Up Bidder, if any, and shall file with the Court a notice of the Successful Bidder and the Back-Up Bidder, if any.  If and only if the Stalking Horse Bidder is not the Successful Bidder for the Acquired Assets, counterparties to the Debtors' Contracts and Leases shall have until September 25, 2025, at 11:59 p.m. (ET) (the "Supplemental Adequate Assurance Objection Deadline") to object to the assumption and assignment of a Contract or Lease (a "Supplemental Adequate Assurance Objection") solely on the issue of whether the Successful Bidder can provide adequate assurance of future performance as required by section 365 of the Bankruptcy Code.  For the avoidance of doubt, if the Stalking Horse Bidder is the Successful Bidder, all adequate assurance objections must be filed by the Sale Objection Deadline.

d.   **Dispute Resolution**. Any objection to the proposed assumption and assignment or related cure of a Contract or Lease in connection with the proposed sale that remains unresolved as of the Sale Hearing shall be heard

at the Sale Hearing or such later hearing if the objection is not resolved and the Debtors determine that an adjournment is appropriate. To the extent any such objection is resolved or determined unfavorably to the applicable Debtor, the Debtors may, subject to the terms of an agreement with the Successful Bidder, seek to reject the applicable Contract or Lease after such determination.

24.     Any party who fails to timely file an objection to its scheduled cure amount listed on the Cure Notice or to the assumption and assignment of a Contract or Lease (i) shall be forever barred, estopped and enjoined from objecting thereto, including (a) making any demands for additional cure amounts or monetary compensation on account of any alleged defaults for the period prior to the applicable objection deadline against the Debtors, their estates or the Contract Party or the Stalking Horse Bidder or other Successful Bidder selected at the Auction, if any, with respect to any such Contract or Lease and (b) asserting that the Contract Party or the Successful Bidder has not provided adequate assurance of future performance as of the date of the Sale Order; (ii) shall be deemed to consent to (a) the sale of the Acquired Assets as approved by the Sale Order and (b) the assumption and assignment of the Contracts and Leases; and (iii) shall be forever barred and estopped from asserting or claiming against the Debtors or the assignee of the relevant Contract or Lease that any conditions to assumption and assignment of such Contract or Lease must be satisfied (pursuant to section 365(b)(1) of the Bankruptcy Code or otherwise).

**B.      Scheduling and Notice**

25.     Given the marketing efforts to date and the marketing and diligence period to be established by the Bid Procedures, the proposed timeline is sufficient to complete a fair and open sale process that will maximize the value received for the Debtors' assets.  The most likely interested bidders are those who have already indicated interest, accessed the Data Room and had the opportunity to perform due diligence.  Thus, potential bidders need a shorter length of time for due diligence to submit competing bids.  If new bidders emerge, the proposed timeline will provide

them with sufficient time to perform due diligence given that the process is well understood at this juncture.  Thus, the schedule is sufficient, while respecting the necessity to consummate the Sale as quickly as possible to maximize the value received for the Acquired Assets.

26.     **Notice of Sale Hearing**.  Within one week after the Petition Date, or as soon thereafter as practicable, the Debtors shall cause to be served, by first-class mail, postage prepaid, a sale notice (the "Sale Notice") setting forth, among other things, the proposed dates established for submission of Qualified Bids, the Auction and the Sale Hearing, substantially in the form attached to the Bid Procedures Order as **Exhibit 3**, upon: (a) the United States Trustee for the District of Delaware (b) all known material creditors of the Debtors, including contingent, unliquidated and disputed creditors, as well as each  creditor listed on the Debtors' consolidated list of thirty (30) largest unsecured creditors, as filed with the Debtors' chapter 11 petitions, (c) any official committee appointed in the Debtors' cases; (d) all parties asserting a security interest in the Acquired Assets to the extent any such interest is reasonably known to the Debtors; (e) applicable federal, state, county and city tax and regulatory authorities; (f) all entities known to have expressed a written interest in a transaction with respect to the Acquired Assets or that have been identified by the Debtors or their advisors as a potential purchaser of the Acquired Assets; (g) local, state and federal authorities and agencies that have issued licenses or permits to the Debtors with respect to the operation and use of the Acquired Assets; (h) each counterparty to the Debtors' Contracts and Leases; and (i) all parties entitled to notice pursuant to Bankruptcy Rule 2002 (collectively, the "Sale Notice Parties").

