**<u>EXHIBIT B</u>**

**Stalking Horse Agreement**

**ASSET PURCHASE AGREEMENT**

**BY AND AMONG**

**WALKER EDISON HOLDCO LLC, WALKER EDISON INTERMEDIATE, LLC, WALKER EDISON FURNITURE COMPANY LLC, EW FURNITURE, LLC**

**AND**

**TWIN-STAR INTERNATIONAL, INC.**

**Dated as of August 28, 2025**

## Table of Contents

ARTICLE I - DEFINITIONS..................................................................................................1

    1.1    Definitions........................................................................................................1

ARTICLE II - SALE AND PURCHASE OF ASSETS; CONSIDERATION ........................14

    2.1    Sale and Purchase of Assets.............................................................................14

    2.2    Excluded Assets ................................................................................................15

    2.3    Assumed Liabilities ..........................................................................................17

    2.4    Excluded Liabilities ..........................................................................................17

    2.5    Right to Modify Classification of Assets and Liabilities..................................17

    2.6    Consideration. ...................................................................................................17

    2.7    Deposit. .............................................................................................................21

    2.8    Non-Transferrable Acquired Assets .................................................................21

    2.9    Cure Payments ..................................................................................................22

    2.10    Designation Rights............................................................................................22

    2.11    Withholding ......................................................................................................23

    2.12    Shared Costs......................................................................................................23

    2.13    Allocation .........................................................................................................23

ARTICLE III - CLOSING; CONDITIONS TO CLOSING ................................................24

    3.1    Closing ..............................................................................................................24

    3.2    Court Approval Required...................................................................................24

    3.3    Conditions to Obligations of Purchaser ...........................................................24

    3.4    Conditions to Obligations of Sellers ................................................................25

    3.5    Delivery of Possession of Assets .....................................................................25

    3.6    Closing Deliveries of the Parties......................................................................26

ARTICLE IV - REPRESENTATIONS AND WARRANTIES OF SELLERS...........................26

    4.1    Organization, Good Standing and Power..........................................................26

    4.2    Authority Relative to this Agreement; Execution and Binding Effect .................27

    4.3    Governmental and Other Consents ...................................................................27

    4.4    Title to Assets; Sufficiency of Assets ..............................................................27

    4.5    Intellectual Property; IT Systems......................................................................28

    4.6    Compliance with Laws; Permits ......................................................................28

    4.7    Data Privacy and Protection..............................................................................29

    4.8    Financial Statements. ........................................................................................29

i

| | | | |
|---|---|---|---|
| 4.9 | Material Contracts. | | 30 |
| 4.10 | Employment. | | 30 |
| 4.11 | Litigation | | 31 |
| 4.12 | Absence of Certain Changes | | 31 |
| 4.13 | Brokers or Finders | | 31 |
| 4.14 | Customers and Suppliers. | | 32 |

ARTICLE V - REPRESENTATIONS AND WARRANTIES OF PURCHASER .................... 32

| | | | |
|---|---|---|---|
| 5.1 | Organization, Good Standing and Power. | | 32 |
| 5.2 | Authority Relative to this Agreement; Execution and Binding Effect | | 32 |
| 5.3 | Governmental and Other Consents | | 32 |
| 5.4 | Financing. | | 32 |
| 5.5 | No Conflicts | | 33 |
| 5.6 | No Other Representations and Warranties | | 33 |

ARTICLE VI - COVENANTS ................ 33

| | | | |
|---|---|---|---|
| 6.2 | Efforts to Consummate | | 34 |
| 6.3 | Notices and Consents | | 34 |
| 6.4 | Public Announcements | | 34 |
| 6.5 | Bankruptcy Court Matters. | | 34 |
| 6.6 | Approval Order. | | 35 |
| 6.7 | Access to Facilities, Personnel, and Information. | | 36 |
| 6.8 | Further Assurances | | 37 |
| 6.9 | Employee Matters. | | 37 |
| 6.10 | Tax Matters. | | 40 |
| 6.11 | Insurance Access | | 41 |
| 6.12 | Post-Closing Receipt and Possession of Assets. | | 42 |
| 6.13 | Transition Services | | 42 |

ARTICLE VII - TERMINATION; EFFECT OF TERMINATION .......................... 42

| | | | |
|---|---|---|---|
| 7.1 | Termination | | 42 |
| 7.2 | Effect of Termination. | | 44 |
| 7.3 | Competing Bids | | 45 |

ARTICLE VIII
GENERAL PROVISIONS ................ 45

| | | | |
|---|---|---|---|
| 8.1 | "As Is", "Where Is", and "With all Faults" Transaction | | 45 |

8.2     Transaction Expenses...............................................................................45

8.3     Certain Interpretive Matters and Definitions ........................................45

8.4     Survival; Termination of Representations and Warranties.....................47

8.5     Amendment..............................................................................................47

8.6     Waiver......................................................................................................47

8.7     Notices .....................................................................................................47

8.8     Jurisdiction ..............................................................................................49

8.9     Waiver of Jury Trial ................................................................................49

8.10    Governing Law ........................................................................................49

8.11    Damages...................................................................................................49

8.12    Time is of the Essence .............................................................................50

8.13    Severability..............................................................................................50

8.14    Titles and Headings..................................................................................50

8.15    Assignment; Successors and Assigns ......................................................50

8.16    No Third-Party Rights..............................................................................50

8.17    Confidentiality Agreement.......................................................................50

8.18    Entire Agreement .....................................................................................50

8.19    Execution of this Agreement ...................................................................51

8.20    Release .....................................................................................................51

## EXHIBITS

Exhibit A                      Bill of Sale and Assignment and Assumption Agreement
Exhibit B                      Contract Assignment Agreement
Exhibit C                      IP Assignment Agreement
Exhibit D                      Bidding Procedures
Exhibit E                      Approval Order

## ASSET PURCHASE AGREEMENT

**THIS ASSET PURCHASE AGREEMENT** (this "<u>Agreement</u>") is dated as of August 28, 2025, and entered into by and among Walker Edison Holdco LLC, a Delaware limited liability company, Walker Edison Intermediate, LLC, a Delaware limited liability company, Walker Edison Furniture Company LLC, a Utah limited liability company, and EW Furniture, LLC, a Utah limited liability company (each individually, a "<u>Seller</u>", and collectively, "<u>Sellers</u>"), and Twin-Star International, Inc., a Florida corporation ("<u>Purchaser</u>"). Sellers and Purchaser are collectively referred to as the "<u>Parties</u>" and individually as a "<u>Party</u>."

**WHEREAS**, Sellers are in the business of ready-to-assemble home furnishings through e-commerce channels (the "<u>Business</u>");

**WHEREAS**, Sellers filed voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. § 101, *et seq*. ("<u>Bankruptcy Code</u>"), in the United States Bankruptcy Court for the District of Delaware ("<u>Bankruptcy Court</u>") on August 28, 2025 (the "<u>Petition Date</u>"), Case No. _____ (the "<u>Chapter 11 Cases</u>");

**WHEREAS**, Sellers continue in the possession and control of their assets and properties in accordance with Sections 1107 and 1108 of the Bankruptcy Code; and

**WHEREAS**, Sellers desire to sell, assign, transfer, convey and deliver to Purchaser all of the Acquired Assets pursuant to the terms and conditions of this Agreement, and Purchaser desires to so purchase, acquire, assume and accept the Acquired Assets from Sellers in accordance with the terms and conditions of this Agreement and the Bidding Procedures Order and Free and Clear.

**NOW, THEREFORE**, in consideration of the foregoing premises, the representations, warranties, covenants and agreements contained herein, and certain other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereto agree as follows:

## ARTICLE I
## DEFINITIONS

1.1 **Definitions**.

As used herein, the following terms shall have the following meanings:

"<u>Accounting Methodology</u>" means GAAP applied using the same accounting principles, methods, practices, reserves and accruals utilized in preparing the Financial Statements, applied on a consistent basis with such Financial Statements.

"<u>Accounts Receivable</u>" shall mean all gross accounts receivable of Sellers and other receivables of Sellers (whether or not billed) as determined in accordance with the Accounting Methodology.

"<u>Acquired Assets</u>" has the meaning assigned to that term in <u>Section 2.1</u>.

"Acquired Claims" has the meaning assigned to that term in Section 2.1(c).

"Action" means any action, audit, claim (including any cross-claim or counterclaim), cause of action, assessment, inquiry, investigation, examination, proceeding, arbitration or litigation of any kind (whether civil, criminal, administrative, or investigative, and including any appellate proceeding arising therefrom) commenced, brought, conducted or heard by or before any Governmental Body or arbitrator, including any cancellation, opposition, inter parties review, or similar proceeding.

"Additional Payment Amount" has the meaning set forth in Section 2.6(b)(iv).

"Affiliate" means, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person, and the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by contract or otherwise. For purposes of this Agreement, Purchaser and its Affiliates shall be deemed not to be "Affiliates" of any Seller and Sellers and their respective Affiliates shall be deemed not to be "Affiliates" of Purchaser and its Affiliates.

"Affiliated Plan Liabilities" has the meaning assigned to that term in Section 6.9(b).

"Agreement" has the meaning assigned to that term in the Preamble.

"Allocation" has the meaning assigned to that term in Section 2.13.

"Alternative Transaction" has the meaning assigned to that term in Section 7.1(c).

"Ancillary Agreements" means any certificate, agreement, document or other instrument to be executed and delivered in connection with this Agreement.

"Annual Financial Statement" has the meaning assigned to that term in Section 4.8.

"Assigned IP" has the meaning assigned to that term in Section 2.1(f).

"Approval Order" has the meaning assigned to that term in Section 6.6(a).

"Assigned Contracts" has the meaning assigned to that term in Section 2.1(g).

"Assumed Liabilities" has the meaning assigned to that term in Section 2.3.

"Assumption Notice" has the meaning assigned to that term in Section 2.10(b).

"Balance Sheet Date" has the meaning assigned to that term in Section 4.8.

"Bankruptcy Code" has the meaning assigned to that term in the Preamble.

"Bankruptcy Court" has the meaning assigned to that term in the Preamble.

2

"Bankruptcy Court Milestones" has the meaning assigned to that term in Section 6.5(b).

"Bankruptcy Petition" shall mean the voluntary bankruptcy petition filed by each Seller on the Petition Date, with the Bankruptcy Court, and "Bankruptcy Petitions" shall mean, collectively, the voluntary bankruptcy petitions of all of Sellers.

"Base Purchase Price" has the meaning assigned to that term in Section 2.6(a)(i).

"Bid Procedures" or "Bidding Procedures" means those certain bidding procedures filed and approved by the Bankruptcy Court and attached as Exhibit 1 to the Bidding Procedures Order.

"Bid Protections" means any Break-Up Fee and Expense Reimbursement.

"Bidding Procedures Order" has the meaning assigned to that term in Section 6.5.

"Bill of Sale and Assignment and Assumption Agreement" means that certain Bill of Sale and Assignment and Assumption Agreement, dated as of the Closing Date, by and between Purchaser and Sellers, substantially in the form attached here to as Exhibit A.

"Break-Up Fee" has the meaning assigned to that term in Section 7.2(b).

"Business" has the meaning assigned to that term in the Preamble.

"Business Day" means any day on which commercial banking institutions are open for business in Wilmington, Delaware.

"Cash Payment" has the meaning assigned to that term in Section 2.6(a)(iii).

"Chapter 11 Cases" has the meaning assigned to that term in the Preamble.

"CIM" means the Confidential Information Presentation of Walker Edison prepared by Lincoln International dated June 18, 2025.

"Closing" has the meaning assigned to that term in Section 3.1.

"Closing Date" has the meaning assigned to that term in Section 3.1.

"Closing Date Report" has the meaning assigned to that term in Section 2.6(a)(ii).

"COBRA" means Part 6 of Subtitle B of Title I of ERISA, Section 4980B of the Code, or similar state or local Law.

"Code" means the Internal Revenue Code of 1986, as amended.

"Confidentiality Agreement" has the meaning assigned to that term in Section 8.17.

"Continuation Costs" has the meaning assigned to that term in Section 2.10(a).

3

"Contract Assignment Agreement" means that certain Contract Assignment Agreement, dated as of the Closing Date, by and between Purchaser and Sellers, substantially in the form attached here to as Exhibit B.

"Contracts" means all agreements, contracts, leases, consensual obligations, promises, commitments or undertakings (including any indenture, note, bond, mortgage, deed of trust, or other evidence of indebtedness), whether written or oral, other than Employee Benefit Plans.

"Cure Amount Schedule" has the meaning assigned to that term in Section 2.9.

"Cure Amounts" means all amounts, costs and expenses payable in respect of the Assigned Contracts so that they may be assumed and assigned to Purchaser pursuant to Sections 363 and 365 of the Bankruptcy Code, as agreed to by Purchaser and each party to the Assigned Contracts or, absent such agreement, as determined by a Final Order of the Bankruptcy Court.

"Data Protection Requirements" means all applicable Laws, industry requirements, public statements or privacy policies, and Contracts relating to the (i) privacy, confidentiality, integrity, availability, collection, use, access, processing, protection, Security Incident notification, deletion or disclosure of Sellers' data or IT systems, (ii) cybersecurity (including secure software development), or (iii) artificial intelligence, automated decision making, or machine learning technologies.

"Debtors" shall mean Sellers collectively, and "Debtor" shall mean each of the foregoing individually.

"Deposit" has the meaning assigned to that term in Section 2.7(a).

"Designation Cost Overage" has the meaning assigned to that term in Section 2.10(a).

"Designation Right Contract" has the meaning assigned to that term in Section 2.10(a).

"Designation Rights Period" means the period of sixty (60) days from and after the Closing Date, which period may be extended by mutual agreement of Sellers and Purchaser.

"DIP Budget" means the debtor-in-possession financing budget approved by the debtor-in-possession lender and authorized by any Order by the Bankruptcy Court on or about the date hereof.

"Disputed Items" has the meaning assigned to that term in Section 2.6(b)(ii)(C).

"Effective Time" has the meaning assigned to that term in Section 3.1.

"Employee Benefit Plans" shall mean all "employee benefit plans" (as defined in Section 3(3) of ERISA, whether or not subject to ERISA) and each other compensation or benefit plan, program, practice, policy, arrangement or agreement, including any pension, retirement,

profit sharing, employment, consulting, non-competition, employee non-solicitation, employee loan, bonus, incentive, compensation, equity or equity-based compensation, stock purchase, deferred compensation, retention, change in control, severance, unemployment benefits, sick leave, leave of absence, vacation, paid time off, salary continuation, disability, hospitalization, health, medical, life insurance or other death benefit, educational assistance, training, service award, Section 125 cafeteria, dependent care, flexible spending account, tax gross-up, welfare, fringe benefit or similar plan, program, policy, practice agreement or arrangement, in each case, whether written or unwritten, qualified or unqualified, funded or unfunded and all underlying insurance policies, trusts and other funding vehicles, in each case, (i) that is maintained, sponsored, contributed to or required to be contributed to by Sellers or any of their Affiliates, (ii) that is for the benefit of any current or former employee or other service provider of Sellers or any of their Affiliates (or a beneficiary or dependent thereof), or (iii) as to which Sellers or any of their Affiliates are a party or with respect to which Sellers or any of their Affiliates have or could reasonably be expected to have any obligation or Liability, contingent or otherwise.

"Equity Interests" means, with respect to any Person, (a) capital stock of, partnership interests, membership interests or other equity interests in, such Person, (b) securities or other rights exercisable, convertible into or exchangeable for shares of capital stock, partnership interests, membership interests, voting securities or other equity interests in such Person and (c) options, warrants, calls, commitments or other rights to acquire any of the foregoing described in clauses (a) and (b), whether fixed or contingent, matured or unmatured, contractual, legal, equitable or otherwise.

"ERISA" shall mean the Employee Retirement Income Security Act of 1974, as amended from time to time, and regulations and formal guidance issued thereunder.

"ERISA Affiliate" means any trade or business (whether or not incorporated) which together with any Seller would be treated as a single employer under Section 414 of the Code or Section 4001 of ERISA.

"Escrow Agent" has the meaning assigned to that term in Section 2.7(a).

"Estate" shall mean the estate of each Debtor created by Section 541 of the Bankruptcy Code upon the filing of the Bankruptcy Petition, and "Estates" shall mean, collectively, the estates of all of the Debtors created by Section 541 of the Bankruptcy Code in the Chapter 11 Case.

"Estate Causes of Action" shall mean any and all causes of action, defenses, and counterclaims accruing to the Debtors or to a trustee or to a creditor or that is property of their Estates or related to their claims, based upon facts, circumstances and transactions or agreements that occurred prior to the Closing Date, including any avoidance, illegal or unauthorized dividend, fraudulent transfer, or other recovery action that belongs to, have previously been raised by, could have been raised, or can be raised post-filing by the Debtors or the debtors in possession or their respective Estates under Chapter 5 of the Bankruptcy Code or other federal or state law, except for any Acquired Claims, but including, for the avoidance of doubt, any and all claims between and among Debtors, against current and prior direct and indirect stockholders, members, directors,

managers, officers or employees; provided, that Estate Causes of Action shall include the right to defend and assert counterclaims in respect to any Acquired Claims.

"Estimated Accounts Receivable" has the meaning assigned to that term in Section 2.6(a)(ii).

"Estimated Post-Petition Inventory" has the meaning assigned to that term in Section 2.6(a)(ii).

"Estimated Pre-Petition In-Transit Inventory" has the meaning assigned to that term in Section 2.6(a)(ii).

"Estimated Pre-Petition On-Hand Inventory" has the meaning assigned to that term in Section 2.6(a)(ii).

"Estimated Retained Employee Costs" has the meaning assigned to that term in Section 2.6(a)(ii).

"Estimated Specified Vendor Costs" has the meaning assigned to that term in Section 2.6(a)(ii).

"Estimated Unfilled Customer Order Inventory" has the meaning assigned to that term in Section 2.6(a)(ii).

"Excluded Assets" has the meaning assigned to that term in Section 2.2.

"Excluded Inventory" means any and all Inventory set forth in Schedule 1.1(a).

"Excluded Liabilities" has the meaning assigned to that term in Section 2.4.

"Excluded Taxes" means, without duplication, any (a) Taxes imposed on Sellers or any of its Affiliates, including any liability of Sellers or any of their Affiliates for Taxes of any other Person under Treasury Regulation Section 1.1502-6 (or any similar provision of state, local or non-U.S. Law), as transferee or successor, by contract or operation of law, or otherwise, (b) Taxes arising out of, relating to or with respect to the Excluded Assets or Excluded Liabilities for any taxable period, (c) Taxes arising out of, relating to or with respect to the Assumed Liabilities, Business or the Acquired Assets with respect to any Pre-Closing Tax Period (including with respect to the portion of any Straddle Period ending on the Closing Date), and (d) any bulk sale or similar Taxes not exempt under the Final Order pursuant to Section 6.10(d).

"Expense Reimbursement" has the meaning assigned to that term in Section 7.2(b).

"Final Adjustment Report" has the meaning set forth in Section 2.6(b)(ii)(B).

"Final Cash Payment" has the meaning set forth in Section 2.6(b)(ii)(C).

"Final Order" means an Order of the Bankruptcy Court that has not been appealed based on the assertion that the Parties have entered into this Agreement and agreed to the

transactions and performance provided for herein in bad faith, reversed, modified, amended or stayed.

"Financial Statements" has the meaning assigned to that term in Section 4.8.

