**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re<br><br>WALKER EDISON HOLDCO LLC, *et al.*,<br><br>Debtors.[1] | Chapter 11<br><br>Case No. 25-11602 (TMH)<br><br>(Joint Administration Requested)<br><br>**Re: D.I. 15, 18** |

**DECLARATION OF BRENT C. WILLIAMS IN SUPPORT OF THE
DEBTORS' BID PROCEDURES AND SALE MOTION**

I, Brent C. Williams, hereby declare under penalty of perjury that the following is true and correct to the best of my knowledge, information, and belief:

1. I am a Managing Director of Lincoln International LLC ("Lincoln"), which has its principal office at 110 N. Wacker Dr., 51st Floor, Chicago, Illinois 60606. I am authorized to make this declaration on behalf of Lincoln in support of the *Debtors' Motion for (I) an Order Pursuant to Sections 105, 363, 364, 365 and 541 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006 and 9007, and Del. Bankr. L.R. 2002-1 and 6004-1 (A) Approving Bid Procedures for the Sale of Substantially All of the Debtors' Assets; (B) Approving the Debtors' Entry into Stalking Horse Agreement and Related Bid Protections; (C) Approving Procedures for the Assumption and Assignment or Rejection of Designated Executory Contracts and Unexpired Leases; (D) Scheduling an Auction and Sale Hearing; (E) Approving Forms and Manner of Notice of Respective Dates, Times, and Places in Connection Therewith; and (F) Granting Related Relief; (II) an Order (A) Approving the Sale of the Debtors' Assets Free and Clear of Claims, Liens, and Encumbrances;*

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal EIN, are as follows: Walker Edison Holdco LLC (8817); Walker Edison Intermediate, LLC (3363); Walker Edison Furniture Company LLC (6576); and EW Furniture, LLC (6288). The Debtors' mailing address is 1553 W 9000 S, West Jordan, UT 84088.

1

*and (B) Approving the Assumption and Assignment of Designated Executory Contracts and Unexpired Leases; and (III) Certain Related Relief* (the "<u>Bid Procedures and Sale Motion</u>").[2] Unless otherwise stated in this declaration, I have personal knowledge of the facts set forth herein or provide this declaration based upon information provided to me by other Lincoln professionals.

**<u>Qualifications</u>**

2. Lincoln is an internationally recognized investment banking firm with approximately 1,000 professionals in more than 21 offices around the world. Lincoln has an excellent reputation and extensive relevant experience providing investment banking and related services in other complex chapter 11 cases. Lincoln has assisted and advised numerous debtors, committees, creditors, and other constituencies with respect to the Chapter 11 process, has knowledge of potential strategic and financial buyers in the Debtors' industry and is experienced in analyzing and testifying regarding corporate restructuring issues, including post-petition financing and section 363 asset sales. In 2024 alone, Lincoln closed over 400 transactions and completed over 15,000 company valuations. Lincoln and its senior professionals have extensive experience in providing investment banking services to various parties in complex situations, including both in- and out-of-court.

3. In addition to numerous out-of-court restructuring situations, Lincoln and its professionals have been actively involved in major chapter 11 cases. *See, e.g.*, *In re Noble House Home Furnishings, LLC*, Case No. 23-90773 (CML) (Bankr. S.D. Tex.); *In re IEH Auto Parts*

---

[2] Capitalized terms used but not defined herein shall have the meaning ascribed to them in the Bid Procedures and Sale Motion or *Debtors' Motion for Interim and Final Orders (I) Authorizing Secured Post-Petition Financing Pursuant to 11 U.S.C. § 364, (II) Authorizing Use of Cash Collateral, (III) Granting Adequate Protection Pursuant to 11 U.S.C. §§ 361, 363, and 364, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief.*

*Holding LLC*, Case No. 23-90054 (CML) (Bankr. S.D. Tex.); *In re Vital Pharmaceuticals, Inc.*, Case No. 22-17842 (PDR) (Bankr. S.D. Fla.); *In re Fast Radius, Inc.*, Case No. 22-11051 (JKS) (Bankr. D. Del.); *In re Pyxus International, Inc.*, Case No. 20-11570 (LSS) (Bankr. D. Del.); *In re Benevis Corp*, Case No. 20-33918 (MI) (Bankr. S.D. Tex.); *In re Valeritas Holdings, Inc.*, Case No. 20-10290 (LSS) (Bankr. D. Del); *In re Dura Automotive Sys., LLC*, Case No. 19-12378 (KBO) (Bankr. D. Del.); *In re PG&E Corp.*, Case No. 19-30088 (DM) (Bankr. N.D. Cal.); *In re CRS Reprocessing, LLC*, Case No. 17-32565 (ACS) (Bankr. W.D. Ky).

