## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| Walker Edison Holdco LLC, *et al.*,[1] | Case No. 25-11602 (TMH) |
| Debtors. | (Jointly Administered) |
| | **Re: Docket Nos. 286 & 287** |
| | **Hearing Date: Nov. 12, 2025 at 11:00 a.m. (ET)** |
| | **Obj. Deadline: Nov. 6, 2025 at 4:00 p.m. (ET)[2]** |

**UNITED STATES TRUSTEE'S OBJECTION TO
DEBTORS' MOTION FOR ENTRY OF AN ORDER (I) APPROVING
THE COMBINED DISCLOSURE STATEMENT AND PLAN ON AN
INTERIM BASIS FOR SOLICITATION PURPOSES ONLY; (II) ESTABLISHING
PROCEDURES FOR SOLICITATION AND TABULATION OF VOTES TO
ACCEPT OR REJECT THE COMBINED DISCLOSURE STATEMENT AND
PLAN; (III) APPROVING THE FORM OF BALLOT AND SOLICITATION
PACKAGES; (IV) ESTABLISHING THE VOTING RECORD DATE; (V) SCHEDULING
A COMBINED HEARING FOR FINAL APPROVAL OF THE ADEQUACY OF
DISCLOSURES IN, AND CONFIRMATION OF, THE COMBINED DISCLOSURE
STATEMENT AND PLAN; (VI) APPROVING THE FORM OF COMBINED
HEARING NOTICE, AND (VII) GRANTING RELATED RELIEF**

Andrew R. Vara, the United States Trustee for Regions Three and Nine (the "U.S.

Trustee"), through his undersigned counsel, hereby objects (this "Objection") to the *Debtors'*

*Motion for Entry of an Order (I) Approving the Combined Disclosure Statement and Plan* (the

"Combined Plan" or "Plan") *on an Interim Basis for Solicitation Purposes Only; (II) Establishing*

*Procedures for Solicitation and Tabulation of Votes to Accept or Reject the Combined Disclosure*

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal EIN, are as follows: Walker Edison Holdco LLC (8817); Walker Edison Intermediate, LLC (3363); Walker Edison Furniture Company LLC (6576); and EW Furniture, LLC (6288). The Debtors' mailing address is 1553 W 9000 S, West Jordan, UT 84088.

[2] Extended from November 5, 2025 at 4:00 p.m. (ET) for the U.S. Trustee with the Debtors' consent.

*Statement and Plan; (III) Approving the Form of Ballot and Solicitation Packages; (IV) Establishing the Voting Record Date; (V) Scheduling a Combined Hearing for Final Approval of the Adequacy of Disclosures In, and Confirmation of, the Combined Disclosure Statement and Plan; (VI) Approving the Form of Combined Hearing Notice, and (VII) Granting Related Relief* [D.I. 287] (the "Motion"),[3] and in support of this Objection respectfully states:

## PRELIMINARY STATEMENT

1.      The Court should deny interim approval of the Combined Plan for purposes of solicitation for multiple separate and independent reasons.

2.      *First*, the proposed Combined Plan fails to provide adequate information as required pursuant to 11 U.S.C. § 1125.[4] For example, the Combined Plan fails to adequately inform creditors about the third-party release provisions contained therein.

3.      *Second*, the Combined Plan's proposed nonconsensual third-party releases render the Combined Plan unconfirmable. These releases extinguish a broad range of direct claims against non-debtor parties held by other non-debtor parties without their affirmative consent. The Releasing Parties include "all Holders of Claims or Interests who are sent a Ballot or Non-Voting Opt-Out Form and do not timely elect to opt-out of the releases provided by the Plan in accordance with the Solicitation Procedures," as well as such Holders' "Related Parties."

---

[3] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Combined Plan [D.I. 286].

[4] The U.S. Trustee provided the Debtors with informal comments to the Combined Plan and Motion, and the parties continue to discuss those comments in good faith. The U.S. Trustee understands that the Debtors may make certain changes to the Combined Plan and proposed solicitation procedures before the hearing thereon, including providing a solicitation version of their Liquidation Analysis. Out of an abundance of caution, and to avoid waiving any rights, the U.S. Trustee reserves the right to raise any and all objections at such hearing to the extent that the parties are unable to resolve the U.S. Trustee's comments.

4.      Accordingly, and for the reasons discussed in more detail herein, the Court should deny the Motion and deny interim approval of the Combined Plan.

## JURISDICTION AND STANDING

5.      This Court has jurisdiction to hear and determine the Motion, interim approval of the Combined Plan and this Objection pursuant to: (i) 28 U.S.C. § 1334; (ii) applicable order(s) of the United States District Court of the District of Delaware issued pursuant to 28 U.S.C. § 157(a); and (iii) 28 U.S.C. § 157(b)(2).

6.      Pursuant to 28 U.S.C. § 586, the U.S. Trustee is charged with overseeing the administration of chapter 11 cases filed in this judicial district. The duty is part of the U.S. Trustee's overarching responsibility to enforce the bankruptcy laws as written by Congress and interpreted by the Courts. *See Morgenstern v. Revco D.S., Inc. (In re Revco D.S., Inc.)*, 898 F.2d 498, 500 (6th Cir. 1990) (describing the U.S. Trustee as a "watchdog").

7.      Pursuant to 28 U.S.C. § 586(a)(3)(B), the U.S. Trustee has the duty to monitor plans and disclosure statements filed in chapter 11 cases, and to file "in connection with hearings under [11 U.S.C. §§ 1125 and 1128] comments with respect to such plans and disclosure statements" whenever the U.S. Trustee considers it appropriate to do so.

8.      The U.S. Trustee has standing to be heard on the Motion, interim approval of the Combined Plan and this Objection pursuant to 11 U.S.C. § 307. *See United States Trustee v. Columbia Gas Sys., Inc. (In re Columbia Gas Sys., Inc.)*, 33 F.3d 294, 295-96 (3d Cir. 1994) (noting that U.S. Trustee has "public interest standing" under 11 U.S.C. § 307, which goes beyond mere pecuniary interest).

