<u>**Exhibit 1**</u>

**Further Revised Plan**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| WEH Liquidating, LLC, *et al.*, | Case No. 25-11602 (TMH) |
| Debtors.[1] | (Jointly Administered) |

### COMBINED DISCLOSURE STATEMENT AND CHAPTER 11 PLAN OF LIQUIDATION OF WEH LIQUIDATING, LLC F/K/A WALKER EDISON HOLDCO LLC AND ITS DEBTOR AFFILIATES

**MORRIS, NICHOLS, ARSHT & TUNNELL LLP**
Robert J. Dehney, Sr. (No. 3578)
Donna L. Culver (No. 2983)
Daniel B. Butz (No. 4227)
Scott D. Jones (No. 6672)
Jonathan M. Weyand (No. 6959)
1201 N. Market Street, 16th Floor
Wilmington, Delaware 19801
Telephone: (302) 658-9200
Facsimile: (302) 658-3989
Email: rdehney@morrisnichols.com
         dculver@morrisnichols.com
         dbutz@morrisnichols.com
         sjones@morrisnichols.com
         jweyand @morrisnichols.com

*Counsel to the Debtors and Debtors in Possession*

November 11, 2025

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal EIN, are as follows: WEH Liquidating, LLC f/k/a Walker Edison Holdco LLC (8817); WEI Liquidating, LLC f/k/a Walker Edison Intermediate, LLC (3363); WEFC Liquidating, LLC f/k/a Walker Edison Furniture Company LLC (6576); and EWF Liquidating, LLC f/k/a EW Furniture, LLC (6288). The Debtors' mailing address is 6890 S 2300 E #71067, Salt Lake City, UT 84171.

**IMPORTANT INFORMATION REGARDING THIS
COMBINED DISCLOSURE STATEMENT AND PLAN**[2]

> **THIS COMBINED DISCLOSURE STATEMENT AND PLAN IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THE INFORMATION IN THIS COMBINED DISCLOSURE STATEMENT AND PLAN IS SUBJECT TO CHANGE.**

        **The Debtors are soliciting votes on this Combined Disclosure Statement and Chapter 11 Plan of Liquidation of WEH Liquidating, LLC f/k/a Walker Edison Holdco LLC and Its Debtor Affiliates from the Holders of Class 3 Prepetition Term Loan Claims and Class 4 General Unsecured Claims.**

        **If you are in Class 3 or Class 4, you are receiving this document and the accompanying materials because you are entitled to vote on the Plan. Before submitting a Ballot to vote on the Plan, you should review this Combined Disclosure Statement and Plan.**

        **ABSENT THE WRITTEN CONSENT OF THE DEBTORS, ALL BALLOTS MUST BE PROPERLY COMPLETED, EXECUTED, AND DELIVERED ACCORDING TO THE VOTING INSTRUCTIONS IN THE BALLOTS AND THE SOLICITATION AND TABULATION PROCEDURES, SO THAT THE BALLOTS ARE ACTUALLY RECEIVED BY THE DEBTOR'S CLAIMS AGENT, EPIQ CORPORATE RESTRUCTURING, LLC NO LATER THAN [●], 2025, AT 5:00 P.M. (PREVAILING EASTERN TIME). BALLOTS MUST BE SUBMITTED TO THE CLAIMS AGENT ELECTRONICALLY (ON THE CLAIMS AGENT'S ONLINE PORTAL) OR BY PHYSICAL DELIVERY BY HAND OR MAIL.**

        You can vote electronically by visiting the case information website maintained by the Claims Agent, Epiq, clicking on the "E-Ballot" tab and following the prompts and directions. You will need your unique E-Ballot ID# to submit your electronic ballot; your E-Ballot ID# can be found on your Ballot. Each E-Ballot ID# is to be used solely for voting only those Claims described in Item 1 of your Ballot. Holders who vote electronically via the Claims Agent's online portal should not also submit a paper Ballot. The electronic ballot portal is the only approved method to submit Ballots electronically, and Holders of Claims entitled to vote on the Plan are strongly encouraged to submit their Ballots via the electronic ballot portal. Ballots delivered by email, facsimile, or any other electronic means may not be counted.

---

[2] Capitalized terms used but not defined in this section shall have the meanings ascribed to them elsewhere in this *Combined Disclosure Statement and Chapter 11 Plan of Liquidation of WEH Liquidaitng, LLC f/k/a Walker Edison Holdco LLC and Its Debtor Affiliates* (as it may be altered, amended, modified, or supplemented from time to time in accordance with the terms thereof (including all appendices, exhibits, schedules, and supplements (including any Plan Supplements) thereto), the "Disclosure Statement," the "Combined Disclosure Statement and Plan," or the "Plan," as applicable).

**If you choose to vote via a paper Ballot, you must deliver, prior to the Voting Deadline, an original, completed, and executed Ballot in the pre-addressed postage-paid envelope that accompanied your Ballot or as follows:**

| If by First-Class Mail |
|:---:|
| WEH Liquidating, LLC f/k/a<br>Walker Edison Holdco LLC<br>c/o Epiq Ballot Processing<br>P.O. Box 4422<br>Beaverton, OR 97076-4422 |

| If by Hand Delivery or Overnight Mail |
|:---:|
| WEH Liquidating, LLC f/k/a<br>Walker Edison Holdco LLC<br>c/o Epiq Ballot Processing<br>10300 SW Allen Blvd.<br>Beaverton, OR 97005 |

**PLEASE READ YOUR BALLOT CAREFULLY FOR FURTHER INFORMATION AND INSTRUCTIONS. FAILURE TO ABIDE BY SUCH INSTRUCTIONS MAY RESULT IN YOUR BALLOT NOT BEING COUNTED.**

**\*\*\***

## PRELIMINARY STATEMENT AND DISCLAIMERS

The Bankruptcy Court has established **[●], 2025 at 4:00 p.m. (prevailing Eastern Time)** as the deadline for filing and serving objections to the final approval of the Disclosure Statement and the confirmation of the Plan (the "Combined Disclosure Statement and Plan Objection Deadline"). *See* D.I. [●]. Any objection to the final approval of the Disclosure Statement or the confirmation of the Plan must (a) be in writing, (b) comply with the Bankruptcy Code, Bankruptcy Rules, Local Rules of the United States Bankruptcy Court for the District of Delaware, and the Interim Approval and Procedures Order, (c) state, with specificity, the legal and factual bases thereof, and (d) be filed with the Bankruptcy Court no later than the Combined Disclosure Statement and Plan Objection Deadline.

A hearing on the final approval of the Disclosure Statement and the confirmation of the Plan (as such hearing may be continued from time to time, the "Combined Hearing") will commence on **[●], 2025 at []:00 a.m. (prevailing Eastern Time**) in the Bankruptcy Court before the Honorable Thomas M. Horan, 3rd Floor, 824 N. Market St., Wilmington, DE 19801. The Combined Hearing may be adjourned or continued from time to time by the Bankruptcy Court or the Debtors by announcement of the adjournment or continuance at a hearing before the Bankruptcy Court or by filing a notice on the docket of these chapter 11 cases. In accordance with

the Plan, the Plan may be modified, if necessary, before, during, or as a result of the Combined Hearing without further action by the Debtors and without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.

This Combined Disclosure Statement and Plan contains summaries of certain provisions and certain other documents and information. The financial information included herein is provided solely for the purpose of soliciting votes on the Combined Disclosure Statement and Plan and should not be relied upon for any purpose other than to determine whether and how to vote on the Combined Disclosure Statement and Plan. While the summaries in the Disclosure Statement shall not constitute or be construed as an admission of fact, liability, stipulation, or waiver by the Debtors or any other party, the Debtors believe that the summaries contained in the Disclosure Statement are fair and accurate. The summaries of the financial information in the Disclosure Statement and the documents that are attached to, or incorporated by reference in, this Combined Disclosure Statement and Plan are qualified in their entirety by reference to such information and documents.

Except as otherwise provided herein or in accordance with applicable law, the Debtors are under no duty to update or supplement the Combined Disclosure Statement and Plan. The Bankruptcy Court's approval or confirmation of the Combined Disclosure Statement and Plan does not constitute a guarantee of the accuracy or completeness of the information contained herein or the Bankruptcy Court's endorsement of the merits of the Combined Disclosure Statement and Plan. The statements and information contained herein have been made as of the date hereof unless otherwise specified. Holders of Claims reviewing the Combined Disclosure Statement and Plan should not assume at the time of such review that there have been no changes to the facts or information set forth herein since the date of the Combined Disclosure Statement and Plan. All Holders of Claims entitled to vote on the Plan are advised and encouraged to read the Combined Disclosure Statement and Plan in its entirety and consult with their respective legal, business, financial, tax and other advisors before voting on the Plan. No Holder of a Claim should rely on any information, representations, or inducements that are not contained in or are inconsistent with the information contained in the Combined Disclosure Statement and Plan (including the documents attached hereto). The Combined Disclosure Statement and Plan does not constitute, and shall not be deemed to constitute, legal, business, financial, tax, or other advice, including as it relates to Holders of Claims against or Interests in the Debtors or any other party in interest. Any Person or Entity desiring any such advice should consult with their own advisors.

Although the Debtors have attempted to ensure the accuracy of the financial information provided herein or incorporated herein by reference, such information has not been audited, except to the extent specifically indicated otherwise herein. The financial information provided has been prepared by the Debtors' management and their financial advisor. Such information, while presented with numerical specificity, is necessarily based on a variety of estimates and assumptions that, although considered reasonable by management, may not be realized and are inherently subject to significant business, economic, competitive, industry, regulatory, market, financial and other uncertainties and contingencies, many of which are beyond the Debtors' control. The Debtors caution that no representations can be made as to the accuracy of such information or the ability to achieve the projected results. Some assumptions inevitably will not materialize. Further, events and circumstances occurring after the date on which the financial information was prepared may be different from those assumed or may have been

unanticipated and, thus, the occurrence of these events may affect financial results in a materially adverse or materially beneficial manner. Such information, therefore, may not be relied upon as a guarantee or other assurance of the actual results that will occur.

With respect to any contested matters, adversary proceedings, and any other pending, threatened, or potential litigation or other actions, nothing in the Combined Disclosure Statement and Plan, nor any action taken by the Debtors in connection herewith, shall constitute or be construed as an admission of fact, liability, stipulation, or waiver by the Debtors or any other party, but rather constitutes, and is to be construed as, a statement made in the context of settlement negotiations in accordance with rule 408 of the Federal Rules of Evidence and any applicable analogous state or foreign laws or rules.

Except as otherwise expressly set forth herein, all information, representations, or statements contained herein have been provided by the Debtors. No Person or other Entity is or has been authorized to give any information with respect hereto and the matters addressed herein, other than that which is contained herein or incorporated herein by reference. No representations concerning the Debtors, or the value of their property have been authorized by the Debtors other than as set forth herein. Any information, representations, or inducements made to obtain a vote on the Plan other than, or inconsistent with, the information contained herein should not be relied upon by any Holder of a Claim.

The Combined Disclosure Statement and Plan contains forward-looking statements within the meaning of the "safe harbor" provisions of the Private Securities Litigation Reform Act of 1995, as amended, all of which are based on various estimates and assumptions. Such forward-looking statements are subject to inherent uncertainties and to a wide variety of significant business, economic, and competitive risks, including those summarized herein. When used in the Combined Disclosure Statement and Plan, the words "believe," "expect," "anticipate," "estimate," "intend," "project," "plan," "likely," "may," "will," "should," "shall," or other words or phrases of similar import generally identify forward-looking statements. Although the Debtors believe that their plans, intentions, and expectations reflected in the forward-looking statements are reasonable, they cannot be sure they will be achieved. These statements are only predictions and are not guarantees. Forward-looking statements are subject to risks and uncertainties that could cause actual results to differ materially from those contemplated by a forward-looking statement. All forward-looking statements attributable to the Debtors or Persons or Entities acting on their behalf are expressly qualified in their entirety by the cautionary statements set forth in the Combined Disclosure Statement and Plan. Forward-looking statements speak only as of the date on which they are made. Except as required by law, the Debtors expressly disclaim any obligation to update or revise any forward-looking statement, whether as a result of new information, subsequent events, anticipated or unanticipated circumstances, or otherwise. *See* Article V for a discussion of certain considerations and risk factors that Holders entitled to vote on the Plan should consider.

This Combined Disclosure Statement and Plan has been prepared in accordance with section 1125 of the Bankruptcy Code and Bankruptcy Rule 3016(b) and not in accordance with federal or state securities laws or other non-applicable bankruptcy laws. This Combined Disclosure Statement and Plan has not been approved or disapproved by the Securities and Exchange Commission ("SEC") or any state or non-U.S. regulatory authority and neither the SEC

nor any state or non-U.S. regulatory authority has passed upon the accuracy or adequacy of the information contained herein.  Any representation to the contrary is a criminal offense.  Neither the solicitation of votes on the Plan, nor this Combined Disclosure Statement and Plan, is intended to constitute an offer to sell or the solicitation of an offer to buy securities in any state or other jurisdiction in which such offer or solicitation is not authorized or is unlawful.

***

## TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................................................................1

ARTICLE I DEFINED TERMS AND RULES OF INTERPRETATION ...............................................2

ARTICLE II CLASSIFICATION OF CLAIMS AND INTERESTS AND ESTIMATED RECOVERIES......19

  2.1    GENERAL RULES OF CLASSIFICATION ...................................................................19
  2.2    UNIMPAIRED CLASSES OF CLAIMS ........................................................................21
  2.3    IMPAIRED CLASSES OF CLAIMS .............................................................................22
  2.4    IMPAIRED CLASS OF INTERESTS .............................................................................22

ARTICLE III BACKGROUND AND DISCLOSURES............................................................................22

  3.1    GENERAL BACKGROUND ........................................................................................22
  3.2    EVENTS LEADING TO CHAPTER 11 .........................................................................23
  3.3    THE CHAPTER 11 CASE ..........................................................................................26

ARTICLE IV CONFIRMATION AND VOTING PROCEDURES ..........................................................31

  4.1    CONFIRMATION PROCEDURE ..................................................................................31
  4.2    PROCEDURE FOR OBJECTIONS ................................................................................31
  4.3    REQUIREMENTS FOR CONFIRMATION .....................................................................31
  4.4    CLASSIFICATION OF CLAIMS AND INTERESTS ........................................................32
  4.5    IMPAIRED CLAIMS OR INTERESTS ..........................................................................33
  4.6    CONFIRMATION WITHOUT NECESSARY ACCEPTANCES; CRAMDOWN .....................33
  4.7    FEASIBILITY ...........................................................................................................35
  4.8    BEST INTERESTS TEST AND LIQUIDATION ..............................................................35
  4.9    ACCEPTANCE OF THE PLAN ....................................................................................36

ARTICLE V CERTAIN RISK FACTORS TO BE CONSIDERED PRIOR TO VOTING ...............................36

  5.1    THE PLAN MAY NOT BE ACCEPTED .......................................................................37
  5.2    THE PLAN MAY NOT BE CONFIRMED......................................................................37
  5.3    DISTRIBUTIONS TO HOLDERS OF ALLOWED CLAIMS UNDER THE PLAN MAY BE INCONSISTENT WITH
          PROJECTIONS ..........................................................................................................37
  5.4    OBJECTIONS TO CLASSIFICATIONS OF CLAIMS ......................................................37
  5.5    FAILURE TO CONSUMMATE THE PLAN ...................................................................38
  5.6    ALLOWANCE OF CLAIMS MAY SUBSTANTIALLY DILUTE THE RECOVERY TO HOLDERS OF CLAIMS UNDER
          THE PLAN ...............................................................................................................38
  5.7    PLAN RELEASES MAY NOT BE APPROVED ..............................................................39
  5.8    CERTAIN TAX CONSIDERATIONS ............................................................................39

ARTICLE VI TREATMENT OF UNCLASSIFIED CLAIMS ..................................................................39

  6.1    DIP FINANCING CLAIMS .......................................................................................39
  6.2    ADMINISTRATIVE CLAIMS .....................................................................................40
  6.3    PROFESSIONAL FEE CLAIMS ..................................................................................41
  6.4    TAX CLAIMS ..........................................................................................................42

ARTICLE VII TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS ...........................................42

  7.1    CLASS 1: OTHER PRIORITY CLAIMS.......................................................................42
  7.2    CLASS 2: OTHER SECURED CLAIMS .......................................................................43
  7.3    CLASS 3: PREPETITION TERM LOAN CLAIMS .........................................................43
  7.4    CLASS 4: GENERAL UNSECURED CLAIMS ..............................................................43
  7.5    CLASS 5: INTERESTS ..............................................................................................43
  7.6    RESERVATION OF RIGHTS REGARDING CLAIMS AND INTERESTS ............................43

**ARTICLE VIII ACCEPTANCE OR REJECTION OF THE PLAN** ................................................................ 44

| | | |
|---|---|---|
| 8.1 | CLASSES ENTITLED TO VOTE | 44 |
| 8.2 | ACCEPTANCE BY IMPAIRED CLASSES OF CLAIMS OR INTERESTS | 44 |
| 8.3 | PRESUMED ACCEPTANCE BY UNIMPAIRED CLASSES | 44 |
| 8.4 | PRESUMED REJECTIONS BY IMPAIRED CLASS | 44 |
| 8.5 | CONFIRMATION PURSUANT TO SECTION 1129(B) OF THE BANKRUPTCY CODE | 44 |
| 8.6 | CONTROVERSY CONCERNING IMPAIRMENT | 44 |
| 8.7 | ELIMINATION OF VACANT CLASSES | 45 |
| 8.8 | VOTING CLASSES; DEEMED ACCEPTANCE BY NON-VOTING CLASSES | **ERROR! BOOKMARK NOT DEFINED.** |

**ARTICLE IX MEANS OF IMPLEMENTING THE PLAN** ................................................................ 45

| | | |
|---|---|---|
| 9.1 | GLOBAL SETTLEMENT | 45 |
| 9.2 | DISSOLUTION OF DEBTORS & TRANSFER OF BOOKS AND RECORDS | 45 |
| 9.3 | LIQUIDATING TRUST | 46 |
| 9.4 | LIQUIDATING TRUSTEE | 48 |
| 9.5 | FEES AND EXPENSES | 51 |
| 9.6 | LIQUIDATING TRUSTEE AS ESTATE REPRESENTATIVE AND SUCCESSOR | 52 |
| 9.7 | DISTRIBUTIONS | 52 |
| 9.8 | CORPORATE ACTION | 52 |
| 9.9 | DIRECTORS, OFFICERS, MANAGERS, MEMBERS AND AUTHORIZED PERSONS OF THE DEBTORS | 53 |
| 9.10 | CLOSING OF THE CHAPTER 11 CASES | 53 |
| 9.11 | COMMITTEE | 53 |
| 9.12 | EFFECTUATING DOCUMENTS; FURTHER TRANSACTIONS | 53 |
| 9.13 | RELEASE OF LIENS | 53 |
| 9.14 | EXEMPTION FROM CERTAIN TRANSFER TAXES | 54 |
| 9.15 | SETOFFS | 54 |
| 9.16 | WITHDRAWAL OF PLAN | 54 |
| 9.17 | INSURANCE PRESERVATION | 54 |
| 9.18 | D&O INSURANCE POLICIES | 55 |
| 9.19 | INDEMNIFICATION OF DIRECTORS, OFFICERS AND EMPLOYEES | 55 |
| 9.20 | WITHHOLDING AND REPORTING REQUIREMENTS | **ERROR! BOOKMARK NOT DEFINED.** |

**ARTICLE X EFFECT OF PLAN ON CLAIMS AND INTERESTS** ................................................................ 56

| | | |
|---|---|---|
| 10.1 | BINDING EFFECT | 56 |
| 10.2 | TREATMENT OF CLAIMS | 56 |
| 10.3 | NO DISCHARGE OF THE DEBTORS | 56 |
| 10.4 | INJUNCTION | 56 |
| 10.5 | EXCULPATION | 57 |
| 10.6 | RELEASES BY THE DEBTORS | 58 |
| 10.7 | THIRD PARTY RELEASES | 59 |
| 10.8 | EXTINGUISHMENT OF INTERCOMPANY CLAIMS | 59 |
| 10.9 | TERMS OF INJUNCTIONS OR STAYS | 60 |

**ARTICLE XI EXECUTORY CONTRACTS AND UNEXPIRED LEASES** ................................................................ 60

| | | |
|---|---|---|
| 11.1 | EXECUTORY CONTRACTS AND UNEXPIRED LEASES DEEMED REJECTED | 60 |
| 11.2 | CLAIMS BASED ON REJECTION OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES | 60 |
| 11.3 | CURE OF DEFAULTS FOR ASSUMED EXECUTORY CONTRACTS AND UNEXPIRED LEASES | 60 |
| 11.4 | MODIFICATIONS, AMENDMENTS, SUPPLEMENTS, RESTATEMENTS, OR OTHER AGREEMENTS | 61 |
| 11.5 | RESERVATION OF RIGHTS | 61 |

**ARTICLE XII DISTRIBUTIONS** ................................................................ 62

| | | |
|---|---|---|
| 12.1 | TRANSFER OF CLAIMS | 62 |
| 12.2 | DELIVERY OF DISTRIBUTIONS AND UNDELIVERABLE OR UNCLAIMED DISTRIBUTIONS | 62 |

TABLE OF CONTENTS (Continued)

| | | |
|---|---|---|
| **12.3** | Interest on Claims | 63 |
| **12.4** | Withholding and Reporting Requirements | 63 |
| **12.5** | Miscellaneous Distribution Provisions | 64 |
| **12.6** | *De Minimis* Distribution Provisions | 64 |
| **12.7** | Residual Assets | 64 |

**ARTICLE XIII PROCEDURES FOR DISPUTED CLAIMS** ........................................................64

| | | |
|---|---|---|
| **13.1** | Objections to Claims | 64 |
| **13.2** | Estimation of Claims | 65 |
| **13.3** | Disputed Claims Reserve | 65 |
| **13.4** | No Distribution Pending Allowance | 65 |
| **13.5** | Resolution of Claims | 65 |
| **13.6** | Amendments to Late Filed Claims | 66 |

**ARTICLE XIV CONFIRMATION AND CONSUMMATION OF THE PLAN** ...........................66

| | | |
|---|---|---|
| **14.1** | Conditions to Confirmation | 66 |
| **14.2** | Conditions to Effective Date | 66 |
| **14.3** | Consequences of Non-Occurrence of Effective Date | 67 |
| **14.4** | Substantial Consummation | 67 |
| **14.5** | Effect of Vacatur of Confirmation Order | 67 |

**ARTICLE XV ADMINISTRATIVE PROVISIONS** .....................................................................68

| | | |
|---|---|---|
| **15.1** | Retention of Jurisdiction | 68 |
| **15.2** | Amendments | 70 |
| **15.3** | Successors and Assigns | 70 |
| **15.4** | Governing Law | 70 |
| **15.5** | Corporate Action | 71 |
| **15.6** | Effectuating Documents and Further Transactions | 71 |
| **15.7** | Miscellaneous Rules | 71 |
| **15.8** | Notices | 71 |
| **15.9** | No Admission or Waiver | 72 |

## **INTRODUCTION**

Pursuant to sections 1121(a) and 1125 of the Bankruptcy Code,[3] the Debtors propose this *Combined Disclosure Statement and Chapter 11 Plan of Liquidation of WEH Liquidating, LLC f/k/a Walker Edison Holdco LLC and Its Debtor Affiliates*, as it may be amended, modified, or supplemented from time to time in accordance with the terms thereof (including all appendices, schedules, and supplements (including any Plan Supplements) thereto, to Holders of Claims against and Interests in the Debtors in connection with the solicitation of votes on the Plan and the Combined Hearing to consider confirmation thereof.  The Debtors are the proponent of the Plan within the meaning of section 1129 of the Bankruptcy Code.  Other agreements and documents may supplement this Plan; such items have been or may be filed with the Bankruptcy Court.  Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code, Bankruptcy Rule 3019, and Article XV, the Debtors reserve the right to alter, supplement, amend, or modify (one or more times), revoke, or withdraw the Plan prior to its substantial consummation.

The purpose of the Disclosure Statement is to describe the Plan and its provisions and to provide adequate information, as required under section 1125 of the Bankruptcy Code, to Holders of Claims against the Debtors who have the right to vote on the Plan so they can make informed decisions in doing so.  Holders of Claims entitled to vote to accept or reject the Plan will receive a Ballot together with this Disclosure Statement to enable them to vote on the Plan in accordance with the voting instructions and make any other elections or representations required pursuant to the Plan.

The Disclosure Statement includes information pertaining to the Debtors' prepetition business operations and financial history and the events leading up to the chapter 11 cases.  In addition, this Combined Disclosure Statement and Plan includes the effects of confirmation of the Plan, certain risk factors associated with the Plan, the way Plan Distributions will be made, the confirmation process, and confirmation requirements.

The Bankruptcy Court entered an order approving on an interim basis the Disclosure Statement contained in this Combined Disclosure Statement and Plan, as containing "adequate information" in compliance with section 1125 of the Bankruptcy Code (D.I. [●]) (the "Interim Approval and Procedures Order").  Entry of the Interim Approval and Procedures Order does not constitute a judgment by the Bankruptcy Court as to the desirability of the Plan or as to the value or suitability of any consideration proposed thereunder.  The Bankruptcy Court's interim approval of the Disclosure Statement contained herein does indicate, however, that the Bankruptcy Court has determined on an interim basis that the Disclosure Statement contains adequate information to permit a Holder entitled to vote on the Plan to make an informed judgment in doing so.  The adequacy of the Disclosure Statement is still subject to final approval by the Bankruptcy Court at the Combined Hearing.

---

[3]     Capitalized terms used herein shall have the meanings ascribed to them in Article I unless otherwise defined elsewhere herein.

**ALL HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE PLAN ARE ENCOURAGED TO READ THIS COMBINED DISCLOSURE STATEMENT AND PLAN IN ITS ENTIRETY AND CONSULT WITH THEIR RESPECTIVE LEGAL, BUSINESS, FINANCIAL, TAX AND OTHER ADVISORS BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.**

**The Debtors believe that confirmation and consummation of the Plan are in the best interests of the Debtors, their Estates, and their creditors. The Plan provides for an equitable Distribution to Holders of Claims and the compromise and settlement of certain Claims and controversies among the Debtors and their key stakeholders. The Debtors believe that any alternative to confirmation of the Plan, such as liquidation under chapter 7 of the Bankruptcy Code, could result in the loss, or elimination of significant value (and a corresponding reduction in the Distributions to Holders of Claims in certain Classes), and the potential for delay, litigation, and additional costs. Consequently, the Debtors urge all eligible Holders of Claims entitled to vote on the Plan to vote to ACCEPT the Plan and to complete and submit their Ballots so that they will be RECEIVED by the Claims Agent on or before the Voting Deadline.**

## ARTICLE I
## DEFINED TERMS AND RULES OF INTERPRETATION

Defined Terms

1.1    "503(b)(9) Claims" means Claims arising under section 503(b)(9) of the Bankruptcy Code Filed against the Debtors on or before the Bar Date.

1.2    "Additional Administrative Claim" means an Administrative Claim arising from and after October 8, 2025.

1.3    "Additional Administrative Claims Bar Date" means the first Business Day that is thirty (30) days following the Effective Date.

1.4    "Administrative Claim" means an unsecured Claim, including a Professional Fee Claim and U.S. Trustee Fees for payment of costs or expenses of administration specified in sections 503(b) and 507(a) of the Bankruptcy Code, including the actual, necessary costs and expenses incurred after the Petition Date of preserving the Estates and operating the business of the Debtors (such as wages, salaries, or commissions for services rendered). Administrative Claims shall include Additional Administrative Claims.