27.     **Post-Auction Supplement**.  Following the Auction, the Debtors will promptly file with the Court a supplement (the "Supplement") that will inform the Court of the results of the Auction.  The Supplement will identify, among other things, (i) the Successful Bidder

as the proposed purchaser of the Acquired Assets, (ii) the amount and form of consideration to be paid by the Successful Bidder for the Acquired Assets, (iii) the Assumed Liabilities to be assumed by the Successful Bidder, and (iv) the Contracts and Leases that may be assumed by the Debtors and assigned to the Successful Bidder, or the Debtors' rights and interests therein sold and transferred to the Successful Bidder, as the case may be, in connection with the Sale. The Supplement will also include similar information relating to the Back-Up Bidder and the Back-Up Bid. In addition, the Debtors will file as soon as practicable (i) any revised proposed Sale Order approving the Sale to the Successful Bidder, (ii) a copy of the purchase agreement entered into by the Debtors and the Successful Bidder following the Auction, and (iii) any additional information or documentation relevant to the Successful Bid. The Debtors will file the Supplement on the docket for the chapter 11 cases as promptly as is reasonably practicable prior to the Sale Hearing but will not be required to serve the same on any parties-in-interest in the chapter 11 cases.

### C.  <u>Sale Order</u>

28.     The Debtors request that this Court set the Sale Hearing for a date that is not later than September 26, 2025. At the Sale Hearing, the Debtors intend to seek entry of the Sale Order approving the Sale free and clear of all Liens to the fullest extent possible pursuant to Bankruptcy Code section 363(f), including without limitation, successor liability or similar theories (except for those Assumed Liabilities and obligations expressly assumed by the Successful Bidder) and providing that the Successful Bidder will be protected from liability for any claims owed by the Debtors. In addition, the Sale Order will have findings that the Sale is not a fraudulent conveyance. The Bid Procedures provide proper and adequate notice for these and the other terms and conditions of the bidding, Auction and Sale processes.

## BASIS FOR RELIEF REQUESTED

**(i)** **Approval of the Sale is Warranted Under Bankruptcy Code Section 363(b), and the Bid Procedures, Including Entry into the Stalking Horse Agreement, Are Appropriate and in the Best Interests of the Debtors' Estates and Creditors.**

29.    Section 363(b)(1) of the Bankruptcy Code provides that, "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate . . . ." 11 U.S.C. § 363(b)(1). Bankruptcy Code section 105(a) further provides, in relevant part, that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105.

30.    A debtor should be authorized to sell assets out of the ordinary course of business pursuant to Bankruptcy Code section 363 if it demonstrates a sound business purpose for doing so. *See In re Federal Mogul Global, Inc.*, 293 B.R. 124, 126 (D. Del. 2003) (finding that a court should approve a debtor's use of assets outside ordinary course of business if debtor can demonstrate a sound business justification for proposed transaction); *see also In re Montgomery Ward Holding Corp.*, 242 B.R 147, 154 (Bankr. D. Del. 1999) (finding that the debtor's sound business purpose justified its sale of the assets outside of the ordinary course of business).

31.    Indeed, the paramount goal of a chapter 11 process is to maximize the proceeds received by the estate. *See Four B. Corp. v. Food Barn Stores, Inc. (In re Food Barn Stores, Inc.)*, 107 F.3d 558, 564–65 (8th Cir. 1997) ("[A] primary objective of the [Bankruptcy] Code [is] to enhance the value of the estate at hand."); *In re Abbotts Dairies of Penn., Inc.*, 788 F.2d 143, 149 (3d Cir. 1986) (noting the fairness and reasonableness of prices); *Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 659 (S.D.N.Y. 1992) ("It is a well-established principle of bankruptcy law that the . . . debtor's duty . . . is to obtain the highest price or greatest overall benefit possible for the estate.") (quoting *Cello Bag Co. v. Champion Intl Corp. (In re Atlanta Packaging Prods., Inc.)*, 99 B.R. 124, 131

(Bankr. N.D. Ga. 1988)); *In re Summit Global Logistics, Inc.*, No. 08-11566, 2008 WL 819934, at *14 (Bankr. D.N.J. Mar. 26, 2008) (describing a proposed transaction as one that "maximize[d] value and return to interested parties."). To that end, courts have recognized that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate of a debtor and therefore are appropriate. *See Integrated*, 147 B.R. at 659 (providing that such procedures "encourage bidding . . . to maximize the value of the debtor's assets."); *In re Fin. News Network Inc.*, 126 B.R. 152, 156 (S.D.N.Y. 1991) ("[C]ourt-imposed rules for the disposition of assets [should] provide an adequate basis for comparison of offers, and [should] provide for a fair and efficient resolution of bankrupt estate.").