"Fraud" means actual and intentional common law fraud by a Party or its representatives, as determined in accordance with the Laws of the State of Delaware, with respect to the making of any representation or warranty by such Party set forth in this Agreement.

"Free and Clear" means free and clear of all Liens, claims, and interests to the maximum extent permitted by Section 363(f) of the Bankruptcy Code.

"GAAP" means generally accepted accounting principles, consistently applied.

"Governmental Authorization" means any consent, franchise, license, registration, Permit, Order or approval issued, granted, given or otherwise made available by or under the authority of any Governmental Body or pursuant to any Law, including, as the context may require, any declarations or filings with, or expiration of waiting periods imposed by, any such Governmental Body.

"Governmental Body" means any (a) nation, state, county, city, town, borough, village, district or other jurisdiction, (b) federal, state, local, municipal, foreign or other government, (c) governmental or quasi-governmental body of any nature (including any agency, branch, department, board, commission, court, tribunal or other entity exercising governmental or quasi-governmental powers), (d) multinational organization or body, (e) body exercising, or entitled or purporting to exercise, any administrative, executive, judicial, legislative, police, regulatory or taxing authority or power, or (f) official of any of the foregoing.

"Holdback Amount" has the meaning assigned to that term in Section 2.6(b)(v).

"Indebtedness" of any Person means, without duplication, (a) the principal, interest and premium (if any) in respect of (i) indebtedness of such Person for money borrowed and (ii) indebtedness evidenced by notes, debentures, bonds or other similar instruments for the payment of which such Person is responsible or liable; (b) all obligations of such Person issued or assumed as the deferred purchase price of property, all conditional sale obligations of such Person and all obligations of such Person under any title retention agreement (but excluding trade accounts payable arising in the ordinary course of business); (c) all obligations of such Person under leases required to be capitalized in accordance with GAAP; (d) all obligations of such Person with respect to any letter of credit, banker's acceptance or similar credit transaction; (e) all (i) earned, unused or accrued or outstanding severance or termination payments or benefits, (ii) earned, unused or accrued paid time off (including vacation, personal and sick days), (iii) earned, unused or accrued bonuses, commissions or other incentive compensation, (iv) any unfunded or underfunded pension, deferred compensation or retirement Liabilities and (v) any Liabilities associated with any post-retirement medical, post-employment benefit or nonqualified deferred compensation plans, programs, agreements or arrangements, in each case of clauses (i) through (v), together with the employer's portion of all payroll, employment, unemployment, social security or similar Taxes in connection with such Liabilities or amounts, (f) all obligations of the type referred to in clauses (a) through (e) of any Persons for the payment of which such Person is responsible or liable,

directly or indirectly, as obligor, guarantor, surety or otherwise, including guarantees of such obligations; and (g) all obligations of the type referred to in clauses (a) through (f) of other Persons secured by any Lien on any property or asset of such Person (whether or not such obligation is assumed by such Person).

"Insurance Policies" means the material insurance policies related to the Business or the Acquired Assets or the Assumed Liabilities, in each case, owned or held by any Seller (including policy periods and the amounts of coverage, limits and deductibles) as of the date hereof.

"Intellectual Property" means (a) patents, pending applications for patents and statutory invention registrations, including continuations, continuations-in-part, divisions, provisional and non-provisional applications, reexaminations, reissues and extensions; (b) trademarks, service marks, trade names, corporate names, and other indicia of source of origin, including all common law rights thereto and all goodwill associated therewith and registrations and pending applications for registration thereof ("Trademarks"); (c) works of authorship, copyrights, and all applications and registrations thereof; (d) domain name registrations ("Copyrights"); (e) trade secrets, know-how, confidential or proprietary technical, business and other information, including processes, techniques, methods, formulae, designs, product specifications, algorithms, supplier information, prospect lists, customer lists, projections, analyses, market studies and similar proprietary items that are in Sellers' possession, and all rights therein and thereto ("Trade Secrets"); (f) inventions (whether patentable or unpatentable, and whether or not reduced to practice), invention disclosures, mask works, circuit designs and other designs, industrial design rights, discoveries, ideas, developments, data, and software; (g) all other proprietary and intangible rights; and (h) all copies and tangible embodiments thereof (in whatever form or medium).

"Interim Financial Statements" has the meaning assigned to that term in Section 4.8.

"Inventory" means all inventory of any kind or nature, whether or not prepaid, and wherever located, owned by any Seller or by the Business, including all raw materials, work in process, semi-finished and finished products, replacement and spare parts, packaging materials, operating supplies, in-transit or consigned inventory and fuels and other similar items, but excluding any and all Excluded Inventory.

"IP Assignment Agreement" means that certain IP Assignment Agreement, dated as of the Closing Date, by and between Purchaser and Sellers, substantially in the form attached here to as Exhibit C.

"IT Systems" means the Software, systems, servers, network equipment and other information technology systems owned, leased or licensed by Sellers and used in connection with the operation of the Business.

"Knowledge" means the actual knowledge of Jeffrey P. Werner and Nate Brown.

"Law" means any applicable federal, state, local, municipal, foreign, international, multinational or other constitution, law, ordinance, principle of common law, code, regulation, statute or treaty.

"Leased Real Property" has the meaning assigned to that term in Section 2.2(j).

"Liability" means any and all obligations, liabilities, debts and commitments, whether known or unknown, asserted or unasserted, fixed, absolute or contingent, matured or unmatured, accrued or unaccrued, liquidated or unliquidated, due or to become due, whenever or however arising (including, without limitation, whether arising out of any contract or tort based on negligence, strict liability, or otherwise) and whether or not the same would be required by GAAP to be reflected as a liability in financial statements or disclosed in the notes thereto.

"Lien" means all forms of lien (including mechanic's, warehousemen's, carrier's, contractor's or other similar liens arising under or relating to the provision of goods or services on or to any Acquired Assets, and lien issued pursuant to Section 361, 363 or 364 of the Bankruptcy Code), encumbrance, mortgage, deed to secure debt, transfer restriction, deed of trust, pledge, charge, title defect, security interest, pledge, leasehold interest or other legal or equitable encumbrance of any kind, including any other rights granted or consensual as or against any Acquired Assets including easements, encroachments, rights of first refusal, options, or any other interest or right in property that constitutes a lien or interest within the definition or adjudication of such terms under the Bankruptcy Code.

"Material Adverse Effect" means a material adverse effect on (a) the Business, Acquired Assets, Assumed Liabilities, or condition (financial or otherwise) of Sellers (other than those resulting solely from the commencement of the Bankruptcy Petition), (b) the ability of Sellers to perform any of its obligations under this Agreement (other than those resulting solely from the commencement and continuation of the Chapter 11 Cases), (c) the legality, validity, or enforceability of this Agreement, or (d) the rights and remedies of Purchaser under this Agreement, but in each case excluding such effect to the extent resulting from or arising in connection with the following (except to the extent such effect disproportionately affects Sellers relative to other companies in the same industry): (i) changes or conditions affecting the industries generally in which Sellers operate, including changes to tax, stamp duty, tariffs, customs, duties and similar charges, (ii) changes in national or international business, economic, political or social conditions, including the engagement of the United States of America in hostilities, whether or not pursuant to the declaration of a national emergency or war, or the occurrence of any military or terrorist attack upon the United States of America or any of its territories, possessions or diplomatic or consular offices or upon any military instillation, equipment or personnel of the United States of America, (iii) changes in financial, banking or securities markets (including any disruption thereof or any decline in the price of securities generally or any market or index), (iv) the announcement, pendency or completion of the Transactions, including losses or threatened losses of employees, customers, suppliers, distributors or others having relationships with Sellers, or (v) changes in Law or GAAP or interpretations thereof.

"Material Contracts" has the meaning assigned to that term in Section 2.9.

"Neutral Firm" means a recognizable, reputable and impartial certified public accounting firm that is mutually acceptable to Purchaser and Sellers.

"Neutral Firm's Report" has the meaning assigned to that term in Section 2.6(b)(ii)(C).

"Next-Highest Bidder" has the meaning set forth in the Bid Procedures.

"Notice of Disagreement" has the meaning assigned to that term in Section 2.6(b)(ii)(B).

"Order" means any award, decision, determination, temporary or permanent injunction, order, judgment, ruling, decree, writ, subpoena, stipulation, settlement, verdict, or assessment or arbitration award entered, issued, promulgated, made, or rendered by any court, administrative agency, or other Governmental Body or by any arbitrator.

"Outside Date" means the date that is earlier of (a) sixty (60) days following the Petition Date and (b) October 24, 2025.

"Permit" means all permits, authorizations, licenses, registrations, certificates, franchises, clearances, qualifications, exemptions, waivers, variances, privileges, consents and other approvals issued by or from any Governmental Body.

"Person" means any individual, corporation, partnership, joint venture, trust, association, limited liability company, unincorporated organization, other entity, or Governmental Body or subdivision, agency, commission or authority thereof.

"Personal Property" has the meaning assigned to that term in Section 2.1(a).

"Petition Date" has the meaning assigned to that term in the Preamble.

"Post-Petition Inventory" means all Inventory purchased by the Sellers during the period from the Petition Date to the Closing Date only to the extent such Inventory (a) (i) is en-route from the U.S. port to the Warehouse Locations or (ii) is located at the Warehouse Locations, prior to or on the Closing Date (whether it has been fully paid or not), (b) is Free and Clear and (c) has not been sold by the Sellers prior to or on the Closing Date, with such amount determined in accordance with the Accounting Methodology.

"Pre-Closing Tax Period" means any tax period ending on or before the Closing Date and the portion of any Straddle Period ending on the Closing Date.

"Pre-Petition In-Transit Inventory" means the Inventory set forth on Schedule 1.1(b) owned by the Sellers not located in the Warehouse Locations as of the Petition Date only to the extent such Inventory (a) (i) is en-route from the U.S. port to the Warehouse Locations or (ii) is located at the Warehouse Locations, prior to or on the Closing Date (whether it has been fully paid or not), (b) is Free and Clear and (c) has not been sold by the Sellers prior to or on the Closing Date, with such amount determined in accordance with the Accounting Methodology.

"<u>Pre-Petition On-Hand Inventory</u>" means the Inventory owned by the Sellers located in the Warehouse Locations as of the Petition Date with such amount determined in accordance with the Accounting Methodology.

"<u>Prepetition ABL Financing Agreement</u>" means that certain ABL Credit Agreement dated as of September 26, 2018 by and among Sellers, Wells Fargo Bank, as administrative agent and collateral agent, and the lenders and other parties thereto, as amended from time to time and as may be further amended from time to time.

"<u>Prepetition Financing Agreements</u>" means the Prepetition ABL Financing Agreement and the Prepetition Term Loan Financing Agreement.

"<u>Prepetition Lenders</u>" means the lenders under the Prepetition Financing Agreements.

"<u>Prepetition Secured Debt</u>" means any amounts payable to the Prepetition Lenders in respect of secured Indebtedness of Sellers.

"<u>Prepetition Term Loan Financing Agreement</u>" means that certain Amended and Restated Loan Agreement dated as of March 1, 2023 by and among Sellers, Owl Rock Capital Corporation, as administrative agent and collateral agent, and the lenders and other parties thereto, as amended from time to time and as may be further amended from time to time.

"<u>Proceeding</u>" means any action, arbitration, audit, collection action, hearing, investigation, litigation, proceeding or suit (whether civil, criminal, administrative or investigative) commenced, brought, conducted, heard by or before, or otherwise involving (a) any Governmental Body, (b) any citizen suit brought on behalf of the public or a Governmental Body, (c) any private arbitration, mediation or other alternative dispute resolution body or (d) any other Person.

"<u>Purchase Price</u>" has the meaning assigned to that term in <u>Section 2.6(a)(i)</u>.

"<u>Purchase Price Adjustment Resolution Period</u>" has the meaning assigned to that term in <u>Section 2.6(b)(ii)(B)</u>.

"<u>Purchase Price Adjustment Review Period</u>" has the meaning assigned to that term in <u>Section 2.6(b)(ii)(A)</u>.

"<u>Purchaser</u>" has the meaning assigned to that term in the Preamble.

"<u>Purchaser Adjustment Report</u>" has the meaning assigned to that term in <u>Section 2.6(b)(i)</u>.

"<u>Purchaser Plans</u>" has the meaning assigned to that term in <u>Section 6.9(c)</u>.

"<u>Registered Assigned IP</u>" has the meaning assigned to that term in <u>Section 4.5(a)</u>.

"Registered IP" means any and all Intellectual Property that is registered, filed or issued (or for which an application is pending for registration, filing or issuance) under the authority of, with or by any Governmental Body (or, in the case of internet URLs and domain names, under the authority of any authorized private registrar).

"Rejection Notice" has the meaning assigned to that term in Section 2.10(c).

"Related Claims" means all claims or causes of action (whether in contract or tort, in law or in equity, or granted by statute or otherwise) that may be based upon, arise out of or relate to this Agreement, the Ancillary Agreements and any other document or instrument delivered pursuant to this Agreement or the Ancillary Agreements, or the negotiation, execution, termination, validity, interpretation, construction, enforcement, performance or nonperformance of this Agreement or the Ancillary Agreements or otherwise arising from the Transactions (including any claim or cause of action based upon, arising out of or related to any representation or warranty made in or in connection with, or as an inducement to enter into, this Agreement or the Ancillary Agreements).

"Retained Employee Costs" the aggregate amount of any Liabilities (including benefits) exclusively related to the Retained Employees that are not Transferred Employees accrued from and after the Petition Date and, with respect to any such individual Retained Employee, up to five (5) days following Sellers receipt of notice from Purchaser that such Retained Employee will not be a Transferred Employee, that remain outstanding and unpaid as of the Closing Date and were incurred in the ordinary course of business.

"Retained Employee(s)" has the meaning assigned to that term in Section 6.9(a).

"Security Incident" means any unauthorized processing of Sellers' data, any unauthorized access or disruption to the Sellers' IT systems, or any incident that may require notification to any Person under Data Protection Requirements.

"Seller" or "Sellers" has the meaning assigned to that term in the Preamble.

"Software" means computer software (including software implementations of algorithms, models and methodologies, whether in source code or object code, HTML code and firmware and other software embedded in hardware devices), data files, source and object codes, technical components, application programming interfaces, tools, user interfaces, manuals and other specifications and documentation and all know-how relating thereto, in each case with respect to any environment (including development, testing, production, distribution, maintenance and support).

"Specified Vendor Costs" means the aggregate amount of any Liabilities incurred and accrued after the Petition Date by Sellers to the Specified Vendors that qualify as administrative claims, net of any defenses or rights of offset, against the Sellers under 503 of the Bankruptcy Code and which remain outstanding and unpaid as of the Closing Date and constitute an Assumed Liability related to an Assigned Contract, if such liability arises under a Contract. For the avoidance of doubt, Cure Amounts other than such administrative claims against the Sellers related to such Assigned Contracts shall not be Specified Vendor Costs and shall not reduce the Purchase Price as set forth in Section 2.6.

12

"Specified Vendors" means the vendors or other parties set forth in Schedule 1.1(c).

"Straddle Period" means any taxable period beginning before and ending after the Closing.

"Subsidiary" means, with respect to any Person, any other Person a majority of the outstanding voting securities or other voting Equity Interests of which is owned, directly or indirectly, by such first Person.

"Target Accounts Receivable" means $7,527,343.

"Target Pre-Petition On-Hand Inventory" means $27,499,202.

"Tax" or "Taxes" means (i) any federal, state, local, or foreign income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental, custom duties, capital stock, franchise, profits, withholding, social security (or similar excises), unemployment, disability, tariff, escheat or unclaimed property, ad valorem, real property, personal property, sales, use, transfer, registration, value added, alternative or add-on minimum, estimated, or other tax of any kind whatsoever, including any interest, penalty, or addition thereto (or relating to an obligation to file a Tax Return), whether disputed or not, by any Governmental Body responsible for imposition of any such tax (domestic or foreign); or (ii) any liability of Sellers for the payment of amounts with respect to payments of a type described in clause (i) as a result of being a member of an affiliated, consolidated, combined or unitary group, or as a result of any obligation of Sellers under any Tax sharing arrangement, Tax indemnity agreement or similar Contracts, as a transferee or successor, by Contract or operation of Law or otherwise.

"Tax Proceeding" means any audit, request for information, investigation, hearing, litigation, claim, legal action, judicial contest or other dispute relating to Taxes.

"Tax Return" means any return, declaration, information report, election, claim for refund or filing with respect to Taxes, including any schedules, supplements or attachments thereto and including any amendment thereof.

"Transactions" has the meaning assigned to that term in Section 2.4.

"Transfer Taxes" has the meaning assigned to that term in Section 6.10(a).

"Transferred Employees" has the meaning assigned to that term in Section 6.9(a).

"Trustee" means any trustee or fiduciary appointed to act on behalf of the Debtors or as successor to the Debtors.

"Unfulfilled Customer Orders" means customer orders made through Sellers' website, which are paid on credit and for which there is an outstanding accounts receivable on the Closing Date, but for which the Company has not yet released inventory in respect to such order.

"Unfulfilled Customer Order Inventory" means on-hand Inventory attributable to Unfulfilled Customer Orders.

"Warehouse Locations" means those locations set forth in Schedule 1.1(d).

"WARN Act" means federal Worker Adjustment and Retraining Notification Act or any similar state, local or foreign law.