4. I personally have over 25 years of advisory experience on operational and financial restructurings, mergers and acquisitions (M&A) and capital raising services to stakeholders in stressed and distressed situations. I have advised in situations across the globe and have been involved in more than 100 restructuring transactions, involving over $125 billion of debt and $40 billion of distressed M&A deals. I have also testified on more than 35 bankruptcy related matters.

5. My partner Chris Stradling, who is working with me on this transaction, is the Co-Head of the U.S. Consumer Group at Lincoln International. In that role, he leads Lincoln's consumer products practice and advises companies on mergers and acquisitions. Mr. Stradling has extensive experience in the consumer industry, including expertise in areas such as e-commerce and direct-to-consumer marketing.

**The Prepetition Marketing Process**

6. On June 4, 2025, the Debtors engaged Lincoln as investment banker to provide advice, including the sale of the Debtors' assets, initiating these chapter 11 cases, all in the midst of an increasingly difficult liquidity situation.

7. Immediately upon its engagement, Lincoln worked closely with the Debtors' management to analyze the Debtors' financial position and outlook, prepare marketing and

diligence materials (including a Confidential Information Presentation), and populate an electronic data room (the "Data Room"). Specifically, Lincoln coordinated with management and conducted an on-site meeting culminating in a 32-page Confidential Information Presentation, a three-statement financial model and 133 files of pertinent Debtor information for upload into the Data Room.

8. Because of Lincoln's overall experience in the furniture sales sector, Lincoln was quickly able to identify the universe of potential purchasers. Lincoln contacted approximately 45 potential buyers, some of which were backed by private equity sponsors. Lincoln deemed these potential buyers the most likely to be interested in the acquisition of the Company given, among other things, the operational losses at the Company and the potential buyers' ability to pursue cost synergies.

9. The potential buyers included both domestic and international companies domiciled outside of the United States, in part because the Company has operations outside of the United States. Twenty of these parties signed non-disclosure agreements. Five parties submitted preliminary, non-binding Indications of Interest ("IOIs"), four parties have held direct meetings with management, and three parties submitted letters of intent ("LOIs"). Lincoln and management of the Debtors addressed approximately 230 diligence questions from the parties either via e-mail or during meetings with management. These efforts culminated in the submission of four (4) offers for substantially all of the Debtors' assets. Lincoln and the Debtors evaluated each submission and ultimately selected the Stalking Horse Bidder (as defined below) as the highest and best offer for the Debtors' assets.

10. As of the Petition Date, the potential buyers contacted by Lincoln have had approximately three (3) months to assess the opportunity. This amount of time is commensurate in

length with comparable distressed sale processes. Further, Lincoln has continued to engage with these potential purchasers and provide them the necessary diligence and analysis throughout the marketing process given the opportunity for potential buyers to overbid and the anticipated expedited sale timeline.

### The Stalking Horse Agreement

11.     The foregoing prepetition process culminated in the Asset Purchase Agreement dated as of August 28, 2025 (the "Stalking Horse Agreement") by and between the Debtors and Twin-Star International, Inc. (the "Stalking Horse Bidder"), a third-party private equity owned company, for the sale of substantially all the Debtors' assets. Pursuant to the terms of the Stalking Horse Agreement, the Stalking Horse Bidder has agreed to buy the purchased assets for $20 million, subject to a working capital adjustment, plus the assumption of certain liabilities. In addition, the Stalking Horse Bidder has agreed to retain a substantial number of the Company's employees post-Closing. The Stalking Horse Agreement has an outside closing date of September 28, 2025.

12.     Based on my knowledge of the Debtors' present economic circumstances, and on feedback received from potential buyers, I believe that the Stalking Horse Agreement represents the current highest and best offer for the Debtors' assets.