**BACKGROUND**

**A.      The Chapter 11 Cases**

9.      On August 28, 2025 (the "Petition Date"), the above-captioned debtors and debtors in possession (collectively, the "Debtors") each filed a voluntary petition for relief pursuant to chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code," or "Code"), in the United States Bankruptcy Court for the District of Delaware (this "Court"), thereby commencing their respective above-captioned chapter 11 cases (the "Chapter 11 Cases").

10.      The Debtors continue to manage and operate their business as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

11.      On September 10, 2025, pursuant to section 1102(a)(1) of the Bankruptcy Code, the U.S. Trustee appointed an official committee of unsecured creditors in the Chapter 11 Cases (the "Committee"). D.I. 81.

12.      As of the date hereof, no trustee or examiner has been requested in the Chapter 11 Cases.

**B.      Relevant Provisions of the Proposed Solicitation Procedures**

13.      The Motion requests approval of the form of Ballot for use in soliciting votes from Class 3 (Prepetition Term Loan Claims) and Class 4 (General Unsecured Claims). Mot., ¶ 23. A form of ballot is appended to the proposed interim approval and procedures order [D.I. 287-2] (the "Proposed Order") as Exhibit 3. The Ballot does not mention the Third-Party Release (defined herein) until page 5. Proposed Order, Ex. 3, p. 5. The text of the Third-Party Release does not appear until page 8. *Id.* at Ex. 3, p. 8.

14.      The Motion also requests approval of the Combined Hearing Notice. *Id.* at ¶ 19. A form of Combined Hearing Notice is appended to the Proposed Order as Exhibit 2. The Combined

Hearing Notice does not mention the Third-Party Release prominently at the outset. Instead, at the bottom of page 3, the Combined Hearing Notice provides that the Combined Plan's injunction, exculpation and release provisions are attached thereto and that the receiving party's rights "might be affected thereunder." Proposed Order, Ex. 2, p. 3. The Combined Hearing Notice provides no other context or information regarding the Third-Party Release.

15.     The Motion also requests approval of a Notice of Non-Voting Status. Mot., ¶ 26. A form of Notice of Non-Voting Status is appended to the Proposed Order as Exhibit 4. Like the Combined Hearing Notice, the Notice of Non-Voting Status does not mention the Third-Party Release prominently at the outset. The Notice provides on page 2 that the Combined Plan's injunction, exculpation and release provisions are attached thereto. Proposed Order, Ex. 4, p. 2. The Notice of Non-Voting Status further provides that non-voting parties who do not submit an Opt-Out Election Form will be deemed to consent to the Third-Party Release. *Id.*

16.     The Motion also requests approval of the Opt-Out Election Form. Mot., ¶ 26. A form of Opt-Out Election Form is appended to the Proposed Order as Exhibit 5. The Opt-Out Election Form provides that "certain release, injunction and exculpation provisions set forth in the Plan" will become effective on the Effective Date, including the Third-Party Release. Proposed Order, Ex. 5, p. 1. The Opt-Out Election Form provides no other context or information regarding the Third-Party Release.

**C.      Specific Provisions of the Combined Plan**

17.     Article 10.7 of the Plan provides as follows (the "Third-Party Release"):

Except as otherwise expressly provided in the Plan or the Confirmation Order, on the Effective Date, except (i) for the right to enforce the Plan, and (ii) as otherwise expressly provided in the Plan or in the Confirmation Order, in exchange for good and valuable consideration, including the obligations of the Debtors under the Plan, to the fullest extent permissible under applicable law, the Released Parties shall be deemed conclusively, absolutely, unconditionally, irrevocably and forever released by the Releasing Parties in each case, from any and all Claims and Causes of

Action, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or hereinafter arising, in law or equity, whether arising under federal or state statutory or common law, or any other applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty, requirement or otherwise, that such entity would have been legally entitled to assert in their own right (whether individually, derivatively, or collectively) or on behalf of the Holder of any Claim or Interest or other Person, based on or relating to, or in any manner arising prior to the Effective Date (including prior to the Petition Date), in whole or in part, the Debtors, the chapter 11 cases, the pre-and post-petition marketing and sale process, the Sale, the DIP Facility or any related agreements, instruments, and other documents relating thereto, the RSA, Prepetition Term Loan Agreement, and any transactions related thereto, the purchase, sale, or rescission of the purchase or sale of any securities issued by the Debtors, the ownership of any securities issued by the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the administration or implementation of the Plan, including the issuance or Distribution of the Liquidating Trust Assets pursuant to the Plan, the creation of the Liquidating Trust, the business or contractual arrangements between any Debtor and any Released Party, the Global Settlement, the Disclosure Statement, the Plan (including any Plan Supplement), or the solicitation of votes with respect to the Plan, or any other act or omission, in all cases based upon any act or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date related or relating to the foregoing.

Notwithstanding anything to the contrary to the foregoing, the releases set forth above do not release (a) any Released Party from any Causes of Action arising from or related to any act or omission by such Released Party that is determined in a Final Order to have constituted willful misconduct, bad faith or gross negligence; and (b) any post-Effective Date obligations of any party or Entity under the Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

Combined Plan, Art. 10.7.

18.    The Combined Plan provides the following definition for "Released Party":

"Released Party" means collectively, (a) the current D&Os, employees, agents, representatives, advisors, attorneys, investment bankers and financial advisors of the Debtors; (b) Morris Nichols, as counsel to the Debtors; (c) Lincoln, as investment banker to the Debtors; (d) Macco, as financial advisor to the Debtors; (e) Epiq, as administrative advisor to the Debtors; (f) GDC, as special litigation counsel to the Debtors; (g) Parsons, as special litigation conflicts counsel to the Debtors; (h) Morris James, as counsel to the Committee; (i) the Prepetition Term Loan Secured Parties; (j) the DIP Secured Parties; (k) the members of the Committee, but solely in relation to their fiduciary duties to the Estates; (l) M3 Partners, as financial advisor to the Committee; (m) the Prepetition ABL Lender;

(n) Thomas B. Walper, as the Independent Restructuring Manager; and (o) the respective Related Parties for each of the foregoing to the extent such parties are or were acting in such capacity of or for any of the Persons identified in (a) through (n) above; provided, however, that for the avoidance of doubt, no defendants in the Utah Litigation or parties that have entered into tolling agreements with respect to potential claims and causes of action in connection with the Utah Litigation are Released Parties under this Plan; provided further, however, that PennantPark and its Related Parties shall each be a Released Party under this Plan except with respect to the specific "Causes of Action" as that term is defined in the PennantPark Tolling Agreements.