1.5    "Administrative Claims Bar Date" means November 6, 2025, at 5:00 p.m. prevailing Eastern Time, as the deadline for each person or entity to file a request to allow any unpaid Administrative Claim against the Debtors arising on or after the Petition Date and through and including October 7, 2025.

1.6    "Affiliate" has the meaning set forth in section 101(2) of the Bankruptcy Code.

1.7    "AlixPartners" means AlixPartners, LLP, as experts to the Debtors and Blue Owl Capital Corporation in the Utah Litigation.

1.8    "Allowed" means, with respect to a Claim in a specified Class or an Allowed Administrative Claim, Tax Claim, or Professional Fee Claim, such Claim is: (a) either (i) scheduled by any Debtor in its Schedules of assets and liabilities in a liquidated amount and not scheduled as contingent or disputed and not superseded by a proof of claim or subject to setoff; or (ii) asserted in the chapter 11 cases by a proof of claim which has been timely filed, or deemed timely filed with the Bankruptcy Court pursuant to the Bankruptcy Code, the Bankruptcy Rules or any applicable order of the Bankruptcy Court, or late filed with leave of Court; and (b) either (i) not objected to within the period fixed by the Bankruptcy Code, the Bankruptcy Rules and/or applicable orders of the Bankruptcy Court; or (ii) that has otherwise been allowed by a Final Order or pursuant to this Plan.  An Allowed Claim: (y) includes a previously Disputed Claim to the extent such Disputed Claim becomes allowed when the context so requires; and (z) shall be net of any valid setoff amount, which amount shall be deemed to have been set off in accordance with the provisions of this Plan.  For the avoidance of doubt, a Proof of Claim filed after the Bar Date or a request for payment of an Administrative Claim required to be filed under Article VI filed after the Bar Date, as applicable, shall not be Allowed for any purposes whatsoever absent express written agreement of the Debtors or the entry of a Final Order allowing such late-filed Claim. "Allowed," "Allow," "Allowance" and "Allowing" shall have correlative meanings.

1.9    "Amended Term Loan Agreement" means the Amended and Restated Loan Agreement (as amended) dated as of March 1, 2023, between Walker Edison, as borrower, Intermediate, as guarantor, and Owl Rock Capital Corporation, as administrative agent for the lenders and as collateral agent for the Prepetition Term Loan Lenders.

1.10    "Approved Budget" shall have the meaning ascribed to it in the Final DIP Order (as may be modified, amended, extended or updated with approval of the DIP Lenders).

1.11    "Assets" means all of the Debtors' right, title and interest of any nature in property of any kind, wherever located, as specified in section 541 of the Bankruptcy Code.

1.12    "Asset Purchase Agreement" means the Asset Purchase Agreement, by and among Twin-Star International, Inc. as Purchaser, and Holdco, Intermediate, Walker Edison, and EWFC, as Sellers, dated August 28, 2025, including all schedules and exhibits thereto, and any further amendments entered into from time to time.

1.13    "Assumed Executory Contracts and Unexpired Leases Schedule" means the list of assumed Executory Contracts and Unexpired Leases filed as an exhibit to the Plan Supplement, which may be supplemented or modified from time to time.

1.14    "Avoidance Causes of Action" means all Causes of Action of the Estates that arise under sections 542, 544, 545, 547, 548, 549, 550, 551, 552 and/or 553 of the Bankruptcy Code and any state law equivalents.

1.15    "Ballot" means the form approved by the Bankruptcy Court and distributed to Holders of Claims entitled to vote on this Plan on which is to be indicated an acceptance or

rejection of this Plan and, to the extent desired by the voting Claim Holder, an election to opt out of the Plan's third party releases described in section 10.7 of this Plan.

1.16   "Bankruptcy Code" means title 11 of the United States Code, 11 U.S.C. §§ 101 *et* seq., and as such title has been, or may be, amended from time to time, to the extent that any such amendment is applicable to these chapter 11 cases.

1.17   "Bankruptcy Court" means the United States Bankruptcy Court for the District of Delaware.

1.18   "Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure, the Official Bankruptcy Forms, or the Local Rules of the Bankruptcy Court, and as each has been, or may be, amended from time to time, to the extent that any such amendment is applicable to these chapter 11 case.

1.19   "Bar Date" means, with respect to any particular Claim, the applicable date set by the Bankruptcy Court as the last day for filing a Proof of Claim or a request for allowance of an Administrative Claim or a proof of interest, against the Debtors in these chapter 11 cases for the applicable Claim or Interest.

1.20   "Bar Date Motion" means the *Debtors' Motion for Entry of an Order (I) Establishing Certain Bar Dates for Filing Prepetition Claims and Administrative Expense Claims, and (II) Granting Related Relief, Including Notice and Filing Procedures* (D.I. 163).

1.21   "Bar Date Order" means the *Order (I) Establishing Certain Bar Dates for Filing Prepetition Claims and Administrative Expense Claims, and (II) Granting Related Relief, Including Notice and Filing Procedures* (D.I. 226), entered by the Bankruptcy Court on October 3, 2025.

1.22   "Bidding Procedures Order" means the *Order Pursuant to Sections 105, 363, 364, 365 and 541 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006 and 9007 and Del. Bankr. L.R. 2002-1 and 6004-1 (A) Approving Bid Procedures for the Sale of Substantially All of the Debtors' Assets; (B) Approving the Debtors' Entry Into the Stalking Horse Agreement and Related Bid Protections; (C) Approving Procedures for the Assumption and Assignment or Rejection of Designated Executory Contracts and Unexpired Leases; (D) Scheduling an Auction and Sale Hearing; (E) Approving Forms and Manner of Notice of Respective Dates, Times, and Places In Connection Therewith; and (F) Granting Related Relief* (D.I. 105), entered by the Bankruptcy Court on September 16, 2025.

1.23   "Business Day" means any day, other than a Saturday, Sunday, or a legal holiday (as used in Bankruptcy Rule 9006(a)).

1.24   "Cash" means legal tender of the United States of America or its equivalents, including but not limited to bank deposits, checks, and other similar items.

1.25   "Causes of Action" means any claims, Claims, interests, damages, remedies, causes of action, demands, rights, actions, suits, obligations, liabilities, accounts, defenses, offsets, powers, privileges, licenses, liens, indemnities, guaranties, and franchises of any

kind or character whatsoever, whether known or unknown, foreseen or unforeseen, contingent or non-contingent, liquidated or unliquidated, secured or unsecured, assertable directly or derivatively, matured or unmatured, suspected or unsuspected, whether arising before, on, or after the Petition Date, in contract or in tort, in law, or in equity or pursuant to any other theory of state, federal, or other law.  For the avoidance of doubt, "Causes of Action" includes: (a) all rights of setoff, counterclaim, or recoupment and claims under contracts or for breaches of duties imposed by law or in equity; (b) the right to object to or to otherwise contest, recharacterize, reclassify, subordinate, or disallow any Claims or Interests; (c) claims pursuant to section 362 and 510 of the Bankruptcy Code; (d) Avoidance Causes of Action; (e) the Utah Litigation; and (f) such claims and defenses as fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code.

1.26    "Claim" means a claim against any Debtor or Debtors for a (a) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or (b) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

1.27    "Claims Agent" means the Debtors' claims agent, Epiq Corporate Restructuring, LLC.

1.28    "Class" means a group of Claims or Interests described in Article II of this Plan.

1.29    "Committee" means the official committee of unsecured creditors appointed by the U.S. Trustee in these chapter 11 cases (D.I. 79), pursuant to section 1102(a) of the Bankruptcy Code, as it may be reconstituted from time to time.

1.30    "Confirmation Date" means the date the Bankruptcy Court enters the Confirmation Order on the docket of these chapter 11 cases.

1.31    "Confirmation Order" means the order of the Bankruptcy Court approving this Disclosure Statement on a final basis and confirming this Plan pursuant to, among others, sections 1125 and 1129 of the Bankruptcy Code.

1.32    "Consummation" means the occurrence of the Effective Date of the Plan.

1.33    "D&Os" means all directors, managers, members, and officers of the Debtors, including but not limited to independent manager Ivar S. Chhina and the Independent Restructuring Manager, who were serving as of the Petition Date.

1.34    "D&O Insurance Policies" means all insurance policies issued or providing coverage for liabilities against any of the Debtors' D&Os, and all agreements, documents or instruments relating thereto.

1.35    "Debtors" means Holdco, Intermediate, Walker Edison, and EWFC.

**1.36**   "DIP Agent" means Blue Owl Capital Corporation, as administrative agent for the DIP Lenders.

**1.37**   "DIP Facility" means the loan facility provided to the Debtors pursuant to the terms of the DIP Term Sheet authorized by the Interim DIP Order and Final DIP Order.

**1.38**   "DIP Facility Claim" means the amounts due and owing under the New Money DIP Loans and the Litigation DIP Loans as well as the Litigation Roll-Up Amount and the New Money Roll-Up Amount.

**1.39**   "DIP Lenders" means all participating Prepetition Term Loan Lenders pursuant to the Final DIP Order.

**1.40**   "DIP Liens" means the Liens provided to the DIP Secured Parties pursuant to the Final DIP Order.

**1.41**   "DIP Secured Parties" means collectively, the DIP Agent and DIP Lenders.

**1.42**   "DIP Term Sheet" means that junior secured superpriority debtor in possession credit facility summary of Principal Terms and Conditions attached as Exhibit 1 to the Interim DIP Order.

**1.43**   "Disallowed" means with respect to any Claim or portion thereof, any Claim against the Debtors which: (a) has been disallowed, in whole or part, by a Final Order; (b) has been withdrawn, in whole or in part, by the Holder thereof; (c) if listed in the Schedules as zero or as disputed, contingent, partially liquidated or unliquidated and in respect of which a Proof of Claim has not been timely Filed or deemed timely Filed pursuant to the Plan, the Bankruptcy Code or any Final Order or other applicable law; (d) has been reclassified, expunged, subordinated or estimated to the extent that such reclassification, expungement, subordination or estimation results in a reduction in the Filed amount of any Proof of Claim or proof of Interest; (e) was not timely or properly Filed; (f) is unenforceable to the extent provided in section 502(b) of the Bankruptcy Code; (g) has been paid by the Debtors, and with respect to such Claim, a notice of satisfaction of Claim has been filed or will be filed and the Holder of such Claim fails to object to or respond to such notice of satisfaction; and (h) where the Holder of a Claim is a Person or Entity from which property is recoverable under sections 542, 543, 550 or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549 or 724(a) of the Bankruptcy Code, unless such Person, Entity or transferee has paid the amount, or turned over any such Property, for which such Person, Entity or transferee is liable under section 522(i), 542, 543, 550 or 553 of the Bankruptcy Code.  In each case a Disallowed Claim is disallowed only to the extent of disallowance, withdrawal, reclassification, satisfaction, expungement, subordination, or estimation.

**1.44**   "Disputed Claim" means any Claim or Interest which has not yet been Allowed or Disallowed in accordance with the terms of this Plan.  For the purposes of this Plan, a Claim shall be considered a Disputed Claim in its entirety before the time that an objection has been or may be filed if: (a) the amount or classification of the Claim specified in a relevant Proof of Claim exceeds the amount or classification of any corresponding Claim scheduled in the Debtors' Schedules; (b) any corresponding Claim scheduled by the Debtors has been scheduled as

6

disputed, contingent or unliquidated; or (c) no corresponding Claim has been scheduled by the Debtors in their Schedules.

   **1.45** "Disputed Claims Reserve" means Liquidating Trust Assets allocable to Disputed Claims.

   **1.46** "Distribution" means the distribution of Cash or other property, as the case may be, in accordance with this Plan with respect to the Holders of Allowed Claims.

   **1.47** "Distribution Address" means the address for a Holder set forth in a Proof of Claim, as amended or supplemented.  If no Proof of Claim is filed with respect to a particular Claim, such defined term means the address for the Holder set forth in the Debtors' Schedules.

   **1.48** "Distribution Date" means the date determined by the Liquidating Trustee when Distributions will be made under the Plan.

   **1.49** "Distribution Record Date" means the record date for purposes of making Distributions under this Plan on account of Allowed Claims, which shall be the Confirmation Date.

   **1.50** "Effective Date" means, with respect to each Debtor, the date that the Plan becomes effective, which shall be after all the conditions specified in Section 14.2 of the Plan have been satisfied or waived (to the extent waivable).

   **1.51** "Entity" has the meaning set forth in section 101(15) of the Bankruptcy Code.

   **1.52** "Epiq" means Epiq Corporate Restructuring, LLC.

   **1.53** "Equity Interest" or "Interest" means (i) any outstanding ownership interest in any of the Debtors, including interests evidenced by common or preferred stock, membership interests, options, stock appreciation rights, restricted stock, restricted stock units or their equivalents, or other rights to purchase or otherwise receive any ownership interest in any Debtor and any right to payment or compensation based upon any such interest, whether or not such interest is owned by the Holder of such right to payment or compensation, and (ii) any Claim against the Debtors that is subordinated and has the same priority as common or preferred stock by operation of the Bankruptcy Code or any order entered by the Bankruptcy Court.

   **1.54** "Estate" or "Estates" means individually or collectively, the estate of each Debtor created under section 541 of the Bankruptcy Code on the Petition Date.

   **1.55** "EWFC" means EWF Liquidating, LLC f/k/a EW Furniture, LLC.

   **1.56** "Exculpated Parties" means the following, to the extent permitted by applicable law, in their capacity as such: (a) the Debtors; (b) the D&Os of the Debtors who served at any time between the Petition Date and the Effective Date; (c) Morris Nichols, as counsel to the Debtors; (d) Macco, as financial advisor to the Debtors; (e) Lincoln, as investment banker to the Debtors; (f) Epiq, as administrative advisor to the Debtors; (g) GDC, as special litigation counsel to the Debtors; (h) Parsons, as special litigation conflicts counsel to the Debtors; (i) Morris James,

as counsel to the Committee; (j) M3 Partners, as financial advisor to the Committee; (k) the Committee and its members, but solely in relation to their fiduciary duties to the Estates; (l) the Related Parties for each Entity in clauses (c) through (k) of the foregoing to the extent they are estate fiduciaries; *provided*, *however*, that for the avoidance of doubt, no defendants in the Utah Litigation or parties that have entered into tolling agreements with respect to potential claims and causes of action in connection with the Utah Litigation are Exculpated Parties under this Plan.

1.57    "Executory Contract" means a contract to which a Debtor is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

1.58    "Fee Application" means an application for allowance and payment of a Professional Fee Claim.

1.59    "File," "Filed," or "Filing" means, respectively, file, filed, or filing with the Bankruptcy Court or Epiq in these chapter 11 cases.

1.60    "Final DIP Order" means the *Final Order (I) Authorizing Debtors to (A) Obtain Postpetition Financing and (B) Use Cash Collateral, (II) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (III) Granting Adequate Protection, (IV) Modifying the Automatic Stay, and (V) Granting Related Relief* (D.I. 229), which was entered on October 3, 2025.

1.61    "Final Order" means (a) an order or judgment of the Bankruptcy Court or any other court or adjudicative body as to which the time to appeal, petition for certiorari or move for reargument or rehearing has expired and as to which no appeal, petition for certiorari or other proceedings for reargument or rehearing shall then be pending, or (b) in the event that an appeal, writ of certiorari, reargument or rehearing thereof has been sought, such order of the Bankruptcy Court or any other court or adjudicative body shall have been affirmed by the highest court to which such order was appealed, or certiorari has been denied, or from which reargument or rehearing was sought, and the time to take any further appeal, petition for certiorari or move for reargument or rehearing shall have expired; provided, that no order shall fail to be a Final Order solely because of the possibility that a motion pursuant to section 502(j) of the Bankruptcy Code, Rule 59 or Rule 60 of the Federal Rules of Civil Procedure or Bankruptcy Rule 9024 may be filed with respect to such order.

1.62    "First Day Declaration" means the *Declaration of Nate Brown in Support of Debtors' Chapter 11 Petitions and First Day Motions* (D.I. 2).

1.63    "GDC" means Gibson, Dunn & Crutcher as counsel to the Debtors, Blue Owl Capital Corporation, Bain Capital, and Evolution Credit Partners in the Utah Litigation and any related litigation.

1.64    "General Bar Date" means 5:00 p.m. (prevailing Eastern Time) on November 6, 2025, as the deadline for each person or entity, other than a Governmental Unit, to file a Proof of Claim in respect of any prepetition claim against the Debtors, including, without limitation, any secured claim, unsecured claim, priority claim, or claim asserted under section

503(b)(9) of the Bankruptcy Code for goods delivered and received by the Debtors within 20 days before the Petition Date, unless otherwise provided in this Order.

1.65    "General Unsecured Claim" means any unsecured nonpriority Claim against the Debtors.

1.66    "Global Settlement" means the settlement agreement by and between the Debtors, the Committee, the DIP Secured Parties, , the Prepetition Term Loan Secured Parties, and the Prepetition ABL Lender, which was attached to, and approved in connection with, the Final DIP Order.

1.67    "Governmental Bar Date" means February 24, 2026, as the deadline by which a Governmental Unit must file a Proof of Claim in respect of a prepetition claim against the Debtors.

1.68    "Governmental Unit" means the United States; State; Commonwealth; District; Territory; municipality; foreign state; department, agency, or instrumentality of the United States (but not a United States trustee while serving as a trustee in a case under this title), a State, a Commonwealth, a District, a Territory, a municipality, or a foreign state; or other foreign or domestic government.

1.69    "Holdco" means Debtor WEH Liquidating, LLC f/k/a Walker Edison Holdco LLC.

1.70    "Holder" or "Holders" means a Person or an Entity holding a Claim or Interest.

1.71    "Impaired Class" means a Class of Claims or Interests that is impaired within the meaning of section 1124 of the Bankruptcy Code.

1.72    "Independent Restructuring Manager" means Thomas B. Walper.

1.73    "Initial Estate Payment" means (i) the $250,000 received by the Estates from the Sale plus (ii) up to $250,000.00 of the Sale Proceeds remaining after payment of the ABL Subordinated Claim pursuant to the ABL Payment Priority set forth in the Interim DIP Order as a carve out from the collateral of the DIP Lenders and/or Prepetition Term Loan Secured Parties.

1.74    "Insider" has the meaning set forth in section 101(31) of the Bankruptcy Code.

1.75    "Insurance Policies" means all insurance policies and all surety bonds and related agreements of indemnity that have been issued at any time or provide coverage, benefits, or proceeds to the Debtors and all agreements, documents, or instruments relating thereto, including the D&O Insurance Policies.

1.76    "Insurer" means any company or other entity that issued an Insurance Policy, any third-party administrator, and any respective predecessors and/or Affiliates thereof.

1.77    "Intercompany Claims" means any Claim held by a Debtor against the other Debtor or any Interest held by a Debtor in the other Debtor, including, without limitation: (a) any account reflecting intercompany book entries by a Debtor with respect to the other Debtor, (b) any Claim not reflected in such book entries that is held by a Debtor against the other Debtor, and (c) any derivative Claim asserted by or on behalf of one Debtor against the other Debtor.

1.78    "Interim Approval and Procedures Order" means the *Order (I) Approving the Combined Disclosure Statement and Plan on an Interim Basis for Solicitation Purposes Only; (II) Establishing Procedures for Solicitation and Tabulation of Votes to Accept or Reject the Combined Disclosure Statement and Plan; (III) Approving the Form of Ballot and Solicitation Packages; (IV) Establishing the Voting Record Date; (V) Scheduling a Combined Hearing for Final Approval of the Adequacy of Disclosures in, and Confirmation of, the Combined Disclosure Statement and Plan; and (VI) Approving the Form of Combined Hearing Notice, and (VII) Granting Related Relief* (D.I. ●), entered by the Bankruptcy Court on [●], 2025.

1.79    "Interim Compensation Procedures Order" means the *Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Retained Professionals* (D.I. 173), entered by the Bankruptcy Court on September 25, 2025.

1.80    "Interim DIP Order" means the *Interim Order (I) Authorizing Debtors to (A) Obtain Postpetition Financing and (B) Use Cash Collateral, (II) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (III) Granting Adequate Protection, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing and (VI) Granting Related Relief* (D.I. 52), entered by the Bankruptcy Court on September 2, 2025.

1.81    "Intermediate" means Debtor WEI Liquidating, LLC f/k/a Walker Edison Intermediate, LLC.

1.82    "Internal Revenue Code" means the Internal Revenue Code of 1986, as amended.

1.83    "IRS" means the United States Internal Revenue Service.

1.84    "Lien" means: (a) a judicial lien as defined in section 101(36) of the Bankruptcy Code; (b) a lien as defined in section 101(37) of the Bankruptcy Code; (c) a security interest as defined in section 101(51) of the Bankruptcy Code; (d) a statutory lien as defined in section 101(53) of the Bankruptcy Code; and (e) any other lien, interest, charge, or encumbrance.

1.85    "Lincoln" means Lincoln International LLC, as investment banker to the Debtors.

1.86    "Liquidating Trust" means the trust to be created pursuant to Article IX of the Plan on the Effective Date for the benefit of the Holders of Allowed Claims.

1.87    "Liquidating Trust Agreement" means the trust agreement, in form and substance reasonably acceptable to the Debtors, the DIP Agent, and the Committee to be filed as part of the Plan Supplement, which will, among other things: (a) establish and govern the Liquidating Trust; (b) set forth the respective powers, duties and responsibilities of the Liquidating

Trustee; and (c) provide for Distributions to Holders of Allowed Claims in accordance with Article XII hereof.

**1.88** "Liquidating Trust Assets" means all property of the Estates as of the Effective Date, including but not limited to (i) all Cash held by the Debtors as of the Effective Date, excluding amounts held in trust with respect to the Professional Fee Account but including the Initial Estate Payment, (ii) the Utah Litigation Assets, (iii) Litigation DIP Loan Proceeds, (iv) Other Litigation Assets, and (v) Other Assets, all of which are being transferred pursuant to this Plan to the Liquidating Trust upon the Effective Date.

**1.89** "Liquidating Trust Beneficiaries" shall mean the Holders of Allowed Class 3 Claims, and Allowed Class 4 Claims, each of which shall receive Liquidating Trust Interests in accordance with this Plan.

**1.90** "Liquidating Trust Distributions" shall mean Distributions of Cash or other property pursuant to the Plan and Liquidating Trust Agreement as may be authorized from time to time by the Liquidating Trustee.

**1.91** "Liquidating Trust Interests" shall mean the beneficial interests in the Liquidating Trust that shall entitle the holder thereof to receive Distributions of Cash pursuant to the Liquidating Trust Agreement, which interests shall be issued in two (2) series: Series A Liquidating Trust Interests to Holders of Allowed Class 3 Claims and Series B Liquidating Trust Interests to Holders of Allowed Class 4 Claims.

**1.92** "Liquidating Trustee" means the Independent Restructuring Manager, who will be appointed pursuant to the Global Settlement, and shall be responsible for the duties, powers, and affairs of the Liquidating Trust in accordance with the Liquidating Trust Agreement.

**1.93** "Liquidating Trustee Professionals" means the agents, financial advisors, attorneys, consultants, independent contractors, representatives, and other professionals retained by the Liquidating Trustee (in their capacities as such).

**1.94** "Litigation DIP Loans" means the new money term loan for the funding of the Utah Litigation as defined in the DIP Term Sheet, the Global Settlement and Final DIP Order and, for the avoidance of doubt, includes any supplemental Litigation DIP Loans made in accordance with the DIP Term Sheet, the Global Settlement and Final DIP Order. For the avoidance of doubt, supplemental Litigation DIP Loans shall not contribute to the Litigation Roll-Up Amounts.

**1.95** "Litigation Roll-Up Amount" means the amount of the "roll up" of the Prepetition Term Loans held by the DIP Secured Parties on a three-to-one basis into postpetition loans relative to the initial $7,000,000 of Litigation DIP Loans (i.e., $3.00 of Prepetition Loans rolled-up for every $1.00 of Litigation DIP Loan Commitments), which excludes any supplemental Litigation DIP Loans.

**1.96** "Local Rules" means the Local Rules of the United States Bankruptcy Court for the District of Delaware.

**1.97**    "M3 Partners" means M3 Partners, LP, as the financial advisor to the Committee.

**1.98**    "Macco" means MACCO Restructuring Group, LLC, as restructuring advisor to the Debtors.

**1.99**    "Morris James" means Morris James LLP, as counsel to the Committee.

**1.100**    "Morris Nichols" means Morris, Nichols, Arsht & Tunnell LLP, as counsel to the Debtors.

**1.101**    "Net Utah Litigation Proceeds" means the net proceeds available for Distribution from the resolution of the Utah Litigation or other liquidation of the Utah Litigation Assets for the benefit of holders of Liquidating Trust Interests after, in accordance with the Global Settlement, the following payments are made:

(1)    Payment to the DIP Lenders of all outstanding New Money DIP Loans and Litigation DIP Loans; then

(2)    Payment of the Subsequent Estate Payment for the benefit of the Debtors' Estates; then

(3)    Proceeds paid 97% to the DIP Lenders and 3% to the Debtors' Estates (the "Initial Utah Litigation Proceeds Split") until the New Money Roll-Up and Litigation Roll-Up are paid in full; then

(4)    Payment of any outstanding Utah Litigation Expenses, including those incurred by the DIP Secured Parties and Prepetition Term Loan Secured Parties, not otherwise paid through the Litigation DIP Loans; then

(5)    Payment to the Prepetition Term Loan Secured Parties in the amount of the Initial Estate Payment received by the Debtors' Estates.

**1.102**    "New Money DIP Loans" means the new money term loan for the funding of these chapter 11 cases as defined in the DIP Term Sheet, the Global Settlement and Final DIP Order and, for the avoidance of doubt, includes any supplemental loans made in accordance with the DIP Term Sheet, the Global Settlement and Final DIP Order.

**1.103**    "New Money Roll-Up Amount" means the amount of the "roll up" of the Prepetition Term Loans held by the DIP Secured Parties on a two-to-one basis into postpetition loans relative to the New Money DIP Loans (including any supplemental New Money DIP Loans pursuant to the Global Settlement or other order of the Court) (i.e., $2.00 of Prepetition Loans rolled-up for every $1.00 of New Money DIP Loan Commitments).

**1.104**    "Original Term Loan Agreement" means the Term Loan Agreement dated as of March 31, 2021, with Walker Edison, as borrower, Intermediate, as guarantor, Owl Rock Capital Corporation, as administrative agent for the lenders and as collateral agent for the secured parties.

**1.105** "Other Assets" means any Assets not sold pursuant to the Sale or otherwise disposed of after the Sale, including all letters of credit, bonds, tax refunds, Utility Deposits, and the proceeds from the foregoing, but not including the Other Litigation Assets.

**1.106** "Other Litigation Assets" means any and all Avoidance Causes of Action retained by the Debtors in connection with the Sale and not waived, released or settled prior to the Effective Date.

**1.107** "Other Priority Claim" means any Claim entitled to priority under section 507(a) of the Bankruptcy Code that is not a Tax Claim.

**1.108** "Other Secured Claims" means a Claim, other than a Prepetition Term Loan Claim, which is classified separately, and other than any claim held by the Prepetition ABL Lender arising from the Prepetition ABL Loan Agreement, which has been paid in full prior to the Effective Date, that is: (a) secured by a valid and perfected Lien on property in which an Estate has an interest, but only to the extent of the value of the Holder's interest in the applicable Estate's interest in such property as determined pursuant to section 506(a) of the Bankruptcy Code; or (b) subject to setoff under section 553 of the Bankruptcy Code, but only to the extent of the amount subject to setoff, as determined pursuant to section 553 of the Bankruptcy Code.