32.     With this in mind, courts defer to a debtor's business judgment in the context of bidding and auction procedures. *See In re Trans World Airlines Inc.*, No. 01-0056, 2001 WL 1820326, at *10 (Bankr. D. Del. Apr. 2, 2001) ("It is not the function of a bankruptcy court to independently exercise a business judgment as to which proposal among competing proposals should be adopted by the debtor in effecting a § 363(b) sale.").

33.     In exercising their fiduciary duties and in the sound exercise of the Debtors' business judgment, the Debtors have determined that the Bid Procedures, including entry into the Stalking Horse Agreement, are the most appropriate method for encouraging competing bids that will maximize creditor recoveries and that will ensure the value received for the Acquired Assets is the highest and best the market can generate.

34.     The Bid Procedures provide a framework to facilitate and entertain bids for the Acquired Assets and, if such bids are received, to conduct an Auction in an orderly yet competitive fashion, thereby encouraging bids that maximize the value realized from a sale of the Acquired Assets. In particular, the Bid Procedures contemplate an open and fair auction process

with minimum barriers to entry and provide Potential Bidders with sufficient time to perform due diligence, many of whom will have likely performed due diligence in the very recent past, and acquire the information necessary to submit a timely and well-informed bid. *See In re Federal Mogul*, 293 B.R. 124, at 126.

35.     The Bid Procedures provide the Debtors with an adequate opportunity to consider competing bids and select the highest acceptable offer for the purchase of substantially all the Debtors' assets. The Debtors therefore believe that submitting the purchase of the Acquired Assets to a market-based test will ensure maximum recovery for all stakeholders. Accordingly, the Debtors and their stakeholders can be assured that the consideration obtained will be fair and reasonable and at or above market. *In re Summit Global Logistics*, 2008 WL 819934, at *14.

36.     If the Debtors do not receive any Qualified Bids (other than the Stalking Horse Bid), the Debtors will (i) notify all Potential Bidders and the Court in writing that (a) the Auction is cancelled and (b) the Stalking Horse Bid is the Successful Bid, and (ii) seek authority at the Sale Hearing to consummate the Sale transactions with the Stalking Horse Bidder contemplated by its Stalking Horse Agreement.

37.     Similar bidding, auction and notice procedures have been previously approved by this Court in other chapter 11 cases. *See, e.g.*, *In re Royal Interco, LLC, et al.*, Case No. 25-10674 (TMH) (Bankr. D. Del. May 6, 2025); *In re Coach USA, Inc.,* Case No. 24-11258 (MFW) (Bankr. D. Del. July 16, 2024); *In re Dermitech, Inc.,* Case No. 24-11378 (JTD) (Bankr. D. Del. July 15, 2024); *In re Vyaire Medical, Inc.,* 24-11217 (BLS) (Bankr. D. Del. July 11, 2024); *In re MRRC Hold Co.,* Case No. 24-11164 (CTG) (Bankr. D. Del. July 10, 2024); *In re Ambri Inc.,* Case No. 24-10952 (LSS) (Bankr. D. Del. June 12, 2024); *In re Near Intelligence, Inc.*, Case No. 23-11962 (TMH) (Bankr. D. Del. Jan. 23, 2024).

38.     In sum, the Debtors believe that the proposed Bid Procedures, including entry into the Stalking Horse Agreement, create an appropriate framework for expeditiously establishing that the Debtors are receiving the best and highest offer for the Acquired Assets. Accordingly, the proposed Bid Procedures and the Stalking Horse Agreement are reasonable, appropriate, and within the Debtors' sound business judgment under the circumstances.

**(ii)     Approval of the Bid Protections is Appropriate.**

39.     The Debtors believe that the Bid Protections are fair and reasonable under the circumstances.  The Bid Protections provided for in the Stalking Horse Agreement were negotiated at arm's-length and in good faith and were a necessary inducement to Stalking Horse Bidder's participation in the proposed sale transaction and willingness to subject its bid to a competitive auction process.  As discussed below, the Stalking Horse Bid sets a "floor" value for the Acquired Assets that maximizes the likelihood that the Debtors will receive the highest acceptable offer for the Acquired Assets to the benefit of the Debtors' estates.