## ARTICLE II
## SALE AND PURCHASE OF ASSETS; CONSIDERATION

2.1    **Sale and Purchase of Assets**. On the terms and subject to the conditions set forth in this Agreement, on the Closing Date, Purchaser shall purchase from Sellers, and Sellers shall sell, assign, transfer, convey and deliver to Purchaser, all of each Seller's right, title and interest in and to all assets, properties, rights, interests, benefits and privileges of whatever kind or nature, both tangible and intangible, real and personal, wherever located, whether owned or leased, that are used by Sellers in connection with the operation of the Business (except for the Excluded Assets), to the extent transferable under applicable Law, the Bankruptcy Code or otherwise, as those assets, properties, rights, interests, benefits and privileges exist on the Closing Date, Free and Clear. Without limiting the foregoing, the assets, properties, rights, interests, benefits and privileges sold, assigned, transferred, conveyed and delivered by Sellers hereunder (collectively, the "Acquired Assets") shall include all of each Seller's right, title and interest in and to the following:

(a)    all tangible personal property, including all machinery, equipment (including all transportation and office equipment), vehicles, computers, mobile phones, personal digital assistants, fixtures, trade fixtures, computer equipment, hardware, peripherals, information technology infrastructure, telephone systems, furniture, office supplies, production supplies, spare parts, other miscellaneous supplies, and other tangible personal property of any kind owned by Sellers, wherever located, including all such items which are located in any building, warehouse, office or other space leased, owned or occupied by Sellers or any other space where any of Sellers' properties or any other assets maybe situated, in each case, except as set forth on Schedule 2.1(a) (collectively, "Personal Property");

(b)    without duplication, all Pre-Petition On-Hand Inventory, Pre-Petition In-Transit Inventory and Post-Petition Inventory, but excluding any and all Excluded Inventory;

(c)    all rights, claims and causes of action of Sellers against third parties relating primarily to the Acquired Assets and the Assumed Liabilities existing on or after the Closing Date (including all guaranties, warranties, indemnities, and similar rights in favor of Sellers to the extent related to the Acquired Assets or the Assumed Liabilities) except to the extent they are Excluded Assets (the "Acquired Claims");

(d)    subject to Section 2.2(m), all books and records of Sellers relating primarily to the Acquired Assets, including production records, accounting records, Tax records, financial records, property records, mailing lists, marketing plans and market research, sales and purchase correspondence and customer and vendor lists, *provided* that Sellers may obtain, at their own expense, copies of any or all such books and records before their transfer to Purchaser; *provided, further* that Sellers may retain any and all documents they determine, in their reasonable discretion,

14

to be relevant to any causes of action that constitute Excluded Assets provided that they provide copies and reasonable access to any such documents;

(e)       all intangible personal property owned or held by Sellers, but in all cases only to the extent of Sellers' interest and only to the extent transferable including, without limitation, the customer and supplier relationships of the Business, the goodwill of the Business, processes, catalogues, customer lists and other customer data bases, advertising materials, and telephone numbers identified with the Business;

(f)       all Intellectual Property in which Sellers have (or purport to have) an ownership interest of any nature (whether exclusively, jointly with another Person or otherwise) and transferrable to Purchaser without cost to Sellers in accordance with Sections 363 and 365 of the Bankruptcy Code (the "Assigned IP");

(g)       all Contracts, agreements, licenses (to the extent transferable), leases, warranties, commitments, and purchase and sale orders set forth on Schedule 2.1(g), in each case, to the extent transferable to Purchaser without cost to Sellers in accordance with Section 365 of the Bankruptcy Code (collectively, "Assigned Contracts"); and provided, further, that Purchaser shall have provided adequate assurance of future performance under Section 365(b)(1)(C) of the Bankruptcy Code with respect to any Assigned Contract;

(h)       all Governmental Authorizations and all pending applications therefor or renewals thereof, in each case to the extent transferable to Purchaser and excluding Governmental Authorizations or pending applications therefor required for the continued operation of an Excluded Asset;

(i)       all Accounts Receivable (including any credit card receivables) arising or accrued prior to Closing;

(j)       to the extent transferrable, any Permits held by any Seller;

(k)       all IT systems to the extent transferable in accordance with Sections 363 and 365 of the Bankruptcy Code, other than those set forth on Schedule 2.1(k), provided, that in respect to any IT system that is not an Acquired Asset, Sellers shall provide reasonable access to any such IT system during the transition period set forth in Schedule 6.13 and with respect to any IT system that is an Acquired Asset, Sellers shall be permitted to clone an instance or otherwise copy any such IT system before the Closing Date; and

(l)       all pre-petition deposits and prepaid items to the extent relating to the Acquired Assets, including all prepaid rentals, prepaid expenses, prepaid maintenance and supplies, prepaid freight, holdbacks (including ordinary credit card holdback payments or protection reserves), security and unbilled charges, fees and deposits, except to the extent relating to the Estate or any Excluded Liabilities;

(m)       all other assets, properties and rights identified on Schedule 2.1(m).

2.2       **Excluded Assets**. Notwithstanding the provisions of Section 2.1 or any other provision of this Agreement, the Acquired Assets do not include, and Sellers shall not transfer to

15

Purchaser any of the following assets, properties, rights, interests, benefits and privileges (collectively, the "Excluded Assets"):

(a)    all cash, bank deposits, securities and cash equivalents, including for this purpose, all cash and cash equivalents if credited to Sellers' bank accounts prior to the Closing Date;

(b)    all Excluded Inventory;

(c)    all Contracts that are not Assigned Contracts;

(d)    the Personal Property set forth in Schedule 2.1(a);

(e)    all corporate minute books and records of internal corporate proceedings, stock transfer ledgers, blank stock certificates, corporate seals, tax and accounting records, work papers and other records relating to the organization or maintenance of the legal existence of each Seller;

(f)    all records that Sellers are required by law to retain;

(g)    all deposits and prepaid items that relate to the Estate, Excluded Assets or Excluded Liabilities, including all prepaid insurance, prepaid Taxes, letters of credit and bonds and prepaid charges and deposits for utilities;

(h)    all Estate Causes of Action, including, without limitation, the actions set forth on Schedule 2.2(h) or that relate in any way to or that could have been pursued in those actions;

(i)    all Equity Interests, or interests convertible into or exchangeable for Equity Interests, held by any Seller including any such interests of any Seller in another Seller;

(j)    all rights, title and interest in and to the leases, subleases, tenancy agreements, licenses or other rights of occupation (written or oral) affecting any real property used or occupied, or permitted to be used or occupied, listed on Schedule 2.2(j) (collectively, "Leased Real Property");

(k)    (i) all Employee Benefit Plans (A) all rights in connection with the funding of any obligation under any Employee Benefit Plan and (B) all trusts and other assets attributable thereto and (ii) all other assets arising out of or directly or indirectly relating to or any other employee benefit or compensation plan, program, policy or arrangement presently or formerly maintained, contributed to (obligated to be contributed to) or entered into by any Seller or any of their Affiliates or ERISA Affiliates, or with respect to which any Seller or any of their ERISA Affiliates has or could reasonably be expected to have any actual or contingent Liability;

(l)    all assets, properties and rights identified on Schedule 2.2(l);

(m)    all books and records of Sellers primarily unrelated to the Acquired Assets and Assumed Liabilities, including any books and records relevant to causes of action that constitute Excluded Assets;

(n)    any attorney-client or otherwise privileged information arising from or reflecting communications between and among any Seller or their Subsidiaries (including any one or more officers, directors, employees or stockholders), on the one hand, and its or their internal or external counsel, on the other hand;

(o)    the IT systems set forth on Schedule 2.1(k); and

(p)    all Insurance Policies.

2.3    **Assumed Liabilities**. Upon the terms and subject to the conditions set forth herein, at the Closing, Purchaser shall assume and shall timely perform and discharge in accordance with their respective terms (a) all Liabilities and Cure Amounts with respect to the Assigned Contracts, (b) all Liabilities (including for any Tax) that arise on or after the Closing Date with respect to Purchaser's ownership or operation of the Acquired Assets on and after the Closing, (c) all Liabilities arising from the employment of Transferred Employees by Purchaser or any of its Affiliates after the Closing for wages, compensation, bonuses, deferred compensation, overtime, benefits workers' compensation, sick pay, vacation, personal days and severance benefits that are on account of events, matters and circumstances occurring after the Closing, (d) the Specified Vendor Costs, (e) Unfilled Customer Orders; and (f) all Transfer Taxes not otherwise exempt under the Final Order pursuant to Section 6.10(a) (collectively "Assumed Liabilities").

2.4    **Excluded Liabilities**. Purchaser, by its execution and delivery of this Agreement and the Ancillary Agreements and its performance of the transactions contemplated by this Agreement and the Ancillary Agreements (the "Transactions"), shall not assume and will not be obligated to assume or be obligated to pay, perform or otherwise discharge or in any way be liable or responsible for any Liability whatsoever (including, for the avoidance of doubt, Excluded Taxes and any and all claims entitled to administrative expense priority under Section 503(b)(9) of the Bankruptcy Code), whether existing on or prior to the Closing or arising thereafter, other than the Assumed Liabilities (collectively, the "Excluded Liabilities").

2.5    **Right to Modify Classification of Assets and Liabilities**. At any time up to five (5) Business Days prior to the Closing Date, Purchaser shall have the right, in its sole discretion and upon written notice to Sellers, to add or remove any Contract from the definition of Acquired Assets or Excluded Assets.  Upon delivery of such written notice by Purchaser to Sellers, Sections 2.1, 2.2, 2.3 and 2.4, as applicable, and any related schedules to this Agreement shall be deemed amended automatically to reflect such additions or removals, and the Parties shall cooperate reasonably and in good faith to execute any further documents necessary to effectuate such changes. For the avoidance of doubt, any such additions or removals shall not result in any adjustment to the Purchase Price.

2.6    **Consideration**.

    (a)    <u>Purchase Price</u>.

        (i)    In consideration of the sale of the Acquired Assets to Purchaser, and upon the terms subject to the conditions set forth in this Agreement, the purchase price (the "<u>Purchase Price</u>") for the Acquired Assets shall be equal to the sum of: (A) Twenty Million Dollars ($20,000,000.00) (the "<u>Base Purchase Price</u>"), subject to this <u>Section 2.6</u>, *plus* (B) the assumption of the Assumed Liabilities by Purchaser.

        (ii)    At least five (5) Business Days prior to the Closing Date, Sellers shall prepare and deliver to Purchaser a written report (the "<u>Closing Date Report</u>") setting forth in reasonable detail Sellers' good faith estimate of the following amounts, each as of the Effective Time: (A) Accounts Receivable (the "<u>Estimated Accounts Receivable</u>"); (B) Pre-Petition On-Hand Inventory ("<u>Estimated Pre-Petition On-Hand Inventory</u>"); (C) Pre-Petition In-Transit Inventory ("<u>Estimated Pre-Petition In-Transit Inventory</u>"); (D) Post-Petition Inventory ("<u>Estimated Post-Petition Inventory</u>"); (E) the Specified Vendor Costs ("<u>Estimated Specified Vendor Costs</u>") (F) the Retained Employee Costs ("<u>Estimated Retained Employee Costs</u>"); and (G) Unfilled Customer Order Inventory (the "<u>Estimated Unfilled Customer Order Inventory</u>"). Sellers shall make available to Purchaser and its representatives reasonable access during normal business hours to all relevant personnel, representatives of Sellers, books and records of the Business and other items reasonably requested by Sellers in connection with Purchaser's review of the Closing Date Report.

        (iii)    On the Closing Date, subject to <u>Schedule 2.12</u>, Purchaser shall pay in cash to Sellers, by wire transfer of immediately available funds into one or more accounts designated by Sellers, the sum of: (A) the Base Purchase Price, *less* (B) the Deposit, *less* (C) 75% *multiplied by* the amount, if any, that Estimated Accounts Receivable is less than the Target Accounts Receivable, *plus* (D) 75% *multiplied by* the amount, if any, that Estimated Accounts Receivable is more than the Target Accounts Receivable, *less* (E) 52% *multiplied by* the amount, if any, that Estimated Pre-Petition On-Hand Inventory is less than the Target Pre-Petition On-Hand Inventory, *plus* (F) the Estimated Pre-Petition In-Transit Inventory, *plus* (G) the Estimated Post-Petition Inventory, *less* (H) the Estimated Specified Vendor Costs, *plus* (I) the Estimated Retained Employee Costs, *less* (J) 52% *multiplied by* the Estimated Unfilled Customer Order Inventory (collectively, the "<u>Cash Payment</u>").

    (b)    <u>Determination of Final Purchase Price</u>.

        (i)    As soon as reasonably practicable following the Closing Date (but no later than sixty (60) days after the Closing Date), Purchaser shall deliver to Sellers a statement (the "<u>Purchaser Adjustment Report</u>") setting forth in reasonable detail Purchaser's good-faith calculation of Cash Payment, including each of clauses (A)-(J) of the definition of Cash Payment, in each case, as of the Effective Time.

        (ii)    The following procedures shall apply with respect to the review of the Purchaser Adjustment Report:

            (A)    Sellers shall have a period of thirty (30) days after receipt by Sellers of Purchaser Adjustment Report to review the Purchaser Adjustment Report (the "<u>Purchase Price Adjustment Review</u>

Period"). During the Purchase Price Adjustment Review Period, Purchaser shall make available to Sellers and their representatives reasonable access during normal business hours to all relevant personnel, representatives of Purchaser, books and records of the Business and other items reasonably requested by Sellers in connection with Sellers' review of the Purchaser Adjustment Report and any dispute with respect thereto as contemplated by this Section 2.6(b).

(B)   If Sellers do not deliver to Purchaser a written statement describing any objections Sellers have to the Purchaser Adjustment Report (a "Notice of Disagreement") on or before the final day of the Purchase Price Adjustment Review Period, then Sellers shall be deemed to have irrevocably accepted such Purchaser Adjustment Report, and such Purchaser Adjustment Report shall be deemed to be the "Final Adjustment Report" for purposes of the payment (if any) contemplated by Section 2.6(b)(iii). If Sellers deliver to Purchaser a Notice of Disagreement on or before the final day of the Purchase Price Adjustment Review Period, then Purchaser and Sellers shall attempt to resolve in good faith the matters contained in the Notice of Disagreement within thirty (30) days after Purchaser's receipt of the Notice of Disagreement (the "Purchase Price Adjustment Resolution Period"). If Purchaser and Sellers reach a resolution with respect to such matters on or before the final day of the Purchase Price Adjustment Resolution Period, then Purchaser Adjustment Report, as modified by such resolution, shall be deemed to be the "Final Adjustment Report" for purposes of the payment (if any) contemplated by Section 2.6(b)(iii).

(C)   If such a resolution is not reached on or before the final day of the Purchase Price Adjustment Resolution Period, then Purchaser and Sellers shall promptly (and in any event no later than five (5) Business Days after the last day of the Purchase Price Adjustment Resolution Period) retain the Neutral Firm (including by executing a customary agreement with the Neutral Firm in connection with its engagement) and submit any unresolved objections covered by the Notice of Disagreement (the "Disputed Items") to the Neutral Firm for resolution in accordance with this Section 2.6(b)(ii)(C). The Neutral Firm will be instructed to (i) make a final determination on an expedited basis (and in any event within thirty (30) days after submission of the Disputed Items) with respect to each of the Disputed Items (and only the Disputed Items) that is within the range of the respective positions taken by each of Purchaser and Sellers and (ii) prepare and deliver to Purchaser and Sellers a written

statement setting forth its final determination (and a reasonably detailed description of the basis therefor) with respect to each Disputed Item (the "Neutral Firm's Report"). During the ten (10) days after submission of the Disputed Items to the Neutral Firm, each of Purchaser and Sellers may provide the Neutral Firm with a definitive statement in writing of their respective positions with respect to the Disputed Items (and only the Disputed Items). The Neutral Firm will be provided with reasonable access to the books and records of Purchaser and Sellers for purposes of making its final determination with respect to the Disputed Items, and Purchaser and Sellers shall otherwise reasonably cooperate with the Neutral Firm in connection therewith. Each of Purchaser and Sellers agrees that (w) the Neutral Firm's determination with respect to each Disputed Item as reflected in the Neutral Firm's Report shall be deemed to be final, conclusive, binding and non-appealable, absent Fraud or manifest error, (x) Purchaser Adjustment Report, as modified by any changes thereto in accordance with the Neutral Firm's Report, shall be deemed to be the "Final Adjustment Report" for purposes of the payment (if any) contemplated by Section 2.6(b)(iii), (y) the procedures set forth in this Section 2.6(b)(ii) shall be the sole and exclusive remedy with respect to the final determination of the Final Adjustment Report and (z) the Neutral Firm's determination under this Section 2.6(b)(ii)(C) shall be enforceable as an arbitral award, and judgment may be entered thereupon in any court having jurisdiction over the Party against which such determination is to be enforced. The Cash Payment as of the Effective Time and as set forth in the Final Adjustment Report shall be deemed the "Final Cash Payment".

(D)   Each of Purchaser and Sellers shall (i) pay their own respective costs and expenses incurred in connection with this Section 2.6(b) and (ii) be responsible for 50% of the fees and expenses of the Neutral Firm.

(iii)   Within two (2) Business Days after the determination of the Final Adjustment Report in accordance with this Section 2.6(b) (including by failure to timely deliver a Notice of Disagreement):

(A) if the Additional Payment Amount is a positive number, then Purchaser shall pay an amount in cash equal to the Additional Payment Amount to Sellers by wire transfer of immediately available funds to an account of Sellers designated in writing by Sellers to Purchaser; or

(B)   if the Additional Payment Amount is a negative number, then Sellers shall pay an amount in cash equal to the absolute

value of the Additional Payment Amount to Purchaser by wire transfer of immediately available funds to an account of Purchaser designated in writing by Purchaser to Sellers.

(iv)    For purposes hereof, "<u>Additional Payment Amount</u>" means the Final Cash Payment *minus* the Cash Payment made by Purchaser in connection with the Closing (for the avoidance of doubt, the Additional Payment Amount may be a negative number).

(v)    Notwithstanding any provision herein to the contrary, pending final resolution of the Additional Payment Amount, the amount of five hundred thousand dollars ($500,000.00) (the "<u>Holdback Amount</u>") shall be held back from the Deposit and continue to be held in escrow by the Escrow Agent solely for the purpose of satisfying any payment obligation of the Sellers pursuant to <u>Section 2.6(b)(iii)(B)</u>. If the Additional Payment Amount is a positive number, the Holdback Amount shall be promptly released to Sellers. If the Additional Payment Amount is a negative number, the lesser of (A) the Holdback Amount or (B) the absolute value of the Additional Payment Amount that portion of the Holdback Amount, shall be promptly released to the Purchaser and following such release any remaining Holdback Amount shall be promptly released to Sellers.

2.7    **Deposit**.

(a)    Purchaser has, on or prior to the date hereof, made an earnest money deposit with Epiq Corporate Restructuring, LLC (the "<u>Escrow Agent</u>") in the amount of Two Million Five Hundred Thousand Dollars ($2,500,000.00), representing twelve and a half percent (12.5%) of the Base Purchase Price (together with any interest, dividends, gains and other income earned with respect to such earnest money deposit, the "<u>Deposit</u>"), by wire transfer of immediately available funds for deposit into a separate escrow account, established pursuant to an escrow agreement. The Deposit shall not be subject to any Lien, attachment, trustee process, or any other judicial process of any creditor of any of Sellers or Purchaser and shall be applied against payment of the Cash Payment on the Closing Date.

(b)    If this Agreement has been terminated by Sellers pursuant to <u>Section 7.1(b)</u> (at no fault of Sellers) or <u>7.1(e)</u>, then Sellers shall retain the Deposit together with all received investment income.

(c)    If this Agreement has been terminated by any Party, other than as contemplated by <u>Section 2.7(b)</u>, then the Deposit, together with all received investment income, if any, shall be returned to Purchaser within three (3) Business Days after such termination.

(d)    The Parties hereto agree that Sellers' right to retain the Deposit, as set forth in <u>Section 2.7(b)</u>, is not a penalty, but rather is liquidated damages in a reasonable amount that will compensate Sellers for their respective efforts and resources expended and the opportunities foregone while negotiating this Agreement and in reliance on this Agreement and on the expectation of the consummation of the Transactions, which amount would otherwise be impossible to calculate with precision.

2.8    **Non-Transferrable Acquired Assets**. Notwithstanding any other provision of this Agreement to the contrary, this Agreement shall not constitute an agreement to assign any Acquired

Asset or any right thereunder if an attempted assignment, without the consent of a Governmental Body, would constitute a breach or in any way adversely affect the rights of Purchaser or any Seller thereunder. Sellers shall use reasonable best efforts to obtain such consent prior to Closing and for so long as the Chapter 11 Cases are ongoing. If such consent is not obtained or such assignment is not attainable pursuant to an Order of the Bankruptcy Court under Sections 105, 363 and/or 365 of the Bankruptcy Code, in form and substance acceptable to Sellers and Purchaser, then such Acquired Assets shall not be transferred hereunder, and the Closing shall proceed with respect to the remaining Acquired Assets.

2.9     **Cure Payments**. At the Closing, Purchaser shall pay all Cure Amounts in connection with the assumption and assignment of Assigned Contracts.  Sellers have provided to Purchaser a schedule set forth on Schedule 2.9 (the "Cure Amount Schedule") setting forth a good faith estimate of all Cure Amounts for all Contracts to which Seller is party, which schedule Sellers may update prior to the date that is five (5) days prior to the Closing Date. Sellers shall use commercially reasonable efforts to provide, as soon as reasonably practicable and no later than 30 days following the Petition Date, a schedule containing the wire information and contact information for each party entitled to receive any Cure Amounts and, prior to the Closing, Sellers and Purchaser shall cooperate in good faith to establish a protocol for the payment by Sellers of the Cure Amounts as of the Closing.