13.     Notwithstanding that Lincoln and the Debtors were negotiating with the Stalking Horse Bidder for several weeks prior to the Petition Date, Lincoln continued to work with potential buyers, seeking to encourage continuing interest in the assets and their participation in an overbid process. We have continued to cooperate and provide diligence to any party that indicated interest in further information. Importantly, none of these parties stated that the proposed shortened sale procedures would have any effect on their unwillingness to bid on the Debtors' assets.

14.     I believe that the Bid Protections, which provide for reimbursement of the

Stalking Horse Bidder's actual, reasonable, documented out-of-pocket expenses up to an amount not to exceed $500,000 and a break-up fee in the amount of $700,000 for the Stalking Horse Bidder, which were negotiated at arm's-length, are reasonable under the circumstances, will not discourage potential interested bidders from participating in the sale process, and are economically in the same range as other similar cases.  I believe these Bid Protections were a necessary component of the Stalking Horse Agreement.  I do not believe that the Stalking Horse Bidder would have agreed to the Stalking Horse Agreement or permitted their bids to be subject to superior offers post-petition, without the Bid Protections.

15. The Debtors, with the assistance of Lincoln, will continue marketing their assets throughout the chapter 11 cases, including by engaging in discussions with any party that executed or executes a confidentiality agreement, with the goal of having such parties participate in a value maximizing Auction and sale overbid process.

**Bid Procedures**

16. I have reviewed and am familiar with the Bid Procedures and Sale Motion. The Bidding Procedures describe, among other things, the procedures for interested parties to gain access to due diligence information, the process for submitting bids, the requirements for bidders and bids to become "qualified," the receipt and negotiation of bids received, the conduct of any auction, the selection and approval of one or more Successful Bidders (and designation of Back-Up Bids, each as defined in the Bid Procedures), and the deadlines with respect to the foregoing. I believe the Bidding Procedures will allow the Debtors to conduct any Auction in a fair and transparent manner that will encourage participation by financially capable bidders with a demonstrated ability to consummate a sale or sales.

17. As discussed in the First Day Declaration and above, the Debtors' liquidity is stressed, and an extended sale process will only negatively impact the value of their assets.

Lincoln has and continues to encourage interested parties to complete necessary diligence and analysis throughout the marketing period in order to be prepared for an expedited process. As set forth in the Debtors' proposed Bid Procedures, the Debtors are seeking a bid deadline of September 22, 2025, with an auction and hearing shortly thereafter, and a sale hearing on September 26, 2025.

18. It is urgently important that the sale process proceed promptly. Prolonging the sale process will only result in lost value as the Debtors are no longer purchasing inventory. I believe the Bid Procedures offer the best option reasonably available under the circumstances (including in light of the Debtors' limited liquidity and DIP Facility) to generate the greatest possible level of interest and consideration in purchasing the Debtors' assets.

### Debtor in Possession Financing

19. Finally, the Debtors' determination to move forward with the DIP Facility is a sound exercise of their business judgment following an arm's-length process and careful evaluation of available alternatives. The Debtors require significant postpetition financing to continue their operations and consummate the sale. As discussed herein and in the First Day Declaration, the Debtors and their advisors determined that the DIP Facility is the best way to stabilize the business and it is on fair and reasonable terms and similar to terms we see in transactions in similar circumstances. The Debtors and their advisors also determined that the DIP Facility provides certainty with respect to the capital necessary for the administration of these chapter 11 cases during the ongoing sale process. The fees, interest rate, and other borrowing availability provided for in the DIP Facility, taken as a whole, are fair and in the Debtors' best interests and the DIP Facility is the best financing option currently available to the Debtors under the circumstances.

20. The Debtors filed these chapter 11 cases to effectuate a sale of substantially all their assets to a going-concern buyer through a transaction that will preserve the Debtors'

business operations, jobs, and vendor relationships, subject to an auction/overbidding process, and maximize the value of the Debtors' estates for the benefit of all stakeholders. The Debtors anticipate that disclosure of the Stalking Horse Agreement and approval of the Bid Procedures will facilitate the continuation of the marketing process, which may lead to the receipt of competing bids and an auction. Whether or not any overbids are received, the Debtors' sale process will enable their estates to achieve a value-maximizing transaction.

        Pursuant to 28 U.S.C. § 1746, I declare under the penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated: August 28, 2025

By: */s/ Brent C. Williams*
Brent C. Williams
Lincoln International LLC