*Id.* at Art. 1.130.

19.     The Combined Plan provides the following definition for "Releasing Parties":

"Releasing Parties" means (a) all Holders of Claims or Interests who are sent a Ballot or Non-Voting Opt-Out Form and do not timely elect to opt-out of the releases provided by the Plan in accordance with the Solicitation Procedures and (b) each Released Party, and (ii) with respect to any Person or Entity in the foregoing clauses (a) and (b), the Related Party of such Person or Entity solely in their capacity as such (provided that with respect to any Related Party identified herein, each such Person constitutes a Releasing Party under this clause solely with respect to claims that such Related Party could have properly asserted for or on behalf of a Person identified in clauses (a) and (b) of the definition of Releasing Parties).

*Id.* at Art. 1.131.

20.     The Combined Plan provides the following definition for "Related Parties":

"Related Parties" means collectively with respect to any Person, such Person's current and former affiliates, directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, assigns, managed accounts or funds, advisors, employees, agents, attorneys, and other representatives, each in their capacities as such.

*Id.* at Art. 1.129.

21.     Additionally, the Combined Plan includes an injunction enforcing the Combined Plan's release and exculpation provisions, including the Third-Party Release (the "<u>Plan Injunction</u>"):

(a)     From and after the Effective Date, all Persons and Entities who have held, hold, or may hold Claims against or Interests in the Debtors (whether or not proof of such Claims or Interests has been filed and whether or not such Entities vote in

favor of, against or abstain from voting on the Plan or are presumed to have accepted or deemed to have rejected the Plan) are permanently enjoined, on and after the Effective Date, solely with respect to any Claims, Interests, and Causes of Action that will be or are extinguished or released pursuant to the Plan, from taking any of the following actions against the Debtors, the Released Parties, the Liquidating Trustee or the Liquidating Trust, or the property of any of the Debtors, the Released Parties, the Liquidating Trustee or the Liquidating Trust (i) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including, without limitation, any proceeding in a judicial, arbitral, administrative or other forum); (ii) enforcing, levying, attaching (including, without limitation, any prejudgment attachment), collecting, or otherwise recovering by any manner or means, whether directly or indirectly, any judgment, award, decree, or order; (iii) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind; (iv) asserting setoff unless such setoff was formally asserted in a timely Filed proof of Claim or in a pleading Filed with the Bankruptcy Court prior to entry of the Confirmation Order (notwithstanding any indication in any proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of setoff) or right of subrogation of any kind against any debt, liability, or obligation due to the Debtors; and (v) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan.

*Id.* at Art. 10.4. The Plan Injunction appears to prevent any Holder of a Claim from taking any action against a Released Party, whether or not that Holder opted out of the Third-Party Release.

**OBJECTION**

**I.    The Court Should Deny Interim Approval of the Combined Plan Because It Fails to Provide Adequate Information.**

**A.    Applicable Legal Standard**

22.    The disclosure statement requirement of Bankruptcy Code section 1125 is "crucial to the effective functioning of the federal bankruptcy system" and, consequently, "the importance of full and honest disclosure cannot be overstated." *Ryan Operations G.P. v. Santiam-Midwest Lumber Co.*, 81 F.3d 355, 362 (3d Cir. 1996) (citing *Oneida Motor Freight, Inc. v. United Jersey Bank (In re Oneida Motor Freight, Inc.)*, 848 F.2d 414, 417-18 (3d Cir. 1988)).

23.    Section 1125 of the Bankruptcy Code requires that a disclosure statement contain "adequate information." 11 U.S.C. § 1125(b). "Adequate information" under section 1125 is "determined by the facts and circumstances of each case." *See Oneida*, 848 F.2d at 417 (citing H.R. Rep. No. 595, 97th Cong., 2d Sess. 266 (1977)). The "adequate information" requirement is designed to help creditors in their negotiations with debtors over the plan. *See Century Glove, Inc. v. First Am. Bank*, 860 F.2d 94, 100 (3d Cir. 1988). Further, section 1129(a)(2) of the Bankruptcy Code conditions confirmation upon compliance with applicable Code provisions. The disclosure requirement of section 1125 is one of those provisions. *See* 11 U.S.C. § 1129(a)(2); *In re PWS Holding Corp.*, 228 F.3d 224, 248 (3d Cir. 2000).

24.    The Bankruptcy Code defines "adequate information" as:

> information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, including a discussion of the potential material Federal tax consequences of the plan to the debtor, any successor to the debtor, and a hypothetical investor typical of the holders of claims or interests in the case, *that would enable such a hypothetical reasonable investor of the relevant class to make an informed judgment about the plan*[.]

9

*See* 11 U.S.C. § 1125(a)(1) (emphasis added); *see also Momentum Mfg. Corp. v. Employee Creditors Comm. (In re Momentum Mfg. Corp.)*, 25 F.3d 1132, 1136 (2d Cir. 1994); *Kunica v. St. Jean Fin., Inc.*, 233 B.R. 46, 54 (S.D.N.Y. 1999).

25.    To be approved, a disclosure statement must include sufficient information to apprise creditors of the risks and financial consequences of the proposed plan. *See In re McLean Indus.*, 87 B.R. 830, 834 (Bankr. S.D.N.Y. 1987) ("substantial financial information with respect to the ramifications of any proposed plan will have to be provided to, and digested by, the creditors and other parties in interest in order to arrive at an informed decision concerning the acceptance or rejection of a proposed plan"). Although the adequacy of the disclosure is determined on a case-by-case basis, the disclosure must "contain simple and clear language delineating the consequences of the proposed plan on [creditors'] claims and the possible [Bankruptcy Code] alternatives so that they can intelligently accept or reject the plan." *In re Copy Crafters Quickprint, Inc.*, 92 B.R. 973, 981 (Bankr. N.D.N.Y. 1988).