**1.109** "Parsons" means Parsons Behle & Latimer, as counsel to the Debtors and Blue Owl Capital Corporation in the Utah Litigation and any related litigation.

**1.110** "PennantPark" means PennantPark Investment Corporation, PennantPark Credit Opportunities Fund II, LP, and PennantPark Floating Rate Capital Ltd., who are Prepetition Term Loan Secured Parties and DIP Secured Parties as defined herein.

**1.111** "PennantPark Tolling Agreements" refers to those three certain tolling agreements entered into as of March 15, 2025 (i) by and between Walker Edison Furniture Company LLC, PennantPark Credit Opportunities Fund II LP, and Blue Owl Capital Corporation; (ii) by and between Walker Edison Furniture Company LLC, PennantPark Floating Rate Capital Ltd., and Blue Owl Capital Corporation; and (iii) by and between Walker Edison Furniture Company LLC, PennantPark Investment Corporation, and Blue Owl Capital Corporation.

**1.112** "Person" is defined in section 101(41) of the Bankruptcy Code.

**1.113** "Petition Date" means August 28, 2025, the date the Debtors commenced their chapter 11 cases in the Bankruptcy Court.

**1.114** "Plan Documents" means the documents, other than this Plan, to be executed, delivered, assumed, or performed in connection with the Consummation of this Plan, including, without limitation, the documents to be included in the Plan Supplement, and all exhibits to the Plan and the Disclosure Statement.

**1.115** "Plan Supplement" means the supplemental appendix to this Plan, filed with the Bankruptcy Court not less than seven (7) calendar days prior to the Voting Deadline, which contains, among other things: (a) draft forms or signed copies, as the case may be, of the Liquidating Trust Agreement; (b) the Schedule of Assumed Executory Contracts and Unexpired

Leases, if any; and (c) any schedules, lists or documents that supplement or clarify aspects of this Plan and are identified as part of the Plan Supplement.

      **1.116** "Prepetition ABL Lender" means Wells Fargo Bank, N.A.

      **1.117** "Prepetition ABL Loan Agreement" means the ABL Credit Agreement dated as of September 26, 2018 (as amended from time to time) with Debtors Walker Edison and EWFC as borrowers, and Intermediate as guarantor.

      **1.118** "Prepetition Term Loan Agent" means Blue Owl Capital Corporation, as administrative agent for the Prepetition Term Loan Lenders.

      **1.119** "Prepetition Term Loan Agreement" means the Amended Term Loan Agreement and the Original Term Loan Agreement.

      **1.120** "Prepetition Term Loan Claims" means Claims asserted by the Prepetition Term Loan Lenders pursuant to the Walker Edison Amended and Restated Loan Agreement, dated as of March 1, 2023.

      **1.121** "Prepetition Term Loan Lenders" means all term loan lenders under Walker Edison's Amended and Restated Loan Agreement, dated as of March 1, 2023.

      **1.122** "Prepetition Term Loan Secured Parties" means the Prepetition Term Loan Agent and the other Prepetition Term Loan Lenders

      **1.123** "Pro Rata" means the proportion that an Allowed Claim in a particular Class bears to the aggregate amount of Allowed Claims in that respective Class, or the proportion that Allowed Claims in a particular Class bear to the aggregate amount of Allowed Claims in a particular Class and other Classes entitled to share in the same recovery as such Allowed Claim under the Plan, as applicable.

      **1.124** "Professional" or collectively "Professionals," means any professional Person or Entity employed in these chapter 11 cases by Bankruptcy Court order pursuant to sections 327, 328, 363, or 1103 of the Bankruptcy Code.

      **1.125** "Professional Fee Account" means the professional fee escrow account created pursuant to the Final DIP Order and funded pursuant thereto and the Approved Budget for the purpose of payment of Allowed Professional Fee Claims. For the avoidance of doubt, the Professional Fee Account, and all funds held therein, are (and shall be deemed) held in trust exclusively for the benefit of the Professionals and shall be available only to satisfy Professional Fee Claims (to the extent unpaid). Any remaining funds in the Professional Fee Account from and after final allowance and payment in full of all Professional Fee Claims shall revert to the DIP Secured Parties in accordance with the Final DIP Order.

      **1.126** "Professional Fee Claims" means a Claim for compensation or reimbursement of expenses of a Professional pursuant to section 327, 328, 330, 331 or 503(b) of the Bankruptcy Code in connection with the chapter 11 cases, subject to any professional fee cap as set forth in the Global Settlement. "Professional Fee Claim" does not include any Claim for

14

compensation or reimbursement of expenses related to services rendered after the Effective Date by the Liquidating Trustee Professionals.

  **1.127** "Proof of Claim" means a proof of Claim filed against any of the Debtors in these chapter 11 cases.

  **1.128** "Purchaser" means Twin-Star International, Inc. as the "Purchaser" under the Asset Purchase Agreement that was approved by the Bankruptcy Court in the Sale Order.

  **1.129** "Related Parties" means collectively with respect to any Person, such Person's current and former affiliates, directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, assigns, managed accounts or funds, advisors, employees, agents, attorneys, and other representatives, each in their capacities as such.

  **1.130** "Released Party" means collectively, (a) the current D&Os, employees, agents, representatives, advisors, attorneys, investment bankers and financial advisors of the Debtors; (b) Morris Nichols, as counsel to the Debtors; (c) Lincoln, as investment banker to the Debtors; (d) Macco, as financial advisor to the Debtors; (e) Epiq, as administrative advisor to the Debtors; (f) GDC, as special litigation counsel to the Debtors; (g) Parsons, as special litigation conflicts counsel to the Debtors; (h) Morris James, as counsel to the Committee; (i) the Prepetition Term Loan Secured Parties; (j) the DIP Secured Parties; (k) the members of the Committee, but solely in relation to their fiduciary duties to the Estates; (l) M3 Partners, as financial advisor to the Committee; (m) the Prepetition ABL Lender; (n) Thomas B. Walper, as the Independent Restructuring Manager; and (o) the respective Related Parties for each of the foregoing to the extent such parties are or were acting in such capacity of or for any of the Persons identified in (a) through (n) above; *provided*, *however*, that for the avoidance of doubt, no defendants in the Utah Litigation or parties that have entered into tolling agreements with respect to potential claims and causes of action in connection with the Utah Litigation are Released Parties under this Plan; *provided further*, *however*, that PennantPark and its Related Parties shall each be a Released Party under this Plan except with respect to the specific "Causes of Action" as that term is defined in the PennantPark Tolling Agreements.

  **1.131** "Releasing Parties" means (a) all Holders of Claims who are sent a Ballot or Non-Voting Opt-Out Form and do not timely elect to opt-out of the releases provided by the Plan in accordance with the Solicitation Procedures and (b) each Released Party, and (ii) with respect to any Person or Entity in the foregoing clauses (a) and (b), the Related Party of such Person or Entity solely in their capacity as such (provided that with respect to any Related Party identified herein, each such Person constitutes a Releasing Party under this clause solely with respect to claims that such Related Party could have properly asserted for or on behalf of a Person identified in clauses (a) and (b) of the definition of Releasing Parties).

  **1.132** "Sale" means the sale of the Debtors' operating assets to the Purchaser pursuant to the Asset Purchase Agreement and the Sale Order.

  **1.133** "Sale Motion" means the *Debtors' Motion for (I) an Order Pursuant to Sections 105, 363, 364, 365 and 541 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006*

*and 9007 and Del. Bankr. L.R. 2002-1 and 6004-1 (A) Approving Bid Procedures for the Sale of Substantially All of the Debtors' Assets; (B) Approving the Debtors' Entry Into the Stalking Horse Agreement and Related Bid Protections; (C) Approving Procedures for the Assumption and Assignment or Rejection of Designated Executory Contracts and Unexpired Leases; (D) Scheduling an Auction and Sale Hearing; (E) Approving Forms and Manner of Notice of Respective Dates, Times, and Places In Connection Therewith; and (F) Granting Related Relief; (II) an Order (A) Approving the Sale of the Debtors' Assets Free and Clear of Claims, Liens, and Encumbrances; (B) Approving the Assumption and Assignment or Rejection of Designated Executory Contracts and Unexpired Leases; and (III) Certain Related Relief* (D.I. 18)

      **1.134**   "Sale Order" means the *Order (I) Approving the Sale of the Debtors' Assets Free and Clear of Claims, Liens, and Encumbrances, (II) Approving the Assumption and Assignment of Designated Executory Contracts and Unexpired Leases, and (III) Granting Related Relief* (D.I. 222), entered by the Bankruptcy Court on October 2, 2025.

      **1.135**   "Sale Proceeds" means $16,214,369.00 of cash proceeds of the Sale.

      **1.136**   "Schedules" mean the schedules of assets and liabilities, schedules of Executory Contracts and Unexpired Leases and statements of financial affairs Filed by the Debtors pursuant to section 521 of the Bankruptcy Code and in substantial accordance with the Official Bankruptcy Forms, as the same may have been amended, modified, or supplemented from time to time.

      **1.137**   "Series A Liquidating Trust Interests" shall mean the Liquidating Trust Interests that shall entitle the holder thereof to receive Distributions of Cash by the Liquidating Trust consisting of (a) 85% of the Net Utah Litigation Proceeds, (b) all net cash proceeds received on account of Other Assets, and (c) all remaining Cash other than the Initial Estate Payment and Subsequent Estate Payment.

      **1.138**   "Series B Liquidating Trust Interests" shall mean the Liquidating Trust Interests that shall entitle the holder thereof to receive Distributions of Cash by the Liquidating Trust consisting of (a) 15% of the Net Utah Litigation Proceeds, (b) the Debtors' Estates' share of the Initial Utah Litigation Proceeds Split (set forth in the definition of Net Utah Litigation Proceeds, above), (c) all net cash proceeds received on account of Other Litigation Assets, and (d) all remaining Cash attributable to the Initial Estate Payment and Subsequent Estate Payment.

      **1.139**   "Solicitation Materials" means all solicitation materials with respect to the Plan, including the Disclosure Statement and related Ballots, which have been approved by the Bankruptcy Court pursuant to the Interim Approval and Procedures Order.

      **1.140**   "Solicitation Procedures" means the procedures approved by the Interim Approval and Procedures Order by which the Debtors (i) solicit votes to accept or reject the Plan and (ii) obtains releases by the Releasing Parties in favor of the Released Parties.

      **1.141**   "Subsequent Estate Payment" means the $100,000 payment from the resolution of the Utah Litigation or other liquidation of the Utah Litigation Assets made in

accordance with the waterfall set forth in the definition of Net Utah Litigation Proceeds.

1.142 "Tax Claim" means any Claim of a Governmental Unit of the kind entitled to priority in payment under sections 502(i) and 507(a)(8) of the Bankruptcy Code.

1.143 "Unclaimed Distributions" mean any Cash or other distributable property unclaimed on or after the Effective Date or the date on which an additional Distribution would have been made in respect of an Allowed Claim.  Unclaimed Distributions shall include (a) checks (and the funds represented thereby) mailed to a Distribution Address and returned as undeliverable without a proper forwarding address, (b) funds for uncashed checks, (c) checks (and the funds represented thereby) not mailed or delivered because no Distribution Address to mail or deliver such property was available, and (d) any Distribution deemed to be an Unclaimed Distribution pursuant to section 12.2 of this Plan.

1.144 "Unexpired Lease" means a lease to which one or more of the Debtors is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

1.145 "Unimpaired" means, when used in reference to a Claim or Interest, any Claim or Interest that is not impaired within the meaning of section 1124 of the Bankruptcy Code.

1.146 "U.S. Trustee" means the Office of the United States Trustee for the District of Delaware.

1.147 "U.S. Trustee Fees" mean fees payable pursuant to 28 U.S.C. § 1930 and any interest thereon pursuant to 31 U.S.C. § 3717.

1.148 "Utah Litigation" means the cases filed in the Third Judicial District Court for the County of Salt Lake, State of Utah styled as *Walker Edison Furniture Company LLC v. Brad Bonham, et al.*, Civil No. 230902160 and *Blue Owl Capital Corporation v. Brad Bonham, et al.*, Civil No. 240903251, wherever removed or transferred, and including any related litigation or claims pursued by the Debtors.

1.149 "Utah Litigation Assets" means (1) all of the rights, title and interest in the Utah Litigation possessed by the Debtors as of the Effective Date, and (2) all of the Debtors', DIP Secured Parties', and the Prepetition Term Loan Secured Parties' rights to any proceeds on account of any resolution of the Utah Litigation.  For the avoidance of doubt, pursuant to the Global Settlement, the DIP Secured Parties and the Prepetition Term Loan Secured Parties are contributing 100% of their right to Distributions on account of their portions of the Utah Litigation, which shall be Distributed by, and in accordance with, this Plan, but shall retain their ownership of their portions of the Utah Litigation.

1.150 "Utah Litigation Expenses" means all expenses attributed to the prosecution of the Utah Litigation and the retention and compensation applications of the Utah Litigation Professionals in connection therewith, including but not limited to all amounts due and owing under the Litigation DIP Loan and all amounts due and owing to the Utah Litigation Professionals (without duplication), whether (a) arising on or before the Petition Date, after the Petition Date and before the Effective Date, or after the Effective Date, or (b) incurred by the Debtors, the DIP Secured Parties, or the Prepetition Term Loan Secured Parties.

**1.151**    "Utah Litigation Professionals" means AlixPartners, GDC and Parsons.

**1.152**    "Utility Deposits" means the approximately $21,200 amount included in the Approved Budget and described as a transfer from the Operating Account to Utility Escrow.

**1.153**    "Voting Class" means a Class whose members are entitled to vote on this Plan.

**1.154**    "Voting Deadline" shall mean [●], 2025, at 4:00 p.m. (Prevailing Eastern Time), the date specified in the Disclosure Statement, the Ballots, the Opt-Out Election Form, the Interim Approval and Procedures Order or related Solicitation Materials approved by the Bankruptcy Court as the last date for Holders of Claims entitled to vote on this Plan to submit their ballots with respect to this Plan, as such date may be extended.

**1.155**    "Walker Edison" means Debtor WEFC Liquidating, LLC f/k/a Walker Edison Furniture Company LLC.

**1.156**    "Wind-Down Estates" means the Estates of the Debtors after the Effective Date.

**Rules of Interpretation**

1.157    Unless otherwise specified, all section or exhibit references in this Plan are to the respective section in, or exhibit to, this Plan. The words "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to this Plan as a whole and not to any particular section, subsection, or clause contained therein, unless the context requires otherwise. The words "include" and "including" shall mean "include, without limitation," or "including," as the case may be. Whenever from the context it is appropriate, each term, whether stated in the singular or the plural, will include both the singular and the plural. Any term that is not otherwise defined herein but used in the Bankruptcy Code or the Bankruptcy Rules, is used as defined in the Bankruptcy Code or the Bankruptcy Rules, as applicable.

1.158    Any reference in this Plan to a contract, instrument, release, or other agreement or documents being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions, and any reference in this Plan to an existing document or exhibit filed or to be filed means such document or exhibit as it may have been or may be amended, modified, or supplemented. Subject to the provisions of any contract, certificates or articles of incorporation, by-laws, instruments, release, or other agreements or documents entered into in connection with this Plan, the rights and obligations arising under this Plan shall be governed by, and construed

and enforced in accordance with, federal law, including the Bankruptcy Code and Bankruptcy Rules.

     **1.159**   The captions and headings in this Plan are for convenience of reference only and shall not limit or otherwise affect the provisions hereof.  Any reference to any entity as a Holder of a Claim or Interest includes that entity's successors and assigns.

     **1.160**   In the event of an inconsistency between the Plan and any other document other than the Confirmation Order or the Liquidating Trust Agreement, the terms of the Plan shall control (unless expressly stated otherwise herein or in such other document).  The provisions of the Plan, the Liquidating Trust Agreement and the Confirmation Order shall be construed in a manner consistent with each other so as to effect the purposes of each; *provided* that if there is determined to be any inconsistency between any Plan provision and any provision of the Confirmation Order or the Liquidating Trust Agreement that cannot be so reconciled, then, solely to the extent of such inconsistency, the provisions of the Confirmation Order or the Liquidating Trust Agreement, as applicable, shall govern and any such provision of the Confirmation Order or the Liquidating Trust Agreement, as applicable, shall be deemed a modification of the Plan and shall control and take precedence; *provided*, *however*, that the Liquidating Trust Agreement may not materially and adversely affect the interests, rights, treatment or Distributions of any Class of Allowed Claims or Interests under this Plan.  In the event of an inconsistency between the Confirmation Order and the Liquidating Trust Agreement, the terms of the Confirmation Order shall govern solely to the extent of such inconsistency.

**Appendices and Plan Documents**

     1.161   All Plan Documents and appendices to the Plan are incorporated into the Plan by reference and are a part of the Plan as if set forth in full herein.  The documents contained in the exhibits and Plan Supplement shall be approved by the Bankruptcy Court pursuant to the Confirmation Order.  Copies of the Plan Documents are available: (a) free by visiting the website maintained in these chapter 11 cases at https://dm.epiq11.com/case/walkeredison/info; and (b) for a fee via PACER by visiting http://www. https://pacer.uscourts.gov.

**ARTICLE II**
**CLASSIFICATION OF CLAIMS AND INTERESTS AND ESTIMATED RECOVERIES**

**THE PROJECTED RECOVERIES SET FORTH IN THE TABLE BELOW ARE ESTIMATES ONLY AND ARE THEREFORE SUBJECT TO CHANGE.**

     **2.1**     **General Rules of Classification**.

     The Plan groups the Debtors together solely for the purposes of describing treatment under the Plan, confirmation of the Plan, and making Distributions in accordance with the Plan in respect of Claims against and Interests in the Debtors under the Plan.  Notwithstanding such groupings, the Plan constitutes a separate chapter 11 plan of liquidation for each Debtor.  The Plan is not premised upon and will not cause the substantive consolidation of any of the Debtors, but the Debtors reserve the right to seek, in connection with Confirmation of the Plan, substantive consolidation of the Debtors.  A Holder of a Claim against more than one Debtor on a theory of

joint and several liability shall only be entitled to a single recovery in Distribution in any Class. For brevity and convenience, the classification and treatment of Claims and Interests have been arranged into one table set forth below in this section. Such classification shall not affect any Debtor's status as a separate legal entity, change the organizational structure of the Debtors, constitute a change of control of any Debtor for any purpose, cause a merger or consolidation of any legal entities or cause the transfer of any assets. Except as otherwise provided by or permitted under the Plan, all Debtors shall continue to exist as separate legal entities.

The information in the table below is provided in summary form for illustrative purposes only and is subject to material change based on certain contingencies, including the claims reconciliation process. Actual recoveries may vary widely within these ranges, and without any changes to any of the assumptions underlying these amounts could result in material adjustments to recovery estimates provided herein and the actual Distributions received by creditors. The projected recoveries are based on information available to the Debtors as of the date hereof and reflect the Debtors' estimates as of the date hereof only. In addition to the cautionary notes contained elsewhere in the Combined Disclosure Statement and Plan, the Debtors emphasize that they make no representation as to the accuracy of these recovery estimates. The Debtors expressly disclaim any obligation to update any estimates or assumptions after the date hereof on any basis (including new or different information received or errors discovered).

A Claim or Interest is placed in a particular Class only to the extent that the Claim or Interest falls within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest falls within the description of such other Classes. A Claim or Interest is also placed in a particular Class for the purpose of receiving Distributions pursuant to this Plan only to the extent that such Claim or Interest is an Allowed Claim in that Class, and such Claim or Interest has not been paid, released, or otherwise settled prior to the Effective Date.

All Claims and Interests, except the DIP Facility Claim, Administrative Claims, Professional Fee Claims and Tax Claims, are placed in the Classes set forth below. In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Professional Fee Claims and Tax Claims, as described herein, have not been classified, and the respective treatment of such unclassified Claims is set forth below in Article II of the Plan. The categories of Claims and Interests listed below classify Claims and Interests for all purposes, including voting, Confirmation and Distribution pursuant to the Plan and sections 1122 and 1123(a)(1) of the Bankruptcy Code.

| Class/ Designation | Plan Treatment | Status | Projected Recovery | Estimated Amount |
|---|---|---|---|---|
| **Class 1**: Other Priority Claims | Each Holder of an Allowed Class 1 Claim shall receive Cash in an amount equal to the unpaid portion of such Allowed Other Priority Claim. | Unimpaired <br><br> Not entitled to vote <br><br> Deemed to accept Plan | 100% | $150,000.00 |

| Class/ Designation | Plan Treatment | Status | Projected Recovery | Estimated Amount |
|---|---|---|---|---|
| **Class 2:** Other Secured Claims | Each Holder of an Allowed Class 2 Claim shall receive, at the option of the Debtors, as applicable: (i) Cash in an amount equal to the Allowed amount of such Claim; (ii) receive its collateral in full satisfaction of its Claim; or (iii) such other treatment sufficient to render such Holder's Allowed Other Secured Claim Unimpaired. | Unimpaired<br><br>Not entitled to vote<br><br>Deemed to accept Plan | 100% | $0.00 |
| **Class 3:** Prepetition Term Loan Claims | Each Holder of an Allowed Prepetition Term Loan Claim shall be entitled to receive its Pro Rata share of the Series A Liquidating Trust Interests. For the avoidance of doubt, Holders of Allowed Claims in Class 3 shall not share in the Series B Liquidating Trust interests. | Impaired<br><br>Entitled to vote | 0% – 60% | $214,097,528.56 |
| **Class 4:** General Unsecured Claims | Each Holder of an Allowed General Unsecured Claim shall be entitled to receive its Pro Rate share of the Series B Liquidating Trust interests. . | Impaired<br><br>Entitled to vote | 0.5% –60% | $30,000,000 – $34,000,000 |
| **Class 5:** Interests | On the Effective Date, all Interests shall be transferred to the Liquidating Trust, and no Holders of any Interests shall be entitled to receive or retain any property on account of such Interests. | Impaired<br><br>Not entitled to vote<br><br>Deemed to reject Plan | 0% | N/A |

## 2.2    Unimpaired Classes of Claims.

**Class 1: Other Priority Claims.** Class 1 shall consist of Other Priority Claims against the Debtors. Class 1 Claims are Unimpaired by the Plan, and the Holders of Allowed Class 1 Claims are deemed to accept the Plan and, therefore, are not entitled to vote on the Plan.

**Class 2: Other Secured Claims.** Class 2 shall consist of Other Secured Claims against the Debtors. Class 2 Claims are Unimpaired by the Plan, and the Holders of Allowed Class 2 Claims are deemed to accept the Plan and, therefore, are not entitled to vote on the Plan.

**2.3     Impaired Classes of Claims**.

**Class 3: Prepetition Term Loan Claims.**  Class 3 shall consist of the Prepetition Term Loan Claims.  The Class 3 Claims are Impaired by the Plan and entitled to vote to accept or reject the Plan.

**Class 4: General Unsecured Claims.**  Class 4 shall consist of all Allowed General Unsecured Claims against the Debtors.  The Class 4 Claims are Impaired by the Plan and entitled to vote to accept or reject the Plan.

**2.4     Impaired Class of Interests**.

**Class 5: Interests.**  Class 5 shall consist of all Interests.  Because Holders of Class 5 Interests will receive no Distribution under the Plan, Holders of Class 5 Interests are deemed to reject the Plan and, therefore, are not entitled to vote on the Plan.

**ARTICLE III**
**BACKGROUND AND DISCLOSURES**

**3.1     General Background**.

(a)     *The Debtors' Business*

Walker Edison is a Delaware corporation that was founded in 2006.  Walker Edison is managed by its sole member and manager, Intermediate, which in turn is managed by its sole member, Holdco through Holdco's Board of Managers.  Debtor EWFC is a wholly owned subsidiary of Walker Edison.

The Debtors were a leading supplier of innovative and affordable ready-to-assemble home furnishings to global e-commerce platforms.  Headquartered in West Jordan, Utah, the Debtors built a data-driven sourcing and logistics platform that enabled integration with major online retailers, including Amazon, Wayfair, Walmart, and others.  In addition to third-party platforms, Walker Edison also operated its own website to sell products directly to consumers.  Walker Edison focused exclusively on the e-commerce channel, designing and distributing stylish, space-efficient furniture for living rooms, bedrooms, home offices, and outdoor settings.

The vast majority of Walker Edison's products were shipped from manufacturing suppliers in Asia and Brazil to distribution centers located in Ohio and California, or to the distribution centers of Walker Edison's e-commerce partners, where they would be delivered directly to consumers.  The Company's gross sales in 2024 were approximately $124.6 million

(b)     *The Debtor's Ownership Structure.*

The following chart depicts the relationship among the Debtors and their non-Debtor affiliates:



     (c)    *The Debtors' Prepetition Capital Structure.*

As of the Petition Date, Walker Edison had approximately $225 million in principal amount of total debt obligations.

### i.    Prepetition ABL Loan Agreement

Debtors Walker Edison and EWFC as borrowers, and Intermediate as guarantor, are parties to the Prepetition ABL Loan Agreement. As of the Petition Date, the principal amount outstanding pursuant to the Prepetition ABL Loan Agreement was $10,512,451.10. This amount has been satisfied pursuant to the Sale from the Sale Proceeds.

### ii.    Prepetition Term Loan Agreement

Debtor Walker Edison as borrower, and Intermediate as guarantor, are parties to the Prepetition Term Loan Agreement with the Prepetition Term Loan Lenders. As of the Petition Date, the Debtors owed approximately $214,097,528.56 on account of the Prepetition Term Loan Agreement.

### iii.    Trade and Other Unsecured Debt.

In addition, the Debtors have ordinary course trade and vendor obligations. As of the Petition Date, outstanding trade payables were approximately $22,382,951.57. These obligations consist primarily of amounts owed to third-party vendors and service providers.[4]

## 3.2    Events Leading to Chapter 11.

Walker Edison was founded in 2006 by Brad Bonham ("Bonham") and Matt Davis ("Davis") who served on the board of managers of Walker Edison's former holding company (the

---

[4]    This estimate does not reflect the total Allowed General Unsecured Claims. The Debtors have not completed their claims reconciliation process. Therefore, the actual amount of Allowed General Unsecured Claims may vary materially from this estimate.

"Former Holdco")[5] and served, respectively, as the Former Holdco's Chief Executive and Chief Operating Officers.  In September 2018, a Massachusetts-based private equity firm and family of funds now known as Prospect Hill acquired an approximately 55% majority share in the Former Holdco, following which it added five additional members to the Former Holdco's board of managers.  Bonham and Davis continued in their senior management positions and as members of the board of managers.

Walker Edison grew rapidly in the years leading up to and including portions of 2020 amid the COVID-19 pandemic, as their brick-and-mortar competitors shut their doors and consumer demand rose as people were forced to spend more time at home.  From 2017 to 2020, Walker Edison saw earnings before interest, taxes, depreciation and amortization ("EBITDA") grow from $13 million to $84 million.

Seeking to capitalize on this growth, in early 2020, the Former Shareholders (as defined in the First Day Declaration) began to look for ways to monetize their investment.  As alleged in the Utah Litigation, when various non-debt options proved unsuccessful, and seeing strong indications that the company's growth was nearing an end while costs were rising, the Former Shareholders decided to finance an immediate payout through a dividend recapitalization, or "dividend recap," and in March 2021, caused Walker Edison to enter into the Original Term Loan Agreement with the Prepetition Term Loan Secured Parties, the proceeds of which they immediately used to fund a $210 million special dividend (the "Special Dividend") to themselves.