40.     Approval of the Bid Protections is governed by standards for determining the appropriateness of bid protections in the bankruptcy context. In *O'Brien*, the Third Circuit reviewed the following nine factors set forth by the lower court as relevant in deciding whether to award bid protections:

a.     the presence of self-dealing or manipulation in negotiating the break-up fee;

b.     whether the fee harms, rather than encourages, bidding;

c.     the reasonableness of the break-up fee relative to the purchase price;

d.     whether the unsuccessful bidder placed the estate property in a "sale configuration mode" to attract other bidders to the auction;

e.     the ability of the request for a break-up fee to serve to attract or retain a potentially successful bid, establish a bid standard or minimum for other bidders or attract additional bidders;

f.     the correlation of the fee to a maximum value of the debtor's estate;

g.  the support of the principal secured creditors and creditors' committees of the break-up fee;

h.  the benefits of the safeguards to the debtor's estate; and

i.  the substantial adverse impact of the break-up fee on unsecured creditors, where such creditors are in opposition to the break-up fee.

See In re O'Brien Envtl. Energy, Inc., 181 F.3d at 536.

41.    Although none of the factors is dispositive, an application of the facts to several of such factors supports the approval of the Bid Protections.  In particular, the Bid Protections are necessary to preserve the value of the Debtors' estates because they will enable the Debtors to establish an adequate floor value for the Acquired Assets and to therefore insist that competing bids be materially higher or otherwise better than the Stalking Horse Bid—a clear benefit to the Debtors' estates.  The Stalking Horse Bidder would not agree to act as a stalking horse without the Bid Protections given the substantial time and expense it has incurred in connection with negotiating definitive documentation and the risk that it will be outbid at the Auction.  Without the Bid Protections, the Debtors might lose the opportunity to obtain the highest acceptable offer for the Acquired Assets and would certainly lose the downside protection that will be afforded by the existence of the Stalking Horse Bidder.  As discussed in the First Day Declaration, the purchase price contemplated by the Stalking Horse Bid is substantially higher than any other potential bids received as of filing and represents a superior recovery for the estate to the alternatives, including the sizable risk of a chapter 7 liquidation.  The bid of the Stalking Horse Bidder sends a message to all potential bidders that the Acquired Assets are at least worth the Purchase Price and puts pressure on potential competing bidders to "put their best foot forward" in formulating their bids.   Therefore, without the benefit of the bid of the Stalking Horse Bidder, the bids received at the Auction for the Acquired Assets could be substantially lower than the bid offered by the Stalking Horse Bidder.

42.     In addition, the Bid Protections were the product of hard-fought negotiations between the Debtors, their key creditor constituencies, and the Stalking Horse Bidder, in which the Debtors sought to both minimize the magnitude of Bid Protections payable and limit the circumstances under which they are payable.  The resulting Bid Protections fall within the range of stalking horse bid protections approved in this District and others.  *In re iSun, Inc.*, 24-11144 (TMH) (Bankr. D. Del. 2024) (approving a 5% Break-Up Fee); *In re Plastiq Inc.*, 23-10671 (BLS) (Bankr. D. Del. 2023) (same); *In re Orexigen Therapeutics, Inc.*, 18-10518 (JTC) (Bankr. D. Del. 2018) (same); *In re ATopTech, Inc.*, 17-10111 (MFW) (Bankr. D. Del. 2017) (same).

43.     Finally, payment of the Bid Protections in the context of a sale to another purchaser will not diminish the Debtors' estates to the extent they become payable, as the Bid Procedures require that any competing bid must exceed the Stalking Horse Bid by an amount in excess of the Bid Protections.  Accordingly, based on the foregoing, the Debtors submit that the Bid Protections reflect a sound business purpose, are fair and appropriate under the circumstances, and should be approved.

**(iii)   The Acquired Assets Should Be Sold Free and Clear of Claims, Liens and Encumbrances Under 11 U.S.C. § 363(f).**

44.     In the interest of attracting the best offers, the Debtors request authorization to sell the Acquired Assets free and clear of any and all liens, claims, encumbrances, and other interests in accordance with section 363(f) of the Bankruptcy Code, with any such liens, claims, encumbrances, and other interests attaching to the proceeds of the sale of the Acquired Assets and distributed as provided for in a further order of the Court.