2.10    **Designation Rights**.

(a)     Purchaser shall have the right, by written notice to Sellers no later than five (5) Business Days prior to the Closing Date, to specify that any Contracts to which a Seller is party shall be held by Sellers and not rejected pursuant to Section 365 of the Bankruptcy Code (such asset or liabilities, a "Designation Right Contract") for the duration of the Designation Rights Period; *provided that*, with respect to any such Designation Right Contract, (i) Purchaser shall promptly reimburse or advance Sellers on demand, and thereby be solely responsible for, all costs associated with the continuation by, and ultimate assumption or rejection by, Sellers of such Designation Right Contract (as set forth in a budget proposed by Sellers and approved by Purchaser no later than three (3) Business Days prior to the Closing Date for the period from the Closing through the end of the Designation Rights Period (such costs, "Continuation Costs")); (ii) all cash collected by Sellers in respect of, and other benefits deriving from, such Designation Right Contract shall be promptly delivered to Purchaser, provided that Sellers shall be entitled to deduct Continuation Costs from any cash collected by Sellers in respect of the Designation Right Contract giving rise to such costs; and (iii) the foregoing shall not affect the validity of the transfer to Purchaser of any other Acquired Asset that may be related to such Designation Right Contract. In the event that the costs associated with any Designation Right Contract exceed the budgeted Continuation Costs attributable to such Designation Right Contract (a "Designation Cost Overage"), Purchaser shall have the right to, by written notice to Sellers, provide a Rejection Notice with respect to such Designation Right Contract, in which case Sellers shall be liable for such Designation Cost Overage from and after the date of such Rejection Notice from Purchaser. For the avoidance of doubt, in the event Sellers are required to employ or otherwise engage any persons, or continue the employment or engagement of any persons, solely to perform obligations under a Designation Right Contract during the Designation Rights Period, the costs of any such persons shall constitute Continuation Costs.  In the event Purchaser fails to promptly advance or

reimburse Sellers in respect to any Continuation Costs, Sellers shall have the right to reject, liquidate or otherwise terminated the applicable Designation Right Contract.

(b)      As to each Designation Right Contract, as soon as practical after receiving further written notice(s) (each, an "Assumption Notice") from Purchaser during the Designation Rights Period requesting assumption and assignment of any Designation Right Contract, Sellers shall, subject to Purchaser's demonstrating adequate assurance of future performance thereunder, take all actions required by the Approval Order or otherwise that are reasonably necessary to seek to assume and assign to Purchaser pursuant to Section 365 of the Bankruptcy Code any Designation Right Contract(s) set forth in an Assumption Notice.

(c)      As to each Designation Right Contract, as soon as practical after receiving further written notice(s) (each, a "Rejection Notice") from Purchaser during the Designation Rights Period requesting rejection of any Designation Right Contract, Sellers shall take all actions required by the Approval Order or otherwise that are reasonably necessary to reject such contract pursuant to Section 365 of the Bankruptcy Code.

(d)      Sellers and Purchaser agree and acknowledge that the covenants set forth in this Section 2.10 shall survive the Closing.

(e)      Notwithstanding anything in this Agreement to the contrary, on the date any Designation Right Contract is assumed and assigned to Purchaser pursuant to this Section 2.10(e), such Designation Right Contract shall be deemed an Acquired Asset or Assumed Liability, as applicable, for all purposes under this Agreement and no further consideration shall be required to be paid for any Designation Right Contract that is assumed and assigned to Purchaser.

2.11    **Withholding**.    Purchaser shall be entitled to deduct and withhold from the consideration or other payment otherwise payable pursuant to this Agreement to any Seller or any other Person such amounts as is required by law to deduct and withhold with respect to the making of such payment. To the extent that amounts are so withheld, such withheld amounts shall be treated for all purposes of this Agreement as having been paid to the Person in respect of whom such deduction and withholding was made.

2.12    **Shared Costs.**  Purchaser and Sellers agree to pay the costs and expenses set forth on Schedule 2.12 in accordance with Schedule 2.12.

2.13    **Allocation**.  For U.S. federal and applicable state and local income Tax purposes, Purchaser, Sellers, and their respective Affiliates shall allocate the Purchase Price (and any Assumed Liabilities or other amounts treated as part of the purchase price for U.S. federal income Tax purposes) among the Acquired Assets in accordance with the Allocation (as defined below). No later than ninety (90) days following the determination of the final Purchase Price, Purchaser shall provide an allocation to Sellers setting forth the allocation of the Purchase Price (and other amounts treated as part of the purchase price for U.S. federal income Tax purposes) among the Acquired Assets in accordance with Section 1060 of the Code and Treasury regulations promulgated thereunder (the "***Allocation***") to Sellers. The Parties and their respective Affiliates shall file all Tax Returns (including IRS Form 8594) in accordance with such agreed Allocation (as finally determined under this Section 2.13) and not take any position in any Tax Returns or Tax-

related Actions inconsistent with the Allocation, in each case, unless otherwise required by a "determination" within the meaning of Section 1313(a) of the Code.

# ARTICLE III
## CLOSING; CONDITIONS TO CLOSING

3.1    **Closing**. Subject to the terms and conditions of this Agreement, the closing (the "Closing") of the sale and purchase of the Acquired Assets and the assumption of the Assumed Liabilities shall take place on the date that is three (3) Business Days after the date on which all of the conditions set forth in this Article III are satisfied (excluding conditions that, by their terms, are to be satisfied at the Closing, but subject to the satisfaction or waiver of all such conditions at the Closing), at a location to be specified by Sellers or remotely if agreed by Sellers and Purchaser. The time and date upon which the Closing occurs is referred to herein as the "Closing Date." All transactions at the Closing shall be deemed to take place simultaneously and none shall be deemed to have taken place until all shall have taken place. At or prior to the Closing, Purchaser shall have delivered the Deposit in accordance with Section 2.7(a) and shall have provided Sellers with written wire instructions for payment of the Cash Payment in accordance with Section 2.6. The Closing shall be deemed to occur at 12:01am on the Closing Date (the "Effective Time").

3.2    **Court Approval Required**. Purchaser and Sellers acknowledge and agree that the Bankruptcy Court's entry of the Approval Order shall be required in order to consummate the Transactions, and that the requirement that the Approval Order be entered is a condition that cannot be waived by any party hereto.

3.3    **Conditions to Obligations of Purchaser**. The obligation of Purchaser to consummate the transactions contemplated by this Agreement is subject to the satisfaction, at or before the Closing, of each of the following conditions, any of which conditions may, except for the condition set forth in Section 3.2, be waived by Purchaser in its sole discretion:

(a)    Representations and Warranties. (i) The representations and warranties of Sellers set forth in Section 4.1, Section 4.2 and Section 4.4 and Section 4.13 shall be true and correct in all respects (without giving effect to any qualifications or limitations as to materiality, including "Material Adverse Effect") and (ii) each of the other representations and warranties of Sellers set forth in Article IV of this Agreement shall be true and correct in all material respects (except for those representations and warranties qualified by materiality, which shall be true and correct in all respects) on the date of this Agreement and on and as of the Closing Date, as though made on and as of the Closing Date (except for representations and warranties made as of a specified date, which shall be true and correct only as of the specified date).

(b)    Agreements and Covenants. Sellers shall have performed and complied with each material agreement, covenant and obligation required to be performed or complied with by them under this Agreement at or before the Closing in all material respects.

(c)    Deliveries at Closing. Purchaser shall have received from Sellers the closing deliverables required to be delivered by Sellers pursuant to Section 3.6.

(d)    Schedules. The final Schedules prepared by Sellers and attached to this Agreement shall be in form and substance reasonably acceptable to Purchaser.

24

(e) <u>Approval Order</u>. The Bankruptcy Court shall have entered the Approval Order that includes customary release language for the benefit of Purchaser from Sellers (but shall not release the Sellers from any post-Closing covenants contemplated by this Agreement), which shall have become a Final Order; *provided, however*, that Closing shall occur within one (1) Business Day of entry of the Approval Order if the Approval Order contains a waiver of the fourteen (14) day stay under Federal Rule of Bankruptcy Procedure 6004, the Approval Order need not be a Final Order.

(f) <u>Consents</u>. All material consents, authorizations, or approvals required to be obtained from any Governmental Body set forth on <u>Schedule 4.3</u> shall have been obtained and be in full force.

(g) <u>No Material Adverse Effect</u>. Since the date hereof, no Material Adverse Effect shall have occurred.

3.4 **Conditions to Obligations of Sellers**. The obligation of Sellers to consummate the Transactions is subject to the satisfaction, at or before the Closing, of each of the following conditions, any of which conditions may, except for the condition set forth in <u>Section 3.2</u>, be waived by Sellers in their sole discretion:

(a) <u>Representations and Warranties</u>. The representations and warranties of Purchaser set forth in <u>Article V</u> of this Agreement shall be true and correct in all material respects (except for those representations and warranties qualified by materiality, which shall be true and correct in all respects) on the date of this Agreement and on and as of the Closing Date, as though made on and as of the Closing Date (except for representations and warranties made as of a specified date, which shall be true and correct only as of the specified date).

(b) <u>Agreements and Covenants</u>. Purchaser shall have performed and complied with each agreement, covenant and obligation required to be performed or complied with by it under this Agreement at or before the Closing in all material respects.

(c) <u>Orders</u>. The Bankruptcy Court shall have entered the Approval Order.

(d) <u>Payment</u>. Purchaser shall have delivered the Deposit in accordance with <u>Section 2.6(a)</u> and shall have paid the Cash Payment by wire transfer of immediately available funds in accordance with <u>Section 2.6</u>.

(e) <u>Deliveries at Closing</u>. Sellers shall have received from Purchaser the closing deliverables required to be delivered by Purchaser pursuant to <u>Section 3.6</u>.

(f) <u>Consents</u>. All consents, authorizations, or approvals required to be obtained from any Governmental Body set forth on <u>Schedule 4.3</u> shall have been obtained and be in full force.

3.5 **Delivery of Possession of Assets**. Right to possession of all Acquired Assets shall transfer to Purchaser at the Closing. Purchaser shall bear all risk of loss with respect to the Acquired Assets from and after the Closing.

3.6    **Closing Deliveries of the Parties**. At or prior to the Closing:

(a)    Purchaser and Sellers shall execute and deliver the Bill of Sale and Assignment and Assumption Agreement, the Contract Assignment Agreement and the IP Assignment Agreement.

(b)    Purchaser shall deliver, or cause to be delivered to Sellers each of the following:

(i)    a certificate, dated as of the Closing Date, executed by or on behalf of Purchaser as to the satisfaction of the conditions set forth in Section 3.4(a); and

(ii)    such other instruments of assumption and other instruments or documents, including bills of sale and/or assignment and assumption agreements, in form and substance reasonably acceptable to Sellers, as may be necessary to effect Purchaser's assumption of the Assumed Liabilities and the assignment of any Acquired Assets in accordance with the requirements of applicable Law and this Agreement, in each case duly executed by Purchaser.

(c)    Sellers shall deliver, or cause to be delivered to Purchaser each of the following:

(i)    a certificate, dated as of the Closing Date, executed by or on behalf of Sellers as to the satisfaction of the conditions set forth in Section 3.3(a);

(ii)    an IRS Form W-9, duly completed and; executed by each Seller or, in the case of any Seller that is disregarded as a separate entity from its owner for U.S. federal income Tax purposes, such Seller's regarded owner for U.S. federal income Tax purposes;

(iii)    a certificate of status, compliance, good standing or like respect evidencing the good standing of each Seller in its jurisdiction of organization, dated within five (5) Business Days of the Closing Date; and

(iv)    such other instruments of assumption and other instruments or documents, including bills of sale and/or assignment and assumption agreements, in form and substance reasonably acceptable to Sellers, as may be necessary to effect Purchaser's assumption of the Assumed Liabilities and the assignment of any Acquired Assets in accordance with the requirements of applicable Law and this Agreement, in each case duly executed by Sellers.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF SELLERS

Sellers, jointly and severally, represent and warrant to Purchaser that the statements contained in this Article IV are true and correct as of the date of this Agreement and will be true and correct in all material respects on the Closing Date (except for those representations and warranties qualified by materiality, which shall be true and correct in all respects).

4.1    **Organization, Good Standing and Power**. Each Seller is duly organized, validly existing and in good standing under the laws of the state of its formation. Subject to the applicable

provisions of the Bankruptcy Code, each Seller has the power to own, lease or operate its properties and assets to carry on its Business as now being conducted and is qualified or licensed to do business and in good standing in each jurisdiction in which the nature of its Business or the ownership, leasing or operation of its properties and assets makes such qualification or licensing necessary.

4.2 **Authority Relative to this Agreement; Execution and Binding Effect**. Each Seller has full power and authority to execute and deliver this Agreement and the Ancillary Agreements and, subject to receipt of any necessary Bankruptcy Court approval in accordance with the Bankruptcy Code, to consummate the Transactions. The execution and delivery of this Agreement and the Ancillary Agreements and the consummation of the Transactions have been duly and validly approved and adopted by the members, board of directors, or board of managers, as applicable, of each Seller, and, except for Bankruptcy Court approval or as set forth on Schedule 4.2, no other proceedings or approvals on the part of any Seller are necessary to approve this Agreement and the Ancillary Agreements and to consummate the Transactions. This Agreement has been duly and validly executed and delivered by each Seller. Assuming due authorization, execution and delivery by Purchaser, this Agreement constitutes, and each of the Ancillary Agreements at the Closing will constitute, the valid and binding obligation of Sellers, enforceable against Sellers in accordance with their terms, except as such enforcement may be limited by the effect of bankruptcy, insolvency, reorganization, receivership, conservatorship, arrangement, moratorium or other laws affecting or relating to the rights of creditors generally.

4.3 **Governmental and Other Consents**. Except as otherwise set forth on Schedule 4.3, the execution and delivery of this Agreement by Sellers does not and the execution and delivery of the Ancillary Agreements by Sellers will not, and the consummation of the Transactions hereby and thereby will not (a) violate the provisions of the organizational documents of Sellers, (b) subject to the entry of the Approval Order or any other Order required by the Bankruptcy Court in connection with the Transactions, violate or conflict with any Law or Order to which Sellers, the Business and the Acquired Assets are subject, (c) require Sellers to obtain any consent, approval, authorization, waiver or license, or give any notice to, or make any filing with, any Governmental Body (except as required by the Bankruptcy Code or the Approval Order), (d) subject to the entry of the Approval Order or any other Order required by the Bankruptcy Court in connection with the Transactions, result in a breach of or constitute a default (with or without due notice or lapse of time or both), give rise to any right of termination, cancellation or acceleration under, or require the consent, approval, authorization, waiver or license of any third party to, any Assigned Contract or any Permits required for the operation of the Business as conducted or (e) subject to the entry of the Approval Order or any other Order required by the Bankruptcy Court in connection with the Transactions, result in the imposition or creation of any Lien upon or with respect to any of the assets or properties of Sellers or with respect to the Business; excluding from the foregoing clauses (b) through (e) any consents, authorizations, approvals, notices and filings the absence of which, and violations, breaches, defaults, rights of acceleration, cancellation or termination, and Liens, the existence of which would not, individually or in the aggregate, have a Material Adverse Effect.

4.4 **Title to Assets; Sufficiency of Assets**.

(a) At the Closing, Sellers will have good and valid title to, or a valid leasehold interest in, all Acquired Assets. Pursuant to the Approval Order, Sellers will convey (or cause to be conveyed) such title to or rights to use, all of the Acquired Assets to Purchaser, Free and Clear.

(b)     The Acquired Assets, together with this Agreement and the Ancillary Agreements, are sufficient for, and shall constitute all of the assets, properties, rights, privileges, and interests of whatever kind or nature, real, personal, or mixed, tangible, or intangible used to allow Purchaser to operate and conduct the Business as of immediately following the Closing in substantially the same manner as presently conducted without violating any Law, Order, or contractual, legal, title, property, or other right of any other Person.

(c)     No Seller owns any real property related to the Business.

4.5     **Intellectual Property; IT Systems**.

(a)     Schedule 4.5(a) sets forth an accurate list of: (i) each item of Registered IP forming a part of the Assigned IP ("Registered Assigned IP") (and, for each such item, identifies the jurisdiction in which such item of Registered IP has been registered or filed and the applicable registration or serial number; and (ii) each item of Assigned IP (other than Registered IP) that is material to the operation of the Business as currently conducted, including any unregistered Trademarks and any Software for which there is no registered (or pending application to register) Copyrights (and, for each such item, identifies any other Person that has an ownership interest in such item of Assigned IP and the nature of such ownership interest). To the Knowledge of Sellers, all Registered Assigned IP is valid, subsisting and enforceable, and no interference, opposition, reissue, reexamination or other Proceeding is or has been pending or threatened, in which the scope, validity or enforceability of any Assigned IP is being, has been or could reasonably be expected to be contested or challenged. To the Knowledge of Sellers, there is no basis for a claim that any Assigned IP is invalid or unenforceable.

(b)     To the Knowledge of Sellers, Sellers own, or have a valid and enforceable license to use, each item of Intellectual Property that is used in or necessary to the operation of the Business as currently conducted. To the Knowledge of Sellers, Sellers exclusively own all right, title and interest to and in the Assigned IP.

4.6     **Compliance with Laws; Permits**.

(a)     To the Knowledge of Sellers, Sellers are, and since the date that is three (3) years prior to the date hereof have been, in compliance with all applicable Laws in connection with the operation of the Business and Sellers have not received any written notice in the past three (3) years of any violations or liability pursuant to any Law applicable to its operation of the Business.

(b)     To the Knowledge of Sellers, since the date that is three (3) years prior to the date hereof, (i) Sellers have obtained, maintained and complied with all necessary Permits with regard to the ownership or operation of the Acquired Assets and Sellers maintained such Permits in accordance with applicable Law, (ii) none of Sellers have received written notice of material default under any such Permit, and (iii) no material violations exist in respect of such Permits, except for such non-compliance and such facts, conditions, or circumstances, the subject of which have been finally resolved prior to the date hereof.

(c)     Schedule 4.6(c) sets forth a true and correct list of all material Permits associated with the ownership or operation of the Acquired Assets.

4.7     **Data Privacy and Protection**.

(a)     To the Knowledge of Sellers, Sellers and, with respect to the processing of Sellers' data, their data processors comply and have complied in all material respects with Data Protection Requirements except as disclosed on <u>Schedule 4.7(a)</u>. Sellers have in place Contracts with all data processors to ensure that the data processor maintains the confidentiality and security of Sellers' data and complies in all material respects with Data Protection Requirements.

(b)     To the Knowledge of Sellers, Sellers and their data processors have not suffered and are not suffering a Security Incident, have not been and are not required to notify any Person of any Security Incident, and have not been and are not adversely affected by any malicious code, ransomware or malware attacks, or denial-of-service attacks on any IT systems. Sellers have not received a written notice (including any enforcement notice or legal proceeding), letter, or complaint from a Person alleging noncompliance or potential noncompliance with any Data Protection Requirements. Sellers maintain, and has maintained, cyber liability insurance with reasonable coverage limits.

4.8     **Financial Statements**.