26.    Section 1125 of the Bankruptcy Code is geared towards more disclosure rather than less. *See In re Crowthers McCall Pattern, Inc.*, 120 B.R. 279, 300 (Bankr. S.D.N.Y. 1990). The "adequate information" requirement merely establishes a floor, and not a ceiling for disclosure to voting creditors. *In re Adelphia Commc'ns Corp.*, 352 B.R. 592, 596 (Bankr. S.D.N.Y. 2006) (citing *Century Glove*, 860 F.2d at 100).

27.    Once the "adequate disclosure" floor is satisfied, additional information can go into a disclosure statement too, at least so long as the additional information is accurate and its inclusion is not misleading. *Id.* The purpose of the disclosure statement is to give creditors enough information so that they can make an informed choice of whether to approve or reject the debtor's plan. *In re Duratech Indus.*, 241 B.R. 291, 298 (Bankr. E.D.N.Y.), *aff'd*, 241 B.R. 283 (E.D.N.Y.

1999). The disclosure statement must inform the average creditor what it is going to get and when, and what contingencies there are that might intervene. *In re Ferretti*, 128 B.R. 16, 19 (Bankr. D.N.H. 1991).

**B.**      **The Combined Plan Fails to Provide Adequate Information.**

28.      Here, the Court should deny interim approval of the Combined Plan for solicitation purposes because it fails to provide adequate information in one key respect.

29.      The Combined Plan fails to adequately inform creditors about the Third-Party Release. For example, the Combined Plan does not identify all the parties who will be receiving releases. The defined term "Released Parties" itself includes the defined term "Related Parties," which is comprised of broad categories of entities who are not identified in the Combined Plan (or anywhere else) with any specificity. The Related Parties' entitlement to a release is equally unsupported in the Combined Plan.

30.      Additionally, the Combined Plan's definition of "Released Parties" also includes the Debtors' and Committee's professionals. The Debtors' and Committee's professionals are receiving these releases notwithstanding the fact that they are also included in the definition of "Exculpated Parties." Combined Plan, Art. 1.56. The Combined Plan does not include any information regarding what consideration such professionals are providing in support of these releases, or their entitlement to same.[5]

---

[5] The Third-Party Release of estate professionals is especially problematic with respect to Parsons Behle & Latimer, PC in its capacity "as special litigation conflicts counsel to the Debtors." Combined Plan, Art. 1.130(g). The Debtors originally contemplated retaining Parsons as an ordinary course professional. *Order Authorizing the Retention and Employment of Professionals Used in the Ordinary Course Effective as of the Petition Date*, D.I. 267 (the "OCP Order"), Ex. 1, p. 2. However, as of the date of this Objection, Parsons does not appear to have filed its Rule 2014 Statement, which is a condition precedent to the Debtors' retention and payment of an ordinary course professional. *Id.* at ¶¶ 3, 7. It is unclear whether or when Parsons intends to file its Rule 2014 Statement, and the Combined Plan includes no discussion of the foregoing issues.

31.     Because the Combined Plan fails to provide adequate information as to the issue(s) identified above, the Court should not approve it on an interim basis for solicitation purposes.

## II.     The Court Should Deny Interim Approval of the Combined Plan Because It Is Patently Unconfirmable on Its Face.

32.     If a proposed plan is patently unconfirmable on its face, the bankruptcy court must deny the application to approve the disclosure statement. *See generally In re Quigley Co.,* 377 B.R. 110, 115 (Bankr. S.D.N.Y. 2007) *(citing In re Beyond.com Corp.*, 289 B.R. 138, 140 (Bankr. N.D. Cal. 2003) (collecting cases); *In re 266 Washington Assocs.*, 141 B.R. 275, 288 (Bankr. E.D.N.Y.) *aff'd*, 147 B.R. 827 (E.D.N.Y. 1992); *In re Filex, Inc.*, 116 B.R. 37, 41 (Bankr. S.D.N.Y. 1990)). Here, the Combined Plan is unconfirmable because it includes a nonconsensual Third-Party Release.

33.     The Supreme Court held in *Harrington v. Purdue Pharma L.P.* that bankruptcy courts cannot involuntarily alter relationships between non-debtors by imposing nonconsensual releases of, or injunctions barring, claims between them. 603 U.S. 204, 209, 227 (2024). The Court did not prohibit chapter 11 plans from memorializing consensual third-party releases, and it did not "express a view on what qualifies as a consensual release." *Id.* at 226.

34.     A consensual third-party release is a separate agreement between nondebtors governed by nonbankruptcy law. As the Supreme Court recognized in Purdue, a release is a type of settlement agreement. *Purdue*, 603 U.S. at 223 (explaining that what the Sacklers sought was not "a traditional release" because "settlements are, by definition, consensual") (cleaned up). A bankruptcy court can acknowledge the parties' agreement to a third-party release, but the authority for a consensual release is the agreement itself, not the Bankruptcy Code. If a claim has been extinguished by virtue of the agreement of the parties, then the court is not using the forcible authority of the Bankruptcy Code or the bankruptcy court to extinguish the property right.

35.     Here, there is no existing release agreement between nondebtors. The Debtors instead seek to confirm a plan that would use the power of the court to impose a third-party release on claimants without their affirmative and voluntary consent. Such a confirmation order would impermissibly alter the relations between non-debtors because a valid release does not exist under nonbankruptcy law.

### A.    State Contract Law Governs the Third-Party Release Provisions.

36.     "[T]he basic federal rule in bankruptcy is that state law governs the substance of claims." *Travelers Cas. & Sur. Co. of America v. Pac. Gas & Elec. Co.*, 549 U.S. 443, 450-451 (2007) (cleaned up); *accord Butner v. United States*, 440 U.S. 48 (1979). Thus, courts apply state law when the question is whether a debtor has entered a valid settlement agreement. *See Houston v. Holder (In re Omni Video, Inc.)*, 60 F.3d 230, 232 (5th Cir. 1995) ("Federal bankruptcy law fails to address the validity of settlements and this gap should be filled by state law."); *De La Fuente v. Wells Fargo Bank, N.A. (In re De La Fuente)*, 409 B.R. 842, 845 (Bankr. S.D. Tex. 2009) ("Where the United States is not a party, it is well established that settlement agreements in pending bankruptcy cases are considered contract matters governed by state law.").