The circumstances surrounding the disclosures made in connection with the Original Term Loan Agreement and the Former Shareholders actions taken in connection therewith and in connection with the Special Dividend are the subject of the aforementioned Utah Litigation, which were filed in Utah state court and captioned *Walker Edison Furniture Company v. Brad Bonham, et al*. (Case No. 230902160) and *Blue Owl Capital Corporation v. Brad Bonham, et al.* (Case No. 240903251).  These actions have been consolidated for discovery purposes and are in the process of being transferred to the Bankruptcy Court.

These consolidated actions assert claims for, among other things, wrongful distribution, fraudulent transfer, breach of fiduciary duty, aiding and abetting a breach of fiduciary duty, civil conspiracy, unlawful dividend, and fraud and seek to recover hundreds of millions of dollars in actual and punitive damages from the Former Shareholders.  Fact discovery, including party depositions, is underway.  The parties to the litigation are currently negotiating a schedule for the close of fact discovery and pre-trial and trial proceedings.

As alleged in the Utah Litigation, during the latter part of 2020, Walker Edison had experienced financial challenges related to: (i) inflationary cost pressures driven by dramatically elevated freight and shipping costs; and (ii) supply chain disruptions and challenges.  The complaints in the Utah Litigation also allege that at the time of the Special Dividend, and

---

[5]    The Former Holdco was "Walker Edison Holding Company, LLC" (not to be confused with Debtor Holdco, the current holding company).  Walker Edison Holding Company, LLC *is not* one of the Debtors and *is one* of the defendants in the Utah Litigations.  The Former Holdco was replaced by Debtor Holdco in the 2023 transaction in which the Prepetition Term Loan Lenders assumed control of the subsidiary and operating Debtors.

unbeknownst to the Prepetition Term Loan Secured Parties at the close of the Original Term Loan Agreement, the Former Shareholders were aware of sufficient facts to know, among other things, that Walker Edison had substantial cash flow problems and problems meeting its EBITDA forecasts and was facing projected costs for freight, shipping, inventory, and other costs that would impact its ability to maintain its liquidity position and ability to pay debts as they came due as well as to meet the financial covenants required under the Original Term Loan Agreement. In addition, Walker Edison's profitability had been overstated based on a failure to properly account for incurred freight expenses that were rapidly increasing.

As alleged in the Utah Litigation, notwithstanding the receipt of $300 million in term loan proceeds and increased capacity under the ABL Loan Agreement from $55 million to $75 million, Walker Edison lacked the liquidity necessary to fund continued operations for the foreseeable future immediately after the Special Dividend. While the Former Shareholders propped Walker Edison up with small equity infusions for a time, consistent with what the Former Shareholders knew at the time of the Special Dividend, Walker Edison's performance continued to decline dramatically.

Ultimately, on January 27, 2023, the Former Shareholders, Prepetition Term Loan Secured Parties and Walker Edison entered into a Restructuring Support Agreement (the "RSA") through which the Former Shareholders transferred ownership of Walker Edison to the Prepetition Term Loan Secured Parties in exchange for the extension of an additional $13 million under the Original Term Loan Agreement. The transfer of ownership also included the conversion of a portion of the Prepetition Term Loan Secured Parties' loans under the Amended Term Loan Agreement into equity. However, given the fragile state of Walker Edison and continued market challenges, Walker Edison continued to lose money requiring further additional loans from the Prepetition Term Loan Secured Parties of $79.25 million to fund operations.

With the need for additional liquidity amid mounting expenses and soft sales, on June 15, 2025, the Holdco Board of Managers appointed a new independent manager with expertise in restructuring matters and designated him as a special committee of the Board (the "Special Committee") with sole power and authority to explore strategic alternatives for the Debtors. At approximately the same time, the Debtors engaged Morris Nichols, Lincoln, and Macco to assist that effort.

In June 2025, Lincoln commenced outreach to potential buyers with a teaser introducing the opportunity and inviting potential buyers to enter into a confidentiality agreement ("NDA") with the Debtors to receive access to additional information. During the prepetition marketing process, Lincoln contacted approximately 45 potential buyers, of which 20 executed NDAs. Potential buyers that executed NDAs received access to a confidential information presentation that contained a detailed overview of the Debtors' business operations, assets, commercial arrangements, and historical financial results. Additionally, these potential buyers received access to an online data room that contained hundreds of unique documents and diligence materials, and potential buyers were given the opportunity to request specific diligence items, which were provided on a rolling basis into the data room. Lincoln maintained a dialogue with these potential buyers throughout the process and facilitated discussions between potential buyers and the Debtors' management.

This initial stage of the marketing process culminated in the receipt of five non-binding indications of interest ("IOIs").  After reviewing the IOIs, the Debtors and Lincoln engaged with each potential buyer to discuss the terms of each potential bid.  After further diligence, three interested parties submitted letters of interest ("LOIs").  The LOIs representing the highest value for the Debtors' assets required that the Debtors consummate the sale through a chapter 11 sale process in order to realize the values stated in the LOIs.  As such, the Debtors began to negotiate with these potential buyers to develop the terms of an agreement to serve as a stalking horse.

After several weeks, the Debtors reached an agreement with the Purchaser to act as a "stalking horse" bidder, setting the floor for other potential bids to acquire certain assets during these chapter 11 cases.  Under the Asset Purchase Agreement between the Debtors and the Purchaser, the Purchaser committed, subject to Court approval, to acquire substantially all of the operating assets of the Debtors in exchange for (A) Twenty Million Dollars ($20,000,000.00), plus (B) the assumption of the Assumed Liabilities (as defined in the Asset Purchase Agreement); and importantly, as part of the deal, the Purchaser was planning to offer continuing employment to many of the Debtors' employees at the time.

### 3.3    The Chapter 11 Case.

(a)    *Generally.*

On the Petition Date, the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the Bankruptcy Court to implement the then-proposed Sale to the prospective Purchaser.  The commencement of a chapter 11 case creates an estate that is composed of the legal and equitable interests of the debtor as of that date.  The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

After the Petition Date, the Debtors continued to operate their business as debtors and debtors in possession.  By order entered September 4, 2025 (D.I. 36), these chapter 11 cases are jointly administered for procedural purposes only.  No trustee or examiner has been appointed in these chapter 11 cases.  On September 10, 2025, the U.S. Trustee filed the *Notice of Appointment of Committee of Unsecured Creditors* in connection with these chapter 11 cases (D.I. 81).

The filing of the Debtors' bankruptcy petitions on the Petition Date triggered the immediate imposition of the automatic stay under section 362 of the Bankruptcy Code, which, with limited exceptions, enjoins all collection efforts and actions by creditors, the enforcement of Liens against property of the Debtors and both the commencement and the continuation of prepetition litigation against the Debtors.  With certain limited exceptions and/or modifications as permitted by order of the Bankruptcy Court, the automatic stay will remain in effect from the Petition Date until the Effective Date of the Plan.

(b)    *"First Day" Motions.*

On the Petition Date, the Debtors filed a number of "first-day" motions and applications designed to ease the Debtors' transition into chapter 11, maximize the value of the Debtors' Assets and minimize the effects of the commencement of these chapter 11 cases.  On

September 2, 2025 and September 3, 2025, the Bankruptcy Court entered interim orders providing various first-day relief approving:

- *Motion of the Debtors for Entry of Interim and Final Orders (I) Authorizing Debtors to (A) Continue to Operate their Existing Cash Management System, (B) Pay or Honor Certain Prepetition Obligations Related Thereto, (C) Maintain their Bank Accounts and Existing Business Forms, (D) Implement Changes to the Existing Cash Management System as Necessary, and (II) Granting Related Relief* (D.I. 6);

- *Motion of the Debtors for Entry of Interim and Final Orders (I) Authorizing, but Not Directing, the Debtors to (A) Pay Prepetition Employee Wages, Salaries, Other Compensation, and Reimbursable Employee Expenses and (B) Maintain Employee Benefits Programs and (II) Granting Related Relief* (D.I. 7);

- *Debtors' Motion for Interim and Final Orders (I) Authorizing Debtors to Continue Insurance and Surety Bond Program and Pay All Obligations with Respect Thereto, (II) Honor Certain Prepetition Obligations Related to the Foregoing, (III) Renew, Revise, Extend, Supplement, Change or Enter into New Insurance Coverage, Surety Indemnity Agreements and Insurance Premium Financing as Needed in their Business Judgment, and (IV) Granting Related Relief* (D.I. 8);

- *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay Certain Prepetition Taxes and Fees, and (II) Granting Related Relief* (D.I. 9);

- *Debtors' Motion for Entry of Interim and Final Orders (I) Prohibiting Utility Providers from Altering, Refusing or Discontinuing Utility Services, (II) Approving Proposed Adequate Assurance of Payment to Utility Providers and Authorizing Debtors to Provide Additional Assurances, (III) Establishing Procedures to Resolve Requests for Additional Assurance; and (IV) Granting Related Relief* (D.I. 10);

- *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Maintain Honor and Continue Customer Programs and Customer Obligations in the Ordinary Course of Business, and (II) Granting Related Relief* (D.I. 12);

- *Debtors' Motion for Interim and Final Orders (I) Authorizing Payment of Prepetition Claims to (A) Certain Possessory Claimants and (B) Critical Vendors and (II) Granting Related Relief* (D.I. 13);

- *Debtors' Motion for Clarification that the Automatic Stay Does Not Apply to the Utah Litigations or, in the Alternative, to Modify the Automatic Stay*

*to Permit the Utah Litigations to Continue for the Benefit of the Estates* (D.I. 14); and

- *Debtors' Motion for Interim and Final Orders (I) Authorizing Secured Post-Petition Financing Pursuant to 11 U.S.C. § 364, (II) Authorizing Use of Cash Collateral, (III) Granting Adequate Protection Pursuant to 11 U.S.C. §§ 361, 363 and 364, (IV) Scheduling a Final Hearing and (V) Granting Related Relief* (D.I. 15).

On September 22 (at D.I. 126, 127, 128, 129, 130, 131), September 23 (at D.I. 143), and October 3, 2025 (at D.I. 229), the Bankruptcy Court entered orders approving various "first day" motions on a final basis.

(c)     *The DIP Facility Claim*

Upon the entry of the Final DIP Order (D.I. 219), the Debtors were authorized to borrow from two tranches of the DIP Facility: (1) the New Money DIP Loans, which were to fund the costs, fees and expenses of the chapter 11 cases, and (2) the Litigation DIP Loans, which were to fund the costs, fees and expenses of the Utah Litigation.  As part of the terms of the DIP Facility, a portion of the Prepetition Term Loan Claims held by the DIP Secured Parties (defined herein as the Litigation Roll-Up Amount and the New Money Roll-Up Amount) were "rolled-up" into the DIP Facility Claim.  The treatment of the DIP Facility Claim under the Plan is set forth in section 6.1 herein.

(d)     *Rejection of Executory Contracts and Unexpired Leases and Abandonment of Burdensome Assets.*

On September 30, 2025, the Debtors filed a motion to reject, effective as of September 30, 2025, certain unexpired leases of nonresidential real property.  With respect to the rejection of the unexpired leases, the Debtors also requested authority to abandon any property remaining at the leased premises.  The Bankruptcy Court entered an order approving the rejection motion on October 16, 2025 (D.I. 269).

(e)     *Retention of Professional Advisors.*

Pursuant to orders entered on September 25, 2025 and October 8, 2025, the Bankruptcy Court authorized the Debtors to retain and employ (a) Morris, Nichols, Arsht & Tunnell LLP, as their bankruptcy counsel (D.I. 157), (b) Epiq, as their administrative advisor (D.I. 171), (c) Macco, as their financial advisor (D.I. 170), (d) Lincoln, as their investment banker (D.I. 245), and (e) GDC, as their special litigation counsel (D.I. 266).

(f)     *Filing of the Debtors' Schedules and Establishment of the Bar Dates.*

On September 30, 2024, the Debtors filed redacted and unredacted versions of the schedules of assets and liabilities and statements of financial affairs for each Debtor.  (D.I. 155, 156, 157, 158, 159, 160, 161, 162).

On September 24, 2025, the Debtors filed the Bar Date Motion and on October 3, 2025, the Bankruptcy Court entered the Bar Date Order. Pursuant to the Bar Date Order, the Bankruptcy Court established the following Bar Dates:

**1) General Bar Date: November 6, 2025, 5:00 p.m. prevailing Eastern Time** as the deadline to file a Proof of Claim in respect of any prepetition Claim against the Debtor, including, without limitation, any secured Claim, unsecured Claim, priority Claim, or 503(b)(9) Claim;

**2) Administrative Claim Bar Date: November 6, 2025, 5:00 p.m. prevailing Eastern Time** as the deadline to file a request to allow any unpaid Administrative Claims against the Debtors arising on or after the Petition Date and through and including October 7, 2025.

**3) Governmental Bar Date: February 24, 2026,** as the deadline by which a Governmental Unit must file a Proof of Claim in respect of a prepetition Claim against the Debtor;

(g)   *Settlement of Purported Warehouse Lien Claims*

### 1) GXO

The Debtors and GXO Logistics Supply Chain, Inc. ("GXO") were parties to a Logistics Services Agreement dated March 13, 2018, as amended, whereby GXO provided warehouse and third-party logistics services to the Debtors (the "GXO Agreement"). On September 22, 2025, GXO filed the *Objection of GXO Logistics Supply Chain, Inc. to Executory Contract Cure Amount and Reservation of Rights* (D.I. 134) (the "GXO Cure Objection"). As detailed below, the Debtors and GXO entered into a stipulation (the "GXO Stipulation"), which was attached to the Sale Order as Exhibit B. The GXO Stipulation resolved, among other things, the GXO Cure Objection.

### 2) Kenco

The Debtors and Kenco Logistic Services, LLC ("Kenco") were parties to the Kenco Services Agreement dated June 17, 2019, whereby Kenco provided warehousing, handling, and distribution services from its Perris, California facility on behalf of the Debtors (the "Kenco Agreement"). Shortly after the Petition Date, Kenco advised the Debtors that it would not perform under the Kenco Agreement absent the Debtors providing a prepayment. Accordingly, on September 3, 2025, the Debtors filed the *Debtors' Emergency Motion to (I) Enforce the Automatic Stay and (II) Recover Costs Related to Kenco Logistic Services, LLC's Violations of the Automatic Stay* (D.I. 64) (the "Automatic Stay Violation Motion"). The Debtors and Kenco engaged in negotiations and were able to preliminarily resolve the issues. However, the Debtors held the Automatic Stay Violation Motion in abeyance.

On September 17, 2025, Kenco filed the *Kenco Logistic Services, LLC's Motion to Compel Adequate Protection* (D.I. 112) (the "Motion to Compel"). The Motion to Compel was noticed for a hearing on October 8, 2025. In addition, on September 22, 2025, Kenco filed the *Kenco Logistic Services, LLC's Objection to Notice of (I) Possible Treatment of Contracts and Leases, (II) Fixing of Cure Amounts, and (III) Deadline to Object Thereto and Reservation of Rights* (D.I. 133) (the "Kenco Cure Objection"). As detailed below, the Debtors and Kenco entered

into a stipulation (the "Kenco Stipulation"), which, among other things, resolved the Automatic Stay Violation Motion, the Motion to Compel and the Kenco Cure Objection.

(h)   *The Sale of Substantially All of the Debtors' Assets.*

The Debtors filed these chapter 11 cases to pursue a sale of all or substantially all of their Assets with the goal of maximizing the recovery for their Estates and Creditors. To that end, the Bankruptcy Court entered the Bidding Procedures Order (D.I. 105) granting certain of the relief sought in the Sale Motion, including, among other things, (a) approving the bidding procedures, which established the key dates and times related to the Sale and auction, (b) approving assumption procedures, and (c) authorizing the Debtors' entry into and performance under the Asset Purchase Agreement. The Bidding Procedures Order also established a bid deadline of September 22, 2025.

The Debtors did not receive any bids for their Assets other than the Stalking Horse Bid prior to the bid deadline. As a result, the Debtors cancelled the auction. On September 24, 2025, GXO Logistics Supply Chain, Inc. ("GXO") filed the *Limited Objection to Sale and Reservation of Rights of GXO Logistics Supply Chain, Inc.* (D.I. 152) (the "GXO Limited Objection"). Also on September 24, 2025, Kenco filed the *Kenco Logistic Services LLC's Limited Objection to Debtors' Sale Motion and Reservation of Rights* (D.I. 153) (the "Kenco Limited Objection," and with the GXO Limited Objections, the "Objections"). The hearing on the Sale Motion was scheduled for September 29, 2025, at 1:00 p.m. (ET) (the "Sale Hearing"). At the Sale Hearing, the Debtors were able to resolve the GXO Limited Objection through the GXO Stipulation. The Bankruptcy Court scheduled the Kenco Limited Objection for hearing on October 8, 2025. The Debtors and Kenco engaged in good faith negotiations and as a result, the Debtors were able to resolve the Kenco Limited Objection. On October 7, 2025, the Bankruptcy Court entered an order approving the Kenco Stipulation (D.I. 239).

On October 2, 2025, the Bankruptcy Court entered the Sale Order (D.I. 222). The Sale to the Purchaser closed on October 7, 2025. At Closing, the Sale Proceeds were $16,214,369.00, which is subject to adjustment pursuant to the Asset Purchase Agreement. Additionally, after the Closing of the Sale, the corporate names of the Debtors were changed to WEH Liquidating, LLC, WEI Liquidating, LLC, WEFC Liquidating, LLC, and EWF Liquidating, LLC (D.I. 320).

(i)   *The Global Settlement and Resolution of the Chapter 11 Cases.*

In connection with the Debtors' and Committee's investigation of the ABL Lender and the Prepetition Term Loan Secured Parties, the parties entered into the Global Settlement, which was initially approved by the Bankruptcy Court in connection with the entry of the Final DIP Order. The Global Settlement provided for the structure of this Plan, by which Holders of Allowed General Unsecured Claims would be able to meaningfully participate in any recoveries received in connection with the Utah Litigation along with the Prepetition Term Loan Secured Parties. As set forth in more detail herein (and in the Global Settlement itself), the Prepetition Term Loan Secured Parties will receive 85% of the Net Utah Litigation Proceeds and the Holders of Allowed General Unsecured Claims will receive 15% of the Net Utah Litigation Proceeds. The

Net Utah Litigation Proceeds, as defined herein, provides for the payment of the costs of the chapter 11 cases and the Liquidating Trust prior to the 85%/15% splits.

Now, following the Sale of substantially all of the Debtors' Assets to the Purchaser, the Debtors are focused principally on confirming this Plan, which would provide for the funding of the Utah Litigation and the Distribution of any proceeds of the Utah Litigation Assets and other Assets of the Debtors.

## ARTICLE IV
## CONFIRMATION AND VOTING PROCEDURES

### 4.1    Confirmation Procedure.

On [●], 2025, the Bankruptcy Court entered the Interim Approval and Procedures Order conditionally approving the Combined Disclosure Statement and Plan for solicitation purposes only and authorizing the Debtors to solicit votes to accept or reject the Plan. The Combined Hearing has been scheduled for **[●], 2025 at [●] (prevailing Eastern Time)** to consider (a) final approval of the combined Disclosure Statement and Plan as providing adequate information pursuant to section 1125 of the Bankruptcy Code and (b) confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code. The Combined Hearing may be adjourned from time to time by the Debtors without further notice other than by the filing of a notice on the docket of these chapter 11 cases.

### 4.2    Procedure for Objections.

Any objection to final approval of the Combined Disclosure Statement and Plan as providing adequate information pursuant to section 1125 of the Bankruptcy Code and/or confirmation of the Plan must be made in writing and filed with the Bankruptcy Court and served on (a) counsel for the Debtors, Morris, Nichols, Arsht & Tunnell LLP, 1201 N. Market Street, 16th Floor, Wilmington, DE 19801, Attn: Robert J. Dehney, Sr. rdehney@morrisnichols.com, Donna L. Culver, dculver@morrisnichols.com, and Daniel B. Butz, dbutz@morrisnichols.com; (b) counsel to the DIP Lender, Whiteford, Taylor & Preston LLP, 3190 Fairview Park Drive, Suite 800, Falls Church VA 22042 (Attn: David Gaffey, Esq. (DGaffey@whitefordlaw.com) and Brandy M. Rapp, Esq. (BRapp@whitefordlaw.com)); (c) the U.S. Trustee for the District of Delaware, J. Caleb Boggs Federal Building, 844 King Street, Lockbox 35, Wilmington, DE 19801, Attn: Malcolm M. Bates, malcolm.m.bates@usdoj.gov and (d) counsel to the Committee, Morris James LLP, 3205 Avenue North Blvd, Suite 100, Wilmington, DE 19803, Attn: Jeffrey Waxman, Esq. (jwaxman@morrisjames.com) and Eric Monzo, Esq. (emonzo@morrisjames.com) in each case, by no later than **[●], 2025 at 4:00 p.m.** (prevailing Eastern Time). Unless an objection is timely filed and served, it may not be considered by the Bankruptcy Court at the Combined Hearing.

### 4.3    Requirements for Confirmation.

The Bankruptcy Court will confirm the Plan only if it meets all the applicable requirements of section 1129 of the Bankruptcy Code. Among other requirements, the Plan (a) must be accepted by all Impaired Classes of Claims or Interests or, if rejected by an Impaired Class, the Plan must not "discriminate unfairly" against, and be "fair and equitable" with respect

to, such Class; and (b) must be feasible.  The Bankruptcy Court must also find that: (i) the Plan has classified Claims and Interests in a permissible manner; (ii) the Plan complies with the technical requirements of Chapter 11 of the Bankruptcy Code; and (iii) the Plan has been proposed in good faith.

### 4.4    Classification of Claims and Interests.

Section 1123 of the Bankruptcy Code provides that a plan must classify the claims and interests of a debtor's creditors and equity interest holders.  In accordance with section 1123 of the Bankruptcy Code, the Plan divides Claims and Interests into Classes and sets forth the treatment for each Class (other than those claims which, pursuant to section 1123(a)(1) of the Bankruptcy Code, need not be and have not been classified).  The Debtors also are required, under section 1122 of the Bankruptcy Code, to classify Claims and Interests into Classes that contain Claims or Interests that are substantially similar to the other Claims or Interests in such Class.

The Bankruptcy Code also requires that a plan provide the same treatment for each claim or interest of a particular class unless the claim holder or interest holder agrees to a less favorable treatment of its claim or interest.  The Debtors believe that the Plan complies with such standard.  If the Bankruptcy Court finds otherwise, however, it could deny confirmation of the Plan if the Holders of Claims or Interests affected do not consent to the treatment afforded them under the Plan.

A Claim or Interest is placed in a particular Class only to the extent that the Claim or Interest falls within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest falls within the description of such other Classes.  A Claim is also placed in a particular Class for the purpose of receiving Distributions pursuant to the Plan only to the extent that such Claim is an Allowed Claim in that Class, and such Claim has not been paid, released, or otherwise settled prior to the Effective Date.

The Debtors believe that the Plan has classified all Claims and Interests in compliance with the provisions of section 1122 of the Bankruptcy Code and applicable case law. It is possible that a Holder of a Claim or Interest may challenge the Debtors' classification of Claims or Interests and that the Bankruptcy Court may find that a different classification is required for the Plan to be confirmed.  If this occurs, the Debtors intend, in accordance with the terms of the Plan, to make such modifications to the Plan as may be necessary to permit its confirmation. Any such reclassification could adversely affect Holders of Claims by changing the composition of one or more Classes and the vote required of such Class or Classes for approval of the Plan.

EXCEPT AS SET FORTH IN THE PLAN, UNLESS SUCH MODIFICATION OF CLASSIFICATION MATERIALLY ADVERSELY AFFECTS THE TREATMENT OF A HOLDER OF A CLAIM AND REQUIRES RESOLICITATION, ACCEPTANCE OF THE PLAN BY ANY HOLDER OF A CLAIM PURSUANT TO THIS SOLICITATION WILL BE DEEMED CONSENT TO THE PLAN'S TREATMENT OF SUCH HOLDER OF A CLAIM REGARDLESS OF THE CLASS TO WHICH SUCH HOLDER ULTIMATELY IS DEEMED A MEMBER.

The amount of any Impaired Claim that is ultimately Allowed by the Bankruptcy Court may vary from any estimated Allowed amount of such Claim and, accordingly, the total Claims that are ultimately Allowed by the Bankruptcy Court with respect to each Impaired Class of Claims may also vary from any estimates contained herein with respect to the aggregate Claims in any Impaired Class. Thus, the actual recovery ultimately received by a particular Holder of an Allowed Claim may be adversely or favorably affected by the aggregate amount of Claims Allowed in the applicable Class. Additionally, any changes to the assumptions underlying the estimated Allowed amounts could result in material adjustments to recovery estimates provided herein or the actual Distribution received by creditors. The projected recoveries are based on information available to the Debtors as of the date hereof and reflect the Debtors' views as of the date hereof only.

The classification of Claims and Interests and the nature of Distributions to members of each Class are summarized herein. The Debtors believe that the consideration, if any, provided under the Plan to Holders of Claims reflects an appropriate resolution of their Claims taking into account the differing nature and priority (including contractual subordination, if any) of such Claims and Interests. The Bankruptcy Court must find, however, that a number of statutory tests are met before it may confirm the Plan. Many of these tests are designed to protect the interests of Holders of Claims or Interests who are not entitled to vote on the Plan, or do not vote to accept the Plan, but who will be bound by the provisions of the Plan if it is confirmed by the Bankruptcy Court.

### 4.5    Impaired Claims or Interests.

Pursuant to the Plan and the provisions of the Bankruptcy Code, only classes of Claims or Interests that are Impaired under the Plan that are not deemed to reject the Plan may vote to accept or reject the Plan.

Under the Plan, only Holders of Claims in Classes 3 and 4 are Impaired and are entitled to vote on the Plan. Under the Plan, Holders of Interests in Class 5 are Impaired and deemed to reject the Plan. Therefore, Holders of Interests in Class 5 are not entitled to vote on the Plan. Under the Plan, Holders of Claims in Classes 1 and 2 are Unimpaired and, therefore, not entitled to vote on the Plan and are deemed to accept the Plan.

### 4.6    Confirmation Without Necessary Acceptances; Cramdown.

In the event that any Impaired Class of Claims or Interests does not accept a plan, a debtor nevertheless may move for confirmation of the plan. A plan may be confirmed, even if it is not accepted by all Impaired Classes, if the plan has been accepted by at least one Impaired Class of claims, and the plan meets the "cramdown" requirements set forth in section 1129(b) of the Bankruptcy Code. Section 1129(b) of the Bankruptcy Code requires that a court find that a plan (a) "does not discriminate unfairly" and (b) is "fair and equitable," with respect to each non-accepting Impaired Class of claims or interests. Here, because Holders of Claims and Interests in Class 5 are deemed to reject the Plan, the Debtors will seek confirmation of the Plan from the Bankruptcy Court by satisfying the "cramdown" requirements set forth in section 1129(b) of the Bankruptcy Code. The Debtors believe that such requirements are satisfied, in part, as no Holder of an Interest junior to those in Class 5 will receive any property under the Plan.