45.     Under section 363(f) of the Bankruptcy Code, a debtor may sell estate property free and clear of liens, claims, encumbrances, and other interests if one of the following conditions is satisfied:

30

i. applicable nonbankruptcy law permits sale of such property free and clear of such interest;

ii. such entity consents;

iii. such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

iv. such interest is in bona fide dispute; or

v. such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).  Because section 363(f) of the Bankruptcy Code is written in the disjunctive, satisfaction of any one of its five requirements will suffice to permit the sale of the Acquired Assets "free and clear" of liens, claims, encumbrances, and other interests.  *See, e.g.*, *In re Dura Automotive Sys., Inc.,* 2007 WL 7728109, at *6 n.32 (Bankr. D. Del. Aug. 15, 2007).

46.    Furthermore, section 105(a) of the Bankruptcy Code grants the Court broad discretionary powers, providing that "[t]he Court may issue any order, process or judgment that is necessary or appropriate to carry out the provisions" of the Bankruptcy Code.  11 U.S.C. § 105(a).  This equitable power may be utilized to effectuate the provisions of section 363(f).  *See, e.g., In re Trans World Airlines, Inc.*, 2001 WL 1820325, at *6–7 (Bankr. D. Del. Mar. 27, 2001) (highlighting bankruptcy courts' equitable authority to authorize sale of estate assets free and clear).

47.    The Debtors will present evidence at the Sale Hearing that the Sale satisfies the requirements of section 363(f).  Accordingly, the Debtors request authorization to sell the Acquired Assets free and clear of all liens, claims, encumbrances, and other interests.

**(iv)    A Successful Bidder Should Be Entitled to the Protections of Bankruptcy Code Section 363(m).**

48.    Pursuant to section 363(m) of the Bankruptcy Code, a good faith purchaser is one who purchases assets for value, in good faith, and without notice of adverse claims.  *See In re Abbotts Dairies of Penn.*, 788 F.2d at 147; *Miami Ctr. Ltd. P'ship v. Bank of New York*, 838

F.2d 1547, 1554 (11th Cir. 1988); *In re Mark Bell Furniture Warehouse, Inc.*, 992 F.2d 7, 9 (1st

Cir. 1993); *In re Willemain v. Kivitz*, 764 F.2d 1019, 1023 (4th Cir. 1985); *In re Congoleum Corp.*,

Case No. 03-51524, 2007 WL 1428477 (Bankr. D.N.J. May 11, 2007); *In re Temtechco, Inc.*, 1998

WL 887256, at *4 (D. Del. 1998).

49.     As noted above, any asset purchase agreement executed by a Successful

Bidder (including the Stalking Horse Agreement) will have been negotiated at arm's-length and in

good faith in accordance with the Bid Procedures, with each of the parties represented by its own

advisors and counsel.  Accordingly, the Debtors request that the Sale Order include a provision

that any Successful Bidder for the Acquired Assets is a "good faith" purchaser within the meaning

of section 363(m) of the Bankruptcy Code.  The Debtors maintain that providing the Successful

Bidder with such protection will ensure that the maximum price will be received by the Debtors

for the Acquired Assets.

**(v)     Assumption and Assignment of Certain Executory Contracts and Unexpired Leases
Should Be Authorized.**

50.     Section 365(a) of the Bankruptcy Code provides, in pertinent part, that a

debtor in possession, "subject to the court's approval, may assume or reject any executory contract

or [unexpired] lease of the debtor."  11 U.S.C. § 365(a).  A debtor may assume or reject an

executory contract or unexpired lease if its reasonable business judgment supports assumption or

rejection.  *See, In re Stable Mews Assoc., Inc.*, 41 B.R. 594, 596 (Bankr. S.D.N.Y. 1984); *see also

Grp. of Institutional Investors v. Chicago M. St. P. & P.R.R. Co.*, 318 U.S. 523 (1943); *Sharon

Steel Corp. v. Nat'l Fuel Gas Distrib. Corp.*, 872 F.2d 36, 39-40 (3d Cir. 1989).  The business

judgment test "requires only that the trustee [or debtor in possession] demonstrate that [assumption

or] rejection of the contract will benefit the estate."  *Wheeling-Pittsburgh Steel Corp. v. West Penn

Power Co. (In re Wheeling-Pittsburgh Steel Corp.)*, 72 B.R. 845, 846 (Bankr. W.D. Pa. 1987)

(quoting *Stable Mews*).  Any more exacting scrutiny would slow the administration of a debtor's estate and increase costs, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially.  *See Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985).