(a)     Copies of the following financial statements are attached to <u>Schedule 4.8</u>: the unaudited, internally-prepared fiscal year balance sheet of Sellers as of December 31, 2024 (the "<u>Balance Sheet Date</u>"), and the related statements of income, changes in stockholders' equity, and cash flows for the calendar year then ended (the "<u>Annual Financial Statement</u>"), and the unaudited, internally-prepared balance sheet of Sellers as of July 31, 2025, and the related unaudited, internally-prepared statements of income, and cash flows for the months then ended (the "<u>Interim Financial Statements</u>" and, together with the Annual Financial Statement, the "<u>Financial Statements</u>"). The Financial Statements have been prepared in accordance with GAAP and fairly present in all material respects the financial position, and results of operations, changes in stockholders' equity, and cash flows of Sellers as of the dates and for the periods indicated, subject, in the case of the Interim Financial Statements only, to the absence of footnote disclosure, statement of cash flows and any customary year-end adjustments, which are not material in the aggregate. The Financial Statements were derived from the books and records of Sellers, which are accurate and complete in all material respects.

(b)     To the Knowledge of Sellers, the accounts receivable of the Business, (i) except for intercompany claims, have arisen out of actual sales with unaffiliated third parties in the ordinary course of business consistent with past practice, (ii) are free and clear of all defenses and claims of any nature whatsoever other than claims for warranties and claims made in the ordinary course of business that are not material in the aggregate, (iii) net of any allowances for doubtful accounts and reserves for discounts, returns, damages, shortages, short pays and promotions, set forth on the Financial Statements were stated therein in accordance with GAAP applied on a consistent basis throughout the periods indicated and present fairly, in all material respects, the consolidated accounts receivable of Business as of the respective dates thereof, and (iv) are collectible in the ordinary course of business consistent with past practice, net of reserves.

(c)     The Inventory of the Business is of a good and merchantable quality, usable and saleable in the ordinary course of business consistent with past practice, subject to any ordinary

defects, and are in a normal quantity reasonable for the operations of the Business as currently conducted.

(d)     To the Knowledge of Sellers, the accounts payable and accrued liabilities of the Business, (i) except for intercompany claims, have arisen in the ordinary course of business consistent with past practice (ii) set forth on the Financial Statements were stated therein in accordance with GAAP applied on a consistent basis throughout the periods indicated and present fairly, in all material respects, the consolidated accounts receivable of Business as of the respective dates thereof, and (iii) are payable in the ordinary course of business consistent with past practice.

4.9     **Material Contracts**.

(a)     Sellers have made available to Purchaser accurate and complete copies of all of the written Contracts, all amendments, modifications, or supplements thereto, in their possession (and written summaries of any oral Contracts) to which any Seller is a party, each of which is identified in Schedule 4.9(a) (collectively, the "Material Contracts").

(b)     Subject to entry of the Approval Order and payment of all Cure Amounts, each Material Contract that is an Assigned Contract is in full force and effect, is fully assignable without the consent of any Person, except as set forth on Schedule 4.9(b), and is valid, binding and enforceable in accordance with its terms as to Sellers and, to the knowledge of Sellers, the other parties to the Material Contract.

(c)     The Cure Amount Schedule is true and correct as to the cure amounts necessary to satisfy the requirements of Section 365 of the Bankruptcy Code.

4.10     **Employment**.

(a)     With respect to the employees listed on Schedule 4.10(a), Sellers have made available to Purchaser a true and complete list of such employees (i) the dates of hire and the rates of base pay or base salary for each such employee as of the date hereof, (ii) rate of all bonus or any other cash compensation, (iii) location of service, (iv) full or part-time status (or partially retired), (v) exempt or non-exempt status under the Fair Labor Standards Act, (vi) job title or position, (vii) employment status (active or leave, but not the reason for the leave, and, if applicable, the expected return date), (viii) annual paid time off accrual, (ix) type and duration of work visa (if applicable), and (x) any benefits other than those generally provided to all such employees.

(b)     Except as set forth on Schedule 4.10(b), none of Sellers is a party to or bound by any collective bargaining agreement or other agreement with a labor union or like organization, and, to the knowledge of Sellers, there are no activities or proceedings by any individual or group of individuals, including representatives of any labor organizations or labor unions, to organize any employees of any Seller.  There is no pending, and, to the knowledge of Sellers, there has not been any threatened, strike, lockout, slowdown, work stoppage, unfair labor practice or other material labor dispute, or arbitration or grievance that may interfere with the business activities of any Seller.  Each Seller is, and within the past three (3) years has been, in material compliance with all applicable Laws respecting labor, employment and employment

30

practices, terms and conditions of employment, wages and hours and occupational safety and health.

(c)     As of the Petition Date, no Seller (i) is delinquent in any payments and or liable for any arrears to any Transferred Employees, as may be applicable, for any wages, salaries, commissions, incentive pay, bonuses, or other compensation, or any Taxes or any penalty for failure to comply with withholding or reporting all amounts required by Law or by Contract to be withheld and reported with respect to wages, salaries, and other payments to its employees and non-employee workers, and (ii) has any liability for any payment to any trust or other fund governed by or maintained by or on behalf of any Governmental Body with respect to unemployment compensation benefits, social security or other benefits or obligations for any Transferred Employees (other than routine payments to be made in the normal course of business and consistent with past practice).

4.11    **Litigation**. Except for the Chapter 11 Cases, and any Actions or contested motions commenced in connection therewith or otherwise disclosed in <u>Schedule 4.11</u>, there is no Action or Order pending, outstanding or threatened by any Actions, relating to the Acquired Assets or Assumed Liabilities (a) that is material to the Acquired Assets or that would reasonably be expected to give rise to any material Liability of Purchaser or be adverse to the ownership or use by Purchaser of the Acquired Assets after the Closing, as such Acquired Assets are presently owned and used (or held for use) by Sellers, (b) that would challenge the validity or enforceability of the obligations of any of Sellers under this Agreement and the other Ancillary Agreements to which such Person is or will be a party or (c) that is against any of Sellers and seeks to prevent, restrain, materially delay, prohibit or otherwise challenge the consummation, legality or validity, or alter the terms, of the Transactions. There is no Order enjoining any of Sellers from engaging in or continuing any conduct or practice, or requiring such Seller to take any material action, in connection with the ownership, lease, possession, use or operation of the Acquired Assets owned or held by such Persons, and none of Sellers are subject to any outstanding Order relating to the Acquired Assets or Assumed Liabilities other than, in each case, Orders of general applicability.

4.12    **Absence of Certain Changes**. Since the Balance Sheet Date, except for the filing of the Chapter 11 Cases, the Acquired Assets have been maintained and operated in the ordinary course of business and consistent in all material respects with past practices and there has not been any event, change, circumstance, condition, state of facts, occurrence, development or effect that has had or would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect. Between the Balance Sheet Date and the date hereof, (a) none of Sellers have granted any powers of attorney that affect the Acquired Assets and (b) there has not been, with respect to the Business, any forward selling of products or services or acceleration of customer orders or acceleration of soliciting renewals or collecting on renewals, any deferral in paying payables, any discounts to customers or extension of payment terms, intended to increase the current income and cash collection by accelerating revenue that would otherwise be collected after the Closing Date, which acceleration or deferral is inconsistent with past practices prior to the Balance Sheet Date.

4.13    **Brokers or Finders**. Except for fees and expenses payable to Lincoln International LLC, no Sellers have incurred any obligation or Liability, contingent or otherwise, for brokerage or finders' fees or agents' commissions or other similar payments in connection with this

Agreement, the other Ancillary Agreements, or the Transactions contemplated hereby or thereby for which Purchaser is or will become liable.

4.14    **Customers and Suppliers**. Schedule 4.14 sets forth the (a) top 20 customers, (b) top 10 suppliers of the Business, and (c) annual sales volumes of the top 10 customers (in each case determined on the basis of revenues from or payments to any such Person for the fiscal year ended December 31, 2024). With respect to each such customer, such customer has not terminated, materially decreased (whether or not permitted by the applicable Contract) or has indicated (whether in writing or orally) its intent to terminate or not renew, in each case, its relationship with Sellers with respect to the Business.

**ARTICLE V**
**REPRESENTATIONS AND WARRANTIES OF PURCHASER**

Purchaser represents and warrants to Sellers that the statements contained in this Article V are true and correct as of the date of this Agreement and will be true and correct in all material respects on the Closing Date (except for those representations and warranties qualified by materiality, which shall be true and correct in all respects).

5.1    **Organization, Good Standing and Power**. Purchaser is validly existing and in good standing under the laws of the state of its formation. Purchaser has the power to own its properties and carry on its business as now being conducted and is qualified or licensed to do business in each jurisdiction in which the nature of its business or the ownership or leasing of its properties makes such qualification or licensing necessary.

5.2    **Authority Relative to this Agreement; Execution and Binding Effect**. Purchaser has full power and authority to execute and deliver this Agreement and the Ancillary Agreements and to consummate the Transactions. The execution and delivery of this Agreement and the Ancillary Agreements and the consummation of the Transactions have been duly and validly approved and adopted by all necessary action of Purchaser and no other proceedings or approvals (shareholder, member or otherwise) on the part of Purchaser are necessary to approve this Agreement and the Ancillary Agreements and to consummate the Transactions. This Agreement has been duly and validly executed and delivered by Purchaser. Assuming due authorization, execution and delivery by Sellers, this Agreement constitutes, and each of the Ancillary Agreements at the Closing will constitute, the valid and binding obligation of Purchaser, enforceable against Purchaser in accordance with their terms.

5.3    **Governmental and Other Consents**. No consent, notice, authorization or approval of, or exemption by, or filing with or notifications to any Governmental Body or any other Person, whether pursuant to contract or otherwise, is required in connection with the execution and delivery by Purchaser of this Agreement and the Ancillary Agreements and the consummation of the Transactions.

5.4    **Financing**.  Purchaser has secured all necessary financing and commitments to fulfill its obligations under this Agreement, including all required approvals from lenders and financial institutions to ensure that Purchaser has the financial capacity to consummate the Transactions. As of the date hereof, (i) Purchaser is not in default under any credit, financing or

32

similar agreement to which it is a party, and (ii) there are currently no active discussions by Purchaser's governing body or any steps taken by its governing body or its employees or agents regarding the commencement of any bankruptcy or similar insolvency proceeding.

5.5    **No Conflicts**. The execution, delivery, and performance of this Agreement by Purchaser do not and will not conflict with, or result in any violation of, or default under, any provision of any agreement, instrument, or obligation to which the Purchaser is a party or by which it is bound.

5.6    **No Other Representations and Warranties**. Except for the representations and warranties contained in this Article V, Purchaser does not, nor does any other Persons on behalf of Purchaser, make any other express or implied representations or warranties, including with respect to any other information provided to Sellers or their representatives, and Purchaser disclaims any other representations or warranties, whether made by or on behalf of Purchaser or any other Person.

## ARTICLE VI
## COVENANTS

6.1    **Operation of Business**. Except (i) as set forth on Schedule 6.1, (ii) with the prior written consent of Purchaser (which consent will not be unreasonably withheld, delayed or conditioned), (iii) as is otherwise expressly contemplated by this Agreement, (iv) for any changes of operations as a result of the commencement and continuation of the Bankruptcy Case or otherwise imposed by the Bankruptcy Court or the Bankruptcy Code, (v) as is required by applicable Laws, from the date hereof through the earlier of the Closing Date or the termination of this Agreement in accordance with its terms:

(a)    Sellers shall not (i) sell, lease, license, abandon, convey, transfer, assign or otherwise dispose to any Person, in a single transaction or series of related transactions, any of the Acquired Assets, other than sales in the ordinary course of the Business, (ii) effect any sale (whether by merger, consolidation, acquisition of stock or assets or otherwise) of the Business, (iii) (A) terminate the employment of any Transferred Employee of any Seller (excluding terminations for "cause" or (B) increase or change the compensation of any Transferred Employee or (iv) (A) change any customer pricing or offer any discounts, promotions or refunds to customers of the Business (except with respect to Excluded Inventory), other than in the ordinary course of business consistent with past practice or (B) accelerate the collection or receipt of, or cancel or discount, any Accounts Receivable, in each case, outside of the ordinary course of business consistent with past practice;

(b)    Sellers shall use their commercially reasonable efforts to (i) maintain and operate the Acquired Assets in a manner consistent with past practice, (ii) maintain the books, accounts and records relating to the Acquired Assets and Assumed Liabilities in accordance with past custom and practice in all material respects, (iii) preserve intact, in all material respects, the business organizations and relationships with third parties of the Acquired Assets and keep available the services of the employees, consultants and agents of the Business in connection with the services such persons provided in respect of the Acquired Assets in the ordinary course of business consistent with past practice, and (iv) comply, in all material respects, with all applicable Laws and Orders applicable to the Acquired Assets and Acquired Liabilities; and

33

(c)     Notwithstanding anything to the contrary, nothing contained in this Agreement shall give Purchaser or any of its Affiliates, directly or indirectly, any right to control or direct the Business, assets and operations prior to the Closing.  Prior to the Closing, Sellers shall exercise, consistent with the terms and conditions of this Agreement, complete control and supervision over its Business, assets and operations.

(d)     Notwithstanding anything to the contrary, and for the avoidance of doubt, Sellers shall have no obligation to purchase Inventory or accept in-transit Inventory on or after the Petition Date notwithstanding any Seller's past practice of purchasing Inventory.

6.2     **Efforts to Consummate**. Except as otherwise provided in this Agreement, each of the Parties agrees to use its commercially reasonable efforts to cause the Closing to occur as soon as promptly as practicable, including satisfying the conditions precedent set forth in Article III applicable to such Party including executing any additional instruments reasonably requested by the other Party (without cost or expense to the executing Party) necessary to carry out the Transactions and to fully carry out the purposes of this Agreement; *provided*, *however*, that, for purposes of the "commercially reasonable efforts" standard as required by this Section 6.2 or Section 6.3, any Party nor its Affiliates or representatives shall be required to offer or grant any accommodation or concession (financial or otherwise) to any third party, to waive or surrender any right, to modify any agreement (including any Assigned Contract) or to provide financing to Purchaser for the consummation of the Transactions.

6.3     **Notices and Consents**. Reasonably promptly following the execution of this Agreement, Sellers will give, or cause to be given, applicable notices to third parties and thereafter will use its commercially reasonable efforts (as limited by Section 6.2) to obtain the third-party consents set forth on Schedule 6.3; *provided*, *however*, that no representation, warranty, or covenant of Sellers shall be breached or deemed breached as a result of (a) the failure to obtain any such third-party consent, provided Sellers are otherwise in compliance with the terms of this Section 6.3, (b) any termination of a Contract as a result of the failure to obtain such third-party consent or (c) any Action commenced or threatened by or on behalf of any Person arising out of or relating to the failure to obtain any such consent or any such termination.

6.4     **Public Announcements**. Between the date of this Agreement and the Closing Date, except to the extent required by any applicable Law or Action, neither Purchaser nor Sellers shall, and Purchaser and Sellers shall cause their respective Affiliates and representatives not to, directly or indirectly, issue any press release or public announcement of any kind without the prior written consent of Purchaser and Sellers; provided, however, that each Party and its Affiliates may make announcements from time to time to their respective employees, customers, suppliers and other business relations and otherwise as such Party may reasonably determine is necessary to comply with applicable Law or the requirements of this Agreement, any other agreement to which such Party or any such Affiliate is a party or any securities exchange on which the securities of such Party or any such Affiliate are listed. Purchaser and Sellers shall cooperate in good faith to prepare a joint press release to be issued on the Closing Date, the terms of which shall be mutually agreed upon by the Parties.

6.5     **Bankruptcy Court Matters**.

(a)     Bidding Procedures and Orders. The purchase and sale of the Acquired Assets will be subject to competitive bidding in accordance with (and only in accordance with) the terms of the order entered by the Bankruptcy Court approving the sale and bidding procedures, substantially in the form attached hereto as Exhibit D (the "Bidding Procedures Order").

(b)     Milestones. Sellers shall comply with the following timeline (the "Bankruptcy Court Milestones"), subject to further extension only with the prior written consent from Purchaser:

(i)     On the Petition Date, Sellers shall file a motion seeking Bankruptcy Court approval of the Bidding Procedures Order, which shall contain this Agreement and which shall seek approval of the Break-Up Fee and Expense Reimbursement;

(ii)     the Bankruptcy Court shall have entered the Bidding Procedures Order no later than 18 days following the Petition Date; and

(iii)     the Bankruptcy Court shall have entered the Approval Order no later than 40 days following the Petition Date.

(c)     Advance Notice. Sellers shall keep Purchaser reasonably apprised of the status of material matters related to this Agreement, including, upon reasonable request promptly furnishing the other with copies of notices or other communications received from the Bankruptcy Court, the Office of the United States Trustee, or any other third party with respect to the Transactions contemplated by this Agreement. Sellers shall use commercially reasonable efforts to give Purchaser reasonable advance notice of any hearings regarding the motions required to obtain the issuance of the Bidding Procedures Order and the Final Order. Furthermore, Sellers will give Purchaser reasonable advance notice and proposed drafts of all pleadings, motions, Orders, and notices related to, or could reasonably have an impact on, this Agreement or the Transactions prior to the Closing Date and will provide Purchaser and its counsel with a reasonable opportunity to review such documents prior to filing with the Bankruptcy Court, unless such advance notice is impossible or impracticable under the circumstances, in which case Sellers will deliver copies of such documents substantially simultaneously with the filing with the Bankruptcy Court.

6.6     **Approval Order**.

(a)     Prior to the Closing, and subject to the provisions of this Agreement, Purchaser and Sellers shall use their commercially reasonable efforts to obtain entry of an Order or Orders by the Bankruptcy Court pursuant to Sections 363 and 365 of the Bankruptcy Code, substantially in the form attached hereto as Exhibit E (the "Approval Order"), which shall approve of this Agreement and the Transactions, and which shall contain the following provisions in terms reasonably acceptable to the Parties hereto (it being understood that certain of such provisions may be contained in either the findings of fact or conclusions of law to be made by the Bankruptcy Court as part of the Approval Order):

(i)     that Sellers may sell, transfer and assign the Acquired Assets and assume and assign the Assigned Contracts to Purchaser pursuant to this Agreement and Bankruptcy Code Sections 105, 363 and 365, as applicable (including a finding of adequate assurance of future performance by Purchaser of the Assigned Contracts);

(ii)     the transfers of the Acquired Assets by Sellers to Purchaser (A) vest or will vest Purchaser with all right, title and interest of Sellers in and to the Acquired Assets, Free and Clear, and (B) constitute transfers for reasonably equivalent value and fair consideration under the Bankruptcy Code and the laws of the State of Delaware;

(iii)     the transactions contemplated by this Agreement are undertaken by Purchaser and Sellers at arm's length, without collusion and in good faith within the meaning of Section 363(m) of the Bankruptcy Code, and such Parties hereto are entitled to the protections of Section 363(m) of the Bankruptcy Code and the Transaction is entitled to the protections of Section 363(n) of the Bankruptcy Code;

(iv)     a determination that selling the Acquired Assets Free and Clear is in the best interest of Sellers' Estates;

(v)     that Purchaser shall not assume or have any Liability for any Excluded Liabilities;

(vi)     Purchaser has the right to assume or reject any Designation Right Contract during the Designation Rights Period in accordance with, and subject to the terms of, Section 2.10 herein; and

(vii)     a finding that (A) due, proper, timely, adequate and sufficient notice of the Approval Order, this Agreement, the Assigned Contracts, and the Transactions have been provided to all parties in interest (including any parties with any potential interest in the Intellectual Property and counterparties to the Assigned Contracts); (B) such notice was and is good, sufficient and appropriate under the circumstances and reasonably calculated to reach and apprise all holders of liens, claims, encumbrances and other interests, including rights or claims based on any successor, transferee, derivative or vicarious liabilities of their right to appear and be heard, and was provided in accordance with the applicable requirements of the Bankruptcy Code, the Bankruptcy Rules, and other applicable Laws; and (C) no other or further notice of the Approval Order, this Agreement, the Assigned Contracts, or the Transactions is necessary or shall be required.