37.     The rule is no different for third-party releases. They are separate agreements between nondebtors governed by state law. Unlike a bankruptcy discharge, which "is an involuntary release by operation of law," "[i]n the case of voluntary releases, the nondebtor is released from a debt, not by virtue of 11 U.S.C. § 1141(b), but because the *creditor agrees to do so.*" *In re Arrowmill Dev. Corp.*, 211 B.R. 497, 503, 507 (Bankr. D.N.J. 1997) (emphasis in original); *see also Continental Airlines Corp. v. Air Line Pilots Assn., Int'l (In re Continental Airlines Corp.)*, 907 F.2d 1500, 1508 (5th Cir. 1990) (holding that for settlement provisions "unrelated to substantive provisions of the Bankruptcy Code," "the settlement itself is the source

of the bankruptcy court's authority"). Thus, "the Bankruptcy Code has not altered the contractual obligations of third parties, the parties themselves have so agreed." *Arrowmill*, 211 B.R. at 507.

38. Because the Bankruptcy Code does not authorize the imposition of an involuntary release, *Purdue*, 603 U.S. at 209, 227, the release must be consensual under nonbankruptcy law. There is no Bankruptcy Code provision that preempts otherwise applicable state contract law governing releases between non-debtors. *See, e.g., Shady Grove Orthopedic Assocs. v. Allstate Ins. Co.*, 559 U.S. 393, 416 (2010) (plurality) ("For where neither the Constitution, a treaty, nor a statute provides the rule of decision or authorizes a federal court to supply one, 'state law must govern because there can be no other law.'") (quoting *Hanna v. Plumer*, 380 U.S. 460, 471-72 (1965)); *Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938) ("Except in matters governed by the Federal Constitution or by acts of Congress, the law to be applied in any case is the law of the state."). Section 105(a), for example, "serves only to carry out authorities expressly conferred elsewhere in the code." *Purdue*, 603 U.S. at 216 n.2 (quotation marks omitted). But the Code does not confer any authority to impose a release of claims between nondebtors that would not be valid under state law. The Bankruptcy Code does not define a "consensual release." *See* 11 U.S.C. § 101. "There is no rule that specifies an 'opt out' mechanism or a 'deemed consent' mechanism" for third-party releases in chapter 11 plans. *In re Chassix Holdings, Inc.*, 533 B.R. 64, 78 (Bankr. S.D.N.Y. 2015). And no Code provision authorizes bankruptcy courts to deem a nondebtor to have consented to release claims against other nondebtors where such consent would not exist as a matter of state law.

39. Some courts have held that federal rather than state law applies to determine whether a third-party release is consensual. But because there is no applicable Code provision, whether a nondebtor has consented to release another nondebtor is not, as one court concluded, a

"matter of federal bankruptcy law." *In re Spirit Airlines, Inc.*, No. 24-11988, 2025 WL 737068, at

*18, *22 (Bankr. S.D.N.Y Mar. 7, 2025); *see also In re Robertshaw US Holding Corp.*, 662 B.R.

300, 323 (Bankr. S.D. Tex. 2024) (relying on caselaw in the district rather than any provision of

the Bankruptcy Code). Absent express authority in the Code, federal courts cannot simply make

up their own rules for when parties have given up property rights by releasing claims. Bankruptcy

courts cannot "create substantive rights that are otherwise unavailable under applicable law," nor

do they possess a "roving commission to do equity." *In re Dairy Mart Convenience Stores, Inc.*,

351 F.3d 86, 92 (2d Cir. 2003) (quotation omitted). Indeed, nearly a hundred years ago, the

Supreme Court rejected the notion that federal courts can displace state law as "an unconstitutional

assumption of powers by the Courts of the United States which no lapse of time or respectable

array of opinion should make us hesitate to correct." *Erie*, 304 U.S. at 79 (cleaned up); *accord*

*Rodriquez v. FDIC*, 589 U.S. 132, 133 (2020) (holding state law applies to determine allocation

of federal tax refund resulting from consolidated tax return). Courts thus may not invent their own

rule for when parties may be "deemed" to have given up property rights by releasing claims.

40.     Accordingly, state-law contract principles govern whether a third-party release is

consensual. *See, e.g.*, *Patterson v. Mahwah Bergen Ret. Grp., Inc.*, 636 B.R. 641, 684-85 (E.D.

Va. 2022) (describing bankruptcy courts in the District of New Jersey as "look[ing] to the

principles of contract law rather than the bankruptcy court's confirmation authority to conclude

that the validity of the releases requires affirmative consent"); *In re Smallhold, Inc.*, 665 B.R. 704,

720 (Bankr. D. Del. 2024) (recognizing that "some sort of affirmative expression of consent that

would be sufficient as a matter of contract law" is required); *In re SunEdison, Inc.*, 576 B.R. 453,

458 (Bankr. S.D.N.Y. 2017) ("Courts generally apply contract principles in deciding whether a

creditor consents to a third-party release."); *Arrowmill*, 211 B.R. at 506, 507 (explaining that a

third-party release "is no different from any other settlement or contract" and thus "the validity of the release . . . hinge[s] upon principles of straight contract law or quasi-contract law rather than upon the bankruptcy court's confirmation order") (internal quotation marks omitted) (alterations in original). Because "'nothing in the bankruptcy code contemplates (much less authorizes it)' . . . any proposal for a non-debtor release is an ancillary offer that becomes a contract upon acceptance and consent." *In re Tonawanda Coke Corp.*, 662 B.R. 220, 222 (Bankr. W.D.N.Y. 2024) (quoting *Purdue*, 603 U.S. at 223). And "any such consensual agreement would be governed by state law." *Id.*

41.     Even if federal law applied, however, it would not lead to a different result. That is because "federal contract law is largely indistinguishable from general contract principles under state common law." *Young v. BP Expl. & Prod., Inc. (In re Deepwater Horizon)*, 786 F.3d 344, 354 (5th Cir 2015) (cleaned up); *see also Deville v. United States*, 202 F. App'x 761, 763 n.3 (5th Cir. 2006) ("The federal law that governs whether a contract exists 'uses the core principles of the common law of contracts that are in force in most states.' . . . These core principles can be derived from the Restatements.") (quoting *Smith v. United States*, 328 F.3d 760, 767 n.8 (5th Cir. 2003)).