A plan does not "discriminate unfairly" if (a) the legal rights of a nonaccepting class are treated in a manner that is consistent with the treatment of other classes whose legal rights are similar to those of the nonaccepting class and (b) no class receives payments in excess of that which it is legally entitled to receive for its claims or interests, provided that a debtor may be afforded wide latitude for separately classifying and treating claims of the same priority based on, among other factors, the differing factual or legal nature or attributes of the claims or their holders. The Debtors believe that, under the Plan, all Impaired Classes of Claims or Interests are treated in a manner that is consistent with the treatment of other Classes of Claims or Interests that are similarly situated, if any, when taking into account the nature and attribute of such Claims and Interests and their Holders, and no Class of Claims or Interests will receive payments or property with an aggregate value greater than the aggregate value of the Allowed Claims or Allowed Interests in such Class. Accordingly, the Debtors believe that the Plan does not discriminate unfairly as to any Impaired Class of Claims or Interests.

The Bankruptcy Code provides a nonexclusive definition of the phrase "fair and equitable." To determine whether a plan is "fair and equitable," the Bankruptcy Code establishes "cram down" tests for secured creditors, unsecured creditors, and membership holders, as follows:

(a)    *Secured Creditors.*

Either (i) each impaired secured creditor retains its liens securing its secured claim and receives on account of its secured claim deferred cash payments having a present value equal to the amount of its allowed secured claim, (ii) each impaired secured creditor realizes the "indubitable equivalent" of its allowed secured claim or (iii) the property securing the claim is sold free and clear of liens with such liens to attach to the proceeds of the sale and the treatment of such liens on proceeds to be as provided in clause (i) or (ii) above.

(b)    *Unsecured Creditors.*

Either (i) each impaired unsecured creditor receives or retains under the plan property of a value equal to the amount of its allowed claim or (ii) the holders of claims and interests that are junior to the claims of the dissenting class will not receive any property under the plan.

(c)    *Interests.*

Either (i) each holder of an interest will receive or retain under the plan property of a value equal to the greatest of the fixed liquidation preference to which such holder is entitled, the fixed redemption price to which such holder is entitled or the value of the interest or (ii) the holder of an interest that is junior to the nonaccepting class will not receive or retain any property under the plan.

As discussed above, the Debtors believe that the Distributions provided under the Plan satisfy the absolute priority rule, where required.

### 4.7    Feasibility.

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of a plan not likely be followed by liquidation, or the need for further financial reorganization, of the Debtors or any successor to the Debtors (unless such liquidation or reorganization is proposed in the Plan). Inasmuch as the Debtors' principal assets have been liquidated and the Plan provides for the Distribution of all the Cash proceeds of the Debtors' Assets to Holders of Claims that are Allowed as of the Effective Date in accordance with the Plan, for purposes of this test, the Debtors have analyzed the ability of the Liquidating Trust to meet its discreet obligations under the Plan. Based on the Debtors' analysis, the Liquidating Trust will have sufficient assets to accomplish its tasks under the Plan. Therefore, the Debtors believe that the liquidation pursuant to the Plan will meet the feasibility requirements of the Bankruptcy Code.

### 4.8    Best Interests Test and Liquidation.

Even if a plan is accepted by the Holders of each Class of Claims and Interests, the Bankruptcy Code requires a court to determine that such plan is in the best interests of all holders of claims or interests that are impaired by that plan and that have not accepted the plan. The "best interests" test, as set forth in section 1129(a)(7) of the Bankruptcy Code, requires a court to find either that all members of an impaired class of claims or interests have accepted the plan or that the plan will provide a member who has not accepted the plan with a recovery of property of a value, as of the effective date of the plan, that is not less than the amount that such holder would recover if the debtor were liquidated under chapter 7 of the Bankruptcy Code.

To calculate the probable distribution to holders of each impaired class of claims and interests if the debtor were liquidated under chapter 7, a court must first determine the aggregate dollar amount that would be generated from a debtor's assets if its chapter 11 case were converted to a chapter 7 case under the Bankruptcy Code. To determine if a plan is in the best interests of each impaired class, the present value of the distributions from the proceeds of a liquidation of the debtor's unencumbered assets and properties, after subtracting the amounts attributable to the costs, expenses and administrative claims associated with a chapter 7 liquidation, must be compared with the value offered to such Impaired Classes under the plan. If the hypothetical liquidation distribution to holders of claims or interests in any impaired class is greater than the distributions to be received by such parties under the plan, then such plan is not in the best interests of the holders of claims or interests in such impaired class.

Because the Plan is a liquidating plan by means of the Sale, the "liquidation value" in the hypothetical chapter 7 liquidation analysis for purposes of the "best interests" test is substantially similar to the estimates of the results of the chapter 11 liquidation contemplated by the Plan. However, the Debtors believe that in a chapter 7 liquidation, there would be additional costs and expenses that the Estates would incur as a result of liquidating the Estates in chapter 7 cases.

The costs of liquidation under chapter 7 of the Bankruptcy Code would include the compensation of a trustee, as well as the costs of counsel and other professionals retained by the trustee. The Debtors believe such amount would exceed the amount of expenses that would be incurred in implementing the Plan and winding up the affairs of the Debtors. Conversion also

would likely delay the liquidation process and ultimate distribution of the Liquidating Trust Assets. The Estates would also be obligated to pay all unpaid expenses incurred by the Debtors during these chapter 11 cases (such as compensation for professionals) that are allowed in the chapter 7 cases.  Ultimately, the DIP Lenders would need to consent to the use of their cash collateral to fund such a chapter 7 process, and there is no guarantee that they would do so.  Without such consent, conversion to chapter 7 would serve only to increase the amount of claims against the Debtors that would not be paid—both in terms of currently incurred and unpaid administrative and priority claims, as well as any costs incurred in administering the chapter 7 cases.

Accordingly, the Debtors believe that Holders of Allowed Claims would receive less than anticipated under the Plan if the chapter 11 cases were converted to chapter 7 cases, and therefore, the classification and treatment of Claims and Interests in the Plan complies with section 1129(a)(7) of the Bankruptcy Code.  Attached hereto as **Exhibit A** is a hypothetical chapter 7 liquidation analysis.

### 4.9     Acceptance of the Plan.

The rules and procedures governing eligibility to vote on the Plan, solicitation of votes, and submission of ballots are set forth in the Interim Approval and Procedures Order.

For the Plan to be accepted by an Impaired Class of Claims, a majority in number and two-thirds in dollar amount of the Claims voting in such Class must vote to accept the Plan. At least one Voting Class, excluding the votes of Insiders, must vote to accept the Plan.

IF YOU ARE ENTITLED TO VOTE ON THE PLAN, YOU ARE URGED TO COMPLETE, DATE, SIGN AND PROMPTLY MAIL, OR ELECTRONICALLY SUBMIT ON THE SOLICITATION AND CLAIMS AGENT'S WEBSITE, THE BALLOT YOU RECEIVE. PLEASE BE SURE TO COMPLETE THE BALLOT PROPERLY AND LEGIBLY AND TO IDENTIFY THE EXACT AMOUNT OF YOUR CLAIM AND THE NAME OF THE HOLDER. IF YOU ARE A HOLDER OF A CLAIM ENTITLED TO VOTE ON THE PLAN AND YOU DID NOT RECEIVE A BALLOT, YOU RECEIVED A DAMAGED BALLOT OR YOU LOST YOUR BALLOT OR IF YOU HAVE ANY QUESTIONS CONCERNING THE PLAN OR PROCEDURES FOR VOTING ON THE PLAN, PLEASE CONTACT THE SOLICITATION AND CLAIMS AGENT VIA EMAIL AT WALKEREDISON@EPIQGLOBAL.COM WITH A REFERENCE TO "WALKER EDISON" OR "WEH LIQUIDATING, LLC" IN THE SUBJECT LINE.

### ARTICLE V
### CERTAIN RISK FACTORS TO BE CONSIDERED PRIOR TO VOTING

THE PLAN AND ITS IMPLEMENTATION ARE SUBJECT TO CERTAIN RISKS, INCLUDING, BUT NOT LIMITED TO, THE RISK FACTORS SET FORTH BELOW. HOLDERS OF CLAIMS WHO ARE ENTITLED TO VOTE ON THE PLAN SHOULD READ AND CAREFULLY CONSIDER THE RISK FACTORS, AS WELL AS THE OTHER INFORMATION SET FORTH IN THE PLAN AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH OR REFERRED TO OR INCORPORATED BY REFERENCE HEREIN, BEFORE DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN.

THESE FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION.

### 5.1    The Plan May Not Be Accepted.

The Debtors can make no assurances that the requisite acceptances to the Plan will be received, and the Debtors may need to obtain acceptances to an alternative plan of liquidation for the Debtors, or otherwise, that may not have the support of the creditors and/or may be required to liquidate the Estates under chapter 7 of the Bankruptcy Code.  There can be no assurance that the terms of any such alternative restructuring arrangement or plan would be similar to or as favorable to creditors as those proposed in the Plan.

### 5.2    The Plan May Not Be Confirmed.

Even if the Debtors receive the requisite acceptances, there is no assurance that the Bankruptcy Court will confirm the Plan.  Even if the Bankruptcy Court determined that the combined Disclosure Statement and Plan and the balloting procedures and results were appropriate, the Bankruptcy Court could still decline to confirm the Plan if it finds that any of the statutory requirements for confirmation have not been met.  Moreover, there can be no assurance that modifications to the Combined Disclosure Statement and Plan will not be required for Confirmation or that such modifications would not necessitate the resolicitation of votes.  If the Plan is not confirmed, it is unclear what Distributions Holders of Claims or Interests ultimately would receive with respect to their Claims or Interests in a subsequent plan of liquidation.

### 5.3    Distributions to Holders of Allowed Claims Under the Plan May Be Inconsistent with Projections.

Projected Distributions are based upon good faith estimates of the total amount of Claims ultimately Allowed and the funds available for Distribution.  There can be no assurance that the estimated Claim amounts set forth in the Plan are correct.  These estimated amounts are based on certain assumptions with respect to a variety of factors, including the amount and value of assets available for Distribution and the number and value of Claims ultimately Allowed in these cases. Both the actual amount of Allowed Claims in a particular Class and the funds available for Distribution to such Class may differ from the Debtors' estimates.  If the total amount of Allowed Claims in a Class is higher than the Debtors' estimates, or the funds available for Distribution to such Class are lower than the Debtors' estimates, the percentage recovery to Holders of Allowed Claims in such Class will be less than projected.

### 5.4    Objections to Classifications of Claims.

As previously described, section 1122 of the Bankruptcy Code requires that the Plan classify Claims and Interests.  The Bankruptcy Code also provides that the Plan may place a Claim or Interest in a particular Class only if such Claim or Interest is substantially similar to the other Claims or Interests of such Class.  The Debtors believe that all Claims and Interests have been appropriately classified in the Plan.  To the extent that the Bankruptcy Court finds that a different classification is required for the Plan to be confirmed, the Debtors would seek to (i) modify the Plan to provide for whatever classification might be required for Confirmation and (ii)

use the acceptances received from any Holder of Claims pursuant to this solicitation for the purpose of obtaining the approval of the Class or Classes of which such Holder ultimately is deemed to be a member. Any such reclassification of Claims, although subject to the notice and hearing requirements of the Bankruptcy Code, could adversely affect the Class in which such Holder was initially a member, or any other Class under the Plan, by changing the composition of such Class and the vote required for approval of the Plan. There can be no assurance that the Bankruptcy Court, after finding that a classification was inappropriate and requiring a reclassification, would approve the Plan based upon such reclassification. Except to the extent that modification of classification in the Plan requires resolicitation, the Debtors will, in accordance with the Bankruptcy Code and the Bankruptcy Rules, seek a determination by the Bankruptcy Court that acceptance of the Plan by any Holder of Claims pursuant to this solicitation will constitute a consent to the Plan's treatment of such Holder, regardless of the Class as to which such Holder is ultimately deemed to be a member. The Debtors believe that it would be required to resolicit votes for or against the Plan only when a modification adversely affects the treatment of the Claim or Interest of any Holder.

The Bankruptcy Code also requires that the Plan provide the same treatment for each Claim or Interest of a particular Class unless the Holder of a particular Claim or Interest agrees to a less favorable treatment of its Claim or Interest. The Debtors believe that the Plan complies with the requirement of equal treatment. To the extent that the Bankruptcy Court finds that the Plan does not satisfy such requirement, the Bankruptcy Court could deny confirmation of the Plan. Issues or disputes relating to classification and/or treatment could result in a delay in the confirmation and consummation of the Plan and could increase the risk that the Plan will not be consummated.

### 5.5    Failure to Consummate the Plan.

The Plan provides for certain conditions that must be satisfied (or waived) prior to Confirmation and for certain other conditions that must be satisfied (or waived) prior to the Effective Date. As of the date of the Plan, there can be no assurance that any or all of the conditions in the Plan will be satisfied (or waived). Accordingly, there can be no assurance that the Plan will be confirmed by the Bankruptcy Court. Further, if the Plan is confirmed, there can be no assurance that the Plan will be Consummated

### 5.6    Allowance of Claims May Substantially Dilute the Recovery to Holders of Claims Under the Plan.

There can be no assurance that the estimated Claim amounts set forth in the Plan are correct, and the actual Allowed amounts of Claims may differ from the estimates. The estimated amounts are based on certain assumptions with respect to a variety of factors. Should these underlying assumptions prove incorrect, the actual Allowed amounts of Claims may vary from those estimated herein, thereby materially reducing the recovery to the Holders of Claims under the Plan.

**5.7** **Plan Releases May Not Be Approved**.

There can be no assurance that the releases, as provided in Article X of the Plan, will be granted.  Failure of the Bankruptcy Court to grant such relief may result in a plan of liquidation that differs from the Plan, or the Plan not being confirmed.

**5.8** **Certain Tax Considerations**.

There are a number of material income tax considerations, risks and uncertainties associated with the plan of liquidation of the Debtors described in this Combined Disclosure Statement and Plan.

THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. NOTHING HEREIN SHALL CONSTITUTE TAX ADVICE.  THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A HOLDER'S PARTICULAR CIRCUMSTANCES.  ACCORDINGLY, HOLDERS ARE URGED TO CONSULT THEIR TAX ADVISORS ABOUT THE UNITED STATES FEDERAL, STATE AND LOCAL, AND APPLICABLE FOREIGN INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN.

## ARTICLE VI
## TREATMENT OF UNCLASSIFIED CLAIMS

Pursuant to section 1126(f) of the Bankruptcy Code, Holders of Unimpaired Claims are conclusively presumed to have accepted this Plan.  DIP Financing Claims, Administrative Claims, Professional Fee Claims, Tax Claims, Other Priority Claims, and Other Secured Claims are not Impaired under this Plan.

**6.1** **DIP Financing Claims**.

On the Effective Date, unless otherwise agreed to by the Holder of a DIP Facility Claim, each Holder will receive in full and final satisfaction of its DIP Facility Claim an amount of Cash equal to the amount of such Holder's Allowed DIP Facility Claim; *provided*; *however*, that if the DIP Facility Claim is not paid in full, in Cash, on the Effective Date, then (a) from and after the Effective Date, the DIP Liens securing the DIP Facility Claim shall be first-priority perfected liens and security interests on all Liquidating Trust Assets except the Initial Estate Payment and the Subsequent Estate Payment, and (b) the Allowed DIP Facility Claim shall be paid, in full, in Cash, pursuant to the Global Settlement.  For the avoidance of doubt, (i) the DIP Liens shall be effective, unavoidable, and automatically and properly perfected upon entry of the Confirmation Order, without the necessity of the execution, recordation or filing of any document or filing or any other action of any kind by the Debtors or any of the DIP Secured Parties, and (ii) the DIP Facility Claim is an Allowed Claim pursuant to the terms of the Final DIP Order.

Additionally, if the Utah Litigation has not been fully litigated, settled, or otherwise completely resolved on or by the Effective Date, the Litigation DIP Loans shall remain in existence on the same terms as set forth in the Final DIP Order and Global Settlement and shall constitute and be approved as exit financing in the Confirmation Order.  The Litigation DIP Loan Proceeds

shall be available for the Liquidation Trust to continue to prosecute the Utah Litigation on and after the Effective Date.

### 6.2    Administrative Claims.

Unless otherwise agreed to by the Holder of an Allowed Administrative Claim, each Holder of an Allowed Administrative Claim (other than Holders of the DIP Facility Claim, Professional Fee Claims, and Claims for U.S. Trustee Fees) will receive in full and final satisfaction of its Administrative Claim an amount of Cash equal to the Allowed amount of such Administrative Claim either: (a) if an Administrative Claim is Allowed on or prior to the Effective Date, on the Effective Date or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (b) if such Administrative Claim is not Allowed as of the Effective Date, no later than thirty (30) days after the date on which an order Allowing such Administrative Claim becomes a Final Order; (c) if such Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claim; (d) at such time as may be agreed upon by (i) if prior to the Effective Date, such Holder and the Debtors, or (ii) if after the Effective Date, such Holder and the Liquidating Trustee; or (e) at such time and upon such terms as set forth in an order of the Bankruptcy Court.  Any Allowed Administrative Claim (other than a Professional Fee Claim) that becomes due after the Effective Date shall be paid by the Liquidating Trustee from Cash constituting Liquidating Trust Assets.

Holders of Additional Administrative Claims (other than Holders of the DIP Facility Claim, Professional Fee Claims, and Claims for U.S. Trustee Fees), must file with the Claims Agent and serve on the Liquidating Trustee requests for payment, in writing, together with supporting documents, substantially complying with the Bankruptcy Code, the Bankruptcy Rules and the Local Rules, so as to be actually received on or before the Additional Administrative Claims Bar Date.  Any Person or Entity required to timely file such Claim but fails to do so shall not be treated as a Creditor with respect to such Claim for the purpose of Distribution in these chapter 11 cases on account of such Claim and will be barred, estopped, and enjoined from asserting such Claim against the Debtors.  The notice of Confirmation to be delivered pursuant to Bankruptcy Rules 2002(c)(3) and 2002(f) shall set forth the Additional Administrative Claim Bar Date and shall constitute notice of such Bar Date.

For the avoidance of doubt, (i) the deadline for Filing requests for payment of 503(b)(9) Claims was the General Bar Date and (ii) the deadline for Filing requests for payment of Administrative Claims that arose between the Petition Date through and including October 7, 2025, was the Administrative Claim Bar Date, and neither deadline is extended by this Combined Disclosure Statement and Plan nor the Confirmation Order.

All fees under section 1930 of Title 28 of the United States Code plus any interest thereon pursuant to 31 U.S.C. § 3717 ("Quarterly Fees") payable on or before the Effective Date shall be paid by the Debtors in full in Cash on the Effective Date.  On and after the Effective Date, the Debtors or Liquidating Trust shall pay any and all Quarterly Fees in full in Cash when due in each Chapter 11 Case for each quarter (including any fraction thereof) until the earliest of such Chapter 11 Case being closed, dismissed or converted to a case under chapter 7 of the Bankruptcy

Code. The Debtors shall file all monthly operating reports due before the Effective Date when they become due, using UST Form 11-MOR. After the Effective Date, the Debtors or Liquidating Trust shall file with the Bankruptcy Court a post-confirmation quarterly report for each Chapter 11 Case for each quarter (including any fraction thereof) such case is pending, using UST Form 11-PCR. Notwithstanding anything to the contrary in the Plan, (i) Quarterly Fees are Allowed; (ii) the U.S. Trustee shall not be required to file any proof of claim or any other request(s) for payment with respect to Quarterly Fees; and (iii) the U.S. Trustee shall not be treated as providing any release under the Plan.

### 6.3    Professional Fee Claims.

As soon as reasonably practicable on or after the Confirmation Date (and in no event later than the Effective Date), the Debtors shall fund the Professional Fee Account with Cash equal to the amounts allocated for Professional Fee Claims, less any and all amounts previously paid pursuant to any Professionals' Fee Applications (and subject to a maximum of $375,000 for all professionals of the Committee, as agreed to in the Global Settlement). The Professional Fee Account shall be maintained in trust for the Professionals and shall not be considered property of the Debtors' Estates or the Liquidating Trust; *provided*, that after all Allowed Professional Fee Claims have been paid in full, Fee Applications in connection with all Professional Fee Claims have been Filed, there are no Fee Applications pending before the Bankruptcy Court, and there are no Disputed Professional Fee Claims, any remaining Cash in such reserve shall be returned to the DIP Secured Parties. No Liens, Claims, or interests shall encumber the Professional Fee Account in any way. Any Allowed Professional Fee Claims not covered by the Professional Fee Account (including but not limited to those of the Utah Litigation Professionals) shall be paid by the Liquidating Trustee from Cash constituting Liquidating Trust Assets if such payment is not contrary to the Global Settlement. Notwithstanding anything to the contrary set forth herein, the Professional Fee Claims of the Utah Litigation Professionals incurred at any time prior to the Effective Date shall be paid from the proceeds of the DIP Litigation Loans on the Effective Date in accordance with section 9.5 hereof (to the extent not previously paid prior to the Effective Date), and no Fee Applications or other compliance with the Interim Compensation Procedures Order by the Utah Litigation Professionals shall be required.

All requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred prior to the Confirmation Date (other than the Utah Litigation Professionals) must be filed and served in accordance with the Interim Compensation Procedures Order by the date that is forty-five (45) days after the Effective Date. The Bankruptcy Court shall determine the Allowed amounts of such Professional Fee Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Code. If an application for a Professional Fee Claim is not Filed within forty-five (45) days after the Effective Date, such Professional Fee Claim shall be deemed waived and the Holder of such Claim shall be forever barred from receiving payment on account thereof. The notice of Confirmation to be delivered pursuant to Bankruptcy Rules 2002(c)(3) and 2002(f) shall set forth the deadline to file requests for payment of Professional Fee Claims. Objections to the Allowance of Professional Fee Claims must be filed and served no later than 4:00 p.m. (prevailing Eastern Time) on the date that is twenty-one (21) days after the filing of the applicable Fee Application.

To the extent any Professional (other than the Utah Litigation Professionals) has incurred Professional Fee Claims in excess of the amount budgeted for it in the Approved Budget, such Professional shall be deemed to consent under section 1129(a)(9) of the Bankruptcy Code to payment of only those Professional Fee Claims that do not exceed the applicable budgeted amount for it in the Approved Budget and any Professional Fee Claims in excess of the applicable budgeted amount shall be deemed Disallowed, released, waived, or barred.

To the extent of any inconsistency between the Confirmation Order, on the one hand, and any order approving a Fee Application (whether entered before or after the Confirmation Order) on the other, the Confirmation Order shall control.

### 6.4    Tax Claims.

Unless otherwise agreed to by the Holder of an Allowed Tax Claim, each Holder of an Allowed Tax Claim will receive in full and final satisfaction of such Allowed Tax Claim Cash in an amount equal to the unpaid portion of such Allowed Tax Claim either: (a) if a Tax Claim is Allowed on or prior to the Effective Date, on the Effective Date by the Debtors or as soon as reasonably practicable thereafter; (b) if such Tax Claim is not Allowed as of the Effective Date, no later than thirty (30) days after the date on which an order Allowing such Tax Claim becomes a Final Order; (c) at such time as may be agreed upon by (i) if prior to the Effective Date, such Holder and the Debtors or (ii) if after the Effective Date, such Holder and the Liquidating Trustee; or (d) at such time and upon such terms as set forth in an order of the Bankruptcy Court; *provided*, *however*, that all Allowed Tax Claims that are not due and payable on or before the Effective Date shall be paid by the Liquidating Trustee in the ordinary course of business as they become due. Any Claim or demand for any penalty (a) will be subject to treatment as a General Unsecured Claim, if and to the extent it is an Allowed Claim, and (b) the Holder of an Allowed Tax Claim shall not assess or attempt to collect such amounts from the Debtors, the Estates, the Liquidating Trustee, or the Liquidating Trust except as a General Unsecured Claim, if and to the extent it is an Allowed Claim. Any Allowed Tax Claim that becomes due after the Effective Date shall be paid by the Liquidating Trustee from Cash constituting Liquidating Trust Assets.

## ARTICLE VII
## TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS

The Claims in Classes 1 and 2 are Unimpaired, conclusively deemed to accept the Plan and are not entitled to vote on the Plan. The Claims in Classes 3 and 4 are Impaired and entitled to vote to accept or reject this Plan. Holders of Interests in Class 5 are conclusively deemed to reject the Plan and, therefore, are not entitled to vote on the Plan.

### 7.1    Class 1: Other Priority Claims.

Unless otherwise agreed to by the Holder of an Allowed Other Priority Claim, each Holder of an Allowed Other Priority Claim will receive in full and final satisfaction of such Allowed Other Priority Claim an amount of Cash equal to the unpaid portion of such Allowed Other Priority Claim either: (a) if an Other Priority Claim is Allowed on or prior to the Effective Date, on the Effective Date or as soon as reasonably practicable thereafter; (b) if such Other Priority Claim is not Allowed as of the Effective Date, no later than thirty (30) days after the date

on which an order Allowing such Other Priority Claim becomes a Final Order; (c) at such time as may be agreed upon by (i) if prior to the Effective Date, such Holder and the Debtors, or (ii) if after the Effective Date, such Holder and the Liquidating Trustee; or (d) at such time and upon such terms as set forth in an order of the Bankruptcy Court. Any Allowed Priority Claim shall be paid by the Liquidating Trustee from Cash constituting Liquidating Trust Assets.

### 7.2  **Class 2: Other Secured Claims**.

Except to the extent that a Holder of an Allowed Other Secured Claim agrees to different treatment, on the later of the Effective Date and the date that is ten (10) Business Days after the date such Other Secured Claim becomes an Allowed Claim, or as soon thereafter as is reasonably practicable, each Holder of an Allowed Other Secured Claim will receive, on account of such Allowed Claim, (a) Cash in an amount equal to the Allowed amount of such Claim; (b) its collateral in full satisfaction of its Claim; or (c) such other treatment sufficient to render such Holder's Allowed Other Secured Claim Unimpaired. Any Allowed Other Secured Claim that is receiving Cash shall be paid by the Liquidating Trustee from Cash constituting Liquidating Trust Assets.

### 7.3  **Class 3: Prepetition Term Loan Claims**.

On the Effective Date, the Prepetition Term Loan Claims shall become Allowed Class 3 Claims in the aggregate amount of $214,097,528.56, plus such additional interest, fees, and other amounts payable pursuant to the Prepetition Term Loan Agreement that accrue or become payable pursuant to applicable law. For the avoidance of doubt, the Prepetition Term Loan Claims are Allowed Claims pursuant to the terms of the Final DIP Order. Each Holder of an Allowed Prepetition Term Loan Claim shall receive their Pro Rata share of the Series A Liquidating Trust Interests.

### 7.4  **Class 4: General Unsecured Claims**.

Except to the extent that the Holder of an Allowed Claim in Class 4 agrees to less favorable treatment (or such other treatment which the Debtors or the Liquidating Trustee, as applicable, and the Holder of such Allowed Class 4 Claim have agreed upon in writing), each Holder of an Allowed Claim in Class 4 shall receive their Pro Rata share of the Series B Liquidating Trust Interests. For the avoidance of doubt, the Prepetition Term Loan Secured Parties shall not receive any portion of the Series B Liquidating Trust Interests.

### 7.5  **Class 5: Interests**.

On the Effective Date, all Interests shall be transferred to the Liquidating Trust, and each Holder of an Interest in the Debtors shall receive no Distribution pursuant to the Plan.

### 7.6  **Reservation of Rights Regarding Claims and Interests**.

Except as otherwise explicitly provided in the Plan, nothing shall affect the Debtors' rights and defenses, both legal and equitable, with respect to any Claims or Interests, including, but not limited to, all rights with respect to legal and equitable defenses to alleged rights of setoff or recoupment.