51.     Pursuant to section 365(b)(1) of the Bankruptcy Code, for a debtor to assume an executory contract, it must "cure, or provide adequate assurance that the debtor will promptly cure," any default which is required to be cured, including compensating or providing adequate assurance of prompt compensation for any "actual pecuniary loss" relating to such default.  11 U.S.C. § 365(b)(1).  The Designation Procedures are appropriate and reasonably tailored to provide counterparties to Contracts and Leases with adequate notice of the proposed assumption and assignment of their Contracts and Leases, as well as proposed cure amounts, if any.  Such counterparties will then be given an opportunity to object to such cure amounts and assumption and assignment of their Contracts and Leases.  The Designation Procedures further provide that, in the event an objection is not resolved, the Court will determine the disputed issues.  Therefore, the Debtors submit that implementation of the Designation Procedures is appropriate under the facts and circumstances of the chapter 11 cases and the proposed Sale.

52.     Once an executory contract is assumed, the trustee or debtor in possession may elect to assign such contract.  *See In re Rickel Home Centers, Inc*., 209 F.3d 291, 299 (3d Cir. 2000) ("The Code generally favors free assignability as a means to maximize the value of the debtor's estate."); *see also In re Headquarters Dodge, Inc*., 13 F.3d 674, 682 (3d Cir. 1994) (noting that the purpose of section 365(f) is to assist a trustee in realizing the full value of the debtor's assets).  Section 365(f) of the Bankruptcy Code provides that the "trustee may assign an executory contract . . . only if the trustee assumes such contract . . . and adequate assurance of future

33

performance is provided." 11 U.S.C. § 365(f)(2).  The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction."  *See Carlisle Homes, Inc. v. Arrari (In re Carlisle Homes, Inc.)*, 103 B.R. 524, 538 (Bankr. D.N.J. 1989); *see also In re Natco Indus., Inc.*, 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (adequate assurance of future performance does not mean absolute assurance that debtor will thrive and pay rent).  Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned.

53.     The Debtors submit that the assumption and assignment of Contracts and Leases to the Stalking Horse or any other Successful Bidder (as applicable), as of the Closing Date is necessary to the consummation of the Sale and is well within the Debtors' sound business judgment.  Those Contracts and Leases are essential to inducing the highest acceptable offer for the Acquired Assets because they are necessary to run the Debtors' business.  It is unlikely that any purchaser would want to acquire any company on a going-concern basis unless a significant number of the Contracts and Leases needed to conduct the business and manage the day-to-day operations are included in the transaction.  In addition, the Stalking Horse Agreement and Sale Order provide that the Stalking Horse Bidder will have (i) cured and/or provided adequate assurance of cure of any default required to be cured and existing prior to the assumption and assignment; and (ii) provided compensation or adequate assurance of compensation to any counterparty for actual pecuniary loss to such party resulting from such default.

54.     Counterparties to the Debtors' Contracts and Leases will be provided with a Cure Notice and will have an opportunity to object to the potential assumption and assignment of their Contracts and Leases prior to the entry of the Sale Order.  The Debtors propose that any

counterparty that fails to object to the proposed assumption and assignment of its contract or lease will be deemed to consent to that assumption and assignment pursuant to section 365 of the Bankruptcy Code on the terms set forth in the proposed Bid Procedures Order and Sale Order, and to the cure amounts identified in the Cure Notice.  *See*, *e.g.*, *In re Tabone, Inc.*, 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (holding that creditor was deemed to have consented to sale by not objecting to sale motion).

55.      Accordingly, the Debtors submit that the assumption and assignment to the Stalking Horse Bidder or other Successful Bidder of the Debtors' Contracts and Leases should be approved as an exercise of the Debtors' sound business judgment.

**E.      No Consumer Privacy Ombudsman Need Be Appointed**

56.      Pursuant to section 363(b)(1) of the Bankruptcy Code, the Debtors may not sell personally identifiable information if the Debtors, in connection with offering their products or services, have a policy prohibiting the transfer of such information and if such policy is in effect on the day of the commencement of the case, unless "such sale or such lease is consistent with such policy."  11 U.S.C. § 363(b)(1).