(b)     If the Approval Order or any other Orders of the Bankruptcy Court relating to this Agreement shall be appealed by any person (or a petition for certiorari or motion for rehearing or reargument shall be filed with respect thereto), each party hereto agrees to use commercially reasonable efforts to obtain an expedited resolution of such appeal; *provided*, *however*, that nothing herein shall preclude the Parties hereto from consummating the Transactions if the Approval Order shall have been entered and has not been stayed in which event Purchaser shall be able to assert the benefits of Section 363(m) of the Bankruptcy Code; *provided further* that notwithstanding the foregoing, in the event of an appeal, Purchaser may consummate the Transactions only in its discretion.

6.7     **Access to Facilities, Personnel, and Information**.

(a)     Prior to the Closing, Sellers shall permit representatives of Purchaser to have reasonable access during regular business hours and upon reasonable notice, in a manner that does not interfere with the normal business operations of Sellers, to all premises, property, books,

records (including Tax records), Contracts, documents and other information primarily related to the Business, the Acquired Assets and Assumed Liabilities. Such access shall be subject to the confidentiality obligations under the Confidentiality Agreement.  Sellers will make the Chief Executive Officer, the Chief Financial Officer, the Chief Operating Officer and the Chief Sales and Marketing Officer available on a weekly basis to meet with designated representatives of Purchaser to discuss matters primarily related to the Business, the Acquired Assets, and the Assumed Liabilities, including the reports delivered pursuant to Section 6.7(b).

(b)     Beginning on the date hereof and from time to time thereafter (but in any event no less frequently than every week), Sellers shall deliver a report to Purchaser that sets forth (i) variances in the DIP Budget, (ii) inventory ledgers by SKU and location, (iii) sales performance of the Business by SKU, including any variances from the CIM, and (iv) any changes in employee population from the date hereof.

(c)     From the Closing Date through and including the second anniversary of the Closing Date, Purchaser shall retain the books and records transferred to Purchaser pursuant to this Agreement and shall grant Sellers, the Trustee, and their respective representatives reasonable access to the books and records transferred to Purchaser pursuant to this Agreement during regular business hours and upon reasonable notice for the purpose of allowing Sellers or their successors, the Trustee or their respective representatives to perform the duties necessary for the liquidation of the Debtors' Estates. To the extent reasonably required by Sellers, Purchaser shall make one or more of the Transferred Employees available to Sellers to assist in each Seller's wind-down of their Estates *provided* that such access does not unreasonably interfere with the conduct of the Business by Purchaser.  In the event Purchaser becomes aware that it has received any attorney-client or otherwise privileged information from Sellers as set forth in Section 2.2(n), Purchaser shall maintain the confidentiality of such information and immediately delete and destroy it.

6.8     **Further Assurances**. Purchaser and Sellers shall use commercially reasonable efforts to take such further actions and execute such other documents as may be reasonably required to fulfill the conditions to Closing and, after Closing, to fully effect the transactions contemplated by this Agreement and the Ancillary Agreements and further secure to each party hereto the rights intended to be conferred hereby and thereby; *provided*, *however*, that nothing in this Section 6.8 shall prohibit Sellers from ceasing operations or winding up its affairs following the Closing. Purchaser shall use commercially reasonable efforts to cooperate with Sellers and provide Sellers with information reasonably sufficient to enable Sellers to demonstrate adequate assurance of future performance (as required by Section 365 of the Bankruptcy Code) as to Purchaser.

6.9     **Employee Matters**.

(a)     Purchaser or one of its Affiliates shall have the option to make offers of employment to each employee of each Seller who is listed on Schedule 6.9 (the "Retained Employees"), effective as of the Closing, subject to each such employee's satisfaction of Purchaser's standard onboarding requirements, including, without limitation, immigration control requirements and the right to require successful completion of customary employee background checks and drug testing prior to offering employment to any such employee (such employees who receive and accept Purchaser's or its Affiliate's offer of employment and actually commence employment with Purchaser or one of its Affiliates following the Closing, the "Transferred

Employees"). Sellers hereby consent to Purchaser or its Affiliate making offers of employment to, and hiring, any such employee and Sellers shall not take any action that could interfere with the hiring or engaging of any such employee by Purchaser and its Affiliate. Sellers shall terminate the employment of all Transferred Employees as of immediately prior to the Closing and reasonably assist Purchaser in effecting the change of employment of the Transferred Employees as of the Closing in an orderly fashion. Purchaser's obligations under this Agreement are not conditioned upon any particular employees agreeing to employment with Purchaser.

(b)     The Transferred Employees shall cease active participation in each Employee Benefit Plan on or following the Closing Date pursuant to the terms of the applicable Employee Benefit Plan. Sellers shall fully vest each Transferred Employee in all of their benefits under any Employee Benefit Plan that are subject to a vesting schedule or are otherwise subject to a risk of forfeiture and shall pay to each Transferred Employee any accrued time off amounts in respect of any time off as of the Closing Date. Sellers shall retain all assets and bear the expense of any responsibility for all Liabilities relating to Transferred Employees (and Purchaser and its Affiliates shall not bear the expense of any responsibility for any Liabilities relating to Transferred Employees) arising from (i) claims for benefits under the Employee Benefit Plans, (ii) any Transferred Employee's (or any other service provider's) entitlement to severance or other termination payments under any Employee Benefit Plan (or otherwise), and (iii) claims for workers' compensation benefits or occupational health claims (which, solely with respect to Transferred Employees, that are incurred on or prior the Closing Date). Sellers shall take all action necessary to provide that each Transferred Employee who elects to take a distribution of his or her account balance under an Employee Benefit Plan that includes a cash or deferred arrangement under Section 401(k) of the Code may, if applicable, elect for such distribution to include any outstanding loan notes. Upon request, Sellers shall present evidence to Purchaser in a form reasonably satisfactory to Purchaser of Sellers' compliance with the requirements of this Section 6.9(b). Nothing in this Agreement shall result in Purchaser or its Affiliates assuming any Liability or obligation under or in relation to Title IV of ERISA or on account of any violation of COBRA or under any Employee Benefit Plan or any other employee benefit plan of Sellers or any of its Affiliates, including all withholding and employment Taxes and other costs related to such plans (collectively, "Affiliated Plan Liabilities"). Sellers shall retain and shall satisfy as and when due, and shall hold Purchaser and its Affiliates harmless from and against, all Affiliated Plan Liabilities, regardless of when any such Affiliated Plan Liabilities arise, are incurred or are disclosed. For purposes of the foregoing, Affiliated Plan Liabilities includes liabilities relating to workers' compensation claims of Transferred Employees that arise out of events occurring on or prior to the Closing Date.

(c)     With respect to each employee benefit plan, program, policy and arrangement maintained by Purchaser or its Affiliates in which the Transferred Employees participate on or after the Closing Date (the "Purchaser Plans"), Purchaser shall, and shall cause its Affiliates to, use commercially reasonable efforts to (i) recognize the service of Transferred Employees prior to the Closing Date as service with Purchaser and its Affiliates for purposes of any waiting period, vesting, eligibility and level of benefits under Purchaser Plans (*provided that* Purchaser is not required to count such service of the Transferred Employees prior to the Closing Date in calculating the amount of that employee's benefit under Purchaser's plan or policy), (ii) waive, or cause its insurance carriers to waive, all limitations as to pre-existing conditions, if any, with respect to participation and coverage requirements applicable to Transferred Employees

under Purchaser Plans that are health and welfare benefit plans that provide healthcare and disability benefits in which such Transferred Employees are eligible to participate to the same extent that such conditions and waiting periods were waived or previously satisfied under the comparable Employee Benefit Plan immediately prior to the Closing Date and (iii) subject to Sellers providing Purchaser with the applicable information with respect to each Transferred Employee in a form that Purchaser determines is administratively feasible to take into account under a Purchaser Plan, cause Purchaser Plans that are medical and pharmacy benefit plans (but excluding healthcare flexible spending accounts and dental and vision benefits) to provide credit to Transferred Employees for any co-payments, deductibles and out-of-pocket expenses paid by such employees (to the same extent such credit was given for the year under a similar Employee Benefit Plan in effect immediately prior to the Closing Date) during the portion of the relevant plan year including the Closing Date in satisfying any applicable deductible or out-of-pocket requirements for the plan year in which the Closing Date falls; provided, however, that the foregoing shall not apply to the extent it would result in a duplication of benefits with respect to any Transferred Employee.

(d)    Nothing in this Agreement shall constitute any commitment, Contract or understanding (expressed or implied) of any obligation on the part of Purchaser to a post-Closing employment relationship of any fixed term or duration or upon any terms or conditions other than those that Purchaser may establish pursuant to individual offers of employment. Nothing in this Agreement shall be deemed to prevent or restrict in any way the right of Purchaser to terminate, reassign, promote or demote any of the Transferred Employees after the Closing or to change adversely or favorably the title, powers, duties, responsibilities, functions, locations, salaries, future benefits, other compensation or terms or conditions of Purchaser's employment of such employees.

(e)    If any of the arrangements described in this Section 6.9 are determined by any Governmental Body to be prohibited by applicable Law, Purchaser, Sellers shall modify such arrangements to as closely as possible reflect their expressed intent and retain the allocation of economic benefits and burdens to the Parties hereto contemplated herein in a manner that is not prohibited by applicable Law.

(f)    Sellers shall be responsible for all liabilities or obligations under the WARN Act arising out of actions or omissions occurring prior to, on, or following the Closing Date with respect to or involving all employees of Sellers, except that Purchaser and its Affiliates shall be responsible for all liabilities or obligations under the WARN Act resulting from any "employment loss" (as defined in the WARN Act) occurring after the Closing solely with respect to or involving the Transferred Employees only.

(g)    Notwithstanding anything in this Section 6.9 to the contrary, nothing contained herein, whether express or implied, shall (i) be treated as an amendment or other modification of any Employee Benefit Plan or employee benefit plan maintained by Purchaser or any of its Affiliates, or shall limit the right of Sellers, Purchaser or any of their respective Affiliates to amend, terminate or otherwise modify any Employee Benefit Plan or employee benefit plan maintained by Purchaser or any of its Affiliates following the Closing Date or (ii) create any rights in any Person who is not a party to this Agreement. If (i) a party other than the Parties hereto makes a claim or takes other action to enforce any provision in this Agreement as an amendment to any

Employee Benefit Plan or employee benefit plan maintained by Purchaser or any of its Affiliates, and (ii) such provision is deemed to be an amendment to such Employee Benefit Plan or employee benefit plan maintained by Purchaser or any of its Affiliates even though not explicitly designated as such in this Agreement, then, solely with respect to the Employee Benefit Plan or employee benefit plan maintained by Purchaser or any of its Affiliates at issue, such provision shall lapse retroactively and shall have no amendatory effect with respect thereto.

(h)    During the period commencing on the date of this Agreement and ending on the Closing Date, Purchaser shall not, without the Sellers' prior written consent, directly or indirectly, hire any employee of Sellers or its Affiliates located in Brazil.  Notwithstanding the foregoing, Purchasers shall not be prohibited from engaging in discussions with any such employees, *provided* that Purchaser shall keep Sellers reasonably informed as to the time, manner and subject matter of such discussions.

6.10    **Tax Matters**.

(a)    It is the intention of the Purchaser and the Sellers that the Transactions be exempt from all transfer, documentary, sales, use, excise, stock transfer, value-added, stamp, recording, registration and other similar taxes, levies and fees (including any penalties, fines and interest), together with any conveyance fees, recording charges and other similar fees and charges, incurred in connection with this Agreement and the Transactions (collectively, "Transfer Taxes") pursuant to Section 1146(a) of the Bankruptcy Code.  Purchaser and the Sellers shall cooperate in good faith to minimize, to the extent permissible under applicable Law, the amount of any Transfer Taxes due with respect to the Transactions. Solely to the extent not exempt in accordance with Section 1146(a) of the Bankruptcy Code, the Final Order or any available exemption under state or local applicable Tax law, Purchaser shall be responsible for such Transfer Taxes; *provided*, that Sellers shall obtain such exemption in the Final Order.

(b)    Each Party shall, and shall cause its Affiliates to, reasonably cooperate with and provide to the other Party and its Affiliates such documentation, information and assistance as may reasonably be requested in connection with (i) the preparation of any Tax Return relating to the Acquired Assets and Assumed Liabilities (ii) the determination of liability for Taxes pursuant to this Agreement or (iii) the conduct of any Tax Proceeding relating to the Acquired Assets and the Assumed Liabilities.

(c)    For purposes of this Agreement, with respect to any Straddle Period, (A) in the case of Taxes that are imposed on a periodic basis (such as property Taxes), the amount of such Taxes allocable to the Pre-Closing Tax Period shall be determined by multiplying the total amount of such Taxes for the entire Straddle Period by a fraction, the numerator of which is the number of calendar days during the Straddle Period that are in the Pre-Closing Tax Period and the denominator of which is the total number of calendar days in the entire Straddle Period, and (B) in the case of Taxes not described in clause (A), the amount of such Taxes allocable to the Pre-Closing Tax Period shall be computed as if such Tax period ended as of the end of the day on the final day of the Pre-Closing Tax Period, *provided* that exemptions, allowances or deductions that are calculated on an annual basis (including depreciation and amortization deductions) shall be allocated between the Pre-Closing Tax Period and the remainder of the Straddle Period in proportion to the number of days in each period.

(d)     Purchaser hereby waives compliance by Sellers in all respects with respect to any applicable bulk sale, bulk transfer, successor liability and similar Laws, or with any Laws triggered by a bulk sale or transfer of property, of any jurisdiction in connection with the transactions contemplated by this Agreement or similar Laws of any jurisdiction in connection with the transactions contemplated under this Agreement; *provided*, that the Final Order waives compliance by Sellers in all respects with respect to any such Laws.  If the Final Order does not waive compliance by Sellers in all respects with respect to any such Laws, Sellers shall notify all of the Governmental Body in the jurisdictions that impose Taxes on any Seller or where any Seller has a duty to file Tax Returns of the Transactions in the form and manner required by such Governmental Body, if the failure to make such notifications or receive any available tax clearance certificate could subject Purchaser to any Taxes of any Seller.  If any Government Entity asserts that any Seller is liable for any Tax that relates to any Pre-Closing Tax Period, Sellers shall promptly pay any and all such amounts and shall provide evidence to Purchaser that such liabilities have been paid in full or otherwise satisfied.

6.11    **Insurance Access**. Following the Closing, with respect to any actions, inactions, events, omissions, conditions, facts, circumstances, losses, damages, and other Liabilities which occurred or are alleged to have occurred, or were incurred, in whole or in part, or claimed to have been incurred, with respect to the Acquired Assets or the Assumed Liabilities, in each case, prior to the Closing, Sellers will provide (or cause their Affiliates to provide) Purchaser with access to (including by taking commercially reasonable actions as may be necessary to direct any relevant insurer to permit such access or to access as an additional insured party), and Purchaser may, upon prior written notice to Sellers, make claims under the current and historical non-transferable Insurance Policies; *provided*, *however*, that such access to, and the right to make claims under, such Insurance Policies, shall be subject to the terms and conditions of such insurance policies, including any restrictions on coverage or scope, any deductibles, retentions, or self-insurance provision, and any fees, costs, or other expenses, and shall be subject to the following additional conditions:

(a)     Purchaser shall report any potentially insured pre-Closing Date claim to Sellers, as promptly as practicable and in any event in sufficient time so that such claim may be made in accordance with Sellers' claim reporting procedures in effect immediately prior to the Closing;

(b)     Premiums and premium increases, fees and expenses incurred by Sellers or any of their Subsidiaries to the extent resulting from any access to, or any claims made by Purchaser or any of its Affiliates under, any Insurance Policy, including any reasonable legal fees and allocated claims, expenses or claim handling fees, whether such claims are made by Purchaser or its Representatives, will, in each case, be promptly reimbursed to Sellers by Purchaser;

(c)     Any recovery under any Insurance Policy shall be net of all uninsured, uncovered, unavailable or uncollectible amounts of all such claims made by Purchaser under the Insurance Policies (including any deductible, retention or other similar amounts);

(d)     Claims made by Purchaser pursuant to this Section 6.11 will be subject to (and recovery thereon will be reduced by the amount of) any applicable deductibles, retentions, or self-insurance provisions under the Insurance Policies. With respect to any deductibles, retentions or self-insurance provisions described in the immediately preceding sentence that require a

payment by Sellers or any of their Subsidiaries, Purchaser shall reimburse Sellers or such Subsidiary for such payment. In the event that Purchaser submits any claim under an Insurance Policy resulting in coverage payable in part to Sellers or any of their Subsidiaries, such Person's reimbursement obligations to Sellers under this Section 6.11 shall apply only with respect to those amounts attributable to the portion of coverage payable to Purchaser or any of its Affiliates. It is understood that Purchaser will not have access to or coverage under that portion of any non-transferable insurance policy retained by Sellers or any of their Subsidiaries that is not "occurrence based"; and

(e)      Without limiting Purchaser's right to make claims directly against the Insurance Policies, in no event shall any Seller be required to provide Purchaser access under this Section 6.11 after such entity's Chapter 11 Cases have been closed.

6.12    **Post-Closing Receipt and Possession of Assets**.

(a)      After the Closing Date, Sellers shall transfer promptly to Purchaser from time to time (but in any event no less frequently than every two days) any payments constituting Acquired Assets, including any cash received due to the sale of inventory pursuant to Section 6.13, received by Sellers. After the Closing Date, Purchaser shall transfer promptly to Sellers, from time to time (but in any event no less frequently than on a weekly basis), any payments constituting Excluded Assets received by Purchaser after the Closing.

(b)      In the event that, after the Closing Date, Purchaser receives or otherwise is in possession of any other Excluded Asset, Purchaser shall promptly notify Sellers of its receipt or possession of such other Excluded Asset and transfer, if so requested by Sellers, at Sellers' expense, such Excluded Asset to Sellers. In the event that, after the Closing Date, Sellers receive or otherwise are in possession of any other Acquired Asset, Sellers shall promptly notify Purchaser of its receipt or possession of such other Acquired Asset and transfer, at Sellers' expense, such Acquired Asset to Purchaser.

6.13    **Transition Services**. The Sellers shall, and shall use reasonable best efforts to cause the administrator for the Estate to, provide access to the Purchaser to any Excluded Assets for purposes of operating the Business post-Closing. The Purchaser shall use reasonable best to provide access to the Sellers to any Acquiring Assets for purposes of winding down the Estate.

6.14    **Weekly Certification by Purchaser**. Purchaser shall deliver to Sellers email confirmation on a weekly basis, from the date hereof until the Closing Date, certifying Section 5.4 remains true and correct and that there have been no changes to its funding commitments that would affect its ability to consummate the Transactions.