**B.     Under State Law, Silence is Not Acceptance.**

42.     The Debtors bear the burden to prove that their plan is confirmable. *In re American Cap. Equip., LLC*, 688 F.3d 145, 155 (3d Cir. 2012). Under Delaware law, like in other states, an agreement to release claims—like any other contract—requires a manifestation of assent to that agreement. *See, e.g.*, RESTATEMENT (SECOND) OF CONTRACTS § 17(1) ("[T]he formation of a contract requires a bargain in which there is manifestation of mutual assent to the exchange and a consideration."); *In re Hertz Corp.*, 120 F.4th 1181, 1192 (3d Cir. 2024) ("Contract law does not bind parties to promises they did not make."); *Eagle Force Holdings, LLC v. Campbell*, 187 A.3d

1209, 1229 (Del. 2018) ("Under Delaware law, overt manifestation of assent . . . controls the formation of a contract.") (cleaned up).

43.     Thus, "[o]rdinarily[,] an offeror does not have power to cause the silence of the offeree to operate as acceptance." RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a (1981); *accord* 1 Corbin on Contracts § 3.19 (2018); 4 Williston on Contracts § 6:67 (4th ed.); *see also Reichert v. Rapid Investments, Inc.*, 56 F.4th 1220, 1227 (9th Cir. 2022) ("[T]he offeror cannot prescribe conditions so as to turn silence into acceptance."); *Jacques v. Solomon & Solomon P.C.*, 886 F. Supp. 2d 429, 433 n.3 (D. Del. 2012) ("Merely sending an unsolicited offer does not impose upon the party receiving it any duty to speak or deprive the party of its privilege of remaining silent without accepting."); *Elfar v. Wilmington Trust, N.A.*, No. 20-0273, 2020 WL 7074609, at *2 n.3 (E.D. Cal. Dec. 3, 2020) ("The court is aware of no jurisdiction whose contract law construes silence as acceptance of an offer, as the general rule."), *adopted by* 2020 WL 1700778, at *1 (E.D. Cal. Feb. 11, 2021).

44.     There are only very limited exceptions to the "general rule of contracts . . . that silence cannot manifest consent." *Patterson*, 636 B.R. at 686; *see also, e.g.*, *McGurn v. Bell Microproducts, Inc.*, 284 F.3d 86, 90 (1st Cir. 2002) (recognizing "general rule" that "silence in response to an offer . . . does not constitute acceptance of the offer"). "[T]he exceptional cases where silence is acceptance fall into two main classes: those where the offeree silently takes offered benefits, and those where one party relies on the other party's manifestation of intention that silence may operate as acceptance. Even in those cases the contract may be unenforceable under the Statute of Frauds." RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a.

45.     But absent such extraordinary circumstances, "[t]he mere receipt of an unsolicited offer does not impair the offeree's freedom of action or inaction or impose on him any duty to

speak." *Id.* And "[t]he mere fact that an offeror states that silence will constitute acceptance does not deprive the offeree of his privilege to remain silent without accepting." *Id.* § 69, cmt. c; *see also Patterson*, 636 B.R. at 686 (explaining how contract law does not support deeming consent based upon a failure to opt out); *Jacques*, 886 F. Supp. 2d at 433 n.3.

### C. Failure to Opt Out Does Not Provide the Required Affirmative Consent.

46.     The Combined Plan imposes the Third-Party Release on any creditor or equity holder who is "sent a Ballot or Non-Voting Opt-Out Form" and fails to "timely elect to opt-out[.]" Combined Plan, Art. 1.131. In other words, the Debtors purport to impose an otherwise non-existent duty to speak on claimants regarding the offer to release nondebtors, and their silence— the failure to opt out—is "deemed" consent. But under black-letter law that silence is not acceptance of the offer to release nondebtors. *See, e.g.*, *Patterson*, 636 B.R. at 688 ("Whether the Court labels these 'nonconsensual' or based on 'implied consent' matters not, because in either case there is a lack of sufficient affirmation of consent.").

47.     A case from the Ninth Circuit illustrates the point. In *Norcia v. Samsung Telecom. Am., LLC*, 845 F.3d 1279, 1286 (9th Cir. 2017), cited with approval by the Third Circuit in *Noble v. Samsung Elec. Am., Inc.*, 682 F. App'x 113, 117-118 (3d Cir. 2017), and the Fifth Circuit in *Imperial Ind. Supply Co. v. Thomas*, 825 F. App'x 204, 207 (5th Cir. 2020), the court held that a failure to opt out did not constitute consent to an arbitration agreement. A consumer bought a Samsung phone and signed the Verizon Wireless Customer Agreement. *Norcia*, 845 F.3d at 1282. The phone came with a Samsung warranty brochure that contained an arbitration provision but gave purchasers the ability to opt out of it without affecting the warranty coverage. *Id*. The customer did not opt out. *Id*. When the customer later sued Samsung, Samsung argued that the arbitration provision applied. *Id*. at 1282-83.

48.     The Ninth Circuit in *Norcia* held that the customer's failure to opt out did not constitute consent to arbitrate. The court applied the "general rule," applicable under California law, that "silence or inaction does not constitute acceptance of an offer." *Norcia*, 845 F.3d at 1284 (quotation marks omitted). The customer did not agree to arbitrate because he did not "sign the brochure or otherwise act in a manner that would show his intent to use his silence, or failure to opt out, as a means of accepting the arbitration agreement." *Norcia*, 845 F.3d at 1285 (quotation marks omitted). This was true, even though the customer *did* take action to accept the offered contract from Verizon Wireless. "Samsung's offer to arbitrate all disputes with [the customer] cannot be turned into an agreement because the person to whom it is made or sent makes no reply, even though the offer states that silence will be taken as consent, unless an exception to this general rule applies." *Id*. at 1286 (quotation marks and citation omitted).