## ARTICLE VIII
## ACCEPTANCE OR REJECTION OF THE PLAN

**8.1    Classes Entitled to Vote**.

Because Claims in Classes 3 and 4 are Impaired, are not deemed to reject the Plan, and will receive or retain property or an interest in property under the Plan, the Holders of Claims in Class 3 and Class 4 shall be entitled to vote to accept or reject the Plan.

**8.2    Acceptance by Impaired Classes of Claims or Interests**.

In accordance with section 1126(c) of the Bankruptcy Code, and except as provided in section 1126(e) of the Bankruptcy Code, an Impaired Class of Claims shall have accepted the Plan if the Plan is accepted by the Holders of at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the Allowed Claims in such Class that have timely and properly voted to accept or reject the Plan.  In accordance with section 1126(d) of the Bankruptcy Code and except as provided in section 1126(e) of the Bankruptcy Code, an Impaired Class of Interests shall have accepted the Plan if such Plan is accepted by Holders of at least two-thirds (2/3) in amount of the Allowed Interests in such Class that have timely and properly voted to accept or reject the Plan.

**8.3    Presumed Acceptance by Unimpaired Classes**.

Because Claims in Classes 1 and 2 are Unimpaired, pursuant to section 1126(f) of the Bankruptcy Code, Holders of Claims in Classes 1 and 2 are deemed to have accepted the Plan and, therefore, Holders of such Claims are not entitled to vote to accept or reject the Plan.

**8.4    Presumed Rejections by Impaired Class**.

Because Holders of Interests in Class 5 are presumed to have rejected the Plan, Holders of Claims and Interests in such Classes are not entitled to vote to accept or reject the Plan.

**8.5    Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code**.

To the extent that any Impaired Class rejects the Plan or is deemed to have rejected the Plan, the Debtors reserve the right to request confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code.  The Debtors reserve the right to alter, amend, modify, revoke, or withdraw the Plan, the documents submitted in support thereof or any schedule or exhibit, including to amend or modify it to satisfy the requirements of section 1129(b) of the Bankruptcy Code, if necessary.

**8.6    Controversy Concerning Impairment**.

If a controversy arises as to whether any Claim or Interest is Impaired under the Plan, the Bankruptcy Court shall determine such controversy on or before the Confirmation Date.

**8.7** **Elimination of Vacant Classes**.

Any Class of Claims or Interests that does not contain, as of the date of the commencement of the Combined Hearing, a Holder of an Allowed Claim or Interest, or a Holder of a Claim temporarily allowed under Bankruptcy Rule 3018, shall be deemed deleted from the Plan for all purposes, including for purposes of determining acceptance.

**ARTICLE IX**
**MEANS OF IMPLEMENTING THE PLAN**

In addition to the provisions set forth elsewhere in this Plan, the following shall constitute the means of execution and implementation of this Plan.

**9.1** **Global Settlement**.

The Plan implements a structure, first approved by the Bankruptcy Court in the Final DIP Order, by which Holders of Allowed General Unsecured Claims will receive a meaningful share of any of the proceeds of Utah Litigation. This structure was set forth in the Global Settlement by and between the Debtors, the Committee, the DIP Secured Parties, the Prepetition ABL Lender and the Prepetition Term Loan Secured Parties and is incorporated herein by reference and reproduced in the attached **Exhibit B**.

**9.2** **Dissolution of Debtors & Transfer of Books and Records**.

At any time after the Effective Date, the Liquidating Trustee shall be authorized to dissolve the Debtors upon filing a notice of such dissolution with the Bankruptcy Court, notwithstanding any requirements of applicable state law, without the necessity for any other or further actions to be taken by or on behalf of the Debtors or payments to be made in connection therewith.

As soon as practicable after the transfer of the Liquidating Trust Assets to the Liquidating Trust, the Liquidating Trustee shall provide for the retention and storage of the books, records, and files that shall have been delivered to the Liquidating Trust until such time as all such books, records, and files are no longer required to be retained under applicable law, and file a certificate informing the Bankruptcy Court of the location at which such books, records, and files are being stored. With respect to any books and records that are not, in the view of the Liquidating Trustee, relevant for the continuing prosecution of any objections to Claims, defense of any potential Claims or actions against the Debtors or Liquidating Trust, any Causes of Action, or the wind-down of the Debtors' Estates, the Liquidating Trustee shall be free, in its reasonable discretion, to abandon, destroy or otherwise dispose of such books and records in compliance with applicable non-bankruptcy law at any time on and after the Effective Date, without the need for any other Order of the Bankruptcy Court and shall have no liability for same.

**9.3** **Liquidating Trust**.

(a) *Establishment of the Liquidating Trust.*

The Liquidating Trust shall be established and shall become effective on the Effective Date.

(b) *Vesting of Liquidating Trust Assets.*

Upon the occurrence of the Effective Date, (a) the members of each Debtor's board of directors or managers, as the case may be, shall be deemed to have resigned; and (b) the Liquidating Trust Assets shall be transferred to the Liquidating Trust in accordance with this Plan. The Liquidating Trust Assets shall vest in the Liquidating Trust free and clear of all Liens, claims, and interests; *provided*, *however*, that the Liquidating Trust Assets shall be subject to the DIP Liens as set forth herein if the DIP Facility Claim is not paid in full on the Effective Date.

(c) *Liquidating Trust Assets.*

The Liquidating Trust Assets include: (i) all Cash held by the Debtors as of the Effective Date, excluding amounts held in trust with respect to the Professional Fee Account but including the Initial Estate Payment, (ii) the Utah Litigation Assets, (iii) Litigation DIP Loan Proceeds, (iv) Other Litigation Assets, and (v) Other Assets, all of which are being transferred pursuant to this Plan to the Liquidating Trust upon the Effective Date.

The Utah Litigation Assets, to the extent not liquidated prior to the Effective Date are being preserved and contributed by the Debtors, the DIP Secured Parties, and the Prepetition Term Loan Secured Parties to the Liquidating Trust so that these causes of action may be prosecuted cooperatively by the Liquidating Trustee, the DIP Secured Parties, and the Prepetition Term Loan Secured Parties, with any and all recoveries resulting therefrom to be distributed to the Liquidating Trust Beneficiaries in accordance with the Global Settlement and this Plan. In accordance with this Plan and the Confirmation Order, on the Effective Date, and without further order of the Bankruptcy Court, the gross proceeds of any Causes of Action owned by the DIP Secured Parties and the Prepetition Term Loan Secured Parties in the Utah Litigation shall be assigned or otherwise transferred to the Liquidating Trust for the purpose of Distributions for the benefit of Liquidating Trust Beneficiaries in accordance with this Plan. The Liquidating Trust shall have the authority and standing to bring and litigate all of the Debtors' interests in the Utah Litigation Assets. Additionally, in the sole discretion of the Prepetition Term Loan Agent, the Prepetition Term Loan Secured Parties may contribute and assign the entirety of their rights and interests in the Utah Litigation to the Liquidating Trust at any time.

The Other Litigation Assets, to the extent not liquidated prior to the Effective Date by the Debtors, are being preserved and contributed by the Debtors to the Liquidating Trust so that these causes of action may be prosecuted by the Liquidating Trustee with any recoveries resulting therefrom to be distributed to the Liquidating Trust Beneficiaries in accordance with the Global Settlement and this Plan. The Liquidating Trust shall have the authority and standing to bring and litigate all Other Litigation Assets. Pursuant to the Sale Order, the Purchaser purchased certain of the Debtors' Causes of Action, which, for the avoidance of doubt, are not Other Litigation Assets.

No Entity may rely on the absence of a specific reference in this Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Liquidating Trust will pursue or not pursue any and all available Causes of Action. The Liquidating Trustee and the Debtors expressly reserve all rights to prosecute any and all causes of action against any Entity, except as otherwise expressly provided in the Plan or to the extent released pursuant to other Orders of the Bankruptcy Court.

(d)    *Creation and Maintenance of Trust Accounts.*

On or prior to the Effective Date, appropriate trust accounts will be established and maintained in one or more federally insured domestic banks in the name of the Liquidating Trust. Cash deposited in the trust accounts will be invested, held, and used solely as provided in the Liquidating Trust Agreement. The Liquidating Trustee is authorized to establish additional trust accounts after the Effective Date, consistent with the terms of the Liquidating Trust Agreement, as applicable. After the funding of the trust accounts on the Effective Date, the trust accounts will be funded, as applicable, by Cash proceeds obtained through litigation, settlement, disposition, or other monetization of the Liquidating Trust Assets. Upon obtaining an order of the Bankruptcy Court authorizing final Distributions, any funds remaining in the trust accounts shall be distributed in accordance with this Plan and the Liquidating Trust Agreement, and the trust accounts may be closed.

(e)    *Trust Distributions.*

All Distributions to the Holders of (i) Allowed General Unsecured Claims, (ii) Prepetition Term Loan Claims, and (iii) Administrative Claims, Tax Claims, Other Secured Claims and Other Priority Claims that are not Allowed as of the Effective Date but subsequently Allowed, shall be from the Liquidating Trust. The Liquidating Trust shall, among other things, administer the Liquidating Trust Assets. The Liquidating Trustee shall distribute the Liquidating Trust Assets in accordance with the Plan and the Liquidating Trust Agreement. Notwithstanding anything contrary herein, the Liquidating Trustee shall distribute any Distributions on account of any Prepetition Term Loan Claims to the Prepetition Term Loan Agent and the Prepetition Term Loan Agent shall distribute such Distributions to Holders of Allowed Prepetition Term Loan Claims subject to and in accordance with the Prepetition Term Loan Agreement.

(f)    *Duration of the Trust.*

The Liquidating Trust shall have an initial term of five (5) years; *provided, however*, that the Liquidating Trustee shall be authorized to extend the Liquidating Trust. The Liquidating Trust may be terminated earlier than its scheduled termination date if the Liquidating Trustee determines that it has administered all the Liquidating Trust Assets and performed all other duties required by this Plan and the Liquidating Trust Agreement. As soon as practicable after the final Distribution Date (unless all asserted Claims are resolved sooner), the Liquidating Trustee shall seek entry of a Final Order closing the chapter 11 cases pursuant to section 350(a) of the Bankruptcy Code.

### 9.4    Liquidating Trustee.

(a)    *Appointment.*

In accordance with the Global Settlement, the initial Liquidating Trustee shall be Thomas B. Walper.  The appointment of the Liquidating Trustee shall be approved in the Confirmation Order and be effective as of the Effective Date.  Successor Liquidating Trustee(s) shall be appointed as set forth herein and in the Liquidating Trust Agreement.

(b)    *Term.*

The Liquidating Trustee's term, including without limitation the term of any Successor Liquidating Trustee(s), shall expire upon termination of the Liquidating Trust pursuant to this Plan and/or the Liquidating Trust Agreement.

(c)    *Removal and/or Replacement.*

The U.S. Trustee or any Creditor may request the removal of the Liquidating Trustee for "cause" pursuant to a motion Filed with the Bankruptcy Court and served upon (i) the Liquidating Trustee and its counsel, (ii) the U.S. Trustee (if not the movant), (iii) the Prepetition Term Loan Secured Parties, and (iv) all other Entities that have formally requested notice pursuant to Bankruptcy Rule 2002.  In connection with any such motion to remove the Liquidating Trustee, "cause" will include: (a) the Liquidating Trustee's willful failure to perform his, her or its material duties hereunder, which is not remedied within thirty (30) days of notice; (b) the Liquidating Trustee's death; (c) the Liquidating Trustee's mental or physical incapacity that materially and adversely affects the Liquidating Trustee's ability to perform his, her or its duties under the Plan; (d) the Liquidating Trustee's commission of an act of fraud, theft or embezzlement in connection with the Liquidating Trustee's duties under this Plan; (e) the Liquidating Trustee's conviction for the commission of a felony with all appeals having been exhausted or appeal periods lapsed; *provided*, *however*, that no "cause" shall exist involving clause (a) above until the Liquidating Trustee first has failed to cure such failure within thirty (30) days of having been given written notice of such failure.  For purposes of the foregoing, no act or failure to act on the part of the Liquidating Trustee shall be considered "willful" unless it is done, or permitted to be done, by the Liquidating Trustee without reasonable belief that the Liquidating Trustee's action or omission was in the best interests of the Debtors.

In the event that the Liquidating Trustee is removed, resigns, or otherwise can no longer serve, the Prepetition Term Loan Agent shall within twenty-one (21) days thereafter file a motion (a "Liquidating Trustee Replacement Motion") with the Bankruptcy Court requesting the appointment of a replacement trustee selected by the Prepetition Term Loan Agent.  The Bankruptcy Court shall, subject to the Court's availability, hold a hearing on a Liquidating Trustee Replacement Motion within seven (7) days of the filing of such motion or the on the first date thereafter that the Bankruptcy Court is available.  In the event that the Prepetition Term Loan Agent does not file a Liquidating Trustee Replacement Motion within twenty-one (21) days, any other party in interest in the chapter 11 cases may file a Liquidating Trustee Replacement Motion requesting the appointment of a replacement liquidating trustee.

(d)     *Powers and Duties.*

The Liquidating Trustee shall be the exclusive representative of the Debtors' Estates and shall have the rights and powers set forth in the Liquidating Trust Agreement including, but not limited to, the rights and powers of a trustee under the Bankruptcy Code.  The Liquidating Trustee shall be governed in all things by the terms of the Liquidating Trust Agreement and this Plan.  The Liquidating Trustee shall administer the Liquidating Trust, and the Liquidating Trust Assets, and make Distributions in accordance with this Plan and the Liquidating Trust Agreement. In addition, the Liquidating Trustee shall, in accordance with the terms of this Plan, take all actions necessary to wind down the affairs of the Debtors consistent with this Plan and applicable non-bankruptcy law.  Subject to the terms of the Liquidating Trust Agreement, the Liquidating Trustee shall be authorized, empowered, and directed to take all actions necessary to comply with this Plan and exercise and fulfill the duties and obligations arising hereunder, including, without limitation:

i.      To exercise all power and authority that may be or could have been exercised and take all actions that may be or could have been taken by the Debtors with like effect as if authorized, exercised and taken by unanimous action of the Debtors' partners, members, officers, directors and equity holders; including, without limitation, amendment of the certificates of incorporation and by-laws of the Debtors, merger of any Debtor into another Debtor, the dissolution of any Debtor and the assertion or waiver of any Debtors' attorney/client privilege;

ii.      To implement Distributions to Holders of Allowed Claims as provided for or contemplated by the Plan and take other actions consistent with the Plan and the implementation thereof, including the establishment and maintenance of appropriate reserves in accordance with this Plan and the Liquidating Trust Agreement, in the name of the Debtors or the Liquidating Trustee, even in the event of the dissolution of the Debtors;

iii.      Subject to the applicable provisions of the Plan, to administer the winding-up of the affairs of the Debtors;

iv.      To take all actions necessary to preserve and maximize the value of the Liquidating Trust Assets;

v.      To prosecute the Causes of Action transferred to or vested in the Liquidating Trust, by which the Liquidating Trust is hereby granted standing to prosecute any of such Causes of Action and the authority to settle such Causes of Action without Bankruptcy Court approval;

vi.      To maintain customary insurance coverage for the protection of the Liquidating Trustee and professionals on and after the Effective Date;

vii.      To object to any Claims (Disputed or otherwise), and to defend, compromise and/or settle any Claims prior to or following objection without the necessity of approval of the Bankruptcy Court;

        viii.      To make decisions, without further Bankruptcy Court approval, regarding the retention or engagement of professionals, employees and consultants by the Liquidating Trust and to pay, from the Liquidating Trust Assets, (i) the charges incurred by the Liquidating Trust on or after the Effective Date for services of professionals, without application to the Bankruptcy Court, and (ii) disbursements, expenses or related support services relating to the winding down of the Debtors and implementation of the Plan, without application to the Bankruptcy Court;

        ix.      To cause, on behalf of the Liquidating Trust, the Debtors, and their Estates all necessary tax returns and all other appropriate or necessary documents related to municipal, State, Federal or other tax law to be prepared or filed timely, in accordance with the Plan;

        x.      To maintain appropriate books and records (including financial books and records) to govern the liquidation and Distribution of the Liquidating Trust Assets;

        xi.      To pay fees incurred pursuant to 28 U.S.C. § 1930(a)(6) and to file with the Bankruptcy Court and serve on the U.S. Trustee quarterly post-confirmation financial reports for each of the Debtors until such time as such reports are no longer required, or the Bankruptcy Court orders otherwise, a final decree is entered closing these chapter 11 cases or the chapter 11 cases are converted or dismissed;

        xii.      To dissolve the Liquidating Trust if the Liquidating Trustee determines, in reliance on such professionals as it may retain, that the expense of administering the Liquidating Trust so as to make a final Distribution is likely to exceed the value of the remaining Liquidating Trust Assets;

        xiii.      To seek one or more final decrees closing the Debtors' chapter 11 cases;

        xiv.      To do all other acts or things consistent with the provisions of this Plan that the Liquidating Trustee deems reasonably necessary or desirable with respect to implementing this Plan; and

        xv.      To be the Estate representative and successor of the Debtors and the Committee for all purposes.

    (e)    *Limitation of Liability; Exculpation of Liquidating Trustee.*

The Liquidating Trustee (and its agents and professionals) shall be entitled to indemnification and reimbursement for fees and expenses in defending any and all of its or their actions or inactions in its or their capacity as, or on behalf of, the Liquidating Trustee or the Liquidating Trust, except for any actions or inactions involving gross negligence, actual fraud or willful misconduct, each as determined by a Final Order from a court of competent jurisdiction. Any indemnification claims of the Liquidating Trustee and the other parties entitled to

indemnification under this subsection shall be satisfied from the Liquidating Trust Assets, as provided in the Liquidating Trust Agreement. The Liquidating Trustee shall be entitled to rely, in good faith, on the advice of its counsel.

(f)     *Records.*

The Liquidating Trustee shall be provided with originals or copies of or access to all documents and business records of the Debtors, to the extent available, as may be necessary for the disposition of Liquidating Trust Assets and objections to Disputed Claims.

(g)     *Common Interest & Privileges.*

Upon the Effective Date, the attorney-client relationship between the Debtors and their current and former counsel, and the common interest between the Debtors, the Committee, the DIP Secured Parties, and the Prepetition Term Loan Secured Parties, shall be transferred to the Liquidating Trustee, who shall succeed to the rights and claims of, and hold the attorney-client and other privileges for the Debtors, including, without limitation, any common interest privilege. For the avoidance of doubt, nothing in the Plan shall affect the rights of any non-Debtor third parties to assert their own attorney-client and other applicable privileges.

(h)     *Insurance.*

The Liquidating Trustee shall be authorized, but not required, to obtain any reasonably necessary insurance coverage, at the Liquidating Trust's sole expense, for itself and its respective agents, including coverage with respect to the liabilities, duties and obligations of the Liquidating Trustee, which insurance coverage may, at the sole option of the Liquidating Trustee, be extended for a reasonable period after the termination of the Liquidating Trust Agreement.

**9.5     Fees and Expenses**.

Except as otherwise provided in this Plan, compensation of the Liquidating Trustee and the actual costs and expenses of the Liquidating Trustee and the Liquidating Trust (including, without limitation, the actual fees and expenses of the Liquidating Trustee Professionals) shall be paid from the Litigation DIP Loan Proceeds or other available Cash that constitutes Liquidating Trust Assets; *provided*, *however*, that any costs and expenses of the Liquidating Trustee and the Liquidating Trust attributable to Class 4 General Unsecured Claims (such as the administration and reconciliation of unsecured claims, which is defined as the "Unsecured Claims Administration" in the Global Settlement) shall only be payable from amounts otherwise distributable to Holders of Allowed General Unsecured Claims.

The Liquidating Trustee shall pay the actual reasonable fees and expenses of the Liquidating Trustee Professionals and the Utah Litigation Professionals, as necessary to discharge the Liquidating Trustee's duties under this Plan and the Liquidating Trust Agreement and to prosecute the Utah Litigation. Payments to the Liquidating Trustee and the Utah Litigation Professionals shall not require notice to any party, or an order of the Court approving such payments.

Notwithstanding anything to the contrary set forth herein, any Utah Litigation Expenses that are outstanding and have been invoiced to the Debtors prior to the Effective Date shall be paid in full on the Effective Date from the proceeds of DIP Litigation Loans.

Without any further notice to any party or action, order or approval of the Bankruptcy Court, the Liquidating Trustee, on behalf of the Liquidating Trust, may employ professionals and pay in the ordinary course of business the reasonable fees of any employed professional (including professionals previously employed by the Debtors, but excluding any Affiliates, relatives or Related Persons to the Liquidating Trustee) for services rendered or expenses incurred on and after the Effective Date that, in the discretion of the Liquidating Trustee, are necessary to assist the Liquidating Trustee in the performance of the Liquidating Trustee's duties under the Plan and the Liquidating Trust Agreement, subject to any limitations and procedures established under the Liquidating Trust Agreement and the Global Settlement.  For the avoidance of doubt, and as set forth in the Liquidating Trust Agreement, M3 and Morris James shall be employed by the Liquidating Trustee to perform any and all Unsecured Claims Administration when the Liquidating Trustee, in his or her sole discretion, decides it is prudent to begin such Unsecured Claims Administration process.

### 9.6     Liquidating Trustee as Estate Representative and Successor.

Pursuant to sections 1123(a)(5)(B), 1123(b)(3), and 1123(b)(6) of the Bankruptcy Code, the Liquidating Trustee shall be the representative of the Debtors' Estates and successor to the Debtors for all purposes.  The Liquidating Trustee shall have all rights and powers of a trustee under the Bankruptcy Code.  The Liquidating Trustee also shall be the successor to the Committee for all purposes.

### 9.7     Distributions.

Except as otherwise provided in this Plan, the Liquidating Trustee shall make Distributions in accordance with the Liquidating Trust Agreement and the Global Settlement; *provided*, *however*, that the Liquidating Trustee may postpone any Distribution if the Liquidating Trustee determines that the amount of such Distribution would be too small to justify the administrative costs associated with making it.  The Liquidating Trustee shall make continuing efforts to dispose of the Liquidating Trust Assets, make timely Distributions, and not unduly prolong the duration of the Liquidating Trust.

### 9.8     Corporate Action

Upon the Effective Date, all actions contemplated by the Plan (including any action to be undertaken by the Liquidating Trustee or the Debtors) shall be deemed authorized, approved, and, to the extent taken prior to the Effective Date, ratified without any requirement for further action by Holders of Claims or Interests, the Debtors, the Liquidating Trustee or any other Entity or Person.  All matters provided for in the Plan involving the corporate structure of the Debtors, and any corporate action required by the Debtors in connection therewith, shall be deemed to have occurred and shall be in effect, without any requirement of further action by the Debtors or the Debtors' Estates.

**9.9** **Directors, Officers, Managers, Members and Authorized Persons of the Debtors**.

On the Effective Date, each of the Debtors' managers and officers shall be discharged from their duties and terminated automatically without the need for any company action or approval and without the need for any filings, and, unless subject to a separate agreement with the Liquidating Trustee, such managers and officers shall have no continuing or further obligations to the Debtors following the occurrence of the Effective Date.

**9.10** **Closing of the Chapter 11 Cases**.

On the Effective Date, the Liquidating Trustee or the Debtors, in consultation with the Liquidating Trustee, shall be authorized to file a motion requesting entry of an order from this Court closing the chapter 11 cases of *In re WEI Liquidating, LLC* and *In re EWF Liquidating, LLC.* Such motion may be heard by the Court on fourteen-days' notice to the U.S. Trustee and all other parties entitled to notice under Local Rule 2002-1(b). The Liquidating Trustee shall, promptly after the full administration of the chapter 11 cases, file with this Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court and file a motion under Local Rule 3022-1(a) to close the chapter 11 cases of *In re WEH Liquidating, LLC.* and of *In re WEFC Liquidating, LLC* and of any other Debtor whose case remains open at that time. Upon the filing of such a motion, the Liquidating Trustee shall file a final report with respect to all of the chapter 11 cases pursuant to Local Rule 3022-1(c).

**9.11** **Committee**.

On the Effective Date, the Committee will be deemed dissolved and cease to exist. The dissolution of the Committee under this Section shall not prevent any Professional from filing a Professional Fee Claim for service provided to the Committee and receiving payment for fees and costs with respect to the same.

**9.12** **Effectuating Documents; Further Transactions**.

On the Effective Date, the Liquidating Trustee and the Debtors are authorized to and may issue, execute, deliver, file or record such contracts, securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement and further evidence the terms and conditions of the Plan in the name of and on behalf of the Debtors, without the need for any approvals, authorization, or consents except for those expressly required pursuant to the Plan.

**9.13** **Release of Liens**.

Except as otherwise provided in this Plan, the Confirmation Order, or in any document, instrument, or other agreement created in connection with this Plan, on the Effective Date, all mortgages, deeds of trust, Liens, or other security interests against the property of the Estates shall be released. For the avoidance of doubt and notwithstanding anything to the contrary herein, the DIP Liens shall not be released if the DIP Facility Claim is not paid in full on the Effective Date. The Liquidating Trustee shall have the authority to file lien releases in connection with the foregoing.

### 9.14    Exemption from Certain Transfer Taxes.

To the maximum extent provided by section 1146 of the Bankruptcy Code, under this Plan, (a) the issuance, distribution, transfer or exchange of any debt, equity security or other interest in the Debtors or (b) the making, delivery or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, this Plan, including any deeds, bills of sale, assignments or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to this Plan, shall not be taxed under any law imposing a stamp tax or similar tax, whether such tax is assessed against the grantor, grantee, or any other party.  For the avoidance of doubt, this exemption does not apply to any issuance, distribution, transfer or exchange that occurred prior to the Confirmation Date.  To the extent that the Debtors or Liquidating Trustee elects to sell any property after the Confirmation Date, such sales of property will be exempt from any transfer taxes in accordance with section 1146(a) of the Bankruptcy Code.  All subsequent issuances, transfers or exchanges of securities, or the making or delivery of any instrument of transfer by the Debtors in the chapter 11 cases shall be deemed to be or have been done in furtherance of this Plan.

### 9.15    Setoffs.

On or after the Effective Date, the Liquidating Trustee, may, pursuant to applicable law (including section 553 of the Bankruptcy Code), offset against any Claim, including an Administrative Claim, before any Distribution is made on account of such Claim, any and all of the claims, rights and Causes of Action of any nature that the Debtors or the Liquidating Trustee may hold against the Holder of such Claim.

### 9.16    Withdrawal of Plan.

The Debtors reserve the right to revoke and withdraw or modify this Plan at any time prior to the Confirmation Date or, if the Debtors are for any reason unable to Consummate this Plan after the Confirmation Date, at any time up to the Effective Date.  If the Debtors revoke or withdraw this Plan, (a) nothing contained in this Plan shall be deemed to constitute a waiver or release of any claims by or against the Debtors or to prejudice in any manner the rights of the Debtors or any Entity in any further proceeding involving the Debtors and (b) the result shall be the same as if the Confirmation Order were not entered, this Plan was not filed and the Effective Date did not occur.