57.      The Debtors privacy policy specifically allowed the Debtors to transfer some or all of a customer's information if the Debtors were to undergo a business transition, like a merger, acquisition, or sale of all or a portion of their assets.  As the Bid Procedures contemplate and require the execution of confidentiality agreements in connection with due diligence and the proposed Sale, the Debtors submit that they may transfer their personally identifiable information to any Successful Bidder without the need for a consumer privacy ombudsman to be appointed. *See, e.g., In re Crucible Materials Corp*., 2009 Bankr. LEXIS 4893, at *16 (Bankr. D. Del. Aug. 31, 2009) (no appointment of consumer privacy ombudsman required where sale assets complied

with debtors' privacy policy); *In re Penn Traffic Co.*, 2010 Bankr. LEXIS 5399, at *14 (Bankr. D. Del. Jan. 8, 2010) (same).

**F.     The Proposed Notice is Appropriate Under Bankruptcy Rule 2002.**

57.     The notices contemplated by the Bid Procedures give notice of the proposed Sale including a disclosure of the time and place of an Auction, the terms and conditions of the Sale, and the deadline for filing any objections.  The Debtors submit that the notice procedures comply with Bankruptcy Rule 2002 and include information regarding the Bid Procedures necessary to enable interested bidders to participate in the Auction, and constitute good and adequate notice of the Bid Procedures and the other components of the Auction.  Therefore, the Debtors respectfully request this Court approve the proposed notice procedures.

**F.     Relief from Bankruptcy Rules 6004(h) and 6006(d) is Appropriate.**

58.     The Debtors also request that the Court waive the stay imposed by Bankruptcy Rule 6004(h), which provides that "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."  Fed. R. Bankr. P. 6004(h).  To preserve the value of the Debtors' estates and limit the costs of administering and preserving the Acquired Assets, it is critical that the Debtors close the sale of the Acquired Assets as soon as possible after all closing conditions have been met or waived.  Accordingly, the Debtors hereby request that the Court waive the fourteen-day stay periods under Bankruptcy Rules 6004(h) and 6006(d).

**NOTICE**

59.     The Debtors will provide notice of this Motion to: (a) the Office of the United States Trustee for the District of Delaware; (b) counsel to the Proposed DIP Lender;[4] (c)

---

[4]     Capitalized terms used in this section but not otherwise defined in this Motion have the meanings ascribed to them in *Debtors' Motion for Interim and Final Orders (I) Authorizing Secured Post-Petition*

counsel to the ABL Lender; (d) the parties included on the Debtors' consolidated list of their 30 largest unsecured creditors; (e) the Internal Revenue Service; (f) the United States Department of Justice; (g) entities known to have expressed a bona fide interest in a transaction with respect to the Acquired Assets; (h) all entities known to have asserted any lien, claim or encumbrance in or upon any of the Acquired Assets; (i) all federal, state and local environmental, regulatory or taxing authorities or recording offices which have a reasonably known interest in the relief requested by the Motion; and (j) all parties who have requested notice in these chapter 11 cases pursuant to Bankruptcy Rule 2002.  In light of the nature of the relief requested in this Motion, the Debtors respectfully submit that no further notice is necessary.

---

*Financing Pursuant to 11 U.S.C. § 364, (II) Authorizing the Use of Cash Collateral, (III) Granting Adequate Protection Pursuant to 11 U.S.C. §§ 361, 363, and 364, (IV) Scheduling a Final Hearing and (V) Granting Related Relief.*

## CONCLUSION

WHEREFORE, the Debtors request this Court to enter the Bid Procedures Order,

the Sale Order and further relief as the Court may deem just and appropriate.

Dated: August 28, 2025  
       Wilmington, Delaware

Respectfully submitted,

**MORRIS, NICHOLS, ARSHT & TUNNELL LLP**

*/s/ Scott D. Jones*  
Robert J. Dehney, Sr. (No. 3578)  
Donna L. Culver (No. 2983)  
Daniel B. Butz (No. 4227)  
Scott D. Jones (No. 6672)  
Echo Yi Qian (No. 7330)  
1201 N. Market Street, 16th Floor  
Wilmington, Delaware 19801  
Telephone: (302) 658-9200  
Facsimile: (302) 658-3989  
Email: rdehney@morrisnichols.com  
      dculver@morrisnichols.com  
      dbutz@morrisnichols.com  
      sjones@morrisnichols.com  
      eqian@morrisnichols.com

*Proposed Counsel to the Debtors and*  
*Debtors in Possession*