**ARTICLE VII**
**TERMINATION; EFFECT OF TERMINATION**

7.1    **Termination**. This Agreement may, prior to or at the Closing, be terminated as follows:

(a)      by mutual written consent of Purchaser and Sellers;

(b)      by Sellers, by written notice to Purchaser, or by Purchaser, by written notice to Sellers, in the event the Closing has not occurred on or before the Outside Date; *provided*, *however*, that the Party exercising the right to terminate this Agreement pursuant to this Section 7.1(b) shall not be permitted to terminate this Agreement if such Party's breach of this Agreement has been the principal cause of the Parties failing to consummate the Closing on or before the Outside Date;

(c)      by Sellers, by written notice to Purchaser, or by Purchaser, by written notice to Sellers, if either, to the extent in accordance with the Bidding Procedures Order, Sellers accept a competing bid for the purchase of all or substantially all of the Acquired Assets to a Person other than Purchaser (an "Alternative Transaction") and Purchaser is not serving as the Next-Highest Bidder;

(d)      by Purchaser, by written notice to Sellers, if either: (i) Sellers' Chapter 11 Case is dismissed or converted to one under Chapter 7 of the Bankruptcy Code, (ii) Sellers move for appointment of an examiner with expanded powers pursuant to Section 1104 of the Bankruptcy Code or a trustee in the Chapter 11 Case (or such examiner or trustee is otherwise appointed prior to the Closing); (iii) Purchaser is not selected as the highest or otherwise best bid for any asset included in the Acquired Assets and is not serving as the Next-Highest Bidder; (iv) any of the Bankruptcy Court Milestones are not met; (v) the Approval Order is appealed, and such appeal is not withdrawn, dismissed or finally resolved in favor of Sellers, or otherwise resolved in a manner satisfactory to Purchaser within three (3) Business Days following the initiation of such appeal or (vi) the Bidding Procedures Order or the Approval Order is modified in any material respect without the consent of Purchaser;

(e)      by Sellers, by written notice to Purchaser, if there has been a breach or inaccuracy of a covenant, representation or warranty made by Purchaser in this Agreement, and such breach or inaccuracy would result in a failure of any of the conditions in Section 3.4 to be satisfied and which breach is incapable of being cured or, if capable of being cured, has not been cured by Purchaser prior to the earlier of (i) five (5) days after receipt of written notice from Sellers requesting such material breach, material failure to perform or material inaccuracy be cured or (ii) the Outside Date; *provided*, *however*, that the right to terminate this Agreement pursuant to this Section 7.1(e) shall not be available to Sellers if any Seller is in material breach of this Agreement;

(f)      by Purchaser, by written notice from Purchaser to Sellers, if there has been a breach or inaccuracy of a covenant, representation or warranty made by Sellers in this Agreement, and such breach or inaccuracy would result in a failure of any of the conditions in Section 3.3 to be satisfied and which breach is incapable of being cured or, if capable of being cured, has not been cured by Sellers prior to the earlier of (i) five (5) days after receipt of written notice from Purchaser requesting such material breach, material failure to perform, or material inaccuracy be cured, or (ii) the Outside Date; *provided*, *however*, that the right to terminate this Agreement pursuant to this Section 7.1(f) shall not be available to Purchaser if Purchaser is in material breach of this Agreement;

(g)      by Sellers, by written notice to Purchaser, or by Purchaser, by written notice to Sellers, if any court of competent jurisdiction or other competent Governmental Body shall have enacted or issued a Law or decree or taken any other action permanently restraining, enjoining, or

43

otherwise prohibiting the Transaction and such Law or decree or other action shall have become final and non-appealable; *provided*, *however*, that the right to terminate this Agreement under this Section 7.1(g) shall not be available to a Party if the failure to consummate the Closing because of such action by a Governmental Body shall be due to the failure of such Party to have fulfilled any of its obligations under this Agreement; and

(h)     automatically upon the consummation of an Alternative Transaction.

7.2     **Effect of Termination**.

(a)     If this Agreement is validly terminated pursuant to Section 7.1, all further obligations of the Parties under this Agreement or any Ancillary Agreement shall terminate and have no further force and effect and neither Party shall have any Liability (except as set forth in this Section 7.2); *provided*, *however* that that nothing in this Section 7.2 shall relieve any Party from Liability for any breach of this Agreement occurring prior to any such termination; *provided, further*, that no provisions in this Agreement shall prohibit either Party from seeking an injunction or injunctions, specific performance or other equitable relief to prevent breaches of this Agreement and to enforce specifically the terms and provisions hereof.

(b)     In consideration for Purchaser's expenditure of considerable time and expense in connection with this Agreement and the Ancillary Agreements and the negotiation hereof and thereof, Sellers shall, in accordance with the terms hereof and the Bidding Procedures Order, file with and seek approval of the Bankruptcy Court to pay to Purchaser a break-up fee in an amount equal to Seven-Hundred Thousand Dollars ($700,000.00) (the "Break-Up Fee") and all actual documented fees and expenses incurred in connection with this Agreement up to Five-Hundred Thousand Dollars ($500,000.00) (the "Expense Reimbursement"). Sellers shall (a) subject to approval by the Bankruptcy Court of the Bid Protections, pay to Purchaser the Bid Protections no later than the first Business Day after this Agreement is terminated in accordance with Sections 7.1(b), 7.1(c), 7.1(d), 7.1(f), 7.1(g) and 7.1(h) and (ii) return the Deposit to Purchaser no later than the first Business Day after this Agreement is terminated in accordance with Sections 7.1(a), 7.1(b), 7.1(c), 7.1(d), 7.1(f), 7.1(g) and 7.1(h).

(c)     Any obligation to pay the Expense Reimbursement or the Break-Up Fee hereunder shall be absolute and unconditional only to the extent approved by the Bankruptcy Court and in no event shall Sellers be obligated to make such payments if Purchaser has materially breached this Agreement or to the extent any such payments are not approved by the Bankruptcy Court; any such payments shall constitute allowed superpriority administrative claims under sections 503(b) and 507(a)(2) of the Bankruptcy Code and shall be payable as specified herein, and not subject to any defense, claim, counterclaim, offset, recoupment, or reduction of any kind whatsoever; *provided* that the Break-Up Fee shall be payable solely upon the closing and from the proceeds of any Alternative Transaction. Sellers hereby acknowledge and agree that (i) the right of Purchaser to receive payment of the Expense Reimbursement as set forth in Section 7.2 or the Break-Up Fee as set forth in Section 7.2 is necessary and essential to induce Purchaser to execute and deliver this Agreement and to enter into the transactions contemplated hereby, and that Purchaser would not have done so without receiving such right, and (ii) the obligation of Sellers to pay the Expense Reimbursement to Purchaser as set forth in Section 7.2 or the Break-Up Fee as set forth in Section 7.2 was negotiated at arms'-length and in good faith and is (x) designed to

maximize the value of the estate of the Debtors, (y) fair, reasonable and appropriate, and (z) in the best interests of Sellers, the Debtors and the Debtor's estate and the Debtor's and the Debtor's estate's, creditors, interest holders, stakeholders, and all other parties in interest.

7.3     **Competing Bids**. To the extent set forth in the Bidding Procedures, Purchaser and Sellers acknowledge that Sellers may receive competing bids for the Acquired Assets, including in connection with an auction of the Acquired Assets.  Nothing in this Agreement, or any Ancillary Agreement, will require any Seller or any of their respective managers, officers or members, in each case, in their capacity as such, to consummate the Transactions with Purchaser or otherwise take any action, or to refrain from taking any action, to the extent inconsistent with their fiduciary obligations, applicable Law or the Bidding Procedures.

## ARTICLE VIII
## GENERAL PROVISIONS

8.1     **"As Is", "Where Is", and "With all Faults" Transaction**. PURCHASER ACKNOWLEDGES AND AGREES THAT, EXCEPT AS EXPRESSLY PROVIDED IN ARTICLE IV, SELLERS MAKE NO REPRESENTATIONS OR WARRANTIES WHATSOEVER, EXPRESS OR IMPLIED, WITH RESPECT TO ANY MATTER RELATING TO THE ACQUIRED ASSETS. PURCHASER ACKNOWLEDGES THAT PURCHASER HAS CONDUCTED AN INDEPENDENT INSPECTION AND INVESTIGATION OF THE PHYSICAL CONDITION OF ALL ACQUIRED ASSETS AND ALL SUCH OTHER MATTERS RELATING TO OR AFFECTING THE ACQUIRED ASSETS AS PURCHASER DEEMS NECESSARY OR APPROPRIATE AND THAT IN PROCEEDING WITH THE CONSUMMATION OF THE TRANSACTIONS, EXCEPT FOR ANY REPRESENTATIONS AND WARRANTIES EXPRESSLY SET FORTH IN ARTICLE IV, PURCHASER IS DOING SO BASED SOLELY UPON SUCH INDEPENDENT INSPECTIONS AND INVESTIGATIONS. ACCORDINGLY, PURCHASER WILL ACCEPT THE ACQUIRED ASSETS AT THE CLOSING "AS IS," "WHERE IS," AND "WITH ALL FAULTS."

8.2     **Transaction Expenses**. Except as expressly provided for herein, each Party hereto shall pay all fees, costs and expenses incurred by it with respect to this Agreement, whether or not the transactions contemplated by this Agreement are consummated.

8.3     **Certain Interpretive Matters and Definitions**.

(a)     Unless otherwise expressly provided, for purposes of this Agreement and the Ancillary Agreements, the following rules of interpretation shall apply:

(i)     Calculation of Time Period. All references to a day or days shall be deemed to refer to a calendar day or days, as applicable, unless otherwise specifically provided. When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded.

(ii)     Dollars. Any reference to $ shall mean U.S. dollars, which is the currency used for all purposes in this Agreement and the Ancillary Agreements.

(iii)     Exhibits/Schedules. The Exhibits and Schedules to this Agreement are an integral part of this Agreement. All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any matter or item disclosed on one Schedule shall be deemed to have been disclosed on each other Schedule to the extent that the relevance of such disclosure to such other Schedule is reasonably apparent on its face to a reader of such disclosure. Disclosure of any item on any Schedule shall not constitute an admission or indication that any such item is required to be disclosed, or that such item or matter is material or has resulted in or will result in a Material Adverse Effect or that the included items or actions are not in the ordinary course of business. No disclosure on a Schedule relating to a possible breach or violation of any contract, Law or Order shall be construed as an admission or indication that a breach or violation exists or has actually occurred. Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement.

(iv)     Gender and Number. Any reference to gender shall include all genders, and words imparting the singular number only shall include the plural and vice versa.

(v)     Herein. The words such as "herein," "hereinafter," "hereof" and "hereunder" that are used in this Agreement refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires. Uses of such words in the Ancillary Agreement shall refer to such Ancillary Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires.

(vi)     Or. The word "or" shall be construed in the inclusive sense of "and/or" unless otherwise specified.

(vii)     Including. The word "including," or any variation thereof, means (unless the context of its usage otherwise requires) "including, without limitation" and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it.

(viii)     Successors. A reference to any Party to this Agreement, any Ancillary Agreement or any other agreement or document shall include such Party's successors and permitted assigns.

(ix)     Laws. A reference to laws or legislation are references to such laws and legislation as they may be amended or supplemented from time to time, and references to laws and legislation include references to any succeeding law, modification or re-enactment thereof, any legislative provision substituted therefor, and to the implementing rules or regulations promulgated pursuant thereto.

(x)     Reflected On or Set Forth In. An item arising with respect to a specific representation or warranty shall be deemed to be "reflected on" or "set forth in" a balance sheet or financial statements, to the extent any such phrase appears in such representation or warranty, if (A) there is a specific reserve, accrual or other similar item underlying a number on such balance sheet or financial statements that relates to the subject matter of such representation,

(B) such item is otherwise specifically set forth on such balance sheet or financial statements or (C) such item is set forth in the notes to such financial statements.

(xi)    <u>Made Available</u>. Any reference in this Agreement to "made available" means only a document or other item of information that was (A) provided, delivered or made available to Purchaser and its representatives in any "data rooms," or "virtual data rooms," and to which Purchaser and its representatives have access, or (B) publicly filed and available on the SEC database, in each case of clauses (A) and (B), as of 5:00 p.m. (Eastern Time) on the date that is one (1) day prior to the date hereof.

(b)    All representations and warranties set forth in this Agreement or the Ancillary Agreements are contractual in nature only and subject to the sole and exclusive remedies set forth herein, except as otherwise set forth herein. The phrase "to its knowledge" and phrases of similar import or effect are used herein to qualify and limit the scope of any representation or warranty in which they appear and are not affirmations of any Person's "superior knowledge" that the representation or warranty in which they are used is true.

(c)    The Parties have participated jointly in the negotiation and drafting of this Agreement and the Ancillary Agreements and, in the event an ambiguity or question of intent or interpretation arises, this Agreement and the Ancillary Agreements shall be construed as jointly drafted by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any provision of this Agreement and the Ancillary Agreements. The Parties agree that changes from earlier drafts to the final version of this Agreement do not necessarily imply that the Party agreeing to such change is agreeing to a change in meaning (as the Party agreeing to such change may believe the change is stylistic and non-substantive); consequently, no presumption should exist by virtue of a change from a prior draft.

8.4    <u>**Survival; Termination of Representations and Warranties**</u>. Except in the case of Fraud, the representations and warranties of the Parties hereto set forth in this Agreement shall terminate upon, and be of no further force or effect after, the consummation of the Closing. The Parties hereto agree that the covenants contained in this Agreement to be performed at or after the Closing shall survive the Closing hereunder for such period expressly set forth in this Agreement, or if not expressly set forth for a period no greater than three (3) months after the Closing Date.

8.5    <u>**Amendment**</u>. This Agreement may be amended or modified in whole or in part at any time by an agreement in writing among the Parties.

8.6    <u>**Waiver**</u>. The waiver by a Party of a breach of any covenant, agreement, condition or undertaking contained herein shall be made only by a written waiver making specific reference to this Agreement executed by the Party against whom enforcement of any such wavier is sought. No waiver of any breach of any covenant, agreement, condition or undertaking contained herein shall operate as a waiver of any prior or subsequent breach of the same covenant, agreement, condition or undertaking or as a waiver of any breach of any other covenant, agreement, condition or undertaking.

8.7    <u>**Notices**</u>. All notices, requests and other communications hereunder will be deemed to have been duly given (a) if delivered personally, on the date of delivery, (b) if by an established

overnight delivery company, or by certified or registered mail, postage prepaid, return receipt requested, on the Business Day following the date of delivery to such delivery company or postal service and (c) if delivered by electronic mail, on the date of transmission, if sent on a Business Day before 5:00 p.m. local time of the address of the recipient party (otherwise the next succeeding Business Day), in each case to the addresses or email addresses as follows:

If to Sellers:

Walker Edison Furniture Company
Attn: Nate Brown
1553 West 9000 South
West Jordan, Utah 84088
e-mail: nate.brown@walkeredison.com

with a copy to:

Morris, Nichols, Arsht & Tunnell LLP
Attn    Robert J. Dehney, Sr.
        R. Jason Russell
        Daniel Butz
1201 N. Market St.
Suite 1600
Wilmington, DE 19801
Email: rdehney@morrisnichols.com
        jrussell@morrisnichols.com
        dbutz@morrisnichols.com

If to Purchaser:

Twin Star International, Inc.
750 Park of Commerce Blvd #400,
Boca Raton, FL 33487
Attn: Todd Outten, President
e-mail: toutten@twinstarhome.com

with a copy to:

Sidley Austin LLP
Attn: Vijay Sekhon
    Stephen E. Hessler
    Patrick Venter
555 California Street
Suite 2000
San Francisco, CA 94104
Email: vsekhon@sidley.com
    shessler@sidley.com
    pventer@sidley.com

48

or to such other address as may hereafter be designated by a party hereto by the giving of notice in accordance with this <u>Section 8.7</u>. All notices, requests or other communications shall be deemed given when actually delivered if delivered personally or by an established overnight delivery company or upon actual receipt if delivered by certified or registered mail, postage prepaid, return receipt requested.

8.8    **Jurisdiction**. Without limiting any Party's right to appeal any order of the Bankruptcy Court, (a) the Parties hereto agree that the Bankruptcy Court shall retain exclusive jurisdiction to resolve any controversy or claim arising out of or relating to this Agreement or the implementation or breach hereof and (b) any and all proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the Parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court and each Party hereby irrevocably agrees that all Related Claims may be heard and determined in such courts. To the extent the Bankruptcy Court declines, or is otherwise unable to, exercise jurisdiction, including if the Bankruptcy Petitions are closed pursuant to Section 350 of the Bankruptcy Code, then the Parties agree that the state or federal courts in the County of New Castle, State of Delaware (the foregoing courts, including the Bankruptcy Court, the "<u>Chosen Courts</u>"), shall have jurisdiction. The Parties hereby (x) irrevocably and unconditionally waive, to the fullest extent permitted by applicable Law, any objection which they may now or hereafter have to the laying of venue of any such Related Claim brought in the Chosen Courts or any defense of inconvenient forum for the maintenance of such dispute, and (y) agree not to bring any Action arising out of, relating to, or in connection with this Agreement, the Ancillary Agreements, or any Action predicated on or based on a Related Claim, in any court other than a Chosen Court. Each of the Parties agree that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Law.

8.9    **Waiver of Jury Trial**. EACH PARTY HERETO ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS AGREEMENT, THE ANCILLARY AGREEMENTS OR ANY RELATED CLAIMS IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES, AND THEREFORE IT HEREBY IRREVOCABLY AND UNCONDITIONALLY EXPRESSLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY PROCEEDING OR RELATED CLAIM BROUGHT BY OR AGAINST IT, DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE ANCILLARY AGREEMENTS OR ANY RELATED CLAIMS.

8.10    **Governing Law**. To the extent not governed by the mandatory provisions of the Bankruptcy Code, this Agreement and all Related Claims shall be governed by and construed in accordance with the laws of the State of Delaware, without giving effect to rules governing the conflict of law principles.

8.11    **Damages**. NOTWITHSTANDING ANYTHING HEREIN TO THE CONTRARY, NO PARTY HERETO SHALL BE LIABLE FOR CONSEQUENTIAL, INCIDENTAL, EXEMPLARY, SPECIAL, INDIRECT OR PUNITIVE DAMAGES (INCLUDING LOST PROFITS, LOSS OF PRODUCTION OR OTHER DAMAGES ATTRIBUTABLE TO BUSINESS INTERRUPTION) ARISING UNDER OR IN CONNECTION WITH THIS

AGREEMENT; *PROVIDED*, THAT THE LIMITATIONS IN THIS SENTENCE SHALL NOT APPLY TO LIABILITIES ARISING AS A RESULT OF THIRD PARTY CLAIMS.

8.12    **Time is of the Essence**. Time is of the essence in this Agreement, and all of the terms, covenants and conditions hereof.

8.13    **Severability**. If any provision of this Agreement shall be held invalid, illegal or unenforceable, in whole or in part, the validity, legality, and enforceability of the remaining part of such provision, and the validity, legality and enforceability of all other provisions hereof or thereof, shall not be affected thereby. No Party shall assert, and each Party shall cause its respective Affiliates not to assert, that this Agreement or any Ancillary Agreement or any part hereof or thereof is invalid, illegal or unenforceable.

8.14    **Titles and Headings**. Titles and headings of sections of this Agreement are for convenience of reference only and shall not affect the construction of any provision of this Agreement.