49.     The Ninth Circuit held that none of the exceptions to this rule applied. *Norcia*, 845 F.3d at 1284-85. There was no state law imposing a duty on the customer to act in response to the offer, the parties did not have a prior course of dealing that might impose such a duty, and the customer did not retain any benefits by failing to act given that the warranty applied whether or not he opted out of the arbitration provision. *Id*. at 1286.

50.     Here, too, the Debtors' creditors have not signed an agreement to release the non-debtor releasees nor acted in any other manner to suggest that their silence manifests an intention to accept an offer to release the non-debtors.

**D.      Not Voting and Not Opting Out is Not Consent to Release Nondebtors.**

51.     Third-party releases cannot be imposed on those who do not vote and do not opt out. *See Smallhold*, 665 B.R. at 709; *SunEdison*, 576 B.R. at 458–61; *Chassix*, 533 B.R. at 81–82; *In re Washington Mut., Inc.*, 442 B.R. 314, 355 (Bankr. D. Del. 2011). This applies both to creditors in voting classes who do not vote as well as creditors in non-voting classes who receive

an opt-out notice. There is no basis to infer consent by those who do not vote and are taking no action with respect to the plan.

52.     Even where there are conspicuous warnings that a party will be bound if they remain silent, that is not sufficient to recast a party's silence as consent to a third-party release. *SunEdison*, 576 B.R. at 458–61. Creditors have no legal duty to vote on a plan, much less to respond to an offer to release nondebtors included in a plan solicitation. *See, e.g.*, 11 U.S.C. § 1126(a) (providing that creditors "may" vote on a plan); *SunEdison*, 576 B.R. at 460–61 (recognizing that creditors have no duty to speak regarding a plan that would allow a court to infer consent to third-party releases from silence). Consent thus cannot be inferred from their silence because "[t]he mere fact that an offeror states that silence will constitute acceptance does not deprive the offeree of his privilege to remain silent without accepting." RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. c (1981). Nor can it "impose on him any duty to speak." *Id.* § 69 cmt. a.

53.     Further, "[w]hen the circumstances are equally consistent with either of two facts, neither fact may be inferred." *See In re Couture Hotel Corp.*, 554 B.R. 369, 383 n.80 (Bankr. N.D. Tex. 2016). Consent thus cannot be inferred here because parties who are solicited but do not vote may have failed to vote for reasons other than an intention to assent to the releases. *SunEdison*, 576 B.R. at 461. This is especially true for those whose votes are not solicited at all—but who are instead sent a notice informing them they cannot vote, along with a form to opt out that they must return to avoid being bound by the third-party release.

54.     "Charging all inactive creditors with full knowledge of the scope and implications of the proposed third-party releases, and implying a 'consent' to the third-party releases based on the creditors' inaction, is simply not realistic or fair and would stretch the meaning of 'consent' beyond the breaking point." *Chassix*, 533 B.R. at 81. "It is reasonable to require creditors to pay

attention to what the debtor is doing in bankruptcy as it relates to the creditor's rights against the

debtor. But as to the creditor's rights against third parties—which belong to the creditor and not

the bankruptcy estate—a creditor should not expect that those rights are even subject to being

given away through the debtor's bankruptcy." *Smallhold*, 665 B.R. at 721; *see also id.* at 719-20

(discussing *Chassix*). "A party's receipt of a notice imposing an artificial opt-out requirement, the

recipient's possible understanding of the meaning and ramifications of such notice, and the

recipient's failure to opt-out simply do not qualify" as consent. *Emerge Energy Services, LP*, No.

19-11563, 2019 WL 7634308, at *18 (Bankr. D. Del. Dec. 5, 2019) (emphasis in original). "[B]asic

contract principles" require affirmative assent, not inferences drawn from inaction that in fact may

reflect only "[c]arelessness, inattentiveness, or mistake." *Id.*

55.     Simply put, an "opt out mechanism is not sufficient to support the third-party

releases . . . particularly with respect to parties who do not return a ballot (or are not entitled to

vote in the first place)." *In re Washington Mut., Inc.*, 442 B.R. 314, 355 (Bankr. D. Del. 2011); *see*

*also Chassix*, 533 B.R. at 81–82.

**E.     Voting On a Plan and Failing to Opt Out Does Not Manifest Consent to a Nondebtor Release.**

56.     Voting to accept a plan without checking an opt-out box does not constitute the

affirmative consent necessary to reflect acceptance of an offer to enter a contract to release claims

against non-debtors. See RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a (1981). Voting to

approve a plan plus a failure to opt out of a third-party release is nothing more than silence with

respect to the offer to release claims against nondebtors. The act of voting on a chapter 11 plan

without opting out is not conduct that "manifest[s] [an] intention that silence may operate as

acceptance" of a proposal that the creditor release claims against non-debtors. RESTATEMENT

(SECOND) OF CONTRACTS § 69 cmt. a. Impaired creditors have a federal right under the Bankruptcy

Code to vote on a chapter 11 plan. 11 U.S.C. § 1126(a). Merely exercising that right does not manifest consent to release claims against nondebtors.

57.     Even more obviously, those who vote to reject the plan are not consenting to third-party releases by failing to mark an opt-out box. Not only is there no "mutual agreement" as to the plan, much less the third-party release, the creditor has expressly stated its rejection of the plan. As the court in *In re Chassix Holdings, Inc.*, reasoned: "[A] creditor who votes to reject a plan should also be presumed to have rejected the proposed third-party releases that are set forth in the plan. The additional 'opt out' requirement, in the context of this case, would have been little more than a Court-endorsed trap for the careless or inattentive creditor." 533 B.R. 64, 79 (Bankr. S.D.N.Y. 2015) (emphasis added).

58.     One bankruptcy court has found that, in at least some circumstances, a failure to opt out constitutes consent when a claimant votes—either to accept or reject a plan—but not if they do not vote. *See Smallhold*, 665 B.R. at 723. The *Smallhold* court incorrectly reasoned that because the act of voting on a debtor's plan is an "affirmative step" taken after notice of the third-party release, failing to opt out binds the voter to the release. *Id.* But while voting is an "affirmative step" with respect to the debtor's plan, it is not a "manifestation of intention that silence may operate as acceptance" of a third-party release. RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a (1981) (emphasis added). That is because "[t]he mere receipt of an unsolicited offer does not impair the offeree's freedom of action or inaction," *id.*—in this case, the federal right to vote on a chapter 11 plan. 11 U.S.C. § 1126(a). Nor does it "impose on him any duty to speak," RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a, such as by checking an opt out box. Thus, consent to release third-party claims (which are governed by nonbankruptcy law) cannot properly

be inferred from a party's failure to check an opt-out box on a ballot to vote on the proposed treatment of claims against the debtor (governed by bankruptcy law).