### 9.17    Insurance Preservation.

Nothing in this Plan shall diminish or impair the enforceability of any Insurance Policy and related agreements that may cover Claims and Causes of Action against the Debtors, the D&Os, or any other Entity.  Without limiting the foregoing, and notwithstanding anything else in this Plan, (i) nothing in this Plan shall limit any insured from obtaining coverage under any of the Insurance Policies and related agreements, *provided*, *however*, that other orders of the Bankruptcy Court, whether entered before or after the Effective Date, may limit insureds from obtaining the proceeds of such coverage for reasons other than this Plan and shall not be affected by this Plan; and (ii) nothing in this Plan (including, without limitation, any provision that purports to be preemptory or supervening or grants an injunction, discharge, or a release) shall in any way

operate to impair, diminish, or waive, or have the effect of impairing, diminishing or waiving, the legal or contractual rights, claims, defenses, liabilities or obligations of any Entity, including, without limitation, the Debtors, the Committee, the DIP Secured Parties, the Prepetition Term Loan Secured Parties, the Liquidating Trust, the Liquidating Trustee, the D&Os and any insurers, pursuant to any insurance policies and related agreements, including, without limitation, the terms, conditions, limitations, exclusions, and endorsements thereof, that may cover Claims or Causes of Action against the Debtors, the Estates, the Liquidating Trust, the Liquidating Trustee, the D&Os, any insurers or any other Entity.

### 9.18    D&O Insurance Policies.

As of the Effective Date, the Debtors shall be deemed to have assumed all of the D&O Insurance Policies pursuant to sections 105(a) and 365(a) of the Bankruptcy Code, and coverage for defense and indemnity under any of the D&O Insurance Policies shall remain in full force and effect subject to the terms and conditions of the D&O Insurance Policies. Entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Debtors' foregoing assumption of each D&O Insurance Policy. Notwithstanding anything to the contrary contained in the Plan, and except as otherwise may be provided in an order of the Bankruptcy Court, confirmation of the Plan shall not impair or otherwise modify any obligations assumed by the foregoing assumption of the D&O Insurance Policies, and each such obligation will be deemed and treated as an Executory Contract that has been assumed by the Debtors under the Plan as to which no Proof of Claim need be filed. For the avoidance of doubt, the D&O Insurance Policies provide coverage for those insureds currently covered by such policies for the remaining term of such policies and runoff or tail coverage after the Effective Date to the fullest extent permitted by such policies. On and after the Effective Date, the Debtors or the Liquidating Trustee shall not terminate or otherwise reduce the coverage under any of the D&O Insurance Policies in effect or purchased as of the Petition Date, and all directors and officers of the Debtors at any time shall be entitled to the full benefits of any such policy for the full term of such policy regardless of whether such directors and/or officers remain in such positions after the Effective Date. For the avoidance of doubt, nothing herein shall be construed as the Debtors assuming any obligation with respect to any self-insured retention, deductibles, or similar obligations for which the applicable insurer has the ability to assert a prepetition Claim against the applicable Debtor in accordance with the Bar Date Order or other order of the Bankruptcy Court.

### 9.19    Indemnification of Directors, Officers and Employees.

For purposes of the Plan, the obligation of the Debtors to indemnify and reimburse any Person or entity serving at any time on or after the Petition Date as one of their directors, officers or employees by reason of such Person's or entity's service in such capacity, or as a director, officer or employee of any of the Debtors, to the extent provided in such Debtor's constituent documents, a written agreement with the Debtor(s), in accordance with any applicable law, or any combination of the foregoing, shall survive confirmation of the Plan and the Effective Date.

## ARTICLE X
## EFFECT OF PLAN ON CLAIMS AND INTERESTS

### 10.1    Binding Effect.

This Plan shall be binding upon and inure to the benefit of the Debtors, all present and former Holders of Claims and Interests, and their respective successors and assigns, including, but not limited to, the Liquidating Trust and the Liquidating Trustee.

By participating in the Plan by voting or by accepting Distributions pursuant to the Plan (in whatever sum), or by having a Claim or Interest treated under the Plan, each Holder of an Allowed Claim or Interest extinguished, or released pursuant to the Plan shall be deemed to have affirmatively and specifically consented to and accepted the terms of the Plan, and each such Holder acknowledges and accepts that the Plan is a binding compromise of an Allowed Claim or an Interest extinguished and releases all rights in respect of such Allowed Claim or Interest extinguished such that such Holders of Claims agree to waive any right (if any) to object to or otherwise challenge the Plan and its effect on Claims or any other matter whatsoever.  For the avoidance of doubt, any Holder of a Claim or Interest that opts out of the voluntary releases contained in Section 10.8 of the Plan by (i) checking the "opt out" box on the Ballot, and returning it in accordance with the instructions set forth thereon, or (ii) checking the "opt out" box on the Opt-Out Election Form and returning it in accordance with the instructions set forth thereon, shall not be bound by the voluntary releases contained in Section 10.8 of the Plan.

### 10.2    Treatment of Claims.

Notwithstanding anything contained in this Plan to the contrary, the allowance, classification and treatment of all Allowed Claims and their respective Distributions and treatments under this Plan take into account and conform to the relative priority and rights of the Claims and the Interests in each Class with due regard to any contractual, legal and equitable subordination rights relating thereto whether arising under general principles of equitable subordination, sections 510(b) and (c) of the Bankruptcy Code or otherwise.  As of the Effective Date, any and all such rights described in the preceding sentence are settled and compromised pursuant to this Plan.

### 10.3    No Discharge of the Debtors.

Pursuant to section 1141(d)(3) of the Bankruptcy Code, Confirmation will not discharge Claims against the Debtors; provided, however, that no Holder of any Claim or Interest may, on account of such Claim or Interest, seek or receive any payment or other Distribution from, or seek recourse against, any of the Estates, the Liquidating Trust, the Liquidating Trustee and/or their respective successors, assigns and/or property, except as expressly provided in this Plan.

### 10.4    Injunction.

**(a)     From and after the Effective Date, all Persons and Entities who have held, hold, or may hold Claims against or Interests in the Debtors (whether or not proof of such Claims or Interests has been filed and whether or not such Entities vote in favor of, against or abstain from voting on the Plan or are presumed to have accepted or deemed to**

have rejected the Plan) are permanently enjoined, on and after the Effective Date, solely with respect to any Claims, Interests, and Causes of Action that will be or are extinguished or released pursuant to the Plan, from taking any of the following actions against the Debtors, the Released Parties, the Liquidating Trustee or the Liquidating Trust, or the property of any of the Debtors, the Released Parties, the Liquidating Trustee or the Liquidating Trust (i) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including, without limitation, any proceeding in a judicial, arbitral, administrative or other forum); (ii) enforcing, levying, attaching (including, without limitation, any prejudgment attachment), collecting, or otherwise recovering by any manner or means, whether directly or indirectly, any judgment, award, decree, or order; (iii) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind; (iv) asserting setoff unless such setoff was formally asserted in a timely Filed proof of Claim or in a pleading Filed with the Bankruptcy Court prior to entry of the Confirmation Order or right of subrogation of any kind against any debt, liability, or obligation due to the Debtors; and (v) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan. For the avoidance of doubt, nothing herein shall enjoin or prohibit any Governmental Unit from filing a proof of claim by the Governmental Bar Date.

(b)     Upon the Bankruptcy Court's entry of the Confirmation Order, all Holders of Claims and Interests, and other parties in interest, along with their Related Persons, shall be enjoined from taking any actions to interfere with the implementation or substantial Consummation of this Plan by the Debtors, the Liquidating Trustee and/or their respective Related Persons, as applicable.

10.5    **Exculpation**.

To the maximum extent permitted by applicable law, no Exculpated Party will have or incur, and each of the Exculpated Parties are hereby exculpated from any liability for, any claim, obligation, suit, judgment, damage, demand, debt, right, cause of action, remedy, or loss arising on or after the Petition Date through the Effective Date in connection with or arising out of the filing or administration of the chapter 11 cases, the postpetition marketing and sale process, the postpetition purchase, sale, or rescission of the purchase or sale of any security or asset of the Debtors; the negotiation and pursuit of the Disclosure Statement, the Sale, the Plan, or the solicitation of votes for, or confirmation of, the Plan; the funding or Consummation of the Plan; the occurrence of the Effective Date; the DIP Term Sheet; the Global Settlement; the pre-Effective Date administration of the Plan or the property to be distributed under the Plan (including Liquidating Trust Assets); the creation of the Liquidating Trust; or the transactions in furtherance of any of the foregoing; except for gross negligence, bad faith or willful misconduct, as determined by a Final Order, but in all respects such parties shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under this Plan.  This exculpation shall be in addition to, and not in limitation of, all other releases, indemnities, exculpations and any other applicable law or rules protecting such Exculpated Parties from liability. Notwithstanding anything to the contrary in the foregoing, the exculpation set forth herein does not release any post-Effective Date obligation or liability of any Entity under the Plan or any document, instrument, or

agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

10.6   **Releases by the Debtors**.

Except as otherwise expressly provided in the Plan or the Confirmation Order, on the Effective Date, for good and valuable consideration, to the fullest extent permissible under applicable law, each of the Debtors and their Estates, in each case, on behalf of themselves and their respective successors (including the Liquidating Trust), assigns, and representatives, and any and all other persons that may purport to assert any Cause of Action derivatively, by, through or on behalf of the foregoing Persons and Entities, shall, and shall be deemed to, completely and forever release, waive, void, extinguish and discharge unconditionally, each and all of the Released Parties of and from any and all Claims, Causes of Action, obligations, suits, judgments, damages, debts, rights, remedies and liabilities of any nature whatsoever, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise, that are or may be based on or relating to, in whole or in part, on any act, omission, transaction, event or other circumstance taking place or existing on or prior to the Effective Date (including prior to the Petition Date) in connection with or related to any of the Debtors, including, without limitation, (i) the chapter 11 cases; (ii) the Combined Disclosure Statement and Plan; (iii) the subject matter of, or the transaction or events giving rise to, any Claim or Equity Interest that is treated in this Plan; (iv) the business or contractual arrangements between any Debtor and any Released Party; (v) the negotiation, formulation or preparation of this Combined Disclosure Statement and Plan, the Plan Supplement, the Global Settlement, or related agreements, instruments or other documents; (vi) the sale process, Sale or its related transaction documents, and the negotiation, formulation or preparation of the Sale and the related transaction documents; (vii) the DIP Facility and any loans made by the Prepetition Term Loan Lenders and any related transaction documents, and the negotiation, formulation, or preparation of any related transaction documents; and (viii) the confirmation or Consummation of this Plan or the solicitation of votes on this Plan.

Notwithstanding anything to the contrary to the foregoing, the releases set forth above do not release:  (i) any Claims or Causes of Action of the Debtors or any of their respective subsidiaries (a) against any of their respective predecessors, (b) against any former directors and officers of the Debtors (which exclusion for the avoidance of doubt does not include the D&Os as defined herein), and (c) arising under or relating to the asset purchase agreement, share purchase agreement, merger agreement or similar agreement (or any ancillary agreement entered into thereunder, excluding, in case and for the avoidance of doubt, the Asset Purchase Agreement and the RSA, the Prepetition Term Loan Agreement, and any transactions related thereto; and (ii) (a) any Released Party from any Causes of Action brought, or which may be brought, in the Utah Litigation or arising from or related to any act or omission by such Released Party that is determined in a Final Order to have constituted intentional fraud, willful misconduct, bad faith or gross negligence; and (b) any post-Effective Date obligations of any party or Entity under the Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

### 10.7    Third Party Releases

Except as otherwise expressly provided in the Plan or the Confirmation Order, on the Effective Date, except (i) for the right to enforce the Plan, and (ii) as otherwise expressly provided in the Plan or in the Confirmation Order, in exchange for good and valuable consideration, including the obligations of the Debtors under the Plan, to the fullest extent permissible under applicable law, the Released Parties shall be deemed conclusively, absolutely, unconditionally, irrevocably and forever released by the Releasing Parties in each case, from any and all Claims and Causes of Action, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or hereinafter arising, in law or equity, whether arising under federal or state statutory or common law, or any other applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty, requirement or otherwise, that such entity would have been legally entitled to assert in their own right (whether individually, derivatively, or collectively) or on behalf of the Holder of any Claim or Interest or other Person, based on or relating to, or in any manner arising prior to the Effective Date (including prior to the Petition Date), in whole or in part, the Debtors, the chapter 11 cases, the pre-and post-petition marketing and sale process, the Sale, the DIP Facility or any related agreements, instruments, and other documents relating thereto, the RSA, Prepetition Term Loan Agreement, and any transactions related thereto, the purchase, sale, or rescission of the purchase or sale of any securities issued by the Debtors, the ownership of any securities issued by the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the administration or implementation of the Plan, including the issuance or Distribution of the Liquidating Trust Assets pursuant to the Plan, the creation of the Liquidating Trust, the business or contractual arrangements between any Debtor and any Released Party, the Global Settlement, the Disclosure Statement, the Plan (including any Plan Supplement), or the solicitation of votes with respect to the Plan, or any other act or omission, in all cases based upon any act or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date related or relating to the foregoing.

Notwithstanding anything to the contrary to the foregoing, the releases set forth above do not release (a) any Released Party from any Causes of Action arising from or related to any act or omission by such Released Party that is determined in a Final Order to have constituted willful misconduct, bad faith or gross negligence; and (b) any post-Effective Date obligations of any party or Entity under the Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

### 10.8    Extinguishment of Intercompany Claims.

Following the Effective Date, any Claims that any of the Debtors may have against another Debtor shall be forever waived, released, and extinguished for all purposes and no Debtor shall have a Claim or Administrative Claim Allowed against the Estate of any other Debtor.

**10.9    Terms of Injunctions or Stays**.

Unless otherwise provided in this Plan, all injunctions or stays provided for in these chapter 11 cases pursuant to Bankruptcy Code sections 105 or 362, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Cases are closed.

# ARTICLE XI
# EXECUTORY CONTRACTS AND UNEXPIRED LEASES

**11.1    Executory Contracts and Unexpired Leases Deemed Rejected**.

On the Effective Date, except as otherwise provided in the Plan, each Executory Contract and Unexpired Lease not previously rejected, assumed, or assumed and assigned (including any Executory Contract or Unexpired Lease assumed and assigned in connection with the Sale) shall be deemed automatically rejected pursuant to sections 365 and 1123 of the Bankruptcy Code, unless such Executory Contract or Unexpired Lease: (i) as of the Effective Date is subject to a pending motion to assume such Unexpired Lease or Executory Contract; or (ii) is identified for assumption on the Assumption Schedule included in the Plan Supplement. Executory Contracts and Unexpired Leases identified for assumption on the Assumption Schedule shall be deemed assumed pursuant to section 365 of the Bankruptcy Code as of the Effective Date.

**11.2    Claims Based on Rejection of Executory Contracts and Unexpired Leases**.

Unless otherwise provided by an Order of the Bankruptcy Court, any Proofs of Claim based on the rejection of the Debtors' Executory Contracts or Unexpired Leases pursuant to the Plan must be filed with the Bankruptcy Court and served on the Liquidating Trustee no later than thirty (30) days after the notice of occurrence of the Effective Date.  The notice of occurrence of the Effective Date shall include the date by which Proofs of Claim based on the rejection of the Debtors' Executory Contracts or Unexpired Leases must be filed.

Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not filed with the Bankruptcy Court within such time will be forever barred from assertion, and shall not be enforceable against the Debtors, the Liquidating Trust, the Debtors' Estates, or the property for any of the foregoing, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully compromised, settled, and released, notwithstanding anything in the Schedules or a Proof of Claim to the contrary.

**11.3    Cure of Defaults for Assumed Executory Contracts and Unexpired Leases**.

Any cure obligation due under each Executory Contract and Unexpired Lease to be assumed or assumed and assigned pursuant to the Plan shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment in full in Cash on the Effective Date (or as soon as reasonably practicable thereafter), subject to the limitation described below, by the Debtors or the Liquidating Trust, as applicable, or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree.

In the event of a dispute regarding (i) the amount of the cure obligation, (ii) the ability of the Liquidating Trust or any other applicable assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease, or (iii) any other matter pertaining to assumption or assumption and assignment (as applicable), the obligations of section 365 of the Bankruptcy Code shall be deemed satisfied following the entry of one or more Final Orders, which may include the Confirmation Order, resolving the dispute and approving the assumption or assumption and assignment (as applicable); provided, that the Debtors or the Liquidating Trust (as applicable) may settle any dispute regarding the amount of any cure obligation without any further notice to any party or any action, order, or approval of the Bankruptcy Court.

Assumption or assumption and assignment of any Executory Contract or Unexpired Lease pursuant to the Plan, or otherwise, shall result in the full release and satisfaction of any defaults, subject to satisfaction of the Cure Obligations, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time before the Effective Date of assumption and/or assignment. Any prepetition default amount set forth in the Schedules and/or any Proofs of Claim filed with respect to an Executory Contract or Unexpired Lease that has been assumed or assumed and assigned shall be deemed Disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.

### 11.4    Modifications, Amendments, Supplements, Restatements, or Other Agreements.

Unless otherwise provided in the Plan, each assumed Executory Contract or Unexpired Lease shall include all modifications, amendments, supplements, restatements or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and all Executory Contracts and Unexpired Leases related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the chapter 11 cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority or amount of any Claims that may arise in connection therewith.

### 11.5    Reservation of Rights.

Neither the exclusion nor inclusion of any Executory Contract or Unexpired Lease in the Assumption Schedules or the Sale Order, nor anything contained in the Plan or the Plan Supplement, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that the Debtors' Estates have any liability thereunder. In the event of a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors, or the Liquidating Trustee, as

applicable, shall have sixty (60) days following entry of a Final Order resolving such dispute to alter the treatment of such contract or lease as otherwise provided in the Plan.

## ARTICLE XII
## DISTRIBUTIONS

### 12.1    Transfer of Claims.

The Debtors and the Liquidating Trustee shall have no obligation to recognize any transfer of a Claim (i) occurring on or after the Effective Date, or (ii) that does not comply with the Bankruptcy Code or Bankruptcy Rules, including Bankruptcy Rule 3001(e).

### 12.2    Delivery of Distributions and Undeliverable or Unclaimed Distributions.

(a)    *Delivery of Distributions in General.*

Distributions to Holders of Allowed Claims shall be made (i) at the addresses set forth on the Proofs of Claim filed by such Holders, (ii) at the addresses set forth in any written notices of address changes delivered to the Liquidating Trustee after the date of any related Proof of Claim, (iii) at the addresses reflected in the Schedules if no Proof of Claim has been filed and the Liquidating Trustee has not received a written notice of a change of address, (iv) at the addresses set forth in the other records of the Debtors or the Liquidating Trustee at the time of the Distribution, or (v) any change of address as reflected on the Bankruptcy Court docket.

Distributions shall be made from the Liquidating Trust, as applicable, in accordance with the terms of this Plan and, if applicable, the Liquidating Trust Agreement.

In making Distributions under this Plan, the Liquidating Trustee may rely upon the accuracy of the claims register maintained by the Claims Agent in these chapter 11 cases, as modified by any Final Order of the Bankruptcy Court disallowing Claims in whole or in part.

(b)    *Undeliverable and Unclaimed Distributions.*

If the Distribution to any Holder of an Allowed Claim is returned to the Liquidating Trustee as undeliverable or is otherwise an Unclaimed Distribution, no further Distributions shall be made to such Holder unless and until the Liquidating Trustee is notified in writing of such Holder's then-current address, at which time all missed Distributions shall be made to such Holder without interest.  If a Distribution is returned as undeliverable, the Liquidating Trustee shall use reasonable efforts to determine such Creditor's then-current address.  Unclaimed Distributions shall be returned to the Liquidating Trust until such Distributions are claimed.

(c)    *Treatment of Unclaimed Distributions.*

Any Holder of an Allowed Claim that does not assert a Claim pursuant to this Plan for an Unclaimed Distribution within three (3) months after the final Distribution Date shall be deemed to have forfeited its Claim for such undeliverable or unclaimed Distribution and shall be forever barred and enjoined from asserting any such Claim for an Unclaimed Distribution against

the Debtors and their Estates, the Liquidating Trustee, the Liquidating Trust, and their respective agents, attorneys, representatives, employees or independent contractors, and/or any of its and their property. In such cases, any Cash otherwise reserved for Unclaimed Distributions shall become the property of the Liquidating Trust free of any restrictions thereon and notwithstanding any federal or state escheat laws to the contrary and shall be distributed in accordance with the terms of this Plan and the Liquidating Trust Agreement. Nothing contained in this Plan, or the Liquidating Trust Agreement shall require the Debtors or the Liquidating Trustee to attempt to locate any Holder of an Allowed Claim; *provided, however*, that in his, her or its sole discretion, the Liquidating Trustee may periodically publish notice of Unclaimed Distributions.

### 12.3   Interest on Claims.

Except as specifically provided for in this Plan or the Confirmation Order, or required by applicable bankruptcy law, postpetition interest shall not accrue or be paid on any Claims, and no Holder shall be entitled to interest accruing on or after the Petition Date on any Claim. Except as specifically provided for in this Plan or the Confirmation Order, or required by applicable bankruptcy law, interest shall not accrue or be paid upon any Disputed Claim in respect of the period from the Petition Date to the date a final Distribution is made thereon if and after such Disputed Claim becomes an Allowed Claim.

### 12.4   Withholding and Reporting Requirements.

In connection with this Plan and all Distributions under this Plan, the Liquidating Trustee shall, to the extent applicable, comply with all tax withholding, payment, and reporting requirements imposed by any federal, state, local, or foreign taxing authority, and all Distributions under this Plan shall be subject to any such withholding, payment, and reporting requirements. The Liquidating Trustee shall be authorized to take any and all actions that may be necessary or appropriate to comply with such withholding, payment, and reporting requirements. All amounts properly withheld from Distributions to a Holder as required by applicable law and paid over to the applicable taxing authority for the account of such Holder shall be treated as part of the Distributions to such Holder.

Except for the DIP Secured Parties, the Prepetition Term Loan Secured Parties and the Prepetition ABL Lender, all Entities holding Claims shall be required to provide any information necessary to effect information reporting and withholding of such taxes. No Distribution shall be made to or on behalf of such Entity pursuant to this Plan unless and until such Entity has furnished such information. Any property to be distributed pursuant to this Plan shall be deemed: (i) pending the receipt of such information in the manner established by the Liquidating Trustee, an Undeliverable Distribution pursuant to section 12.2(b) of this Plan; or (ii) if such information is not received by the deadline established by the Liquidating Trustee and approved by the Bankruptcy Court upon notice and a hearing, forfeited and treated in accordance with section 12.2(c) of this Plan.

Notwithstanding any other provision of this Plan, (a) each Holder of an Allowed Claim that is to receive a Distribution pursuant to this Plan shall have sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any Governmental Unit, including income, withholding, and other tax obligations, on account of such

Distribution, and (b) no Distribution shall be made to or on behalf of such Holder pursuant to this Plan unless and until such Holder has made arrangements satisfactory to the Debtors or Liquidating Trustee, as applicable, for the payment and satisfaction of such withholding tax obligations or such tax obligation that would be imposed upon the Liquidating Trustee in connection with such Distribution.

### 12.5    **Miscellaneous Distribution Provisions**.

(a)    *Method of Cash Distributions.*

Any Cash payment to be made by the Debtors or Liquidating Trustee, as applicable, pursuant to this Plan will be in U.S. dollars and may be made, at the sole discretion of the Debtors or Liquidating Trustee, as applicable, by draft, check, wire transfer, or as otherwise required or provided in any relevant agreement or applicable law.  In the case of foreign creditors, Cash payments may be made, at the option of the Debtors or Liquidating Trustee, as applicable, in such funds and by such means as are necessary or customary in a particular jurisdiction.

(b)    *No Distribution in Excess of Amount of Allowed Claim.*

Notwithstanding anything to the contrary in the Plan, no Holder of an Allowed Claim shall, on account of such Allowed Claim, receive a Distribution in excess of the Allowed amount of such Claim.

(c)    *Distributions on Non-Business Days.*

Any payment or Distribution due on a day other than a Business Day shall be made, without interest, on the next Business Day.

### 12.6    *De Minimis* **Distribution Provisions**

No Distribution shall be required to be made hereunder to any Holder of a Claim unless such Holder is to receive in such Distribution at least $100.00.  Any Distribution not made pursuant to this Section 12.6 shall be treated as an Unclaimed Distribution and is subject to Section 12.4 hereof.

### 12.7    **Residual Assets**.

After final Distributions have been made in accordance with the terms of the Plan, the unrestricted Cash remaining with the Liquidating Trust shall be remitted to the Prepetition Term Loan Secured Parties.

### ARTICLE XIII
### PROCEDURES FOR DISPUTED CLAIMS

### 13.1    **Objections to Claims**.

Unless otherwise provided in this Plan, after the Effective Date through the applicable Claims objection deadline, the Liquidating Trustee shall have standing to object to

Claims in order to have the Bankruptcy Court determine the amount and treatment of any Claim. Except as otherwise provided in this Plan, if a party files a Proof of Claim and (i) the Debtors, a party in interest or the Liquidating Trustee, as applicable, file an objection to that Claim or otherwise formally challenge the Claim or (ii) the Claim otherwise is a Disputed Claim under this Plan, then such Claim shall be Disputed unless Allowed or Disallowed by a Final Order or as otherwise set forth in this Plan.

### 13.2    Estimation of Claims.

The Debtors or the Liquidating Trustee, as applicable, may at any time request that the Bankruptcy Court estimate any contingent, unliquidated, or Disputed Claim, pursuant to section 502(c) of the Bankruptcy Code regardless of whether any party in interest previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection. If the Bankruptcy Court estimates any contingent, unliquidated or Disputed Claim, the amount so estimated shall constitute either the Allowed amount of such Claim or the maximum limit of such Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on the amount of such Claim, the Liquidating Trustee may pursue supplementary proceedings to object to the allowance of such Claim. All of the aforementioned objection, estimation and resolution procedures are intended to be cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

### 13.3    Disputed Claims Reserve.

On the Effective Date or as soon thereafter as is practicable, the Liquidating Trustee may establish and administer a Disputed Claims Reserve for Disputed Claims in accordance with the Liquidating Trust Agreement. The Liquidating Trustee may reserve in Cash the expected recovery that such Disputed Claim would receive if it were ultimately determined to be an Allowed Claim (or such lesser amount as may be determined or estimated by the Bankruptcy Court after notice and a hearing) with respect to each such Disputed Claim. For the avoidance of doubt, the Liquidating Trustee may administer the Disputed Claims Reserves by book entry.

### 13.4    No Distribution Pending Allowance.

No Distribution provided under the Plan shall be made on account of a Disputed Claim unless and until such Disputed Claim becomes an Allowed Claim; *provided*, *however*, that a Distribution may be made on an Allowed portion of a Claim pending adjudication of the disputed portion of such Claim.

### 13.5    Resolution of Claims.

Except as otherwise provided herein (including the release provisions hereof) or in the Confirmation Order, or in any contract, instrument, release, or other agreement or document entered into in connection with this Plan, in accordance with section 1123(b) of the Bankruptcy Code, on and after the Effective Date, the Liquidating Trustee may enforce, sue on, settle, or compromise (or decline to do any of the foregoing) all Claims, Disputed Claims, rights, Causes of Action, suits and proceedings, whether in law or in equity, whether known or unknown, that the Liquidating Trust may hold against any Person, and any contract, instrument, release, indenture or

other agreement entered into in connection herewith. From and after the Effective Date, the Liquidating Trustee may settle or compromise any Disputed Claim without approval of the Bankruptcy Court. Notwithstanding anything to the contrary in this section 13.5 or elsewhere in this Combined Disclosure Statement and Plan, the Liquidating Trustee may not settle or compromise any Administrative Claim in an Allowed amount that exceeds $100,000 without consulting with the Prepetition Term Loan Agent in advance.