8.15    **Assignment; Successors and Assigns**. This Agreement and the rights, duties and obligations hereunder may not be assigned by any party hereto without the prior written consent of the other party hereto, and any attempted assignment without consent shall be void. Subject to this Section 8.15, this Agreement and the provisions hereof shall be binding upon each of the Parties hereto, their successors and permitted assigns. Notwithstanding the forgoing, prior to the Closing, Purchaser may assign this Agreement, or any of portion thereof, or any of its rights under this Agreement (a) to one or more of its Affiliates, including to designate one or more Affiliates to purchase the Acquired Assets and assume the Assumed Liabilities and (b) in making a collateral assignment to any debt financing source of Purchaser or its Affiliates for security purposes; *provided* that such assignment shall not release Purchaser from any obligations or other Liabilities hereunder.

8.16    **No Third-Party Rights**. The Parties hereto do not intend to confer any benefit hereunder on any Person other than the Parties hereto.

8.17    **Confidentiality Agreement**. The Parties hereto acknowledge that the Confidentiality Agreement dated as of June 24, 2025, between Z Capital Partners, L.L.C. and Sellers (the "Confidentiality Agreement") shall remain in full force and effect until the Closing; provided that Section 3 of the Confidentiality Agreement shall have no further effect with regards to employees of Walker Edison Brasil Servicios Unipossoal LTDA, a company organized under the laws of Brazil, as of the date hereof. .

8.18    **Entire Agreement**. This Agreement, the Ancillary Agreements and the Confidentiality Agreement constitute the entire agreement between the Parties hereto regarding the subject matter hereof and supersede all prior contemporaneous agreements, arrangements, Contracts, discussions, negotiations, undertakings and understandings (including any letters of intent or term sheets, whether written or oral, between the Parties with respect to such subject matter or any prior course of dealings). No extrinsic evidence whatsoever may be introduced in any proceeding involving this Agreement, the Ancillary Agreements or the Confidentiality Agreement. The Parties each hereby acknowledge that this Agreement, the Ancillary Agreements and the

Confidentiality Agreement embody the justifiable expectations of sophisticated parties derived from arm's-length negotiations, and all parties to this Agreement, the Ancillary Agreements and the Confidentiality Agreement specifically acknowledge that no party has any special relationship with another party that would justify any expectation beyond that of an ordinary purchaser and an ordinary seller in an arm's-length transaction.

8.19    **Execution of this Agreement**. This Agreement may be executed in two or more counterparts, each of which shall be deemed to be an original, but all of which shall constitute one and the same agreement. The exchange of copies of this Agreement and of signature pages by electronic transmission shall constitute effective execution and delivery of this Agreement as to the Parties hereto and may be used in lieu of the original Agreement for all purposes. Signatures of the Parties hereto transmitted by electronic transmission shall be deemed to be their original signatures for all purposes.

8.20    **Release**. Effective as of immediately prior to the Closing, Sellers for itself and each of their Affiliates and each of their respective equityholders, successors and assigns, fully and unconditionally releases, acquits and forever discharges Purchaser from any and all manner of actions, causes of actions, claims obligations, demands, damages, costs, expenses, compensation or other relief, whether known or unknown, whether in law or equity, of any kind, Sellers now have or have ever had against Purchaser. Notwithstanding the foregoing, the release and discharge provided for in this Agreement shall not release Purchaser of their respective obligations or liabilities pursuant to this Agreement, the Ancillary Agreements or the Confidentiality Agreement.

*(Signatures appear on following page)*

IN WITNESS WHEREOF, the Parties hereto have caused their duly authorized officers to execute this Agreement as of the day and year first written above.

**SELLERS:**

**WALKER EDISON HOLDCO LLC**

By: _____

Name: Jeffrey P. Werner

Title: Chief Executive Officer

**WALKER EDISON INTERMEDIATE, LLC**

By: _____

Name: Jeffrey P. Werner

Title: Chief Executive Officer

**WALKER EDISON FURNITURE COMPANY LLC**

By: _____

Name: Jeffrey P. Werner

Title: Chief Executive Officer

**EW FURNITURE, LLC**

By: _____

Name: Jeffrey P. Werner

Title: Chief Executive Officer

**PURCHASER:**

**TWIN STAR INTERNATIONAL, INC.**

By: _Todd Outen_ _____
Signed by:
Todd Outen
2D5D7DEB279F4AA...

Name: Todd Outen
Title: President and Chief Commercial Officer

# EXHIBIT A

**Bill of Sale and Assignment and Assumption Agreement**

**BILL OF SALE AND ASSIGNMENT AND ASSUMPTION AGREEMENT**

This **BILL OF SALE AND ASSIGNMENT AND ASSUMPTION AGREEMENT**, dated as of [●], 2025 (this "Bill of Sale"), is entered into by and among Walker Edison Holdco LLC, a Delaware limited liability company, Walker Edison Intermediate, LLC, a Delaware limited liability company, Walker Edison Furniture Company LLC, a Utah limited liability company, and EW Furniture, LLC, a Utah limited liability company (collectively, "Sellers"), and Twin Star International, Inc., a Florida corporation ("Purchaser"). Sellers and Purchaser are sometimes herein referred to collectively as the "Parties" and individually as a "Party."

**WHEREAS**, the Parties entered into that certain Asset Purchase Agreement dated as of August 28, 2025 (as amended, the "Asset Purchase Agreement") providing for, among other things, the sale by the Sellers of certain specified assets relating to the business of the Sellers and certain of the liabilities of the Sellers to Purchaser, as further described in the Asset Purchase Agreement for consideration in the amount and upon the terms provided in the Asset Purchase Agreement; and

**WHEREAS**, by this instrument Sellers are vesting in Purchaser all of the properties, assets, rights, liabilities and obligations of Sellers hereinafter described.

**NOW, THEREFORE**, in consideration of the mutual covenants and agreements contained herein and in the Asset Purchase Agreement, and other good and valuable consideration, the receipt, adequacy and legal sufficiency of which are hereby acknowledged, the Parties hereto, intending to be legally bound, hereby agree as follows:

1.    **Sale and Transfer of Acquired Assets**. For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and pursuant to, and subject to the terms and conditions of, the Asset Purchase Agreement, effective as of the Closing, Sellers hereby sell, assign, transfer, convey and deliver to Purchaser, and Purchaser hereby purchases, acquires and accepts from Sellers, all of Sellers' right, title and interest in or to the Acquired Assets (other than (i) the Intellectual Property and (ii) the Assigned Contracts). For the avoidance of doubt, the Sellers are not selling, assigning, transferring, conveying or delivering to Purchaser any of the Excluded Assets.

2.    **Assumption of Assumed Liabilities**. For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and subject to the terms and conditions set forth in the Asset Purchase Agreement, effective as of the Closing, Purchaser hereby assumes and agrees to pay, perform and discharge in accordance with their respective terms, subject to all defenses or counterclaims with respect thereto, the Assumed Liabilities of Sellers (other than any Assumed Liabilities associated with the Intellectual Property or Assigned Contracts). For the avoidance of doubt, Purchaser is not assuming in any manner and shall not be liable or responsible for any of the Excluded Liabilities.

3.    **Terms of the Asset Purchase Agreement**. Capitalized terms used but not defined herein shall have the meanings given to such terms in the Asset Purchase Agreement. This Bill of Sale is entered into pursuant to, and subject to all of the terms and conditions of, the Asset Purchase

Agreement. Nothing contained in this Bill of Sale shall be deemed to supersede, enlarge on or modify any of the obligations, agreements, covenants or warranties of any Seller or Purchaser contained in the Asset Purchase Agreement. In the event of any conflict or inconsistency between this Bill of Sale and the Asset Purchase Agreement, the terms of the Asset Purchase Agreement shall prevail.

4.        **Miscellaneous**. Sections 8.5 (Amendment), 8.6 (Waiver), 8.7 (Notices), 8.8 (Jurisdiction), 8.9 (Waiver of Jury Trial), 8.10 (Governing Law), 8.11 (Damages), 8.13 (Severability), 8.14 (Titles and Headings), 8.15 (Assignment; Successors and Assigns); 8.16 (No Third-Party Rights) 8.18 (Entire Agreement) and 8.19 (Execution of this Agreement) of the Asset Purchase Agreement shall apply *mutatis mutandis* to this Bill of Sale.

*(Signatures appear on following page)*

IN WITNESS WHEREOF, the Parties hereto have caused their duly authorized officers to execute this Bill of Sale as of the day and year first written above.

**SELLERS:**

**WALKER EDISON HOLDCO LLC**

By:_____

Name:_____

Title:_____

**WALKER EDISON INTERMEDIATE, LLC**

By:_____

Name:_____

Title:_____

**WALKER EDISON FURNITURE COMPANY LLC**

By:_____

Name:_____

Title:_____

**EW FURNITURE, LLC**

By:_____

Name:_____

Title:_____

**PURCHASER:**

**TWIN STAR INTERNATIONAL, INC.**

By:_____
Name: Todd Outen
Title: President and Chief Commercial Officer

## <u>EXHIBIT B</u>

**Contract Assignment Agreement**

## CONTRACT ASSIGNMENT AGREEMENT

This **CONTRACT ASSIGNMENT AGREEMENT**, dated as of [●], 2025 (this "Assignment"), is entered into by and among Walker Edison Holdco LLC, a Delaware limited liability company, Walker Edison Intermediate, LLC, a Delaware limited liability company, Walker Edison Furniture Company LLC, a Utah limited liability company, and EW Furniture, LLC, a Utah limited liability company (collectively, "Sellers"), and Twin Star International, Inc., a Florida corporation ("Purchaser"). Sellers and Purchaser are sometimes herein referred to collectively as the "Parties" and individually as a "Party."

**WHEREAS**, the Parties entered into that certain Asset Purchase Agreement dated as of August 28, 2025 (as amended, the "Asset Purchase Agreement") providing for, among other things, the sale by the Sellers of certain specified assets relating to the business of the Sellers and certain of the liabilities of the Sellers to Purchaser, as further described in the Asset Purchase Agreement for consideration in the amount and upon the terms provided in the Asset Purchase Agreement; and

**WHEREAS**, by this instrument Sellers are vesting in Purchaser all of the properties, assets, rights, liabilities and obligations of Sellers hereinafter described.

**NOW, THEREFORE**, in consideration of the mutual covenants and agreements contained herein and in the Asset Purchase Agreement, and other good and valuable consideration, the receipt, adequacy and legal sufficiency of which are hereby acknowledged, the Parties hereto, intending to be legally bound, hereby agree as follows:

1.    **Assignment**. Pursuant to, and subject to the terms and conditions of, the Asset Purchase Agreement, effective as of the Closing, Sellers hereby sell, transfer, assign, convey and deliver to Purchaser, and Purchaser hereby accepts the sale, transfer, assignment, conveyance and delivery of, all of Sellers' right, title and interest in and to the Assigned Contracts set forth on Schedule 1.

2.    **Assumption**. Pursuant to, and subject to the terms and conditions of, the Asset Purchase Agreement, effective as of the Closing, Purchaser hereby assumes and agrees to pay, perform and discharge in accordance with their respective terms, and subject to all defenses or counterclaims with respect thereto, the Assumed Liabilities of Sellers associated with the Assigned Contracts set forth on Schedule 1.

3.    **Terms of the Asset Purchase Agreement**. Capitalized terms used but not defined herein shall have the meanings given to such terms in the Asset Purchase Agreement. This Assignment is entered into pursuant to, and subject to all of the terms and conditions of, the Asset Purchase Agreement. Nothing contained in this Assignment shall be deemed to supersede, enlarge on or modify any of the obligations, agreements, covenants or warranties of any Seller or Purchaser contained in the Asset Purchase Agreement. In the event of any conflict or inconsistency between this Assignment and the Asset Purchase Agreement, the terms of the Asset Purchase Agreement shall prevail.

4.     **Miscellaneous**.  Sections  8.5  (Amendment),  8.6  (Waiver),  8.7  (Notices),  8.8 (Jurisdiction),  8.9  (Waiver  of  Jury  Trial),  8.10  (Governing  Law),  8.11  (Damages),  8.13 (Severability), 8.14 (Titles and Headings), 8.15 (Assignment; Successors and Assigns); 8.16 (No Third-Party Rights) 8.18 (Entire Agreement) and 8.19 (Execution of this Agreement) of the Asset Purchase Agreement shall apply *mutatis mutandis* to this Assignment.

*(Signatures appear on following page)*

IN WITNESS WHEREOF, the Parties hereto have caused their duly authorized officers to execute this Assignment as of the day and year first written above.

**SELLERS:**

**WALKER EDISON HOLDCO LLC**

By:_____

Name:_____

Title:_____

**WALKER EDISON INTERMEDIATE, LLC**

By:_____

Name:_____

Title:_____

**WALKER EDISON FURNITURE COMPANY LLC**

By:_____

Name:_____

Title:_____

**EW FURNITURE, LLC**

By:_____

Name:_____

Title:_____

**PURCHASER:**

**TWIN STAR INTERNATIONAL, INC.**

By:_____

Name: Todd Outen

Title: President and Chief Commercial Officer

**<u>Schedule 1</u>**

**Assigned Contracts**

(*See attached*)

## <u>EXHIBIT C</u>

**IP Assignment Agreement**

## INTELLECTUAL  PROPERTY  ASSIGNMENT  AGREEMENT

This **INTELLECTUAL PROPERTY ASSIGNMENT AGREEMENT**, dated as of [●], 2025 (such date, the "Effective Date", and such agreement, this "Intellectual Property Assignment"), is entered into by and among by and among Walker Edison Holdco LLC, a Delaware limited liability company, Walker Edison Intermediate, LLC, a Delaware limited liability company, Walker Edison Furniture Company LLC, a Utah limited liability company, and EW Furniture, LLC, a Utah limited liability company (each individually, an "Assignor", and collectively, "Assignors"), and Twin Star International, Inc., a Florida corporation ("Assignee"). Assignors and Assignee are sometimes herein referred to collectively as the "Parties" and individually as a "Party."

WHEREAS, the Parties entered into that certain Asset Purchase Agreement dated as of August 28, 2025 (as amended, the "Asset Purchase Agreement") providing for, among other things, the sale by Assignors of certain specified assets relating to the business of Assignors and certain of the liabilities of Assignors to Assignee, as further described in the Asset Purchase Agreement for consideration in the amount and upon the terms provided in the Asset Purchase Agreement; and

WHEREAS, Assignors own the Intellectual Property, which includes the (a) issued patents and patent applications, (b) trademark and service mark registrations and applications, (c) copyright registrations and applications and (d) registered Internet domain names, in each case, set forth on Schedule 1 hereto; and

WHEREAS, pursuant to the Asset Purchase Agreement, Assignors desire to assign, transfer, convey and deliver to Assignee, and Assignee wish to acquire from Assignors, all of Assignors' right, title and interest in, to and under the Intellectual Property and all goodwill associated therewith or symbolized thereby.

NOW, THEREFORE, in consideration of the mutual covenants and agreements contained herein and in the Asset Purchase Agreement, and other good and valuable consideration, the receipt, adequacy and legal sufficiency of which are hereby acknowledged, the Parties hereto, intending to be legally bound, hereby agree as follows:

1.    **Assignment**. As of the Effective Date, Assignors hereby irrevocably sell, transfer, assign, convey and deliver to Assignee, and Assignee hereby accepts the sale, transfer, assignment, conveyance and delivery of, all right, title and interest in and to the Intellectual Property, together with all right, title and interest in and to (a) all goodwill of the business associated with or symbolized by the trademarks and service marks included in the Intellectual Property, (b) all common law rights in, and all rights derived from, the Intellectual Property and all issuances and registrations that may be granted thereon, (c) any past, present or future claims or causes of action (either in law or in equity) arising out of or related to any infringement, misappropriation, dilution or other violation of any of the Intellectual Property, and the right to sue for damages, injunctive relief, lost profits in connection therewith or any other remedy or otherwise recover therefor, (d) any and all income, royalties, damages and payments now or hereafter due and/or payable with respect to the Intellectual Property and the right to receive such

income, royalties and payments,€ the right to prosecute, maintain and defend the Intellectual Property, (f) the right to claim priority based on the Intellectual Property and (g) the right to fully and entirely stand in the place of Assignors in all matters related thereto, the same to be held and enjoyed by Assignee for its own use and enjoyment and the use and enjoyment of its successors and assigns as fully and entirely as the same would have been held and enjoyed by Assignors if this assignment had not been made. The assignments contemplated herein are meant to be an absolute assignment and not by way of security.

2.      **Further Assurances**.  As may be necessary, each Assignor shall use reasonable best efforts to (i) execute, acknowledge and deliver such other instruments, documents and agreements and (ii) do such other things, in each case, as may be reasonably necessary, proper or advisable to carry out its obligations under this Intellectual Property Assignment and as may be reasonably necessary, proper or advisable to more completely effectuate, consummate, record, perfect or confirm the transactions contemplated hereby. Each Assignor further agrees to assist Assignee in changing the technical and administrative contact information for the Internet domain names included in the Intellectual Property with the applicable Internet domain name registrars to such information of Assignee's choice (including by delivering to Assignee any and all applicable user names and passwords for any accounts related to such Internet domain names to enable Assignee to assume control of such Internet domain names).  If any Assignor fails to promptly take or execute any action or document described in this Section 2 after written request by Assignee, then such Assignor hereby constitutes and appoints Assignee as its true and lawful agent and attorney-in-fact, with full power of substitution, in the name and stead of such Assignor but on behalf and for the benefit of Assignee, to take and execute in the name of such Assignor any and all actions and documents that may be deemed necessary or proper to effectuate, consummate, record, perfect or confirm the transactions contemplated in this Intellectual Property Assignment.

3.      **Terms of the Asset Purchase Agreement**.  Capitalized terms used but not defined herein shall have the meanings given to such terms in the Asset Purchase Agreement. This Intellectual Property Assignment is entered into pursuant to, and subject to all of the terms and conditions of, the Asset Purchase Agreement.  Nothing contained in this Assignment shall be deemed to supersede, enlarge on or modify any of the obligations, agreements, covenants or warranties of any Assignor or Assignee contained in the Asset Purchase Agreement.  In the event of any conflict or inconsistency between this Intellectual Property Assignment and the Asset Purchase Agreement, the terms of the Asset Purchase Agreement shall prevail.

4.      **Miscellaneous**.  Sections 8.5 (Amendment), 8.6 (Waiver), 8.7 (Notices), 8.8 (Jurisdiction), 8.9 (Waiver of Jury Trial), 8.10 (Governing Law), 8.11 (Damages), 8.13 (Severability), 8.14 (Titles and Headings), 8.15 (Assignment; Successors and Assigns); 8.16 (No Third-Party Rights) 8.18 (Entire Agreement) and 8.19 (Execution of this Agreement) of the Asset Purchase Agreement shall apply *mutatis mutandis* to this Intellectual Property Assignment.

*(Signatures appear on following page)*

IN WITNESS WHEREOF, the Parties hereto have caused their duly authorized officers to execute this Intellectual Property Assignment as of the day and year first written above.

**ASSIGNORS:**

**WALKER EDISON HOLDCO LLC**

By:_____
Name:_____
Title:_____

**WALKER EDISON INTERMEDIATE, LLC**

By:_____
Name:_____
Title:_____

**WALKER EDISON FURNITURE COMPANY LLC**

By:_____
Name:_____
Title:_____

**EW FURNITURE, LLC**

By:_____
Name:_____
Title:_____

**ASSIGNEE:**

**TWIN STAR INTERNATIONAL, INC.**

By:_____
Name: Todd Outen
Title: President and Chief Commercial Officer