### F.     The Proposed Notices are Insufficient.

59.      The Combined Plan cannot be approved for solicitation because it fails to provide adequate notice of the Third-Party Release. Imputing state-law consent to a nondebtor release assumes that the creditor understands that the failure to opt out will have this dramatic impact. This, in turn, would require both that the creditor see the nondebtor release provision and that the creditor understand its terms. But in these cases, that is an assumption lacking any evidentiary support.

60.      There is no acceptance of an offer when there is insufficient notice of the alleged contractual terms. *See Norcia*, 845 F.3d at 1285. "[A]n offeree, regardless of apparent manifestation of his consent, is not bound by inconspicuous contractual provisions of which he was unaware, contained in a document whose contractual nature is not obvious." *Id*. (quotation marks omitted); *see also Noble v. Samsung Elec. Am., Inc.*, 682 F. App'x 113, 117-118 (3d Cir. 2017) (reaffirming that a person cannot be presumed to have agreed to contractual provisions unless "there is a reasonable basis to conclude that consumers will have understood the document contained a bilateral agreement")**]**. Hence, failing to opt out does not reflect actual and knowing consent, particularly in the context of "an immensely complicated plan" where "it would be difficult for any layperson to comprehend all of its details." *In re Congoleum Corp.*, 362 B.R. 167, 194 (Bankr. D.N.J. 2007).

61.      Here, the proposed notices bury the Third-Party Release provisions, do not include any meaningful discussion of their terms, include the releases written in dense legalese, and are written so vaguely that parties cannot determine who is being released.

**G.      Opt Outs Cannot Be Imposed Based on a Procedural Default Theory.**

62.      Applicable state contract law cannot be disregarded on a procedural default theory, applied by some courts, under which creditors who remain silent are held to have forfeited their rights against nondebtors if they received notice of the nondebtor release but failed to object, just as they would forfeit their right to object to a debtor's plan if they failed timely to do so. *See, e.g.*, *In re Arsenal Intermediate Holdings, LLC*, No. 23-10097, 2023 WL 2655592, at *5-*6 (Bankr. D. Del. Mar. 27, 2023), *abrogated by Smallhold, Inc.*, 665 B.R. at 716; *In re Mallinckrodt PLC*, 639 B.R. 837, 879-80 (Bankr. D. Del. 2022); *In re DBSD North America, Inc.*, 419 B.R. 179, 218-19 (Bankr. S.D.N.Y. 2009), *aff'd on other grounds*, 2010 WL 1223109 (S.D.N.Y. Mar. 24, 2010), *rev'd in part and aff'd in part*, 634 F.3d 79 (2d Cir. 2011). These courts reasoned that so long as the creditors received notice of a proposed nondebtor release and were informed of the consequences if they did not opt out or object to that release, there is no unfairness or deprivation of due process from binding them to the release. *Cf. Smallhold*, 665 B.R. at 708 (describing this reasoning as having treated a mere "failure to opt out" as "allow[ing] entry of the third-party release to be entered by default").

63.      A fuller explanation of this theory was articulated prior to the *Purdue* ruling in *In re Mallinckrodt PLC*, 639 B.R. 837, 879-80 (Bankr. D. Del. 2022). The *Mallinckrodt* court stated that "the notion that an individual or entity is in some instances deemed to consent to something by their failure to act is one that is utilized throughout the judicial system." *Id.* "When a party to a lawsuit is served with a complaint or a motion, they need to file an answer or otherwise respond, or a judgment is automatically entered against them." *Id.* at 879. The court reasoned that "[t]here is no reason why this principle should not be applied in the same manner to properly noticed releases within a plan of reorganization." *Id.*

64.     This is wrong. *First*, when a party in litigation is bound to a result based on a failure to timely respond, it is not because the defaulting party has consented to an adverse ruling. Rather, "failure to make timely assertion of [a] right before a tribunal having jurisdiction to determine it" results in forfeiture of the right. *United States v. Olano*, 507 U.S. 725, 731 (1993). Forfeiture, unlike waiver, is not an intentional relinquishment of a known right. *Id.* at 733; *cf. Smallhold*, 665 B.R. at 718 ("In this context, the word 'consent' is used in a shorthand, and somewhat imprecise, way. It may be more accurate to say that the counterparty forfeits its objection on account of its default."). Forfeiture principles thus do not show consent.

65.     *Second*, there is no basis to hold that parties have forfeited claims against nondebtor third parties based on their silence in response to a debtor's chapter 11 plan. No one has submitted the released claims for adjudication by the bankruptcy court. *See Olano*, 507 U.S. at 731.

66.     For all the foregoing reasons, the Court must deny interim approval of the Combined Plan for purposes of solicitation.

## **RESERVATION OF RIGHTS**

67.     The U.S. Trustee leaves the Debtors to their burden of proof and reserves any and all rights to (i) amend or supplement this Objection and (ii) conduct discovery.

**WHEREFORE**, the U.S. Trustee respectfully requests that the Court enter an order: (i) denying the Motion; (ii) denying interim approval of the Combined Plan for solicitation purposes and (iii) granting such other and further relief as the Court deems just and equitable.

Dated: November 6, 2025                              Respectfully submitted,

**ANDREW R. VARA**
**UNITED STATES TRUSTEE**
**REGIONS 3 AND 9**

By: */s/ Joseph J. McMahon, Jr.*
Joseph J. McMahon, Jr. (#4819)
Assistant United States Trustee
Malcolm M. Bates
Trial Attorney
United States Department of Justice
Office of the United States Trustee
J. Caleb Boggs Federal Building
844 N. King Street, Room 2207, Lockbox 35
Wilmington, DE 19801
Telephone: (302) 573-6491
Email:  Malcolm.M.Bates@usdoj.gov

26