### 13.6    Amendments to Late Filed Claims.

Following the Effective Date, except as otherwise provided in this Plan (including with respect to the filing of Claims by Governmental Units by the Governmental Bar Date), the Confirmation Order or the Liquidating Trust Agreement, no Claim may be filed, amended or supplemented without the approval of the Bankruptcy Court or without the prior written authorization of the Liquidating Trustee, and any such new or amended Claim filed without such prior authorization shall be deemed disallowed in full and expunged without any further action, order or approval of the Bankruptcy Court.

## ARTICLE XIV
## CONFIRMATION AND CONSUMMATION OF THE PLAN

### 14.1    Conditions to Confirmation.

The following are conditions precedent to the occurrence of the Confirmation Date:

(a)    Final Order finding that the Disclosure Statement contains adequate information pursuant to section 1125 of the Bankruptcy Code shall have been entered by the Bankruptcy Court (which Final Order may be the Confirmation Order);

(b)    Entry of a Confirmation Order that is in form and substance acceptable in all respects to the Debtors, the Committee, and the DIP Agent;

(c)    All documents contained in the exhibits and the Plan Supplement are in form and substance acceptable in all respects to the Debtors, the Committee, and the DIP Agent; and

(d)    Approval of all provisions, terms, and conditions hereof shall be contained in the Confirmation Order.

### 14.2    Conditions to Effective Date.

The following are conditions precedent to the occurrence of the Effective Date, each of which must be satisfied or waived by the Debtors, the DIP Agent, and the Committee in writing:

(a)    The Confirmation Order shall have been entered and shall provide that the Debtors, the Liquidating Trust, and the Liquidating Trustee are authorized and directed to take all actions necessary or appropriate to enter into, implement,

and consummate the contracts, instruments, releases, leases, indentures, and other agreements or documents created in connection with this Plan and effectuate, advance, or further the purposes thereof;

(b)     The Confirmation Order, the Plan and all Plan Exhibits shall be, in form and substance acceptable in all respects to the Debtors, the DIP Agent, and the Committee, and shall have been executed and delivered by all parties signatory thereto;

(c)     All other actions, documents, and agreements necessary to implement this Plan shall have been effected or executed;

(d)     The Confirmation Order shall have become a Final Order; and

(e)     The Debtors shall have filed a Notice of Effective Date.

**14.3    Consequences of Non-Occurrence of Effective Date**.

If the Effective Date does not timely occur, the Debtors reserve all rights to seek an order from the Bankruptcy Court directing that the Confirmation Order be vacated and that this Plan be null and void in all respects. If the Bankruptcy Court enters an order vacating the Confirmation Order, the time within which the Debtors may assume and assign or reject all Executory Contracts and unexpired leases not previously assumed, assumed and assigned, or rejected, shall be extended for a period of thirty (30) days after the date the Confirmation Order is vacated, without prejudice to further extensions.

**14.4    Substantial Consummation**.

On the Effective Date, the Plan shall be deemed to be substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

**14.5    Effect of Vacatur of Confirmation Order**.

If the Confirmation Order is vacated, (a) no further Distributions under the Plan shall be made; (b) the Debtors and all Holders of Claims and Interests shall, to the extent deemed possible, be restored to the status quo ante as of the day immediately preceding the Confirmation Date as though the Confirmation Date never occurred; and (c) all the Debtors' obligations with respect to the Claims and the Interests shall remain unchanged and nothing contained herein shall be deemed to constitute a waiver or release of any Claims by or against the Debtors or any other entity or to prejudice in any manner the rights of the Debtors or any other entity in any further proceedings involving the Debtors or otherwise.

# ARTICLE XV
## ADMINISTRATIVE PROVISIONS

**15.1    Retention of Jurisdiction**.

Notwithstanding confirmation of this Plan or occurrence of the Effective Date, and except as otherwise provided by applicable law, the Bankruptcy Court shall retain such jurisdiction as is legally permissible, including for the following purposes:

(a)    To determine the allowability, classification, or priority of Claims upon objection of the Liquidating Trustee or any other party in interest entitled to file an objection, and the validity, extent, priority and nonavoidability of consensual and nonconsensual liens and other encumbrances;

(b)    To issue injunctions or take such other actions or make such other orders as may be necessary or appropriate to restrain interference with this Plan or its execution or implementation by any Entity, to construe and to take any other action to enforce and execute this Plan, the Confirmation Order, or any other order of the Bankruptcy Court, to issue such orders as may be necessary for the implementation, execution, performance and consummation of this Plan and all matters referred to herein, and to determine all matters that may be pending before the Bankruptcy Court in these chapter 11 cases on or before the Effective Date with respect to any Entity;

(c)    To protect the property of the Estates, including Liquidating Trust Assets, from claims against, or interference with, such property, including actions to quiet or otherwise clear title to such property or to resolve any dispute concerning Liens on property of the Estates or Liquidating Trust Assets;

(d)    To determine any and all applications for allowance of Professional Fee Claims;

(e)    To determine any Other Priority Claim, Administrative Claims, or any other request for payment of claims or expenses entitled to priority under section 507(a) of the Bankruptcy Code;

(f)    To resolve any disputes arising under or related to the implementation, execution, consummation, or interpretation of this Plan and the making of Distributions hereunder;

(g)    To determine any and all motions related to the rejection, assumption or assignment of Executory Contracts or unexpired leases, or to determine any motion to reject an Executory Contract or Unexpired Lease pursuant to this Plan;

(h)    To determine all applications, motions, adversary proceedings, contested matters, actions, and any other litigated matters instituted in and prior to the closing of these chapter 11 cases, including any remands;

(i)      To enter one or more Final Orders closing the Debtors' chapter 11 cases;

(j)      To modify this Plan under section 1127 of the Bankruptcy Code, to remedy any defect, cure any omission, or reconcile any inconsistency in this Plan or the Confirmation Order to carry out its intent and purposes;

(k)      To issue such orders in aid of consummation of this Plan and the Confirmation Order notwithstanding any otherwise applicable non-bankruptcy law, with respect to any Entity, to the full extent authorized by the Bankruptcy Code;

(l)      To enable the Liquidating Trustee to prosecute any and all proceedings to set aside Liens and to recover any transfers, assets, properties, or damages to which the Estates may be entitled under applicable provisions of the Bankruptcy Code or any other federal, state or local laws except as may be expressly waived pursuant to this Plan;

(m)      To determine any tax liability of the Debtors or the Liquidating Trust pursuant to section 505 of the Bankruptcy Code, and to address any request by the Liquidating Trustee or the Liquidating Trust for a prompt audit pursuant to section 505(b) of the Bankruptcy Code;

(n)      To enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified or vacated;

(o)      To resolve any disputes concerning whether an Entity had sufficient notice of the chapter 11 cases, the Bar Date Order or the otherwise applicable Claims bar date, the hearing to consider approval of the Disclosure Statement or the Combined Hearing;

(p)      To resolve any dispute or matter arising under or in connection with any order of the Bankruptcy Court entered in these chapter 11 cases;

(q)      To resolve any disputes concerning any exculpation of a non-debtor hereunder or the injunction against acts, employment of process or actions against such non-debtor arising hereunder;

(r)      To approve any Distributions, or objections thereto, under this Plan;

(s)      To approve any Claims settlement entered into or offset exercised by the Liquidating Trustee; and

(t)      To determine such other matters, and for such other purposes, as may be provided in the Confirmation Order or as may be authorized under provisions of the Bankruptcy Code.

### 15.2    **Amendments**.

(a)    *Preconfirmation Amendment.*

The Debtors may modify this Plan at any time prior to the entry of the Confirmation Order, provided that this Plan, as modified, and the disclosure statement pertaining thereto meet applicable Bankruptcy Code requirements.

(b)    *Postconfirmation Amendment Not Requiring Resolicitation.*

After the entry of the Confirmation Order and before substantial consummation of this Plan, the Debtors may, with the consent of the DIP Agent, the Prepetition Term Loan Agent (with respect to amendments that affect Holders of Class 3 Claims), and the Committee, if still in existence (with respect to amendments that affect Holders of Class 4 Claims), modify this Plan to remedy any defect or omission or to reconcile any inconsistencies in this Plan or in the Confirmation Order, as may be necessary to carry out the purposes and effects of this Plan, provided that: (i) the Debtors obtain approval of the Bankruptcy Court for such modification, after notice and a hearing; and (ii) such modification shall not materially and adversely affect the interests, rights, treatment or Distributions of any Class of Allowed Claims or Interests under this Plan.

(c)    *Postconfirmation and Pre-consummation Amendment Requiring Resolicitation.*

After the Confirmation Date and before substantial consummation of this Plan, the Debtors may, with the consent of the DIP Agent, the Prepetition Term Loan Agent, and the Committee, modify this Plan in a way that materially or adversely affects the interests, rights, treatment, or Distributions of a Class of Claims or Interests, provided that: (i) this Plan, as modified, meets applicable Bankruptcy Code requirements; (ii) the Debtors obtain Bankruptcy Court approval for such modification, after notice and a hearing; (iii) such modification is accepted by at least two-thirds in amount, and more than one-half in number, of Allowed Claims or Interests voting in each Class materially or adversely affected by such modification; and (iv) the Debtors comply with section 1125 of the Bankruptcy Code with respect to this Plan as modified.

### 15.3    **Successors and Assigns**.

The rights, benefits and obligations of any person or entity named or referred to in this Plan shall be binding on, and shall inure to the benefit of, the heirs, executors, administrators, successors and/or assigns of such person or entity.

### 15.4    **Governing Law**.

Except to the extent that the Bankruptcy Code, Bankruptcy Rules, or other federal laws apply, the rights and obligations arising under this Plan shall be governed by and construed and enforced in accordance with the laws of the State of Delaware, without giving effect to principles of conflicts of law.

### 15.5    Corporate Action.

Any matters provided for under this Plan involving the corporate structure of the Debtors or corporate action, as the case may be, to be taken by or required of the Debtors shall be deemed to have occurred and be effective as of the Effective Date and shall be authorized and approved in all respects, without any requirement of further action by the Debtors or the Liquidating Trustee, as the case may be.

### 15.6    Effectuating Documents and Further Transactions.

The Debtors and the Liquidating Trustee shall be authorized to execute, deliver, file, or record such documents, contracts, instruments, releases, and other agreements and take such other actions as may be necessary to effectuate and further evidence the terms and conditions of this Plan.

### 15.7    Miscellaneous Rules.

This Combined Disclosure Statement and Plan is subject to the following miscellaneous rules: (i) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply, unless superseded herein or in the Confirmation Order; (ii) in computing any period of time prescribed or allowed by this Plan, the provisions of Bankruptcy Rule 9006(a) shall apply; and (iii) whenever this Plan provides that a payment or Distribution shall occur "on" any date, it shall mean "on, or as soon as reasonably practicable after", such date.

### 15.8    Notices.

All notices or requests in connection with this Plan shall be in writing and will be deemed to have been given when received by mail and addressed to:

**Liquidating Trustee:**

To be provided in the Plan Supplement.

**Debtors:**

**MORRIS, NICHOLS, ARSHT & TUNNELL LLP**
Robert J. Dehney, Sr.
Donna L. Culver
Daniel B. Butz
Scott D. Jones
Jonathan M. Weyand
1201 N. Market Street, 16th Floor
Wilmington, Delaware 19801
Telephone: (302) 658-9200
Facsimile: (302) 658-3989
Email: rdehney@morrisnichols.com
         dculver@morrisnichols.com
         dbutz@morrisnichols.com

sjones@morrisnichols.com
jweyand@morrisnichols.com

**DIP Agent and Prepetition Term Loan Agent:**

**WHITEFORD, TAYLOR & PRESTON, LLP**
David W. Gaffey
Brandy M. Rapp
3190 Fairview Park Drive, Suite 800
Falls Church, VA  22042
Telephone:  (703) 280-3374
Email:    dgaffey@whitefordlaw.com
        brapp@whitefordlaw.com

**Committee:**

**MORRIS JAMES LLP**
Jeffrey R. Waxman
Eric J. Monzo
3205 Avenue North Blvd, Suite 100
Wilmington, DE 19803
Telephone: (302) 888-6800
Facsimile: (302) 571-1750
Email: jwaxman@morrisjames.com
      emonzo@morrisjames.com

**15.9    No Admission or Waiver**.

Notwithstanding anything herein to the contrary, nothing contained in this Plan shall be deemed an admission or waiver by the Debtors with respect to any matter set forth herein, including liability on any Claim or the propriety of a Claim's classification.

                                       _/s/ Draft_____
                                         Nate Brown, Chief Financial Officer

# **Exhibit A**

Liquidation Analysis

**Walker Edison, et al**
**Liquidation Analysis**

Exit Date By:                                                    12/27/2025

| Line Item | Chapter 11 | Chapter 7 |
|---|---|---|
| Cash on Hand | 8,212,403 | 8,212,403 |
| Release of Earnest Money Deposit | 500,000 | 500,000 |
| Release of IT Migration Escrow Deposit | 200,000 | 200,000 |
| Professional Fee Escrow | 609,918 | 609,918 |
| **Total - Inflows** | **9,522,321** | **9,522,321** |
| | | |
| Professional Fees | (5,001,918) | (5,001,918) |
| Post Petition Vendor Expenses | (1,131,900) | (1,131,900) |
| Other Operating Expenses | (86,120) | - |
| Other - Designated Rights Pre funding | (1,395,319) | (1,395,319) |
| **Total - Post-Petition Expenses** | **(7,615,256)** | **(7,529,136)** |
| | | |
| Wind Down / Liquidating  Expenses | (755,009) | (755,009) |
| Chapter 7 Trustee | - | (250,000) |
| **Total - Funding of Wind Down Trust / Chapter 7 Case** | **(755,009)** | **(1,005,009)** |
| | | |
| **Distributable Cash (excluding any potential litigation proceeds)** | **1,152,056** | **988,176** |

| Cash Distribution Amounts | | |
|---|---|---|
| Est. Initial DIP Lender Recovery | 402,056 | 488,176 |
| Est. Initial Pre Petition Lender Recovery | - | - |
| Est. Initial Unsecured Creditor Recovery | 750,000 | 500,000 |
| **Total - Distributions (excluding any potential litigation proceeds)** | **1,152,056** | **988,176** |

**Notes:**

This analysis does not include any recoveries from the Utah Litigation or any other Causes of Action.

This analysis assumes, for comparison purposes, that the Global Settlement is enforceable and effective in a chapter 7 case, which may not necessarily be the case.

## **Exhibit B**

Global Settlement Term Sheet

**In re Walker Edison Holdco LLC**
**Case # 25-11602 (TMH)**

**SETTLEMENT AGREEMENT**

The following settlement agreement (the "<u>Settlement Agreement</u>") is entered into as of October 1, 2025, by and between (i) Walker Edison Holdco LLC and its affiliated debtors (the "<u>Debtors</u>"), (ii) the DIP Secured Parties, (iii) the Prepetition Term Loan Secured Parties, and (iv) the Official Committee of Unsecured Creditors (the "<u>Committee</u>") (collectively, the "<u>Parties</u>") with respect to and in resolution of any Committee objection to the proposed terms of the Final Order approving the DIP Facility. Capitalized terms not defined herein shall have the meanings ascribed to them in the *Interim Order (I) Authorizing Debtors to (A) Obtain Postpetition Financing and (B) Use Cash Collateral, (II) Granting Liens and Providing Claims With Superpriority Administrative Expense Status, (III) Granting Adequate Protection, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing and (VI) Granting Related Relief* [D.I. 52] (the "<u>Interim DIP Order</u>") or the order granting the relief set forth in the Interim Order on a final basis, to which this Settlement Agreement is attached (the "<u>Final DIP Order</u>," and collectively with the Interim DIP Order, the "<u>DIP Order</u>").

1. **Final DIP Order and Final Approval of the DIP Facility**
    a. The Committee shall not file any objection to and shall support the entry of the Final DIP Order approving the DIP Facility, subject to the terms of this Settlement Agreement. The terms of this Settlement Agreement shall be incorporated into the Final DIP Order as if set forth therein.

2. **Releases and Stipulations**
    a. The Committee and Debtors agree to the stipulations and releases in favor of the DIP Secured Parties, the Prepetition Term Loan Secured Parties, and their respective Representatives set forth in the Final Order (the "<u>Stipulations</u>"), subject to the settlement embodied herein. The Committee agrees that upon entry of the Final DIP Order, the Committee and each of its individual members may not file a Challenge as against the Prepetition Term Loan Secured Parties and waives any remaining Challenge Period as to the Prepetition Term Loan Secured Parties. The Debtors and the Committee agree (i) that this Settlement Agreement resolves all potential Challenges by the Debtors and Committee as against the Prepetition Term Loan Secured Parties, and (ii) that the Final DIP Order shall provide that the Stipulations shall be binding in all respects on the Debtors, and the Committee irrespective of the filing of a Challenge as against the Prepetition Term Loan Secured Parties by any party, and that all Challenges as against the Prepetition Term Loan Secured Parties by the Debtors, and any right to assert a Challenge as against the Prepetition Term Loan Secured Parties by the Debtors, are hereby irrevocably waived and relinquished. The Debtors and Committee further agree, and the Final DIP Order shall provide, that notwithstanding anything to the contrary in the Interim DIP Order or Final DIP Order, no DIP Loans, DIP Collateral, Cash Collateral (including the DIP Loan Proceeds), Prepetition Term Loan Collateral, or any portion of the Carve-Out may hereafter be used in connection with the investigation, threatened initiation, or prosecution of any Challenge as against

the Prepetition Term Loan Secured Parties or any claims, causes of action, adversary proceedings or other litigation of the types identified in Paragraph 19(a)(i) of the Interim DIP Order.  For the sake of clarification, nothing herein shall release any claim or impair any Challenge right as against any party other than the Prepetition Term Loan Secured Parties.

b.  The Parties further agree to support a chapter 11 plan that implements this Settlement Agreement (the "<u>Plan</u>") which shall include customary releases and exculpations of the Debtor's officers and directors who were in such positions as of the Petition Date.  Such releases shall not include any actions or inactions arising from fraud, gross negligence, illegality, bad faith or willful misconduct.

**3.  Funding and Sharing Agreement** – The Parties agree as follows:

a.  **Committee Budget** – The Committee shall have a budget for professional fees within the Carve-Out of $375,000.00.

b.  **503(b)(9) Claims** – The Approved Budget shall provide for the payment of all allowed claims under section 503(b)(9) of the Bankruptcy Code on the effective date of the Plan.  The Parties reserve all rights as to the validity, amount, and allowance of all claims asserted under section 503(b)(9).

c.  **DIP Loans**
  i.  **New Money DIP Loan** – The DIP Lender agrees to fund up to an additional $750,000.00 (the "<u>Supplemental New Money DIP Loans</u>") in New Money DIP Loans, if and to the extent needed, to fund administrative expenses of these Chapter 11 Cases through the effective date of the Plan.  The Supplemental New Money DIP Loans may be provided upon notice filed with the Court but without further order of the Court.

  ii.  **Litigation DIP Loan** – The Litigation DIP Loan Commitments may be increased from time to time as needed to fund the costs incurred by the Parties in connection with the Utah Litigation (the "<u>Supplemental Litigation DIP Loans</u>")[1] upon the filing of a notice with the Court.  If no objection to the notice of Supplemental Litigation DIP Loans is filed with the Court by a party-in-interest within seven (7) days, the Supplemental Litigation DIP Loans shall be deemed approved without the need for further order of the Court.  The Litigation DIP Loans, including any Supplemental Litigation DIP Loans, may be used to pay all fees and costs incurred by the Parties, whether outstanding as of the date hereof or hereafter incurred, in connection with the prosecution of the Utah Litigation.

---

[1]  For the avoidance of doubt, the defined term "Utah Litigation" is without prejudice to the state or federal forum or tribunal in which such litigation may be heard.

d. **Final Roll-Up**

    i. **New Money Roll-Up** – Notwithstanding anything to the contrary in the Interim DIP Order, the New Money Roll-Up shall be a "roll up" of the Prepetition Term Loans held by the DIP Lender (or their affiliates) on a two-to-one basis relative to the New Money DIP Loan Commitments (including any increased amount of the New Money DIP Loan Commitments pursuant to this Settlement Agreement or other order of the Court) (i.e., $2.00 of Prepetition Loans rolled-up for every $1.00 of New Money DIP Loan Commitments).

    ii. **Litigation Roll-Up** – Notwithstanding anything to the contrary in the Interim DIP Order, the Litigation Roll-Up shall be a "roll up" of the Prepetition Term Loans held by the DIP Lender (or their affiliates) on a three-to-one basis relative to the Litigation DIP Loan Commitments (i.e., $3.00 of Prepetition Loans rolled-up for every $1.00 of Litigation DIP Loan Commitments). However, in the event that the Litigation DIP Loan Commitments are increased pursuant to this Settlement Agreement, any such Supplemental Litigation DIP Loans shall not participate in the Litigation Roll-Up.

e. **Initial Payment to the Estate** – Upon closing of the sale of the Debtors' assets pursuant to the sale motion filed by the Debtors (D.I. 18) and the bidding procedures order entered by the Court (D.I. 105), the Debtors' Estates shall receive, free and clear of any liens, (i) $250,000.00 plus 5% of any net purchase price in excess of the Stalking Horse Bid, plus (ii) up to $250,000.00 of any sale proceeds remaining after payment of the ABL Subordinated Claim pursuant to the ABL Payment Priority set forth in the Interim DIP Order (the "Initial Estate Payment") as a carve out from the collateral of the DIP Lenders and/or Prepetition Term Loan Secured Parties. For the avoidance of doubt, the DIP Lender and the Prepetition Term Loan Lenders shall not participate in any distributions to unsecured creditors on account of the Initial Estate Payment.

f. **Distribution of Utah Litigation Proceeds**

    i. Proceeds of the Utah Litigation shall be distributed in the following priority in accordance with the Plan:

        1. Payment to the DIP Lender of all outstanding New Money DIP Loans and Litigation DIP Loans; then

        2. Payment to the Debtors' Estates in the amount of $100,000.00; then

        3. Proceeds paid 97% to the DIP Lender and 3% to the Debtors' Estates until the New Money Roll-Up and Litigation Roll-Up are paid in full; then

        4. Payment of any outstanding amounts incurred by the Parties in connection with the Utah Litigation not paid through the Litigation DIP Loans; then

        5. Payment to the Prepetition Term Loan Lenders in the amount of the Initial Estate Payment received by the Debtors' Estates; then

        6. The remaining proceeds of the Utah Litigation shall be paid 85% to the Prepetition Term Loan Lenders and 15% to the Debtors' Estates.

      ii.    For the avoidance of doubt, (i) the DIP Lender and the Prepetition Term Loan Lenders shall not participate in any distributions to unsecured creditors on account of amounts received by the Estate pursuant to this Section 3(f), and (ii) all payments or distributions pursuant to this Section 3(f) shall be free and clear of any liens.

     g.    **Contribution of Proceeds of Claims of the Prepetition Term Loan Secured Parties in the Utah Litigation** – The proceeds of all claims and causes of action belonging to any of the Parties in the Utah Litigation shall be pooled and distributed in accordance with the terms of this Settlement Agreement and the Plan.[2]  For the avoidance of doubt, any and all proceeds of the Utah Litigation shall not be allocated to specific Parties or prorated per claim or cause of action.

## 4.  Avoidance Actions

     a.    Avoidance Actions shall be retained by the Debtors, provided that the Committee shall be consulted prior to the filing of any Avoidance Actions.  The DIP Secured Parties and the Prepetition Term Loan Secured Parties shall not have liens upon or superpriority claims payable from Avoidance Actions or proceeds thereof.

## 5.  Litigation Trust

     a.    The Plan shall provide for the creation of a litigation trust (the "Litigation Trust") which shall control the prosecution of the Utah Litigation and the distribution of proceeds thereof.  The Parties agree (i) to name Thomas Walper (the "Trustee") as the trustee of the Litigation Trust; (ii) that the Trustee shall employ M3 Partners, LP and Morris James LLP, the Committee's financial advisor and legal counsel, respectively, to assist the Trustee as requested in the administration and reconciliation of unsecured claims (the "Unsecured Claims Administration") with all fees and expenses incurred in connection with the Unsecured Claims Administration to be paid from the proceeds reserved for the Debtors' Estate in this Settlement Agreement and the Plan; and (iii) that an oversight committee will not be appointed for the Litigation Trust and the Trustee shall have sole decision-making authority for the Litigation Trust, provided that after the Effective Date of the Plan there will be a post-confirmation committee comprised of former Committee members and the Prepetition Term Loan Secured Parties which shall be entitled, subject to execution of an appropriate confidentiality agreement, to receive information with respect to the Utah Litigation, and with all costs incurred by the former Committee members to be paid from the proceeds reserved for the Debtors' Estate in this Settlement Agreement and the Plan.

## 6.  Effectiveness of Settlement Agreement

     a.    All Parties shall work in good faith to obtain the approval of this Settlement Agreement by the Court and the entry of a Final DIP Order consistent with the terms set forth herein.  The Parties shall also work in good faith to negotiate, prepare, and support a Plan and any trust agreement implementing this Settlement Agreement.  The obligations of the Parties set forth in sections 2 through 5 of this Settlement Agreement shall be effective and enforceable only upon the entry of a Final DIP Order

---

[2]    The DIP Lender and Prepetition Term Loan Lenders shall take all necessary action to ensure that non-participating Term Loan Lenders are not impaired by this Settlement Agreement.

incorporating or approving all terms of this Settlement Agreement without alteration, unless all modifications or revisions are approved in writing by the affected Party or Parties.  Nothing in the Settlement Agreement shall bind the Court or parties in interest (other than the Parties) with respect to the terms of any Plan, which remains subject to further order of the Court.


[Signatures to Appear on Following Pages]

IN WITNESS WHEREOF, the Parties have duly executed and delivered this Settlement Agreement as of the date first set forth above.

**WALKER EDISON HOLDCO LLC,** *ET AL.*

By: _Nathan D Brown_

Title: _CFO_

**DIP SECURED PARTIES**

_____
Blue Owl Capital Corporation, as administrative
agent to the DIP Secured Parties

By: _____

Title: _____

**PREPETITION TERM LOAN SECURED PARTIES**

_____
Blue Owl Capital Corporation, as administrative
agent to the DIP Secured Parties

By: _____

Title: _____

**THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS**

_____

By: _____

Title: _____

6

IN WITNESS WHEREOF, the Parties have duly executed and delivered this Settlement Agreement as of the date first set forth above.

**WALKER EDISON HOLDCO LLC,** *ET AL.*

_____

By: _____

Title: _____

**DIP SECURED PARTIES**

_____

Blue Owl Capital Corporation, as administrative
agent to the DIP Secured Parties

By: Adam Forchheimer

Title: Authorized Signatory

**PREPETITION TERM LOAN SECURED PARTIES**

_____

Blue Owl Capital Corporation, as administrative
agent to the DIP Secured Parties

By: Adam Forchheimer

Title: Authorized Signatory

**THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS**

_____

By: _____

Title: _____

IN WITNESS WHEREOF, the Parties have duly executed and delivered this Settlement Agreement as of the date first set forth above.

**WALKER EDISON HOLDCO LLC, *ET AL.***

By: _____

Title: _____

**DIP SECURED PARTIES**

Blue Owl Capital Corporation, as administrative
agent to the DIP Secured Parties

By: _____

Title: _____

**PREPETITION TERM LOAN SECURED PARTIES**

Blue Owl Capital Corporation, as administrative
agent to the DIP Secured Parties

By: _____

Title: _____

**THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS**

By: _____

Title: _____